Michael P. Lehmann (SBN 77152)
Christopher L. Lebsock (SBN 184546)
Samantha J. Stein (SBN 302034)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
mlehmann@hausfeld.com
clebsock@hausfeld.com
sstein@hausfeld.com

*Attorneys for Plaintiffs and the Proposed Class*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC WINE DISTRIBUTORS, INC.; EQUALITY WINES LLC; KELLY KESKINEN; and RYAN SCHRUM-HERRERA, *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> vs. <br><br> VITOL INC.; SK ENERGY AMERICAS, INC.; and SK TRADING INTERNATIONAL CO. LTD., and DOES 1–100, <br><br> Defendants. | Case No. 3:20-cv-03131-JSC <br><br> **AMENDED CLASS ACTION COMPLAINT PURSUANT TO THE SHERMAN AND CLAYTON ACTS (15 U.S.C. §§ 1, 26); AND THE CARTWRIGHT ACT AND UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §§ 16720 *ET SEQ.* AND 17200 *ET SEQ.*)** <br><br> **DEMAND FOR JURY TRIAL** |

1   Plaintiffs Pacific Wine Distributors, Inc. ("PWDI"), Equality Wines LLC ("EW"), Kelly
2   Keskinen, and Ryan Schrum-Herrera (collectively, "Plaintiffs"), on behalf of themselves and all
3   others similarly situated, bring this Amended Class Action Complaint for damages, restitution, and
4   injunctive relief against named Defendants Vitol Inc. ("Vitol"), SK Energy Americas, Inc. ("SK
5   Energy"), and SK Trading International Co. Ltd. ("SK Trading")[1] (collectively, "Defendants") and
6   unidentified Doe Defendants for violations of Section 1 of the Sherman Act (15 U.S.C. § 1), the
7   California Cartwright Act (Cal. Bus. & Prof. Code §§ 16720 *et seq.*), and the California Unfair
8   Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL")).[2] All allegations herein other
9   than those concerning Plaintiffs are based on information and belief.

10  # I.   **INTRODUCTION**

11      1.      This lawsuit involves agreements that are *per se* unlawful among horizontal
12  competitors—Vitol, SK Energy, and SK Trading and certain of their employees—to restrain
13  competition in the spot market for gasoline formulated for use in California and in certain gasoline
14  blending components used in that gasoline.

15      2.      During all relevant times between February 18, 2015 and December 31, 2016,
16  Defendants were participants in the spot market for delivery of refined gasoline and gasoline
17  blending components to refineries located in the San Francisco Bay Area and Los Angeles.

18      3.      Defendants' illegal scheme commenced as a result of a disruption in certain refining
19  capacity that occurred at the ExxonMobil refinery in Torrance, California on February 18, 2015.
20  Portions of that refinery—specifically the refinery's cracking unit—exploded in the early morning
21  hours of that day and, as a result, eliminated certain portions of that refinery's ability to refine
22  alkylates between February of 2015 and June of 2016. Alkylates are chemicals that are the primary
23  product of alkylation, which converts light olefins, such as butylene, into a high-quality gasoline
24  blendstock by reacting it with isobutane, which are then blended with gasoline in order to boost

---

[1] SK Energy and SK Trading will be collectively referred to as "SK" herein.

[2] Plaintiff PWDI first filed its complaint in this matter on May 6, 2020. ECF No. 1. It served
Defendants Vitol and SK Energy on May 12, 2020. ECF Nos 16, 18. This amended complaint is
now made pursuant to Federal Rule of Civil Procedure 15(a)(1)(A).

octane ratings.[3]

4.      The named Defendants—major traders in the California spot market for gasoline and gasoline blending products—realized that the refinery explosion could serve as an opportunity to artificially inflate the price of gasoline traded on wholesale spot markets in California and to also increase the price of alkylates, the prices of which are tied directly to the wholesale price of gasoline, without unwanted scrutiny by other market participants and regulators.

5.      Immediately upon learning of the explosion at the Torrance refinery, Defendants Vitol and SK Energy negotiated large contracts to supply gasoline and gasoline blending components for delivery in California. The largest of these contracts exceeded more than ten million gallons.

6.      Additionally, Defendants Vitol and SK Energy agreed with each other to manipulate the spot market price for refined gasoline and gasoline blending components so that they could realize windfall profits on these contracts. Defendants further entered into agreements with each other to share the profits and disguise their illegal conduct.

7.      The restraint of trade described herein was coordinated by the lead traders for both Vitol and SK Energy, who were friends and former colleagues at Vitol, and it continued until late 2016, when one of the traders left his position with SK Energy.

8.      Prices for spot market gasoline contracts went up almost immediately for deliveries to San Francisco and Los Angeles. Empirical studies demonstrate that changes in the wholesale price of gasoline are passed through to retail prices and that wholesale price increases are passed through much more quickly than wholesale price decreases. The Bureau of Labor Statistics has noted "that retail prices continue to respond quickly to increases in the spot price, but they respond more slowly to decreases in the spot price."[4] Defendants' agreements violated the Sherman Act,

---

[3] The disruption is described in the United States Chemical & Safety Board's "Investigation Report" No. 2015-02-I-CA (May 3, 2017), available at https://www.csb.gov/file.aspx?DocumentId=6023.

[4] *See* https://www.bls.gov/opub/mlr/2018/article/crude-petroleum-prices-and-retail-fuel-margins-an-empirical-examination.htm; https://stillwaterassociates.com/gasoline-retail-margin-quick-to-rise-slow-to-drop/.

California's Cartwright Act, and constitute unlawful, unfair, or fraudulent practices in violation of the UCL. Plaintiffs and the Class were injured because they paid more for gasoline within the State of California than they would have paid in a retail gasoline market untainted by Defendants' illegal conduct.

9.     On May 4, 2020, Defendants' conduct became known for the first time to Plaintiffs and the Class when the California Attorney General ("AG") filed a partially redacted complaint ("AG Complaint") against Defendants for violations of the Cartwright Act and the UCL.[5]

## II.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367.

11.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or is licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal restraint of trade throughout this District. The anticompetitive conduct alleged herein has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

## III.     INTRADISTRICT ASSIGNMENT

12.     Pursuant to N.D. Cal. Civil Local Rule 3-2 (c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the trade and commerce affected by Defendants' illegal conduct was substantially conducted within, and directed to and impacted Plaintiffs and members of the Class in counties located within the Division. The San Francisco spot market is located within this

---

[5] *See The People of the State of California v. Vitol, Inc., et al.*, Case No. CGC20584456 (S.F. Superior, filed May 4, 2020). The AG Complaint may also be found at https://www.oag.ca.gov/system/files/attachments/press-docs/Scanned%20copy%20of%20redacted%20complaint%20as%20filed.pdf.

1  Division.

2  **IV.**  **PARTIES**

3      **A.**  **PLAINTIFFS**

4      13.   Plaintiff PWDI is a resident of the State of California. PWDI purchased gasoline at

5  retail within the State of California during the Class Period defined herein for its own use and not

6  for resale. It owns the statutory claims set forth in this Amended Complaint.

7      14.   Plaintiff EW is resident of the State of California. EW purchased gasoline at retail

8  within the State of California during the Class Period defined herein for its own use and not for

9  resale. It owns the statutory claims set forth in this Amended Complaint.

10     15.   Plaintiff Ryan Schrum-Herrera is a resident of California. He purchased gasoline at

11 retail within the State of California during the Class Period defined herein for his own use and not

12 for resale.

13     16.   Plaintiff Kelly Keskinen is a resident of California. She purchased gasoline at retail

14 within the State of California during the Class Period defined herein for her own use and not for

15 resale.

16     **B.**  **DEFENDANTS**

17     17.   Defendant Vitol, a Delaware corporation, is an energy company with its principal

18 place of business at 2925 Richmond Avenue, 11th Floor, Houston, Texas 77098. Vitol is registered

19 with the California Secretary of State to conduct business in California. Vitol and a related entity

20 are not strangers to unlawful trading conduct. The Federal Energy Regulatory Commission sued

21 Vitol and one of its traders to collect $3.75 million in fines levied against them after finding Vitol's

22 trading activity manipulated California electricity markets.[6] Vitol S.A. was also fined five million

23 Euros by French authorities for manipulating the French southern gas trading point "Peg Sud"

24 between June of 2013 and March of 2014.[7]

25 _____

[6] ECF No. 1 in *Federal Energy Regulatory Comm'n v. Vitol, Inc.*, No. 2:20-cv-00040-KJM-AC
26 (E.D. Cal. Jan. 6, 2020).

[7] https://www.reuters.com/article/vitol-france-fine-gas/update-1-french-regulator-fines-vitol-5-
27 mln-euros-for-gas-market-manipulation-idUSL8N1WP399.

18.     Defendant SK Energy is a California corporation with its registered office at 1300 Post Oak Boulevard, Suite 425, Houston, Texas 77056. SK Energy is an indirect, wholly-owned subsidiary of Defendant SK Trading. SK Energy is also no stranger to the commission of conduct that violates United States statutes. It and certain of its competitors were sued by the United States government in April of 2018 for conspiring to rig bids for fuel to United States military bases in South Korea; in March of 2019, it agreed to pay a $90 million fine in connection with this unlawful conduct.[8]

19.     Defendant SK Trading is a South Korean corporation with its head office at 26 Jongno, Jongno-gu, Seoul, South Korea.

20.     SK Trading is the indirect parent of SK Energy. SK Trading is also a sister company to SK Energy Co., Ltd. ("SK Energy Korea"), the largest refiner of crude oil in Korea. All of these entities are subsidiaries of SK Innovation Co., Ltd. ("SK Innovation"), a publicly traded holding company headquartered at 26, Jongno, Jongno-gu, Seoul, Korea. SK Innovation owns 100% of both SK Trading and SK Energy.[9]

21.     SK Trading publicly describes its subsidiary SK Energy as the marketing agent for SK Energy Korea in the United States and explains that SK Energy facilitates the export of SK Energy Korea's gasoline and gasoline blending products to the United States. SK Trading graphically depicts these relationships as follows:[10]

---

[8] ECF No. 1 in *United States v. GS Caltex Corp.*, *et al.*, No. 2:18-cv-01456-ALM-CMV (S.D. Ohio Nov. 14, 2018); ECF No. 32 in *United States v. SK Energy Co., Ltd.*, No. 2:18-cv-01456-ALM-CMV (S.D. Ohio Mar. 14, 2019); *see also* https://www.justice.gov/opa/press-release/file/1111226/download.

[9] *See* http://eng.skinnovation.com/company/affiliate.asp.

[10] *See* http://eng.skinnovation.com/company/trading.asp.



22.     SK Trading dominated and controlled SK Energy, and specifically ratified the illegal conduct engaged in by SK Energy that is described herein. SK Trading and SK Energy Korea list their headquarters at the same address as SK Innovation.

23.     At all times relevant to this Amended Complaint, Defendant SK Energy was an agent and alter ego of Defendant SK Trading, due to the nature and extent of control that SK Trading exercised over SK Energy.

24.     At all times relevant to this Amended Complaint, there existed a unity of interest and ownership between SK Energy and SK Trading such that any separateness between them had ceased to exist and SK Trading controlled, dominated, managed, and operated SK Energy. Specifically, SK Trading controlled the business and affairs of SK Energy such that the distinction between the companies were mere technicalities.

25.     Additionally, at all times relevant to this Complaint, SK Energy was acting within the course and scope of its agency with the knowledge, consent, permission, authorization, and

AMENDED CLASS ACTION COMPLAINT                                    CASE NO. 20-CV-03131-JSC

1  ratification, either express or implied, of SK Trading in performing the acts alleged in this
2  Complaint.

3      26.    Doe Defendants 1–100 are other individuals or entities who engaged in or abetted
4  the unlawful conduct by Defendants set forth in this Amended Complaint. The AG Complaint itself
5  named Doe Defendants. Plaintiffs intend to further amend or seek leave to further amend this
6  Complaint upon learning the identity of these Doe Defendants.

7  **V.    AGENTS AND CO-CONSPIRATORS**

8      27.    The anticompetitive and unlawful acts alleged against the Defendants in this
9  Complaint were authorized, ordered or performed by Defendants' respective officers, agents,
10  employees, or representatives, while actively engaged in the management, direction, or control of
11  Defendants' businesses or affairs.

12      28.    Defendants' agents operated under the authority and apparent authority of their
13  principals.

14      29.    Defendants, through their subsidiaries, affiliates, and agents, operated as a single
15  unified entity.

16      30.    Various persons and/or firms not named as Defendants herein may have participated
17  as co-conspirators in the violations alleged herein and may have performed acts and made
18  statements in furtherance thereof.

19      31.    Each Defendant acted as the principal, agent or joint venture of, or for, other
20  Defendants with respect to the acts, violations, and common course of conduct alleged herein.

21      32.    When Plaintiffs refer to a corporate family or companies by a single name in their
22  allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are alleging
23  that one or more employee or agent of entities within the corporate family engaged in conspiratorial
24  acts or meetings on behalf of all of the Defendant companies within that family. In fact, the
25  individual participants in the conspiratorial meetings and discussions did not distinguish among
26  the entities within a corporate family. The individual participants entered into agreements on behalf
27  of, and reported these meetings and discussions to, their respective corporate families. As a result,

the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them. Furthermore, to the extent that subsidiaries within corporate families distributed the alkylate products discussed in this Amended Complaint, these subsidiaries played a significant role in the alleged conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut the pricing agreements reached at these various meetings. Thus, all Defendant entities within the corporate families were active, knowing participants in the alleged conspiracy.

## VI.   CLASS ACTION ALLEGATIONS

33.   Plaintiffs bring this action for damages and injunctive relief on behalf of themselves and a class action of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), which is defined as follows:

> All persons or entities that purchased gasoline from a retailer within the State of California from February 18, 2015 until the time that the adverse effects of Defendants' anticompetitive conduct ceased (the "Class Period").

34.   This definition specifically excludes the following persons or entities: (a) any of the Defendants named herein; (b) any of the Defendants' parent companies, subsidiaries, and affiliates; (c) any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (d) all governmental entities; and (e) the judges and chambers staff in this case, as well as any members of their immediate families.

35.   Plaintiffs do not know the exact number of Class members. Plaintiffs are informed and believe that, due to the nature of the trade and commerce involved, there are millions of Class members geographically dispersed throughout the State of California, such that joinder of all Class members in the prosecution of this action is impracticable.

36.   Plaintiffs' claims are typical of the claims of its fellow Class members because Plaintiffs purchased gasoline during the Class Period. Plaintiffs and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

37.     Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

   a.     Whether Defendants contracted, combined or conspired with one another to restrain trade in the spot market for gasoline at any time during the Class Period;

   b.     Whether Defendants' conduct caused the prices of gasoline sold at retail to be higher than the competitive level as a result of their restraint of trade;

   c.     Whether Plaintiffs and the other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate Class-wide measure of damages; and

   d.     Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

38.     These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

39.     Plaintiffs will fairly and adequately represent the interests of the Class because they purchased gasoline at retail within the State of California during the Class Period and have no conflicts with any other members of the Class. Furthermore, Plaintiffs have retained sophisticated and competent counsel who is experienced in prosecuting antitrust class actions, as well as other complex litigation.

40.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

41.     This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

42.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

1    **VII.    FACTUAL ALLEGATIONS**

2           **A.    CALIFORNIA'S GASOLINE MARKET**

3           43.    Gasoline reaches consumers through a global supply chain that begins with

4    extracting crude oil and transporting it to refineries, mostly via pipelines, marine tankers, and

5    barges. At the refineries, crude oil is processed into gasoline and other petroleum products. Refined

6    gasoline is then transported—again, usually via pipelines, marine tankers, and barges—to storage

7    terminals for wholesale distribution. From there, it is shipped by truck to retail gas stations where

8    consumers fill their tanks. The following chart prepared by the U.S. Governmental Accountability

9    Office ("GAO") visually depicts this supply chain:[11]

10

11   

12

13

14

15

16

17

18

19

20

21

22           44.    California is geographically isolated from refining hubs in the rest of the United

23   States. There are no pipelines that ship finished gasoline products into California. When local

24   supplies are insufficient to meet demand in California, additional refined gasoline and gasoline

25   blending components are typically brought into the state on marine vessels.

26

27   [11] *See* https://www.gao.gov/new.items/d05525sp.pdf at p.2.

45.     California also has vehicle emissions standards that are more stringent than other areas of the country. Gasoline produced pursuant to these standards is called California Reformulated Gasoline Blendstock for Oxygenate Blending ("CARBOB").[12] The CARBOB specifications are unique to California; therefore, gasoline used in neighboring states does not meet the CARBOB specification and cannot be used as a substitute source of supply.

46.     Most of the CARBOB consumed in California is produced by refineries located in clusters near metropolitan centers in the San Francisco Bay Area and in the greater Los Angeles area.

47.     One of the largest refineries in Southern California is located in Torrance, California (the "Torrance Refinery"). The Torrance Refinery produces approximately twenty percent of all of the gasoline sold in Southern California (and ten percent of the statewide supply). The Torrance Refinery also has the capacity to produce significant quantities of alkylate, a high-quality gasoline blending component. In 2015, the Torrance Refinery was owned by ExxonMobil Corp. ("ExxonMobil").

48.     When unexpected supply disruptions occur, gasoline meeting California's unique CARBOB specifications must be sourced from outside of California. Deliveries can take several weeks to arrive at California's ports.

**B.     GASOLINE SPOT MARKET TRADING IN CALIFORNIA**

49.     "Spot" purchases refer to fuel that physically changes hands at a refinery gate or other major pricing hub for delivery on a pipeline or via barge or cargo. Deals are always done in bulk, typically 5,000 barrels (210,000 gallons) to 50,000 barrels (2.1 million gallons).[13]

50.     There are a number of spot markets around the United States, but the two relevant to this litigation are located in San Francisco (for delivery to Northern California refineries located in the Bay Area); the other is in Los Angeles (for delivery to refineries in greater Los Angeles).

---

[12] *See* https://www.mckinseyenergyinsights.com/resources/refinery-reference-desk/carbob/.

[13] *See* https://www.opisnet.com/product/pricing/spot/.

AMENDED CLASS ACTION COMPLAINT                                    CASE NO. 20-CV-03131-JSC

The U.S. spot markets are:[14]



51.     The prices on the two California spot markets are influenced by gasoline prices on the New York Mercantile Exchange ("NYMEX"). Prices on the NYMEX are determined in a centralized market: there are typically thousands of gasoline trades on the NYMEX amounting to billions of gallons on every trading day. Further, all transactions on the NYMEX are publicly reported, so pricing is transparent to market participants.[15]

52.     NYMEX prices generally reflect large-scale national and international factors, while the California spot markets react to the NYMEX price as well as regional and local supply and demand conditions.[16] In many California spot market transactions, the buyer and the seller negotiate only the basis, and the final price is determined by adding the basis to the NYMEX price.[17]

53.     "Rack" or "Wholesale" purchases are made along a fuel distribution system— usually at pipeline terminals. Transactions are conducted in approximately 8,000-gallon increments, the amount of fuel in a typical fuel truck. Companies that re-sell fuel (jobbers) as well

---

[14] *See* http://blog.opisnet.com/spot-fuel-markets-made-simple.

[15] *See id.*

[16] *See* http://blog.opisnet.com/pricing-101-your-basic-guide-to-pricing-gasoline-and-diesel.

[17] *See* http://blog.opisnet.com/spot-fuel-markets-made-simple.

1  as retailers or end users (*e.g.*, trucking companies) pull fuel from the wholesale racks. Wholesale
2  rack prices move up or down each day at 6 p.m. Eastern Time, based on the movements of the spot
3  market.[18]

4        54.     Wholesale terminals are located throughout California and are located in the
5  following geographically dispersed cities: Bakersfield, Barstow, Brisbane, Carson, Chico, Colton,
6  Eureka, Fremont, Fresno, Imperial, Los Angeles (three locations), Montebello, Orange, Richmond,
7  Sacramento, San Diego, San Francisco, San Jose, Stockton, Van Nuys, and Wilmington.[19]

8        55.     This is visually depicted in the following chart prepared by the California Energy
9  Commission's ("CEC") Petroleum Market Advisory Committee ("PMAC"):[20]



Source: Energy Information Administration.

[18]*See* https://www.opisnet.com/product/pricing/rack/.

[19] *See* https://www.opisnet.com/about/rack-pricing-coverage-city/.

[20] *See* https://ww2.energy.ca.gov/business_meetings/2017_packets/2017-09-13/Item_01a.pdf, at p.15.

56.     There are two common grades of CARBOB gasoline that are traded in the San Francisco and Los Angeles spot markets. Regular CARBOB ("Regular") is the most commonly traded grade of gasoline. Premium CARBOB ("Premium") is traded with far less frequency than Regular. Premium trades at a higher price than Regular. As noted above, alkylates are a high-quality gasoline blending component that can be combined with other blendstocks to create Regular and Premium gasoline. Alkylates are critical to achieving the high-octane ratings of Premium gasoline advertised for sale at retail in California.[21]

57.     Unlike the NYMEX, spot market trades in California for both Regular and Premium are traded through non-public transactions, sometimes called over-the-counter ("OTC") trades. These OTC transactions do not occur on a centralized open exchange like the NYMEX, so prices on the California spot markets are not immediately public. Instead, refiners and traders rely on price-reporting services that report spot market prices from sources that participate in the market, such as traders, refiners, and brokers.[22]

58.     The Oil Price Information Service, LLC ("OPIS") is the most widely used reporting service in California. OPIS is a subscription service that publishes a daily OPIS West Coast Spot Market Report (the "Spot Market Report"), which is the industry pricing benchmark used by both buyers and sellers in California. Subscribers to OPIS get the Spot Market Report and can also receive market updates from OPIS throughout the day that include reported deals and other industry news.

59.     The Spot Market Report includes, among other gasoline products, the prices for Regular and Premium gasoline contracts for prompt (*i.e.*, near term) delivery in Southern California and in Northern California. The Spot Market Report also contains forward prices for Regular and

---

[21] *See* https://www.eia.gov/todayinenergy/detail.php?id=9971. Approximately 85% of gasoline sold at retail is "regular" gasoline. Another 10% is "premium" gasoline. The remainder is called "midgrade" gasoline. "[R]efineries do not produce a midgrade gasoline blend; instead, the middle-octane option is blended at the fuel pump from a given gas station's supply of regular and premium gas." *See* https://blog.consumerguide.com/what-is-midgrade-gas/.

[22] *See* https://www.opisnet.com/about/methodology/#wholesale-rack-pricing ("OPIS market assessors follow the marketplace throughout a full day of trading by constant communication with designated and approved traders and brokers to discover done deals, bids and offers.").

Premium gasoline.

60. On a daily basis, there are usually many more Regular trades than Premium trades listed in the Spot Market Report. For example, there could be five, ten, fifteen, or more Regular trades reported on one day compared to one or no Premium trades. Because trading in Premium is less common than Regular, a single Premium trade that is reported to OPIS tends to have a larger impact on the spot market price of gasoline than a single trade of Regular.

61. Furthermore, as OPIS explains on its website, "[t]he spot market is a critical link in the price influence chain because it sets the basis for cost-plus formula deals between suppliers and end users. It also forms the rationale for wholesale fuel price moves every day at 6 p.m. at wholesale racks across the U.S.—which then impacts price increases or decreases at the retail pump".[23]

62. OPIS also visually depicts the "price influence chain" between spot prices and the retail prices paid by California consumers:[24]



63. During the relevant period, Vitol was an active participant in trading gasoline in California. Vitol bought and sold spot market contracts for various types of fuel products, including Regular and Premium.

64. Vitol imported gasoline and gasoline blending components (such as alkylate) into California.

---

[23] *See* https://www.opisnet.com/product/pricing/spot/.

[24] *See* http://blog.opisnet.com/spot-fuel-markets-made-simple.

65.     Vitol employee Brad Lucas ("Lucas") held the title "USWC Trader." Lucas was the primary trader at Vitol with responsibility for trading gasoline and gasoline blending components that were delivered via pipeline within California.

66.     Lucas reported to John Addison ("Addison"), a Vitol executive who in turn reported to the President of Vitol Americas. In addition to supervising Lucas, Addison also had trading responsibility that included trading gasoline and gasoline blending components that were primarily delivered via marine vessels to locations in the U.S. West Coast, including California.

67.     During the relevant period, SK was an active participant in trading gasoline in California. SK Energy bought and sold spot market contracts for various types of fuel products, including Regular and Premium.

68.     SK imported gasoline and gasoline blending components (such as alkylate) into California.

69.     SK Energy employee David Niemann ("Niemann") was the senior trader responsible for executing trades on the U.S. West Coast, including California. Another SK Energy employee, Shelly Mohammed ("Mohammed"), held the role of gasoline scheduler and was Niemann's subordinate.

70.     SK Energy functioned as the California trading arm of SK Trading. While Niemann and Mohammed were nominally employees of Defendant SK Energy, SK's U.S. West Coast Trading Operation was conducted within the continuous and pervasive control and supervision of SK Trading and its subsidiaries, and SK Trading also specifically reviewed and approved key decisions to coordinate trading activities with Vitol.

C.     **FEDERAL AND STATE LAW PROHIBITS FRAUDULENT AND DECEPTIVE COMMODITY TRADING**

71.     Spot market trading of gasoline must comply with California's commodities fraud statute. *See* Cal. Corp. Code § 29504. Under this statute it is unlawful to engage in certain

1  fraudulent acts when buying or selling commodity contracts. *See* Cal. Corp. Code § 29536(a), (b),
2  (c), (d).

3       72.    Under section 29536(c), it is unlawful "[t]o willfully engage in any transaction, act,
4  practice, or course of business which operates or would operate as a fraud or deceit upon any
5  persons." *See* Cal. Corp. Code § 29536(c).

6       73.    In addition, the federal Commodity Exchange Act ("CEA") makes unlawful certain
7  types of "[p]rohibited transactions." *See* 7 U.S.C. § 6c. More specifically, the CEA prohibits any
8  transaction that "is, of the character of, or commonly known to the trade as, a 'wash sale' or
9  'accommodation trade.'" *See* 7 U.S.C. § 6c(a)(2)(A)(i).

10       74.    The CEA also prohibits a transaction that "is used to cause any price to be replied,
11  registered, or recorded that is not a true and bona fide price." *See* 7 U.S.C. § 6c(a)(2)(B).

12      **D.**    **DEFENDANTS' UNLAWFUL CONDUCT**

13       75.    SK Energy hired Niemann in August 2014, and Niemann immediately began
14  trading gasoline contracts on the California spot market. Before being hired by SK, Niemann held
15  a similar role at Vitol for approximately ten years. Niemann and Lucas worked together at Vitol,
16  and they maintained contact after Niemann was hired by SK Energy. Throughout the Class Period,
17  Niemann and Lucas communicated with each other by instant message, emails, telephone calls,
18  and during in-person meetings, dinners, and drinks.

19       76.    "Fluid catalytic cracking" or "FCC" is an important part of refining crude oil. A
20  FCC unit is a secondary refining unit that produces high-value products like alkylate.[25]

21       77.    The Torrance Refinery's FCC unit produced a significant portion of all the
22  high-octane alkylate produced in California. The alkylate produced at the Torrance Refinery was
23  a key gasoline blending component for Premium gasoline produced in California.

24       78.    As noted above, during the morning of February 18, 2015, there was a large
25  explosion at the Torrance Refinery. The blast occurred in a part of the FCC unit.

26

27  [25] *See* https://www.eia.gov/todayinenergy/detail.php?id=9150.

AMENDED CLASS ACTION COMPLAINT               CASE NO. 20-CV-03131-JSC

79.     The Torrance Refinery was forced to shut down its FCC and to reduce production of gasoline products, including alkylate, as repair efforts commenced. As a result of this unplanned outage at the Torrance Refinery—which did not end until approximately June of 2016—ExxonMobil needed to replace a significant amount of lost alkylate production in California.

80.     Beginning at least as early as late February of 2015, Vitol and SK Energy—through Lucas, Niemann, and others—reached agreements with each other and with third parties to raise, fix, and otherwise tamper with the price of refined gasoline in California by manipulating OPIS-reported prices in order to realize supra-competitive profits while limiting bona fide market risk. The explosion at the Torrance Refinery would act as cover for their illegal efforts to increase the price of gasoline in the California spot markets.

81.     Vitol and SK Energy specifically engaged in trades directly or indirectly between them that were reported to OPIS for the purpose of inflating the OPIS-published price for Regular and Premium gasoline. At times, they used the services of an intermediary broker, and sometimes they transacted directly with each other.

82.     This conduct was designed to create the illusion of a supply/demand imbalance for refined gasoline and to drive spot market prices to artificial highs during strategic pricing windows.

83.     Many of these transactions were "leveraged" because they involved taking losses on the purchase of smaller quantities of gasoline to increase the profits on the sale of larger quantities of gasoline or alkylate.

84.     For example, Defendants traded Regular gasoline contracts directly or indirectly with each other at artificially high prices early in the trading day so that OPIS would report an artificially inflated purchase price to other market participants. An early purchase during a strategic trading window at an inflated price signals a supply/demand imbalance to the market and thereby artificially inflates spot market prices.

85.     Defendants also executed market-spiking trades for Premium gasoline directly or indirectly with each other and third parties, and then reported these trades to OPIS. Because Premium gasoline trades were rare—often only zero or one of these trades were reported on any

1    given day—these transactions had a significant impact on the spot market price.

2         86.    Defendants engaged in market-spiking spot trades for Premium gasoline to increase

3    the OPIS-reported price for Premium during strategic pricing windows for large sales of alkylates.

4    While alkylate is a key blending component for Premium gasoline, alkylate is not a separately

5    reported commodity on California's spot markets. Consequently, large price contracts for alkylate

6    were most commonly tied, with a small differential, to the OPIS-reported spot price for Premium

7    gasoline during the associated pricing window.

8         87.    Defendants' manipulation of spot prices for Regular gasoline also affected alkylate

9    contract prices because spot prices for Regular and Premium gasoline often move in tandem.

10        88.    Therefore, to realize supra-competitive profits on alkylate contracts, Vitol and SK

11   worked together to inflate the spot price of Regular and Premium gasoline during key pricing

12   windows, and then coordinated their importation of alkylate into California at these

13   supra-competitive prices. According to the United States Energy Information Association, after the

14   explosion at the Torrance Refinery, substantial importation of gasoline and related products from

15   Asia occurred; "[f]rom March to July [of 2015], more than 50% of the imported motor gasoline

16   volumes have been classified as 'all other motor gasoline blending components,' indicating that

17   the gasoline material being imported consists mostly of higher octane blending components such

18   as alkylate and reformate, which are then used to make California-grade gasoline."[26] These

19   shipments included shipments from not only South Korea, but also Singapore, where SK Energy

20   has substantial production facilities.[27]

21        89.    Defendants also executed secondary offsetting or "wash" trades to hide or disguise

22   their conduct, to limit or eliminate bona fide market risk on the reported trades, and to share their

23   anticompetitive profits with each other. Defendants withheld disclosure from OPIS of these "wash"

24   trades between them, or otherwise disguised them by transacting them through brokers or other

---

25   [26] https://www.eia.gov/todayinenergy/detail.php?id=23312.

26   [27] *See* https://www.spglobal.com/platts/en/market-insights/latest-news/oil/031215-feature-us-
     west-coast-refiners-step-up-gasoline-alkylate-imports-from-asia;
27   https://www.linkedin.com/company/sk-energy-international.

third parties. These secondary trades were executed at the same time, before, or after the OPIS-reported trades.

90.    The CME Group defines a "wash trade" as follows: "A wash trade is a form of *fictitious trade* in which a transaction or a series of transactions give the appearance that authentic purchases and sales have been made, but where the trades have been entered without the intent to take a *bona fide market position* or without the intent to execute bona fide transactions subject to *market risk* or *price competition*."[28]

91.    By moving in the opposite direction of the reported trade, the secondary transaction ensured that there was little or no market risk associated with Defendants' overall conduct.

92.    Defendants called their illegal agreements "joint ventures" or "JVs", but they were nothing more than secret agreements between purported competitors to artificially increase spot market prices for Regular and Premium gasoline in California. These agreements started out as verbal agreements only but were later referenced in various writings. During the Class Period, Defendants' illegal conduct generated millions of dollars of profits for them per month, and Lucas and Niemann also financially benefitted as a result of their conduct.

93.    The price-spikes caused by Defendants' illegal conduct were not consistent with prior actual or perceived supply disruptions within California. The following chart, published by Severin Borenstein, chair of the PMAC—which was formed to investigate gasoline pricing in California between late 2014 and the end of 2016—depicts the historically unprecedented change in gasoline pricing in California relative to the United States that was caused by—and lingered—as a result of Defendants' conduct:[29]

---

[28] https://www.cmegroup.com/education/courses/market-regulation/wash-trades/definition-of-a-wash-trade.html (emphasis in original).

[29] *See* https://energyathaas.wordpress.com/2018/02/26/californias-mystery-gasoline-surcharge-continues/.



94.     Nor were the spot market price spikes explained by any actual decrease in gasoline production following the Torrance Refinery explosion. As the PMAC's Final Report explained, "Energy Commission staff noted that while the ESP tower and FCC unit of the refinery remained off-line until June 2016, the refinery could still create finished gasoline from processed blending components, some of which may be imported."[30]

---

[30] *See* https://ww2.energy.ca.gov/business_meetings/2017_packets/2017-09-13/Item_01a.pdf, at p.12.

95.     In fact, the PMAC demonstrated that overall gasoline production in California was well within the historical five-year production band immediately following the Torrance Refinery explosion and for the remainder of 2015, as depicted in the following chart:[31]



**Figure 5: 2015 California Production and Inventory Figures**

96.     The following chart demonstrates that the Defendants' spot price manipulation, which was in full swing not later than February 2015, impacted CARBOB spot prices in both San Francisco and Los Angeles, whose markets move in tandem:[32]

---

[31] *Id.*

[32] *See* https://www.energy.ca.gov/sites/default/files/2019-05/Data_on_California_Gasoline_Price_Margins.pdf, at p.5.

AMENDED CLASS ACTION COMPLAINT                                     CASE NO. 20-CV-03131-JSC



**Spot CARBOB Prices Recently Increased**

97.     Spot price manipulation increases the price of gasoline at all retailer distribution outlets, whether they supply branded or unbranded gasoline (*i.e.*, gas sold by retail discounters like Arco, Safeway, and Costco). In fact, the PMAC demonstrated that prices for branded and unbranded gasoline move in tandem, with branded pricing slightly higher than unbranded pricing.[33]





---

[33] *See* https://ww2.energy.ca.gov/business_meetings/2017_packets/2017-09-13/Item_01a.pdf, at p.29.

98.     No retailer in the State of California was spared cost increases caused by Defendants' misconduct, and empirical research demonstrates what industry participants have long known: that upstream wholesale price increases are quickly passed on to consumers, but price declines lag. Jeffery Karrenbock ("Karrenbock"), an economist at the Federal Reserve Bank of St. Louis, visually depicted this phenomenon in the following chart:[34]



Figure 2
U.S. Average Retail and Wholesale Gasoline Prices[1]

¹Retail prices include federal and state tax.

99.     Karrenbock demonstrated econometrically that while wholesale price increases were immediately passed through to retail gasoline price changes, wholesale price declines lagged. He graphed his results as follows:[35]

---

[34] *See* Jeffrey D. Karrenbrock, "The behavior of retail gasoline prices: symmetric or not?" *Federal Reserve Bank of St. Louis Review* (July/Aug. 1991), p.23, available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.199.7107&rep=rep1&type=pdf.

[35] *Id.* at 28.



100.    Karrenbock noted that his findings are consistent with the comments of industry participants, as the following quotes demonstrate:

"Retail (gasoline) prices go up much faster than they come down."—a spokesman for the Automobile Association of America. The Wall Street Journal, (Solomon) August 9, 1990.

"Pump prices are fast to respond to rising prices but slower to fall when crude prices fall."—Antonio Szabo, oil consultant with Bonner & Moore. The Wall Street Journal, (Business Bulletin) August 3, 1989.

"Whenever oil prices fall, there is always this stickiness in gasoline prices on the way down. You never see this stickiness on the way up."—Ed Rothschild, energy expert at Citizen Action. New York Times, (Wald) July 2, 1990.

25

"When crude prices go up, product prices tend to rise with crude prices. But when crude prices go down, product prices tend to lag—they go down slowly."—John Hilton, oil industry analyst for Argus Research Corp. St Louis Post-Dispatch, (Crudele) June 19, 1990.[36]

101.    The strong connection between wholesale and retail gasoline prices continues today. As OPIS explains on its website, "[t]he spot market is a *critical link* in the price influence chain *because it sets the basis for cost-plus formula deals between suppliers and end users*. It also forms the rationale for wholesale fuel price moves every day at 6 p.m. at wholesale racks across the U.S.—which then impacts price increases or decreases at the retail pump".[37]

102.    Defendants' repeated manipulation of the spot market price caused retail gasoline prices to be higher throughout the Class Period.

103.    Defendants' gains came at the expense of consumers throughout California, who use 40 million gallons of gasoline per day. California is the third largest market in the world behind the U.S. as a whole and China.[38]

104.    In fact, PMAC concluded its study of the California gasoline market as follows: "Californians continue to pay more than $3 billion per year for gasoline above the levels that could be explained by standard cost analysis. Whether the cause of these excess payments is insufficient competition or logistical impediments, or some combination of these factors, the magnitude of the loss justifies a very significant effort to diagnose its causes and remedy the situation."[39]

105.    As demonstrated by the filing of the AG Complaint against the Defendants on May 4, 2020, Senior Assistant Attorney General Kathleen Foote ("Foote") and her team of antitrust attorneys were able to continue with a non-public investigation into the causes of gasoline prices

---

[36] *Id.* at 20.

[37] *See* https://www.opisnet.com/product/pricing/spot/ (emphasis added). *See also* https://stillwaterassociates.com/gasoline-retail-margin-quick-to-rise-slow-to-drop/ ("We note that retail prices continue to respond quickly to increases in the spot price, but they respond more slowly to decreases in the spot price.").

[38] *See* https://www.forbes.com/sites/judeclemente/2015/03/22/why-are-californias-gasoline-prices-always-higher/#2cfa0b4321ff.

[39] *See* https://ww2.energy.ca.gov/business_meetings/2017_packets/2017-09-13/Item_01a.pdf, at p.33.

following the Torrance Refinery explosion and uncovered secret evidence that Defendants had illegally colluded with each other and third parties to increase the price of gasoline to levels above what competition would have allowed.

106.    According to the AG, the affirmative conduct underlying the illegal conduct alleged herein likely ended at or around the time that Niemann left SK Energy. In April of 2017, Mohammed became a Vice-President of the US West Coast Light Products Group of Tauber Oil Co., which trades in gasoline, jet fuel and distillates; Niemann joined her there in the following month.[40]

## VIII.   TOLLING OF THE STATUTES OF LIMITATIONS

107.    Class member purchases of gasoline within four years prior to the filing of this Complaint are not barred by the applicable four-year statute of limitations and are not required to be tolled in order to be actionable.

108.    Plaintiffs and the Class did not know of Defendants' illegal conduct until the AG filed its complaint against Defendants in May of 2020. Further, Plaintiffs and the Class had no reason to believe that they paid prices for gasoline that were affected by Defendants' illegal conduct prior to that date, and thus had no duty to investigate the claims set forth in this Amended Complaint until May 4, 2020. Defendants' secret joint venture agreements were inherently self-concealing.

109.    Additionally, Defendants engaged in affirmative acts that were designed to mislead and conceal their illegal conduct. For example, Vitol's Lucas affirmatively misled the CEC about the true cause of high prices for gasoline that followed the Torrance Refinery explosion in February 2015. On August 16, 2016, he told the PMAC and Foote that high gasoline prices were caused by a lack of transparency by ExxonMobil, rather than Defendants' illegal manipulation of spot market prices. Lucas stated:

> So you know, last year we brought in quite a few cargos into L.A.,

---

[40] *See* https://tauberoil.com/blog/team/shelly-mohammed/; https://tauberoil.com/blog/team/david-niemann/.

both alkaloid (phonetic) and finish CARBOB that went through Kinder Morgan's system and sold direct to Exxon and some other refiners. You know, one of the big things that this whole conversation has entailed is about the high prices. One of the reasons why, in my opinion, was the lack of transparency with what was going on with Torrance. Because if you remember when it first blew up back in February, there was like an eternal rolling one-month period where they were going to get back up and running. And they kept saying next month, next month, next month. So the trading companies in general, it takes four to five weeks to ship a cargo out, if Exxon is coming back up they're not going to ship into closed ARB. So because there was no real timeline of when Exxon was going to come back up and running, we would generally not—you don't put cargos on the water and ship them to the West Coast just on a punt, basically, hoping that you can sell them when they get there. That's what happened with that one cargo that was done by another trading company who sent it out there, at which point in time the market had collapsed, and so he was unable to sell it, and so he sailed it away again. So that's what happened with that one. So if there was more transparency with what was going on with refinery maintenance, when it was going to come back up, it would have allowed us to see if it was more—if we were going to be able to land these cargos and actually into a competitive market. If Exxon is back up and running the market is going to fall dramatically. So basically kind of that lack of information kept cargos at bay. There were still a lot shipped into the West Coast, but not as many as could have been or would have been done. If we had actually known that Exxon was going to be down for over a year there would have been a much bigger import play over that time frame.[41]

110.   Moreover, Defendants repeatedly misled OPIS about the true nature of their trading activities by reporting artificially high spot trades directly or indirectly between them but concealing the existence of offsetting wash trades that reduced or effectively limited any market risk in the primary trade.

111.   Additionally, the AG, as representative of the people of the State of California, obtained tolling agreements with Defendants that are applicable to the claims of Plaintiffs and the Class, in whole or in part. These tolling agreements have effective dates of August 3, 2018, and March 8, 2019, respectively. Defendants and the AG subsequently executed additional tolling

---

[41] *See* https://www.energy.ca.gov/data-reports/planning-and-forecasting/petroleum-market-advisory-committee, Aug. 16, 2016 Meeting Tr. at 129:24–131:10.

1    agreements to extend the termination dates of the tolling periods specified in the original

2    agreements. These termination dates have not passed as of the filing of this Complaint.

3         112.    Accordingly, to the extent that tolling is necessary to advance some or all of the

4    claims alleged by Plaintiffs and the Class, the four-year statutes of limitations governing claims

5    under the Sherman Act, the Cartwright Act, and the UCL were tolled at least until May 4, 2020

6    pursuant to the injury-discovery rule, the doctrine of fraudulent concealment, and by virtue of

7    express tolling agreements between the AG and Defendants.

8    **IX.    CLAIMS FOR RELIEF**

9                                    **COUNT ONE**

10                              **Violation of the Sherman Act**

11                        **(15 U.S.C. § 1—Injunctive Relief Only)**

12                               **(Against All Defendants)**

13        113.    Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as

14   though fully set forth herein.

15        114.    Defendants entered into and engaged in a continuing combination, conspiracy or

16   agreement to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman

17   Act (15 U.S.C. § 1) by artificially restraining competition with respect to the price of gasoline

18   within the State of California.

19        115.    Defendants' activities constitute a *per se* violation of Section 1 of the Sherman Act.

20        116.    Defendants' anticompetitive and unlawful conduct has proximately caused injury

21   to Plaintiffs and members of the Class by restraining competition and thereby raising, maintaining

22   and/or stabilizing the price of gasoline at levels above what would have occurred if competition

23   had prevailed. For this conduct, Plaintiffs and members of the Class are entitled to injunctive relief

24   pursuant to 15 U.S.C. § 26.

25

26

27

**COUNT TWO**

**Violation of the Cartwright Act**

**(California Business and Professions Code §§ 16720 *et seq*.)**

**(Against All Defendants)**

117.   Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

118.   Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of the Cartwright Act, California Business and Professions Code §§ 16720 *et seq*., by artificially restraining competition with respect to the price of gasoline within the State of California.

119.   Defendants' activities constitute a *per se* violation of the Cartwright Act.

120.   Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiffs and members of the Class by restraining competition and thereby raising, maintaining and/or stabilizing the price of gasoline at levels above what would have occurred if competition had prevailed. For this conduct, Plaintiffs and members of the Class are entitled to treble damages and injunctive relief pursuant to California Business and Professions Code § 16750(a).

**COUNT THREE**

**Violation of the Unfair Competition Law**

**(California Business and Professions Code §§ 17200 *et seq*.)**

**(Against All Defendants)**

121.   Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

122.   Defendants committed acts of unfair competition, as described above, in violation of the UCL.

123.   Defendants' conduct constitutes an "unlawful" business practice within the meaning of the UCL, and includes, without limitation, the following:

   •   Violating the Sherman and Cartwright Acts, as set forth above;

- Engaging in wash sales and otherwise manipulating the benchmark prices reported on the California gasoline spot market in violation of California Corporations Code §§ 29535, 29536, 29537, 29538) and the CEA, 7 U.S.C. §§ 1 *et seq*.

124.    Defendants' conduct separately constitutes an "unfair" business practice within the meaning of the UCL because Defendants' practices have caused and are "likely to cause substantial injury" to the Plaintiffs and the members of the Class that is not "reasonably avoidable" by them.

125.    Defendants' conduct, as alleged herein, is and was contrary to public policy, immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers. Any purported benefits arising out of Defendants' conduct do not outweigh the harms caused to the victims of Defendants' conduct.

126.    Defendants' conduct is also "unfair" because it is contrary to numerous legislatively-declared policies, as set forth in the Sherman Act, the Cartwright Act, the California Corporations Code, and in the Commodities Exchange Act. Here, Defendants' conduct not only violates the letter of the law, but it also contravenes the spirit and purpose of each of those statutes. The conduct threatens an incipient violation of each of those laws and has both an actual and a threatened impact on competition.

127.    Defendants' conduct, as described above, also constitutes a "fraudulent" business practice within the meaning of the UCL. Defendants' trading activity on the California gasoline spot market fraudulently raised the price of gasoline above the competitive level through fictitious "wash" trades and other manipulative conduct that did not shift economic risk for the transaction to an arm's length counterparty. This conduct was designed to deceive—and did deceive—other market participants about the true supply and demand situation for gasoline in order to artificially increase the price of gasoline in California.

128.    Plaintiffs and the members of the Class have suffered injury in fact and have lost money as a result of Defendants' violations of the UCL in that they paid more for gasoline than they would have paid in a competitive market. They are therefore entitled to restitution and injunctive relief pursuant to California Business and Professions Code § 17203.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment on its behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A.      This action may proceed as a class action, with Plaintiffs serving as the Class Representatives, and with Plaintiffs' counsel as Class Counsel;

B.      Defendants have contracted, combined and conspired in violation of the Sherman Act and Cartwright Act;

C.      Defendants have violated the UCL by engaging in conduct that constitutes unlawful, unfair, and fraudulent business practices;

D.      Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

E.      Plaintiffs and the Class are entitled to recover three-fold damages and/or restitution, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount subject to proof at trial;

F.      Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate;

G.      Plaintiffs and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

      i.      A judicial determination declaring the rights of Plaintiffs and the Class, and the corresponding responsibilities of Defendants; and

      ii.     Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

H.      Defendants are to be jointly and severally responsible financially for the costs and

1    expenses of a Court-approved notice program through post and media designed to

2    give immediate notification to the Class;

3    I.    Plaintiffs and the Class recover their costs of this suit, including reasonable

4    attorneys' fees as provided by law; and

5    J.    Plaintiffs and the Class receive such other or further relief as may be just and proper.

6    **JURY TRIAL DEMANDED**

7    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the

8    claims asserted in this Amended Complaint that are so triable.

9    DATED: June 2, 2020                           HAUSFELD LLP

10

11                                                 By:_____

12                                                 Michael P. Lehmann (SBN 77152)
                                                   Christopher L. Lebsock (SBN 184546)
13                                                 Samantha J. Stein (SBN 302034)
                                                   HAUSFELD LLP
14                                                 600 Montgomery St., Suite 3200
                                                   San Francisco, CA 94111
15                                                 Telephone: (415) 633-1908
                                                   Facsimile: (415) 358-4980
16                                                 mlehmann@hausfeld.com
                                                   clebsock@hausfeld.com
17                                                 sstein@hausfeld.com

18
                                                   *Attorneys for Plaintiffs and the Proposed*
19                                                 *Class*

20                                                 Brian Murray (*pro hac vice filed*)
21                                                 Lee Albert (*pro hac vice filed*)
                                                   GLANCY PRONGAY & MURRAY LLP
22                                                 230 Park Avenue, Suite 530
                                                   New York, NY 101689
23                                                 Telephone: (212) 682-5340
                                                   Facsimile: (212) 884-0988
24                                                 Email: bmurray@glancylaw.com
                                                           lalbert@glancylaw.com
25

26                                                 *Attorneys for Plaintiffs Equality Wines*
                                                   *LLC, Kelly Keskinen, and the Proposed*
27                                                 *Class*

33

John Radice (*pro hac vice to be filed*)
RADICE LAW FIRM
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745

*Attorney for Plaintiff Ryan Schrum-Herrera and the Proposed Class*

Wookjae Jin
Dongin Law Group
15F, Samsunglife Seocho Tower,
74 gil 4 Seocho-daero,
Seoul, Korea, Zip code: 06620
T: 82-2-2046-0868
F: 82-2-3482-1177
E: wjae.jin@donginlaw.co.kr

Kweonsik Seo
Law Office of Kweonsik Seo
19F, S-Tower, 82 Saemoonan-ro,
Seoul, Korea, Zip code:  03185
T: 82-2-767-2810
F: 82-2-767-2702
E: kweonsik@lawdata.co.kr

*Attorneys for the Plaintiffs and the Proposed Class*

AMENDED CLASS ACTION COMPLAINT                              CASE NO. 20-CV-03131-JSC