1    Michael P. Lehmann (SBN 77152)        Dena C. Sharp (SBN 245869)
2    Christopher L. Lebsock (SBN 184546)   Jordan Elias (SBN 228731)
     Samantha J. Stein (SBN 302034)        Adam E. Polk (SBN 273000)
3    HAUSFELD LLP                          GIRARD SHARP LLP
     600 Montgomery Street, Suite 3200     601 California Street, Suite 1400
4    San Francisco, CA 94111               San Francisco, CA 94108
     Telephone: (415) 633-1908             Tel: (415) 981-4800
5    Facsimile: (415) 358-4980             Fax: (415) 981-4846
     mlehmann@hausfeld.com                 dsharp@girardsharp.com
6    clebsock@hausfeld.com                 jelias@girardsharp.com
     sstein@hausfeld.com                   apolk@girardsharp.com

7

8    *Interim Co-Lead Class Counsel*

9    [Additional Counsel Listed on Signature Page]

10

11                   **UNITED STATES DISTRICT COURT**

                   **NORTHERN DISTRICT OF CALIFORNIA**
12
                        **SAN FRANCISCO DIVISION**
13

14   IN RE CALIFORNIA GASOLINE SPOT          Case No. 3:20-cv-03131-JSC
     MARKET ANTITRUST LITIGATION
15                                           **CLASS ACTION**

16                                           **CONSOLIDATED CLASS ACTION**
                                             **COMPLAINT FOR VIOLATIONS OF**
17                                           **THE SHERMAN AND CLAYTON ACTS**
                                             **(15 U.S.C. §§ 1, 26) AND OF THE**
18                                           **CARTWRIGHT ACT AND UNFAIR**
                                             **COMPETITION LAW (CAL. BUS. &**
19                                           **PROF. CODE §§ 16720 *ET SEQ*. AND**
                                             **17200 *ET SEQ*.), AND FOR UNJUST**
20                                           **ENRICHMENT**

21
                                             **DEMAND FOR JURY TRIAL**
22

23

24

25

26

27

Plaintiffs Pacific Wine Distributors, Inc. ("PWDI"), Fricke-Parks Press, Inc. ("Fricke-Parks"), Equality Wines LLC ("Equality Wines"), Bogard Construction, Inc. ("Bogard"), Ritual Coffee Roasters, Inc. ("Ritual"), Justin Lardinois, Asante Cleveland, and Dona Young (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Consolidated Class Action Complaint for damages, restitution, non-restitutionary disgorgement, and injunctive relief against named Defendants Vitol Inc. ("Vitol"), SK Energy Americas, Inc. ("SK Energy"), SK Trading International Co. Ltd. ("SK Trading"), Brad Lucas ("Lucas"), and David Niemann ("Niemann") (collectively, "Defendants") and unidentified Doe Defendants for violations of Section 1 of the Sherman Act (15 U.S.C. § 1), the Cartwright Act (Cal. Bus. & Prof. Code §§ 16720 *et seq*.), and the Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL")). All allegations herein other than those relating to Plaintiffs are based on information and belief.

## I.   **INTRODUCTION**

1.   This lawsuit concerns agreements that are *per se* unlawful among horizontal competitors—Vitol, SK Energy, and SK Trading—and certain of their employees (Lucas and Niemann) to restrain competition in the spot market for gasoline formulated for use in California and in certain gasoline blending components used in that gasoline.

2.   During all relevant times, Defendants were participants in the spot market for delivery of refined gasoline and gasoline blending components to refineries located in the greater metropolitan Los Angeles area and the San Francisco Bay Area.

3.   Defendants' scheme exploited a disruption in refining capacity that resulted from an incident at the refinery in Torrance, California ("the Torrance Refinery"), then owned by ExxonMobil Corporation ("ExxonMobil"). In the early morning of February 18, 2015, the Torrance Refinery's cracking unit exploded, thereby eliminating portions of the refinery's ability

to refine alkylates from February of 2015 until at least June of 2016.[1] Alkylate is a chemical used as a high octane blending component for gasoline made by reacting light olefins, such as butylene with isobutane, in the presence of an acidic catalyst.

4. The corporate Defendants and their employees, such as Lucas and Niemann, realized that the supply disruption from the refinery explosion could provide an opportunity to artificially inflate the price of gasoline traded on wholesale spot markets in California and to increase the price of alkylates—the prices of which are tied directly to the wholesale price of gasoline—without unwanted scrutiny by other market participants and regulators.

5. Immediately upon learning of the explosion at the Torrance Refinery, Defendants Vitol and SK Energy, acting through Lucas and Niemann, among others, negotiated large contracts to supply gasoline and gasoline blending components for delivery in California. The largest of these contracts was for more than ten million gallons.

6. Also acting through Lucas and Niemann, among others, Defendants Vitol and SK Energy, acting with the approval of Defendant SK Trading, agreed with each other to manipulate the spot market price for refined gasoline and gasoline blending components so that they could realize windfall profits on these contracts. Defendants further entered into agreements with each other to share the profits and disguise their illegal market interference.

7. In a November 2017 article concerning the "unexplained differential" between prices in California and the national average following the Torrance explosion, the *Los Angeles Times* reported that while this price differential was expected to return to the 30-cent range after the refinery came back online, "[t]he Torrance refinery, now owned by PFF Energy, came back online in May 2016—and statewide prices are still out of whack . . . . That's different from what happened after an August 2012 fire at Chevron's refinery in Richmond, Calif. Then, prices returned

---

[1] The disruption is described in the United States Chemical & Safety Board's "Investigation Report" No. 2015-02-I-CA (May 3, 2017), available at https://www.csb.gov/file.aspx?DocumentId=6023.

to their normal relationship with the U.S. average within about four months."[2] Defendants, through their collusive activity, maintained the elevated prices that prevailed in the wake of the explosion.

8.    The restraint of trade described herein was coordinated by Lucas and Niemann, the lead traders for both Vitol and SK Energy, who were friends and former colleagues at Vitol.

9.    After the Torrance Refinery explosion, prices for spot market gasoline contracts for deliveries to San Francisco and Los Angeles went up almost immediately. As discussed below, empirical studies demonstrate that increases in the wholesale price of gasoline, in contrast to price decreases, are passed through to retail prices quickly. Defendants' conduct violated the Sherman Act and the Cartwright Act, constituted unlawful, unfair, and/or fraudulent practices in violation of the UCL, and/or warrants non-restitutionary disgorgement because it unjustly enriched them. Plaintiffs and the Class were injured because they paid more for gasoline within the State of California than they would have paid in a retail gasoline market untainted by Defendants' illegal activities.

10.    On May 4, 2020, Defendants' conduct became known for the first time to Plaintiffs and the Class when the California Attorney General ("AG") filed a partially redacted complaint ("AG Complaint") against Defendants for Cartwright Act and UCL violations.[3] A declaration filed in the AG's case indicates that its pre-complaint discovery lasted a total of 22 months, involved production of 11 and 13 tranches of documents by SK Energy and Vitol, respectively, and was the subject of a "substantial" review by the AG's office.[4]

---

[2] https://www.latimes.com/business/hiltzik/la-fi-hiltzik-gas-price-20171110-story.html. As explained below, the refinery's cracking unit did not resume operation until June of 2016.

[3] *See The People of the State of California v. Vitol, Inc., et al.*, Case No. CGC20584456 (S.F. Superior, filed May 4, 2020) ("AG Case"). The AG Complaint may also be found at https://www.oag.ca.gov/system/files/attachments/press-docs/Scanned%20copy%20of%20redacted%20complaint%20as%20filed.pdf. An unredacted version of the AG Complaint has been provided by Defendants to Plaintiffs and the portions of the AG Complaint that were filed under seal also furnish the basis for certain allegations in this Consolidated Complaint that are also being filed under seal.

[4] "Declaration of Paul A. Moore In Support Of Plaintiff's First *Ex Parte* Administrative Motion To Seal The Complaint In Part" at p.2-3 (June 12, 2020) in the AG Case.

## II.  JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367, and personal jurisdiction pursuant to 15 U.S.C. § 22 and the doctrine of pendent personal jurisdiction, as well as the California long-arm statute (Cal. Code of Civ. Procedure § 410.10).

12.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or is licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal restraint of trade throughout this District. The anticompetitive conduct alleged herein has been directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

## III.  INTRADISTRICT ASSIGNMENT

13.     Pursuant to N.D. Cal. Civil Local Rules 3-2(c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the trade and commerce affected by Defendants' illegal conduct was substantially conducted within, and directed to and impacted Plaintiffs and members of the Class in counties located within the Division. The San Francisco spot market also is located within this Division.

## IV.  PARTIES

### A.  PLAINTIFFS

14.     Plaintiff PWDI is a resident of the State of California. PWDI purchased gasoline at retail within the State of California during the Class Period defined herein for its own use and not for resale. It owns the statutory claims set forth in this Consolidated Complaint.

15.     Plaintiff Fricke-Parks is a resident of the State of California. Fricke-Parks purchased gasoline at retail within the State of California during the Class Period defined herein for its own

use and not for resale. It owns the statutory claims set forth in this Consolidated Complaint.

16.     Plaintiff Bogard Construction is a resident of the State of California. Bogard Construction purchased gasoline at retail within the State of California during the Class Period defined herein for its own use and not for resale. It owns the statutory claims set forth in this Consolidated Complaint.

17.     Plaintiff Equality Wines is a resident of the State of California. Equality Wines purchased gasoline at retail within the State of California during the Class Period defined herein for its own use and not for resale. It owns the statutory claims set forth in this Consolidated Complaint.

18.     Plaintiff Ritual is a resident of the State of California. Ritual purchased gasoline at retail within the State of California during the Class Period defined herein for its own use and not for resale. It owns the statutory claims set forth in this Consolidated Complaint.

19.     Plaintiff Justin Lardinois is a citizen and resident of California. He purchased gasoline at retail within the State of California during the Class Period defined herein for his own use and not for resale.

20.     Plaintiff Asante Cleveland is a citizen and resident of California. He purchased gasoline at retail within the State of California during the Class Period defined herein for his own use and not for resale.

21.     Plaintiff Dona Young is a citizen and resident of Pennsylvania. She purchased gasoline at retail within the State of California during the Class Period defined herein for her own use and not for resale.

**B.     DEFENDANTS**

22.     Defendant Vitol, a Delaware corporation, is an energy company with its principal place of business at 2925 Richmond Avenue, 11th Floor, Houston, Texas 77098. Vitol is registered with the California Secretary of State to conduct business in California. Vitol and its related entities are not strangers to unlawful trading conduct. Earlier this year, the Federal Energy Regulatory Commission sued Vitol and one of its traders to collect $3.75 million in fines levied against them

after finding Vitol's trading activity unlawfully manipulated California electricity markets.[5] Vitol S.A. was also fined five million Euros by French authorities for manipulating the southern French gas trading point "Peg Sud" between June of 2013 and March of 2014.[6] And the FBI reportedly investigated two former executives of Vitol based in Latin America, Michael Loya and Tony Maarraoui, for efforts to bribe Petrobras, the Brazilian state-owned oil firm.[7]

23.     Defendant SK Energy is a California corporation with its registered office at 1300 Post Oak Boulevard, Suite 425, Houston, Texas 77056. SK Energy is an indirect, wholly-owned subsidiary of Defendant SK Trading.

24.     Defendant SK Trading is a South Korean corporation with its head office at 26 Jongno, Jongno-gu, Seoul, South Korea. SK Trading is the indirect parent of SK Energy. SK Trading is also a sister company to SK Energy Co., Ltd. ("SK Energy Korea"), the largest refiner of crude oil in Korea.[8] All of these entities are subsidiaries of SK Innovation Co., Ltd. ("SK Innovation"), a publicly traded holding company headquartered at 26, Jongno, Jongno-gu, Seoul, Korea. SK Innovation owns 100% of both SK Trading and SK Energy.[9]

25.     SK Trading publicly describes its subsidiary SK Energy as the marketing agent for SK Energy Korea in the United States and explains that SK Energy facilitates the export of SK Energy Korea's gasoline and gasoline blending products to the United States. SK Trading

---

[5] ECF No. 1 in *Federal Energy Regulatory Comm'n v. Vitol, Inc.*, No. 2:20-cv-00040-KJM-AC (E.D. Cal. Jan. 6, 2020).

[6] https://www.reuters.com/article/vitol-france-fine-gas/update-1-french-regulator-fines-vitol-5-mln-euros-for-gas-market-manipulation-idUSL8N1WP399.

[7] https://www.reuters.com/article/us-brazil-corruption-oil-traders-exclusi/exclusive-fbi-investigating-top-vitol-executives-in-americas-sources-idUSKCN1Q21Z6.

[8] The federal government sued SK Energy Korea and certain of its competitors in April of 2018 for conspiring to rig bids for fuel to United States military bases in South Korea, and in March of 2019, SK Energy agreed to pay a $90 million fine in connection with this conduct. ECF No. 1 in *United States v. GS Caltex Corp., et al.*, No. 2:18-cv-01456-ALM-CMV (S.D. Ohio Nov. 14, 2018); ECF No. 32 in *United States v. SK Energy Co., Ltd.*, No. 2:18-cv-01456-ALM-CMV (S.D. Ohio Mar. 14, 2019). *See also* https://www.justice.gov/opa/press-release/file/1111226/download.

[9] *See* http://eng.skinnovation.com/company/affiliate.asp.

---

6

graphically depicts these relationships as follows:[10]



26.     In its Deep Change Sustainability Report, released in 2018,[11] SK Trading touted its international commodities trading activities, including activities involving the United States:

- "SK Trading International is trading feedstock with the US crudes with the sound foundation it has built."

- "SK trading international is establishing and expanding a differentiated trading platform using its tangible and intangible competitiveness in oil trading hubs particularly in Singapore, Europe, North America, and Middle East, while fostering and securing professional traders to add to its global competitiveness based on its sophisticated risk management system."

[10] *See* http://eng.skinnovation.com/company/trading.asp.

[11] https://parts.speedmate.com/_upload/catalog/20190904143349-ed2-2076147f503f.pdf.

27.     SK Trading dominated and controlled SK Energy, and specifically ratified the illegal conduct engaged in by SK Energy that is described herein. SK Trading and SK Energy Korea list their headquarters at the same address as SK Innovation.

28.     At all times relevant to this Consolidated Complaint, Defendant SK Energy was an agent and *alter ego* of Defendant SK Trading, due to the nature and extent of control that SK Trading exercised over SK Energy.

29.     At all times relevant to this Consolidated Complaint, there existed a unity of interest and ownership between SK Energy and SK Trading such that any separateness between them had ceased to exist and SK Trading controlled, dominated, managed, and operated SK Energy. Specifically, SK Trading controlled the business and affairs of SK Energy such that the distinction between the companies were mere technicalities.

30.     Additionally, at all times relevant to this Consolidated Complaint, SK Energy was acting within the course and scope of its agency with the knowledge, consent, permission, authorization, and ratification, either express or implied, of SK Trading in performing the acts alleged in this Consolidated Complaint.

31.     Defendants SK Trading and SK Energy are referred to collectively herein as "SK" unless otherwise indicated.

32.     SK is independent from Vitol, and the two companies are independent centers of decision making.

33.     Defendant Lucas is the West Coast Marketing Director of Vitol. He has been employed at Vitol since 2013, first as a trader (2008-13) in the company's West Coast Marketing Department, then as the company's Marketing Director (2013 to present). Lucas was the primary trader at Vitol responsible for trading gasoline and gasoline blending components that were delivered within California. He is a resident of Houston, Texas. As described herein, he colluded with Niemann of SK Energy.

34.     Defendant Niemann was an executive of SK Energy and was the senior trader responsible for executing trades on the West Coast, including California. Niemann is a resident of

1    Houston, Texas. As described herein, he colluded with Lucas of Vitol.

2           35.    Doe Defendants 1–100 are other individuals or entities who engaged in or abetted

3    the unlawful conduct by Defendants set forth in this Consolidated Complaint. The AG Complaint

4    also names Doe Defendants. Plaintiffs intend to further amend or seek leave to further amend this

5    Consolidated Complaint upon learning the identity of Doe Defendants.

6    **V.      AGENTS AND CO-CONSPIRATORS**

7           36.    The anticompetitive and unlawful acts alleged against the Defendants in this

8    Complaint were authorized, ordered or performed by Defendants' respective officers, agents,

9    employees, or representatives, while actively engaged in the management, direction, or control of

10   Defendants' businesses or affairs.

11          37.    Each corporate Defendant's agents operated under the authority and apparent

12   authority of its respective principals.

13          38.    Each corporate Defendant, through its respective subsidiaries, affiliates, and agents,

14   operated as a single unified entity.

15          39.    Various persons and/or firms not named as Defendants herein may have participated

16   as co-conspirators in the violations alleged herein and may have performed acts and made

17   statements in furtherance thereof.

18          40.    Each Defendant acted as the principal or agent of, or for, other Defendants with

19   respect to the acts, violations, and common course of conduct alleged herein.

20          41.    When Plaintiffs refer to a corporate family or companies by a single name in their

21   allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are alleging

22   that one or more employee or agent of entities within the corporate family engaged in conspiratorial

23   acts or meetings on behalf of all of the Defendant companies within that family. In fact, the

24   individual participants in the conspiratorial meetings and discussions did not distinguish among

25   the entities within a corporate family. The individual participants entered into agreements on behalf

26   of, and reported these meetings and discussions to, their respective corporate families. As a result,

27   the entire corporate family was represented in meetings and discussions by their agents and were

parties to the agreements reached by them. Furthermore, to the extent that subsidiaries within corporate families distributed the alkylate products discussed in this Consolidated Complaint, these subsidiaries played a significant role in the conspiracy because Defendants sought to ensure that the prices paid for such products would not undercut the pricing agreements reached at these various meetings. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to maintain supra-competitive prices.

## VI.   CLASS ACTION ALLEGATIONS

42.    Plaintiffs bring this action for damages or restitution and injunctive relief on behalf of themselves and a class of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), with the class initially defined to include:

> All persons or entities that purchased gasoline from a retailer, for their own use and not for resale, within the State of California from February 18, 2015 until such time as the adverse effects of Defendants' anticompetitive conduct ceased (the "Class Period").

43.    Excluded from the Class are the following persons or entities: (a) any of the Defendants named herein; (b) any of the corporate Defendants' parent companies, subsidiaries, and affiliates; (c) any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (d) all governmental entities; and (e) the judges and chambers staff assigned to this case, as well as the members of their immediate families; and (f) all jurors assigned to this case. Plaintiffs reserve the right to expand, change, or modify the class definition based upon discovery and further investigation.

44.    Plaintiffs do not know the exact number of Class members. Plaintiffs are informed and believe that, due to the nature of the trade and commerce involved, there are millions of Class members geographically dispersed throughout the State of California and throughout the United States, such that joinder of all Class members in the prosecution of this action is impracticable.

45.    Plaintiffs' claims are typical of the claims of their fellow Class members because Plaintiffs purchased gasoline in California during the Class Period. Plaintiffs and all Class members were damaged in the same manner by the same wrongful conduct of Defendants as alleged herein,

1    and the relief sought herein is common to all members of the Class.

2        46.    Numerous questions of law or fact common to the entire Class—including, but not

3    limited to, those identified below—arise from Defendants' anticompetitive and unlawful conduct:

4            a.    Whether Defendants contracted, combined or conspired with one another
                   to restrain trade in the spot market for gasoline at any time during the
5                  Class Period;

6
             b.    Whether Defendants' conduct caused the prices of gasoline sold at retail to
7                  be higher than the competitive level as a result of their restraint of trade;

8
             c.    Whether Plaintiffs and the other members of the Class were injured by
9                  Defendants' conduct and, if so, the determination of the appropriate Class-
                   wide measure of damages; and
10
             d.    Whether Plaintiffs and other members of the Class are entitled to, among
11                 other things, injunctive relief, and, if so, the nature and extent of such
                   relief.
12

13       47.    These and other questions of law and fact are common to the Class and predominate

14   over any questions affecting the Class members individually.

15       48.    Plaintiffs will fairly and adequately represent the interests of the Class because they

16   purchased gasoline at retail within the State of California during the Class Period and have no

17   conflicts with any other members of the Class. Furthermore, Plaintiffs have retained sophisticated

18   and competent counsel who are experienced in prosecuting antitrust class actions, as well as other

19   complex litigation.

20       49.    Defendants have acted on grounds generally applicable to the Class, thereby making

21   final injunctive relief appropriate with respect to the Class as a whole.

22       50.    This class action is superior to other alternatives for the fair and efficient

23   adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will

24   eliminate the possibility of repetitive litigation. There will be no material difficulty in the

25   management of this action as a class action.

26       51.    The prosecution of separate actions by individual Class members would create the

27   risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for

1   Defendants.

2   **VII.    FACTUAL ALLEGATIONS**

3        **A.    CALIFORNIA'S GASOLINE MARKET**

4        52.    Gasoline reaches consumers through a global supply chain that begins with

5   extracting crude oil and transporting it to refineries, mostly via pipelines, marine tankers, and

6   barges. At the refineries, crude oil is processed into gasoline and other petroleum products. Refined

7   gasoline is then transported—again, usually via pipelines, marine tankers, and barges—to storage

8   terminals for wholesale distribution. From there, it is shipped by truck to retail gas stations where

9   consumers fill their tanks. The following chart prepared by the U.S. Governmental Accountability

10  Office ("GAO") visually depicts this supply chain:[12]



**Figure 2: Gasoline Production and Distribution System**

Source: GAO.

23       53.    California is geographically isolated from refining hubs in the rest of the United

24  States. There are no pipelines that ship finished gasoline products into California. When local

25  supplies are insufficient to meet demand in California, additional refined gasoline and gasoline

27  [12] *See* https://www.gao.gov/new.items/d05525sp.pdf at p.2.

blending components are typically brought into the state on marine vessels. Geographically, California is remote from the oil refining centers in Texas and the Gulf of Mexico.

54.     California also has more stringent vehicle emissions standards than other areas of the country. Gasoline produced pursuant to these standards is called California Reformulated Gasoline Blendstock for Oxygenate Blending ("CARBOB").[13] The CARBOB specifications are unique to California; therefore, gasoline used in neighboring states does not meet the CARBOB specification and cannot be used as a substitute source of supply.

55.     Most of the CARBOB consumed in California is produced by refineries located in clusters near metropolitan centers in the San Francisco Bay Area and in the greater Los Angeles area.

56.     One of the largest refineries in Southern California is the Torrance Refinery. It produces approximately twenty percent of all the gasoline sold in Southern California and ten percent of the statewide supply. The Torrance Refinery also has the capacity to produce significant quantities of alkylate.

57.     When unexpected disruptions in supply occur, gasoline meeting California's unique CARBOB specifications must be sourced from outside of California. Deliveries can take several weeks to arrive at California's ports.

58.     Because of the unique characteristics of California's refined gasoline market, Californians have historically paid approximately 30 cents extra per gallon of refined gasoline in comparison to drivers in other states.

**B.     GASOLINE SPOT MARKET TRADING IN CALIFORNIA**

59.     "Spot" purchases refer to fuel that physically changes hands at a refinery gate or other major pricing hub for delivery on a pipeline or via barge or cargo. Deals are always done in bulk, typically 5,000 barrels (210,000 gallons) to 50,000 barrels (2.1 million gallons).[14]

60.     There are a number of spot markets around the United States, but the two relevant

---

[13] *See* https://www.mckinseyenergyinsights.com/resources/refinery-reference-desk/carbob/.

[14] *See* https://www.opisnet.com/product/pricing/spot/.

to this litigation are located in either San Francisco (for delivery to Northern California refineries located in the Bay Area) or Los Angeles (for delivery to refineries in greater Los Angeles). The United States spot markets are:[15]



61.     Fuel is traded both on these physical or "spot" markets, where physical delivery of refined gasoline occurs, and on paper or "futures" markets where traders on a given day agree to a price to purchase or sell gasoline for delivery at a future date. The paper or futures market for Reformulated Blendstock for Oxygenate Blending, or "RBOB" gasoline,[16] and for other petroleum products is run through the New York Mercantile Exchange ("NYMEX"), a division of the Chicago Mercantile Exchange ("CME").

62.     RBOB gasoline contracts are primarily traded through a centralized electronic trading platform on NYMEX. There are typically thousands of gasoline trades every trading day on the NYMEX amounting to billions of gallons. All transactions on the NYMEX are publicly reported, so pricing is transparent to market participants.[17]

63.     NYMEX prices generally reflect large-scale national and international factors,

---

[15] *See* http://blog.opisnet.com/spot-fuel-markets-made-simple.

[16] *See* https://www.cmegroup.com/trading/energy/refined-products/rbob-gasoline_contract_specifications.html

[17] *See id*.

while the California markets—including the spot market—react to the NYMEX price, as well as to regional and local supply and demand conditions.[18] The prices on the two California spot markets are directly influenced by gasoline prices on the NYMEX.

64.     In many California spot market transactions, the buyer and the seller negotiate only the basis (or spread), and the final price is determined by adding the basis to the NYMEX price.[19] The basis can be quoted as a positive or negative differential. In trader terms, these would be quoted as "over," "under" (or "back"), or "flat". For example, a positive basis or spread would be quoted as "15 cents over." This means that the price negotiated would be equal to the NYMEX RBOB price plus 15 cents. Thus, a $2.50 NYMEX RBOB price plus a $0.15 cent basis would result in a price of $2.65 per gallon.

65.     From the spot market, fuel is distributed from a fuel distribution point called a "rack," which is where the fuel is supplied. "Rack" or "wholesale" purchases are made along a fuel distribution system—usually at pipeline terminals. Transactions are conducted in approximately 8,000-gallon increments, the amount of fuel a typical fuel truck holds. Companies that re-sell fuel (jobbers) as well as retailers and certain end users (*e.g.*, trucking companies) pull fuel from the wholesale racks. Wholesale rack prices move up or down each day at 6 p.m. Eastern Time, based on the movements of the spot market.[20]

66.     According to the Oil Price Information Service, LLC ("OPIS"), a private oil and gas price reporting service, "refiners increase or decrease their daily rack costs based on the average daily change in their spot replacement costs." Spot fluctuations are thus passed through to the rack costs. The only additional charges included in a rack price are charges incurred from transporting fuel from the refinery to the distribution rack.

67.     Wholesale terminals are located throughout California in the following geographically dispersed cities: Bakersfield, Barstow, Brisbane, Carson, Chico, Colton, Eureka,

---

[18] *See* http://blog.opisnet.com/pricing-101-your-basic-guide-to-pricing-gasoline-and-diesel.

[19] *See* http://blog.opisnet.com/spot-fuel-markets-made-simple.

[20] *See* https://www.opisnet.com/product/pricing/rack/.

Fremont, Fresno, Imperial, Los Angeles (three locations), Montebello, Orange, Richmond, Sacramento, San Diego, San Francisco, San Jose, Stockton, Van Nuys, and Wilmington.[21]

68.    The regional supply network is visually depicted in the following Energy Information Administration ("EIA") chart used by the California Energy Commission's ("CEC") Petroleum Market Advisory Committee ("PMAC"):[22]



Source: Energy Information Administration.

69.    There are two common grades of CARBOB gasoline that are traded in the San Francisco and Los Angeles spot markets. Regular CARBOB ("Regular") is the most commonly traded grade of gasoline. Premium CARBOB ("Premium") is traded with far less frequency than Regular, and at a higher price. As noted above, alkylates are a high-quality gasoline blending component that can be combined with other blendstocks to create Regular and Premium gasoline.

---

[21] *See* https://www.opisnet.com/about/rack-pricing-coverage-city/.

[22] *See* https://efiling.energy.ca.gov/GetDocument.aspx?tn=221306&DocumentContentId= at p.15.

Alkylates are octane boosters, and are therefore critical to achieving the high-octane ratings of Premium gasoline advertised for retail sale in California.[23]

70.     Spot market trades in California for both Regular and Premium are traded through non-public transactions, known as over-the-counter ("OTC") trades. These OTC transactions do not occur on a centralized open exchange like the NYMEX, but instead are traded in a private, bilateral fashion between buyers and sellers. Prices on the California spot markets, therefore, are not immediately public. Refiners and traders rely on price-reporting services that report spot market prices from sources that participate in the market, such as traders, refiners, and brokers.[24] Some of the most important information the price-reporting services rely on derives from the private bilateral transactions that the traders report to the services.

71.     OPIS is the most widely used reporting service in California and holds itself out as "the most widely accepted price benchmark for supply contracts."[25] As a private subscription service, OPIS describes itself as "provid[ing] price transparency across the global supply chain so that all stakeholders can buy and sell oil and energy commodities with confidence. We do this by providing transparent pricing, real-time news, powerful analytics and software and educational and networking events."[26] OPIS publishes a daily West Coast Spot Market Report (the "Spot Market Report"), which is the industry pricing benchmark used by both buyers and sellers in California. Subscribers to OPIS get the Spot Market Report and can also receive market updates from OPIS throughout the day that include reported deals and other industry news.

72.     The Spot Market Report includes, among other gasoline-product information, the

---

[23] *See* https://www.eia.gov/todayinenergy/detail.php?id=9971. Approximately 85% of gasoline sold at retail is "regular" gasoline. Another 10% is "premium" gasoline. The remainder is called "midgrade" gasoline. "[R]efineries do not produce a midgrade gasoline blend; instead, the middle-octane option is blended at the fuel pump from a given gas station's supply of regular and premium gas." *See* https://blog.consumerguide.com/what-is-midgrade-gas/.

[24] *See* https://www.opisnet.com/about/methodology/#wholesale-rack-pricing ("OPIS market assessors follow the marketplace throughout a full day of trading by constant communication with designated and approved traders and brokers to discover done deals, bids and offers.").

[25] https://www.opisnet.com/wp-content/uploads/2018/10/OPIS-Brochure.pdf.

[26] https://www.opisnet.com/about/company-overview/.

1    prices for Regular and Premium gasoline contracts for prompt (*i.e.*, near term) delivery in Southern

2    California and in Northern California. The Spot Market Report also contains forward prices—the

3    price at which a seller delivers an asset, consisting of spot price and associated carrying costs—for

4    Regular and Premium gasoline.

5        73.    As described above, OPIS obtains its pricing data directly from market participants,

6    who submit their trading info to OPIS, which then derives a spot price by aggregating reported

7    trading data. Thus, voluntarily reported trading data plays a critical role in dictating OPIS-reported

8    daily spot prices.

9        74.    On a daily basis, there are usually many more Regular gasoline trades than Premium

10   gasoline trades listed in the Spot Market Report. For example, there could be five, ten, fifteen, or

11   more Regular gasoline trades reported on one day compared to one or no Premium gasoline trades.

12   Because trading in Premium gasoline is less common than trading in Regular gasoline, a single

13   Premium gasoline trade that is reported to OPIS generally has a larger impact on the spot market

14   price of gasoline than a single trade of Regular gasoline.

15       75.    Moreover, as OPIS explains on its website, "[t]he spot market is a critical link in

16   the price influence chain because it sets the basis for cost-plus formula deals between suppliers and

17   end users. It also forms the rationale for wholesale fuel price moves every day at 6 p.m. at wholesale

18   racks across the U.S.—which then impacts price increases or decreases at the retail pump."[27]

19       76.    Hence, retail prices paid to gas stations for refined gasoline flow directly from the

20   rack price, with federal, state, and local taxes, as well as an additional margin, built in. And,

21   because retail prices are directly linked to the rack price, which fluctuates based on the spot price,

22   the spot price of refined gasoline determines the price paid by consumers at the pump.

---

[27] https://www.opisnet.com/product/pricing/spot/.

18

77.     OPIS visually depicts the "price influence chain" between spot prices and the retail prices paid by California consumers as follows:[28]



### The Fuel Price Influence Chain

**NYMEX**
Paper market, influenced by big-scale regional and international factors.

**SPOT MARKET**
Physical market, high volume, located at refinery hubs. Reacts to NYMEX and regional supply news.

**RACK MARKET**
Smaller volume market, often located off a pipeline. Follows spot market direction, changing at 6pm each day.

**RETAIL MARKET**
Street price for gasoline and diesel. Follows rack pricing, though reaction time is usually two/three days later.

© OPIS, an IHS Markit company

## C.   GASOLINE SPOT MARKET TRADING IN CALIFORNIA BY VITOL AND SK

### 1.   Vitol

78.     During the relevant period, Vitol was an active participant in trading gasoline in California. Vitol bought and sold spot market contracts for various types of fuel products, including Regular and Premium gasoline. Vitol also traded RBOB Futures on the NYMEX on a regular basis.

79.     Vitol imported gasoline and gasoline blending components (such as alkylate) into California.

80.     Lucas held the title "USWC Trader." He was the primary trader at Vitol with responsibility for trading gasoline and gasoline blending components that were delivered via pipeline within California.

81.     Lucas reported to John Addison ("Addison"), a Vitol executive who in turn reported to the President of Vitol Americas. In addition to supervising Lucas, Addison had trading responsibility that included trading gasoline and gasoline blending components that were primarily delivered via marine vessels to locations along the West Coast, including in California.

[28] *See* http://blog.opisnet.com/spot-fuel-markets-made-simple.

19

82.     Vitol employees were issued a "Trading Compliance Manual For Vitol Group Employees Located or Operating in The United States," including one that was dated January 2015 (the "Vitol Compliance Manual"). All Vitol employees were required to read and familiarize themselves with the Vitol Compliance Manual. Section IV of the Vitol Compliance Manual discussed various types of "expressly prohibited" conduct.

83.     Section IV of the Vitol Compliance Manual listed "Leveraged/Loss-Leader Trading" as prohibited conduct:

> Uneconomic trading (*i.e.*, trades that, when viewed in isolation, appear to lack economic sense) is a red flag for regulators and may be alleged to evidence an intent to manipulate prices in order to reap more substantial profits on other market positions. Again, "uneconomic trading" is often described as a willingness to take losses on a transaction in one product or market in order to benefit a transaction or position in another product or market.

The prohibited conduct in Section IV of the Vitol Compliance Manual also included "Prearranged or Wash Trading." The Vitol Compliance Manual described this conduct as follows: "[g]enerally, a wash trade is a prearranged, round-turn transaction executed to avoid taking a bona fide position in the market and/or the risk of price competition."

**2.     SK**

84.     During the relevant period, SK was an active participant in trading gasoline in California. SK Energy bought and sold spot market contracts for various types of fuel products, including Regular and Premium. SK also traded RBOB Futures on the NYMEX on a regular basis.

85.     SK imported gasoline and gasoline blending components (such as alkylate) into California.

86.     Defendant Niemann was the senior trader responsible for executing trades on the West Coast, including in California, for SK Energy. Another SK Energy employee, Shelly Mohammed ("Mohammed"), held the role of gasoline scheduler and was Niemann's subordinate.

87.     SK Energy functioned as the California trading arm of SK Trading. While Niemann

20

and Mohammed were nominally employees of Defendant SK Energy, SK's West Coast trading operation was conducted under the continuous and pervasive control and supervision of SK Trading and its subsidiaries, and SK Trading also specifically reviewed and approved key decisions to coordinate trading activities with Vitol.

88.     SK Trading was directly involved in nearly every aspect of Niemann's employment with SK. From the outset, SK Trading approved the decision to hire both Niemann and Mohammed. During his employment, Niemann's reporting chain of command included Namho Kim ("Kim"), SK Trading's Distillate Book Leader, who oversaw global trading. Among other important contact between the two, Kim personally negotiated Niemann's bonus directly with Niemann.

89.     SK Energy's trades were governed by SK Trading's Trading Risk Management Policy. SK Energy could trade only within parameters that were reviewed and approved by SK Trading. SK Trading reviewed and approved business plans submitted by SK Energy detailing trade items, counterparties, and strategies. SK Trading also set SK Energy's position and loss limits, and verified trade entries made by SK Energy traders.

90.     SK Trading sent its executives on trips to directly supervise SK Energy's operations, as well as for the purpose of meeting with SK Energy's local business partners or competitors to discuss ongoing business and/or attempt to generate business. For example, in April 2015, Kim traveled to the United States and joined Niemann in a meeting with representatives of Defendant Vitol in Houston, Texas.

91.     As discussed in more detail below, SK Trading also reviewed and approved key decisions to coordinate certain trading activities with Vitol.

92.     Niemann left SK Energy in May of 2017. Mohammed became a Vice-President of the US West Coast Light Products Group of Tauber Oil Co., which trades in gasoline, jet fuel and distillates; Niemann joined her there the following month. Kim continues to work with SK.

**D.      FEDERAL AND STATE LAWS PROHIBIT FRAUDULENT AND DECEPTIVE COMMODITY TRADING**

93.      Spot market trading of gasoline must comply with California's commodities fraud statute. *See* Cal. Corp. Code § 29504. This law makes it illegal to engage in certain fraudulent acts when buying or selling commodity contracts. *See* Cal. Corp. Code §§ 29536(a), (b), (c), (d).

94.      Under section 29536(c), it is unlawful "[t]o willfully engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons." Cal. Corp. Code § 29536(c).

95.      In addition, the federal Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq*. ("CEA"), makes unlawful certain types of "[p]rohibited transactions." 7 U.S.C. § 6c. More specifically, the CEA prohibits any transaction that "is, of the character of, or commonly known to the trade as, a 'wash sale' or 'accommodation trade.'" 7 U.S.C. § 6c(a)(2)(A)(i).

96.      The CEA also prohibits a transaction that "is used to cause any price to be replied, registered, or recorded that is not a true and bona fide price." 7 U.S.C. § 6c(a)(2)(B).

**E.      DEFENDANTS' UNLAWFUL CONDUCT**

**1.      Initial Steps of Coordination Between SK and Vitol**

97.      SK Energy hired Niemann in August 2014, and Niemann immediately began trading gasoline contracts on the California spot market. Before being hired by SK, Niemann held a similar role at Vitol for approximately ten years. Niemann and Lucas worked together at Vitol, and they maintained contact after Niemann was hired by SK Energy. During the Class Period Niemann and Lucas communicated with each other by instant message, emails, and telephone calls and during in-person meetings, including over dinner and drinks.

98.      Starting in or around late October of 2014 or early November of 2014, Vitol and SK reached an agreement to coordinate or cooperate in regard to certain trading activities in the West Coast region of the United States, including California.

99.      In October of 2014, a Vitol executive in Asia wrote an email to Vitol executives in the United States, including Addison and Lucas, with a "wish list" of items that included "looking

to work on CARBOB with SK (Nemo) [Niemann] to USWC [U.S. West Coast] in 2015." This item included the instruction to keep the information "super" private and confidential.

100.    In November of 2014, an SK executive wrote a status report to another SK executive outlining the existence of a so-called "JV" with Vitol and explaining that Vitol wanted to cooperate with SK in the California market. Initially, these joint efforts appear to have only involved Regular gasoline, as SK was not yet trading Premium gasoline or alkylate in California.

101.    Within SK, this arrangement was sometimes referred to as an "alliance" or a "joint venture," but the agreements were not typical for a commercial setting. The so-called "joint venture" was not reduced to writing and it does not appear that legal counsel for either company was involved in approving the terms of the initial arrangement. In fact, Vitol and SK took steps not to reveal the nature of these agreements to other market participants.

102.    When Vitol and SK started cooperating in late 2014, there was ample supply in the California market, and spot market prices for Regular gasoline were at or below the NYMEX price for RBOB for much of November and December of 2014.

103.    In December of 2014, however, there were indications that a significant refinery outage might occur. In mid-December, Lucas sent an instant message to Niemann reporting "XOM [ExxonMobil] shuts hydrocracker for leak." The hydrocracker is a part of a refinery that plays an important role in refining heavier oils into fuels.  The traders treated this leak as good news, as it implied a gasoline supply disruption that could allow their companies to raise prices in tandem. Lucas added, "[h]opefully for a month or two," to which Niemann responded, "or it falls into the FCC and kills both units." Lucas agreed: "[t]hat would be ideal. Probably too much to wish for." Niemann responded: "it's a start at least."

104.    To understand this exchange, it is necessary to understand what an "FCC" is and its importance in the context of the Torrance Refinery and the production of gasoline in California. The acronym "FCC" is shorthand for a "fluid catalytic cracking." An FCC unit is a secondary

refining unit that produces high-value products like alkylate.[29] The FCC is a key part of a refinery complex that produces gasoline and related high-value products like alkylates. The Torrance Refinery's FCC unit was particularly important because it produced a significant portion of the high-octane alkylate produced in California. The alkylate produced at the Torrance Refinery was a key gasoline blending component for Premium gasoline produced in California.

105.    At some point in February of 2015, Lucas and Niemann expanded the coordination to include Premium gasoline. Before this agreement with Lucas, Niemann had not participated in trading Premium gasoline in California. By February of 2015, Niemann was the senior trader for SK with responsibility for California trading, Lucas had the same role with Vitol, and their respective firms were horizontal competitors in the California gasoline market.

## 2.    The Torrance Refinery Explosion And Defendants' Resulting Contracts With ExxonMobil

106.    As described above, during the morning of February 18, 2015, there was a large explosion at the Torrance Refinery then owned by ExxonMobil. The blast occurred in a part of the FCC unit.

107.    The Torrance Refinery was forced to shut down its FCC and to reduce production of gasoline products, including alkylate, as repair efforts began and a federal investigation into the explosion was opened. As a result of this unplanned outage of the FCC at the Torrance Refinery, which persisted until June of 2016, ExxonMobil needed to replace a significant amount of lost gasoline and alkylate production in California.

108.    In the days immediately following the explosion, ExxonMobil turned to gasoline trading firms like Vitol and SK to negotiate the purchase of large quantities of Regular gasoline. ExxonMobil entered into large gasoline contracts for Regular gasoline, first from Vitol, then from SK. These large gasoline contracts, the largest of which exceeded ten million gallons of Regular gasoline, were floating price contracts tied to the OPIS-reported price for such gasoline.

---

[29] *See* https://www.eia.gov/todayinenergy/detail.php?id=9150.

109.    Around the same time, ExxonMobil also negotiated contracts to purchase large quantities of alkylate (a key blending component for Premium), first from Vitol and then, later in 2015, from SK. These large alkylate contracts, some of which also exceeded ten million gallons of alkylate, were floating price contracts and usually tied to the OPIS-reported prices for Premium gasoline.

110.    The EIA confirmed this activity to replace the diminished supply. According to the EIA, after the explosion at the Torrance Refinery, substantial importation of gasoline and related products from Asia occurred: "[f]rom March to July [of 2015], more than 50% of the imported motor gasoline volumes have been classified as 'all other motor gasoline blending components,' indicating that the gasoline material being imported consists mostly of higher octane blending components such as alkylate and reformate, which are then used to make California-grade gasoline."[30] These shipments included shipments from not only South Korea, but also Singapore, where sister companies of SK Energy have substantial production facilities.[31] These shipments into California included ExxonMobil's purchases from Vitol and SK of alkylates, whose prices were tied to OPIS spot prices.

### 3.    Defendants' Manipulation of Spot Gasoline Prices on OPIS

111.    Beginning no later than late February of 2015, Vitol and SK Energy—through Lucas, Niemann, and others—reached agreements with each other and with third parties to raise, fix, maintain and otherwise tamper with the price of refined gasoline in California by manipulating OPIS-reported prices in order to realize supra-competitive profits while limiting genuine market risk. The explosion at the Torrance Refinery served as a cover for their illegal efforts to increase and maintain the price of gasoline in the California spot markets.

112.    Vitol and SK Energy specifically engaged in trades directly or indirectly between

---

[30] https://www.eia.gov/todayinenergy/detail.php?id=23312.

[31] *See* https://www.spglobal.com/platts/en/market-insights/latest-news/oil/031215-feature-us-west-coast-refiners-step-up-gasoline-alkylate-imports-from-asia; https://www.linkedin.com/company/sk-energy-international.

them that were reported to OPIS for the purpose of inflating the OPIS-published price for Regular and Premium gasoline. At times, they used the services of an intermediary broker, and sometimes they transacted directly (bilaterally) with each other.

113.   This conduct was designed to create the illusion of a supply/demand imbalance for refined gasoline and to drive spot market prices to artificial highs during strategic pricing windows.

114.   Many of these transactions were "leveraged" because they involved taking losses on the purchase of smaller quantities of gasoline to increase the profits on the sale of larger quantities of gasoline or alkylates by artificially increasing the OPIS-reported price. While the individual market-moving transactions were often uneconomic, Vitol and/or SK realized a price increase on the larger floating price contracts (the leveraged side) that more than made up for any losses on the smaller loss-leader transactions.

115.   These leveraged/loss-leader transactions could take different forms. One tactic used by Vitol and SK when trading Regular gasoline was to transact the high deal of the day when the deal was reported to OPIS. This tactic had the effect of bidding up the OPIS-reported price, as OPIS reported purchases at increasingly higher prices. Sometimes, this deal was the absolute highest deal of the day; other times, subsequent deals pushed the price even higher. By transacting the high deals, SK and Vitol drove up the average price in the OPIS Spot Market Report and created the impression among other market participants that there was strong demand, including demand at higher than prevailing market prices.

116.   A similar tactic in connection with the trading of Regular gasoline was to transact the first deal of the day at an inflated price during key pricing windows. This involved completing an initial transaction during the early trading hours so that OPIS would report an inflated purchase price to other market participants. An early purchase at an inflated price would signal artificially high demand, thereby discouraging would-be sellers from submitting offers to sell below that price.

117.   Another tactic was to execute a market-spiking trade for Premium gasoline that was reported to OPIS. Compared to Regular, there is far less trading of Premium. On a single day there could be several OPIS-reported transactions for Regular gasoline, but there were many days when

1   OPIS reported no Premium deals at all. Therefore, individual Premium gasoline trades reported to

2   OPIS could have a disproportionate impact on the spot market price. In fact, Premium gasoline

3   trading was so uncommon for SK that SK did not trade Premium gasoline at all in California in

4   2014 and only began doing so in 2015 as part of the coordination with Vitol.

5          118.    As part of the scheme, Vitol and SK engaged in unusual market-spiking trades for

6   Premium gasoline with each other and third parties. These individual trades, while generally

7   uneconomic, could spike the market price of Premium gasoline by ten cents or more on a single

8   day.

9          119.    Vitol and SK engaged in market-spiking trades for Premium gasoline to increase

10  the OPIS-reported price for Premium gasoline during the pricing windows for large sales of

11  alkylate. Alkylate, while a key blending component for Premium gasoline, is not a separately

12  reported commodity on California's spot markets. Consequently, large floating price contracts for

13  alkylate were most commonly tied, with a small differential, to the OPIS-reported price for

14  Premium gasoline during the associated pricing window.

15         120.    Thus, to realize supra-competitive profits on alkylate contracts, Vitol and SK

16  worked together to inflate the price of Premium gasoline during key pricing periods. And Vitol and

17  SK also worked to inflate the price of Regular gasoline to advantage floating-price contracts for

18  alkylate, because those contracts were directly tied to the price of Regular gasoline or as part of a

19  strategy to increase prices of both Regular gasoline and Premium gasoline, which often rise in

20  tandem.

21         121.    For example, Defendants traded Regular gasoline contracts directly or indirectly

22  with each other at artificially high prices early in the trading day so that OPIS would report an

23  artificially inflated purchase price to other market participants. An early purchase during a strategic

24  trading window at an inflated price signals a supply/demand imbalance to the market and thereby

25  artificially inflates spot market prices.

26              **4.    Defendants' Use of Facilitating Trades**

27         122.    In another component of the scheme, Vitol and SK executed facilitating trades that

27

were related to the OPIS-reported transactions referenced above. These trades were designed to hide or disguise their conduct, to limit or eliminate bona fide market risk on the reported trades, and to share their anticompetitive profits with each other. These secondary trades were executed at the same time, before, or after the OPIS-reported trades.

123.    Facilitating trades could be executed at the same time, before, or after the OPIS-reported trades. Vitol and SK executed these facilitating trades with each other and with third parties.

124.    For example, Vitol and SK conducted a second trade that was in the opposite direction of the OPIS-reported trade. This type of round-trip or round-turn facilitating trade, sometimes called a "wash" trade,[32] effectively negated the volume of gasoline purportedly exchanged in the OPIS-reported trade. The facilitating trade was often not reported to OPIS, as a means of hiding the manipulative nature of the reported trade from OPIS and the wider market. The second trade ensured that no gasoline would actually change hands as a result of the OPIS-reported trade that inflated the price reported in the Spot Market Report. By moving in the opposite direction of the reported trade, the facilitating transaction ensured that there was little or no market risk associated with the reported transaction.

125.    Many of the facilitating trades—sometimes called "accommodation" or "prearranged" trades—appear to have been pre-planned. The facilitating trade often had the effect of locking in a loss while also limiting the total exposure that Vitol or SK faced as a result of the reported transactions. The facilitating trades could occur before or after the reported trade.

126.    For instance, prior to a pricing window, Vitol and/or SK took preplanned "short" positions, ensuring that they would need to buy during the pricing window. As a result, when Vitol

---

[32] The CME Group defines a "wash trade" as follows: "A wash trade is a form of *fictitious trade* in which a transaction or a series of transactions give the appearance that authentic purchases and sales have been made, but where the trades have been entered without the intent to take a *bona fide market position* or without the intent to execute bona fide transactions subject to *market risk or price competition*." https://www.cmegroup.com/education/courses/market-regulation/wash-trades/definition-of-a-wash-trade.html (emphases in original).

1   and SK went on buying sprees that pushed up the OPIS-reported prices during the pricing windows,

2   it appeared to other participants that there was an increase in demand when, in fact, the demand

3   was pre-planned and artificial.

4        127.    Another facilitating tactic was to engage in unreported trades as a means of sharing

5   profits from the scheme. In this way, Vitol and SK entered into prearranged buy and sell contracts

6   with each other as a means of transferring money rather than actual gasoline. These contracts often

7   deviated from the prevailing market price and were uneconomic.

8        128.    As a further means of sharing profits and aligning incentives to artificially increase

9   the market price, Vitol and SK entered into contracts with each other designed to share in the supra-

10   competitive profits earned from manipulating the floating price contracts. In one example, Vitol

11   entered into a contract with SK to share the profits derived from its floating price contract with

12   ExxonMobil, and a few days later, SK did the same with Vitol. By moving in the opposite direction

13   of the reported trade, the secondary transaction ensured that Defendants' acts in furtherance of their

14   scheme carried little or no market risk.

15         **5.**      **Defendants' Manipulative Practices Were the Product of Secret**

16                 **Agreements**

17        129.    As alleged above, while engaging in their scheme, Vitol and SK entered into covert

18   agreements to share profits. Within SK, these agreements were sometimes referred to as an

19   "alliance" or "joint ventures." Vitol and SK took steps not to reveal the nature of these agreements

20   to other market participants.

21        130.    The coordination between Vitol and SK began with Regular gasoline in late 2014

22   and expanded to include Premium gasoline in February of 2015.

23        131.    In April of 2015, Vitol and SK held an in-person meeting in Houston, Texas. Lucas

24   was among the attendees for Vitol, and Kim and Niemann were among the attendees for SK.

25        132.    At some point in mid-to-late 2015, Vitol and SK expanded their so-called "JVs" to

26   include alkylate cargoes. Under this arrangement, Vitol or SK would import a cargo, and Vitol and

27   SK would work together to boost the profits from selling the alkylate while concealing the

1    cooperation.

2          133.    The agreement was apparently at the outset a verbal agreement only. In September

3    of 2015, Lucas sent an email seeking confirmation of the agreement. "Yes agreed never sent

4    anything before as didn't think you wanted me to do that," replied Niemann.

5          134.    The agreement to share the profits reaped from the alkylate cargoes was central to

6    Defendants' scheme. As discussed above, Vitol and SK engaged in market-spiking trades during

7    the pricing windows for large sales of alkylate. Hence, when Vitol and SK shared the profits from

8    the alkylate cargoes, this aligned their incentives to inflate the OPIS-reported prices during the

9    pricing window for that alkylate.

10          135.    In June of 2016, this coordination was ongoing, as were the efforts to keep it covert.

11   In an internal email that Addison sent to other Vitol executives, including Lucas, Addison wrote

12   regarding an alkylate cargo with SK: "we JV the back side no one knows this so P&C [private &

13   confidential]…."

14          136.    While the so-called "joint venture" agreements were being reached, SK and Vitol

15   engaged in the trading manipulation described above to benefit their common interest. Therefore,

16   while it may have appeared to market participants that Vitol and SK were competitors, in fact the

17   two companies were working together.

18          137.    As part of this coordination, Vitol and SK entered into a large number of pre-

19   planned trades that diverged from prevailing market prices. For the duration of the scheme, Lucas

20   of Vitol and Niemann of SK had the opportunity to coordinate with each other and reach

21   agreements through multiple means of communications, including instant messaging, emails, and

22   telephone calls, as well as in-person meetings, dinners, and drinks.

23          138.    The agreements to coordinate Regular and Premium gasoline trading and to share

24   the profits from alkylate cargoes eliminated competition between Vitol and SK for those products.

25   Despite the terminology used, the "joint ventures" were effectively a sham or pretext for unlawful

26   cooperation and were a method of engaging in prearranged transactions in restraint of trade to

27   avoid competition in violation of federal and state antitrust laws. Use of the term "joint venture"

30

to characterize an agreement by competitors to manipulate prices will not avoid *per se* liability under federal and state antitrust laws.

139.    Here, the agreements were formed in secret, documented only after they had already taken effect, and lacked other indicators of a *bona fide* joint venture agreement. Notably: (1) neither SK nor Vitol publicized the conduct here as "joint ventures," as they had in the past;[33] and (2) neither SK nor Vitol submitted a "business review letter" to the United States Department of Justice as it encourages for the purpose of vetting a proposed joint venture.[34]

140.    During the Class Period, Defendants' illegal conduct generated millions of dollars of profits for them each month, and Lucas and Niemann also financially benefitted as a result of their conduct.

---

[33] Examples of Vitol press releases on joint ventures in other markets (including those with SK) can be found at: https://www.vitol.com/vitol-and-enh-announce-the-launch-of-enh-energy-trading/;
https://www.vitol.com/vitol-tank-terminals-international-b-v-enters-a-joint-venture-agreement-with-misc-berhad/;
https://www.vitol.com/vitol-joint-venture-starts-production-in-the-philippines/;
https://www.vitol.com/nidogas-company-limited-and-vitol-agree-to-form-a-joint-venture-partnership-to-create-the-nations-premier-gas-companynavgas/. Examples of press releases on various joint ventures involving SK entities (including those with Vitol) issued by SK or others can be found at: https://m-en.yna.co.kr/view/AEN20191129004500320;
https://www.power-technology.com/news/sunrun-sk-es-home-electrification-joint-venture-research/;
https://www.google.com/amp/s/mobile.reuters.com/article/amp/idUSKCN1G70F0;
https://www.google.com/amp/s/markets.businessinsider.com/amp/news/bgbs-sk-e-s-will-enter-into-joint-ventures-to-scale-up-natural-gas-business-in-the-prc-1029367202;
https://www.prnewswire.com/news-releases/continental-resources-enters-into-joint-venture-with-sk-es-of-south-korea-to-develop-northwest-cana-woodford-shale-626548828.html;
https://www.google.com/amp/s/mobile.reuters.com/article/amp/idUSTOE66M02C20100723.
[34] 28 C.F.R. § 50.6. *See*
https://www.justice.gov/sites/default/files/atr/legacy/2011/11/03/276833.pdf.

6.      **Defendants' Illegal Conduct Resulted in Artificially High Retail Gasoline Prices**

141.    The price spikes caused by Defendants' illegal conduct were not consistent with prior actual or perceived supply disruptions within California. The following chart, published by Severin Borenstein, chair of the PMAC—which was formed to investigate gasoline pricing in California between late 2014 and the end of 2016—depicts the historically unprecedented change in gasoline pricing in California relative to the United States that was caused by and that lingered as a consequence of Defendants' conduct:[35]



142.    Nor were the spot market price spikes explained by any actual decrease in gasoline production following the Torrance Refinery explosion. As the PMAC's Final Report explained, "Energy Commission staff noted that while the ESP tower and FCCU of the refinery remained

---

[35] *See* https://energyathaas.wordpress.com/2018/02/26/californias-mystery-gasoline-surcharge-continues/.

off-line until June 2016, the refinery could still create finished gasoline from processed blending components, some of which may be imported."[36]

143.    In fact, the PMAC demonstrated that overall gasoline production in California was well within the historical five-year production band immediately following the Torrance Refinery explosion and for the remainder of 2015, as depicted in the following chart:[37]



**Figure 5: 2015 California Production and Inventory Figures**

144.    The Defendants' spot price manipulation, which was in full swing no later than February of 2015, impacted CARBOB spot prices in both San Francisco and Los Angeles, whose markets move in tandem.[38]

145.    As discussed, spot price manipulation increases the price of gasoline at all retailer distribution outlets, whether they supply branded or unbranded (*i.e.*, gas sold by retail discounters like Arco, Safeway, and Costco) gasoline. As shown below, the PMAC demonstrated that prices

---

[36] *See* https://efiling.energy.ca.gov/GetDocument.aspx?tn=221306&DocumentContentId=22709 at p.12.

[37] *Id*.

[38] *See* https://www.energy.ca.gov/sites/default/files/2019-05/Data_on_California_Gasoline_Price_Margins.pdf, at p.5.

for branded and unbranded gasoline move in tandem, with branded pricing slightly above unbranded pricing.[39]



**Figure 15: Average Retail California Regular Gasoline Prices by Branded and Unbranded Retail Sectors, 2007 to 2016**

Source: California Energy Commission analysis of OPIS information

146.    Historically, California gasoline prices have hovered at around 30 cents a gallon more than the national average. When there have been similar refinery incidents, such as the August 2012 fire at Chevron's refinery in Richmond, California, gas prices in California returned to their normal relationship with the United States national average within about four months. After the Torrance Refinery accident in February of 2015, California gas prices remained at levels substantially above the historic average through 2015 and 2016 and into 2017.

147.    The chart below, taken from the PMAC's final report, and in particular the purple line at the bottom, shows a significantly higher differential between California and other United States gasoline prices during the period of Defendants' conspiracy (a period in which Brent crude

---

[39] *See* https://efiling.energy.ca.gov/GetDocument.aspx?tn=221306&DocumentContentId=22709 at p.29.

oil spot prices were declining).[40]



Source: U.S. Energy Information Administration

148.    No retailer in the State of California was spared cost increases caused by Defendants' misconduct, and empirical research demonstrates what industry participants have long known: that upstream wholesale price increases are quickly passed on to consumers. Jeffrey Karrenbock ("Karrenbock"), an economist at the Federal Reserve Bank of St. Louis, visually depicted this phenomenon in the following chart:[41]

---

[40]*Id*. at p.10.

[41] *See* Jeffrey D. Karrenbock, "The behavior of retail gasoline prices: symmetric or not?" Federal Reserve Bank of St. Louis Review (July/Aug. 1991), p.23, available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.199.7107&rep=rep1&type=pdf.

# Figure 2
## U.S. Average Retail and Wholesale Gasoline Prices[1]



[1] Retail prices include federal and state tax.

149.   Karrenbock demonstrated econometrically that, while the downstream effects of wholesale price declines tended to lag, wholesale price increases were *immediately passed through to retail gasoline prices*. He graphed his results as follows:[42]

---

[42] *Id*. at 28.



Figure 3
**Asymmetry in the Pattern of Retail Price Response**
(Estimated Coefficients for Equation 4)

150.    Karrenbock's analysis has been largely reiterated in later reports.[43]

151.    The connection between wholesale and retail gasoline prices remains just as strong, as explained above in the quotation from the OPIS website.

152.    Defendants' repeated and pervasive manipulation of the spot market price caused retail gasoline prices to be higher throughout the Class Period.

---

[43] *See, e.g.*, 2018 United States Bureau of Labor Statistics report, available at https://www.bls.gov/opub/mlr/2018/article/crude-petroleum-prices-and-retail-fuel-margins-an-empirical-examination.htm; 2014 report by the Federal Reserve Bank of St. Louis (https://www.stlouisfed.org/publications/regional-economist/october-2014/rockets-and-feathers-why-dont-gasoline-prices-always-move-in-sync-with-oil-prices); and 2010 report by the Bureau of Economics of the Federal Trade Commission (https://www.ftc.gov/sites/default/files/documents/reports/asymmetric-pass-through-u.s.gasoline-prices/wp302_0.pdf).

153.     Defendants' gains came at the expense of consumers throughout California, who use 40 million gallons of gasoline per day. California is the third largest gasoline market in the world, behind the United States as a whole and China.[44]

154.     The markets connected with retail purchases of gasoline in California are oligopolistic in nature. By interfering with competitive price-setting in the impacted markets, Defendants' unlawful agreements served to increase the prices not only of the gasoline products they sold but those of all other market participants.

155.     The PMAC concluded that Californians may have paid at least $12 billion in extra gasoline costs due to the "unexplained differential" since the 2015 Torrance Refinery explosion.

156.     The PMAC concluded its study of the California gasoline market by noting that "Californians continue to pay more than $3 billion per year for gasoline above the levels that could be explained by standard cost analysis."[45]

157.     As demonstrated by the filing of the AG Complaint against the Defendants on May 4, 2020, Senior Assistant Attorney General Kathleen Foote ("Foote") and her team of antitrust attorneys conducted a non-public investigation into the causes of gasoline prices following the Torrance Refinery explosion and uncovered secret evidence that Defendants illegally colluded with each other and third parties to increase the price of gasoline to levels above what competition would have allowed.

## VIII.   TOLLING OF THE STATUTES OF LIMITATIONS

158.     Class member purchases of gasoline within four years prior to the filing of this Complaint are not barred by the applicable four-year statutes of limitations; the statutes are not required to be tolled for these claims to be actionable.

159.     Plaintiffs and the Class did not know and could not have known of Defendants'

---

[44] *See* https://www.forbes.com/sites/judeclemente/2015/03/22/why-are-californias-gasoline-prices-always-higher/#2cfa0b4321ff.

[45] *See* https://efiling.energy.ca.gov/GetDocument.aspx?tn=221306&DocumentContentId=22709 at p.33.

illegal conduct until the AG filed its complaint against Defendants in May of 2020. Before then, Plaintiffs and the Class had neither actual nor constructive knowledge, and no reason to believe, that they paid prices for gasoline that were affected by Defendants' illegal conduct, and thus until then had no duty to investigate the claims set forth in this Consolidated Complaint.

160.    Defendants' secret agreements were inherently self-concealing and were further concealed by Defendants, as previously described in this Consolidated Complaint.

161.    Moreover, Defendants engaged in public affirmative acts that were designed to mislead and conceal their illegal conduct. For example, Vitol's Lucas affirmatively misled the CEC about the true cause of high prices for gasoline that persisted after the Torrance Refinery explosion of February 2015. On August 16, 2016, he told the PMAC and Foote that high gasoline prices were caused by a lack of transparency by ExxonMobil, rather than by Defendants' illegal manipulation of spot market prices. Lucas stated:

> [L]ast year we brought in quite a few cargos into L.A., both alkaloid [phonetic] and finish CARBOB that went through Kinder Morgan's system and sold direct to Exxon and some other refiners. You know, one of the big things that this whole conversation has entailed is about the high prices. One of the reasons why, in my opinion, was the lack of transparency with what was going on with Torrance. Because if you remember when it first blew up back in February, there was like an eternal rolling one-month period where they were going to get back up and running. And they kept saying next month, next month, next month. So the trading companies in general, it takes four to five weeks to ship a cargo out, if Exxon is coming back up they're not going to ship into closed ARB. So because there was no real timeline of when Exxon was going to come back up and running, we would generally not—you don't put cargos on the water and ship them to the West Coast just on a punt, basically, hoping that you can sell them when they get there. That's what happened with that one cargo that was done by another trading company who sent it out there, at which point in time the market had collapsed, and so he was unable to sell it, and so he sailed it away again. So that's what happened with that one. So if there was more transparency with what was going on with refinery maintenance, when it was going to come back up, it would have allowed us to see . . . if we were going to be able to land these cargos and actually into a competitive market. If Exxon is back up and running the market is going to fall dramatically. So basically kind of that lack of information kept cargos at bay. There were still a lot shipped into the West Coast, but not as many as could have been or would have been done. If we had actually

known that Exxon was going to be down for over a year there would have been a much bigger import play over that time frame.[46]

162.    ExxonMobil responded that Lucas's allegation of "lack of transparency" was without foundation.[47]

163.    SK and its subsidiaries, including SK Trading and SK Energy, falsely represent in their Code of Ethics that they would "comply with the local laws . . . of the communities in which we engage in business."[48]

164.    Vitol's Code of Conduct falsely represents that its employees were expected to "comply with relevant laws and regulations."[49]

165.    Despite a multi-year investigation of California petroleum markets by the PMAC, the advisory committee ultimately determined that it was unable "to reach clear conclusions about the cause of elevated California gasoline prices" during the period from November 2014 to December 2016.[50] Accordingly, any investigation by ordinary class members—had they been on notice to conduct one (which they were not)—to uncover anticompetitive conduct by Defendants would have been futile.

166.    Defendants repeatedly misled OPIS about the true nature of their trading activities by reporting artificially high spot trades directly or indirectly between them but concealing the existence of offsetting wash trades greatly limiting market risk in the primary trade.

167.    Additionally, the AG, as representative of the people of the State of California, obtained tolling agreements with Defendants, and these agreements are applicable, in whole or part, to the claims of Plaintiffs and the Class. These tolling agreements have effective dates of

---

[46] *See* https://efiling.energy.ca.gov/getdocument.aspx?tn=213016, Aug. 16, 2016 Meeting Tr. at 129:24–131:10.

[47] *See* https://www.businessinsider.com/r-exxon-mobil-defends-handling-of-torrance-refinery-outage-2016-8.

[48] *See* http://eng.skinnovation.com/company/ethics.asp.

[49] *See* https://3wy4t48t53n2zjure2oko7k3-wpengine.netdna-ssl.com/wp-content/uploads/2020/08/Vitol-Code-of-Conduct_July20-update.pdf, at p.8.

[50] *See* https://efiling.energy.ca.gov/GetDocument.aspx?tn=221306&DocumentContentId=22709 at p.32.

August 3, 2018, and March 8, 2019, respectively. Defendants and the AG subsequently executed additional tolling agreements to extend the termination dates of the tolling periods specified in the original agreements. These termination dates have not passed as of the filing of this Consolidated Complaint.

168.     Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiffs and the Class, the four-year statutes of limitations governing claims under the Sherman Act, the Cartwright Act, and the UCL were tolled at least until May 4, 2020 pursuant to the injury-discovery rule and the doctrine of fraudulent concealment, and by virtue of express tolling agreements between the AG and Defendants.

## IX.   CLAIMS FOR RELIEF

### COUNT ONE

### Violation of the Sherman Act

### (15 U.S.C. § 1—Injunctive Relief Only)

### (Against All Defendants)

169.     Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as though fully set forth herein.

170.     Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially restraining competition with respect to the price of gasoline within the State of California.

171.     Defendants' activities constitute a *per se* violation of Section 1 of the Sherman Act.

172.     Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiffs and members of the Class by restraining competition and thereby raising, maintaining and/or stabilizing the price of gasoline at levels above what would have occurred if competition had prevailed.

173.     Plaintiffs and members of the Class have no adequate remedy at law. Defendants continue to assert that their conduct was legitimate and the fact that the conduct alleged may have

ceased at some point does not mean that Defendants will not engage in similar types of manipulation in the future. Defendant Lucas continues to be employed by Vitol, despite the allegations herein (also made in the AG Complaint), and, further, as noted above, Vitol and SK are known recidivist antitrust violators.

174. For this conduct, Plaintiffs and members of the Class are entitled to injunctive relief pursuant to 15 U.S.C. § 26.

**COUNT TWO**

**Violation of the Cartwright Act**

**(California Business and Professions Code §§ 16720 *et seq.*)**

**(Against All Defendants)**

175. Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

176. Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of the Cartwright Act, California Business and Professions Code §§ 16720 *et seq.*, by artificially restraining competition with respect to the price of gasoline within the State of California.

177. Defendants' activities constitute *per se* violations of the Cartwright Act.

178. Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiffs and members of the Class by restraining competition and thereby raising, maintaining and/or stabilizing the prices of gasoline at levels above those that would have prevailed in a competitive market. Defendants' conduct restrained trade in the market in which Plaintiffs and members of the Class made their purchases. In paying overcharges as a result of Defendants' conduct, Plaintiffs and members of the Class suffered an injury of a type which the antitrust laws were designed to redress.

179. For this conduct, Plaintiffs and members of the Class are entitled to treble damages and injunctive relief pursuant to California Business and Professions Code § 16750(a).

**COUNT THREE**

**Violation of the Unfair Competition Law**

**(California Business and Professions Code §§ 17200 *et seq.*)**

**(Against All Defendants)**

180.     Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

181.     Defendants committed acts of unfair competition, as described above, in violation of the UCL.

182.     Defendants' conduct constitutes an "unlawful" business practice within the meaning of the UCL, and includes, without limitation, engaging in wash sales and otherwise manipulating the benchmark prices reported on the California gasoline spot market in violation of California Corporations Code §§ 29535, 29536, 29537, 29538) and the federal CEA (7 U.S.C. §§ 1 *et seq.*).

183.     Defendants' conduct separately constitutes "unfair" business practices within the meaning of the UCL because Defendants' practices are unscrupulous, unethical, and substantially injurious to the Plaintiffs and the members of the Class, are not outweighed by any utility from the practices, and were not "reasonably avoidable" by Plaintiffs and the members of the Class. Any purported benefits arising out of Defendants' conduct do not outweigh the harms caused to the victims of Defendants' conduct.

184.     Defendants' conduct, as alleged herein, is and was contrary to California public policy and numerous legislatively declared policies, including those set forth in the California Corporations Code and the CEA, and it also threatened an incipient violation of the Cartwright and Sherman Acts. Defendants' conduct contravenes the spirit and purpose of each of these statutes and further threatens an incipient violation of these laws, with both an actual and a threatened adverse impact on competition.

185.     Defendants' conduct, as described above, also constitutes a "fraudulent" business practice violative of the UCL. Defendants' trading activity on the California gasoline spot market,

as alleged herein, fraudulently raised the price of gasoline above the competitive level through fictitious "wash" trades and other manipulative conduct that did not shift economic risk for the transaction to an arm's length counterparty. This conduct was designed to—and did—deceive other market participants about the true supply and demand situation for gasoline for the purpose of artificially increasing the price of gasoline in California.

186.   Plaintiffs and the members of the Class have suffered injury in fact and have lost money as a result of Defendants' UCL violations in that they paid more for gasoline than its fair value would have allowed in a competitive market. At a minimum, to the extent the Court ultimately deems inadequate the remedies at law that Plaintiffs request, Plaintiffs and members of the Class are entitled to equitable relief such as restitution and injunctive relief pursuant to California Business and Professions Code § 17203.

**COUNT FOUR**

**Unjust Enrichment**

**(Against All Defendants)**

187.   Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

188.   As alleged herein, Defendants obtained money and profits that unjustly enriched themselves at the expense of the Plaintiffs and the members of the Class, and otherwise obtained financial benefits that they would not have otherwise obtained had they acted in a fair and just manner.

189.   Defendants' conduct was wrongful, knowing, and conscious.

190.   Plaintiffs and the members of the Class have suffered injury in fact and have lost money as a result of Defendants' unjust conduct in that they paid more for gasoline than its fair value would have allowed in a competitive market. Plaintiffs and the members of the Class lack an adequate remedy at law with respect to this claim and are entitled to non-restitutionary disgorgement of the financial profits that Defendants obtained as a result of their unjust conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A.  This action may proceed as a class action, with Plaintiffs serving as the Class Representatives and their counsel serving as Class Counsel;

B.  Defendants have contracted, combined and conspired in violation of the Sherman Act and Cartwright Act;

C.  Defendants have violated the UCL by engaging in conduct that constitutes unlawful, unfair, and/or fraudulent business practices;

D.  Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

E.  Plaintiffs and the Class are entitled to recover three-fold damages and/or restitution and/or non-restitutionary disgorgement, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount subject to proof at trial;

F.  Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate;

G.  Plaintiffs and the Class are entitled to injunctive relief suitable to remedy Defendants' past and ongoing restraint of trade, including:

    i.  A judicial determination declaring the rights of Plaintiffs and the Class, and the corresponding responsibilities of Defendants; and

    ii.  Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

45

1

H.    Defendants are to be jointly and severally responsible financially for the costs and

2

expenses of a Court-approved notice program through post and media designed to

3

give immediate notification of this action and their rights to the Class members;

4

I.    Plaintiffs and the Class recover their costs of this suit, including reasonable

5

attorneys' fees as provided by law; and

6

J.    Plaintiffs and the Class receive such other or further relief as may be just and proper.

7

## **JURY TRIAL DEMANDED**

8

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims

9

asserted in this Consolidated Complaint that are so triable.

10

DATED: August 28, 2020

11

12

By: /s/ *Michael P. Lehmann*                      By: /s/ *Dena C. Sharp*
Michael P. Lehmann (SBN 77152)            Dena C. Sharp (SBN 245869)

13

Christopher L. Lebsock (SBN 184546)     Jordan Elias (SBN 228731)
Samantha J. Stein (SBN 302034)             Adam E. Polk (SBN 273000)

14

HAUSFELD LLP                                       GIRARD SHARP LLP
600 Montgomery St., Suite 3200              601 California Street, Suite 1400

15

San Francisco, CA 94111                         San Francisco, CA 94108
Telephone: (415) 633-1908                       Tel: (415) 981-4800

16

Facsimile: (415) 358-4980                        Fax: (415) 981-4846
mlehmann@hausfeld.com                          dsharp@girardsharp.com

17

clebsock@hausfeld.com                            jelias@girardsharp.com
sstein@hausfeld.com                                apolk@girardsharp.com

18

19

*Interim Co-Lead Class Counsel*                  *Interim Co-Lead Class Counsel*

20

21

Judith A. Zahid (SBN 215418)                  Todd A. Seaver (SBN 271067)
ZELLE LLP                                             BERMAN TABACCO

22

44 Montgomery Street, Suite 3400           44 Montgomery Street, Suite 650
San Francisco, CA 94104                         San Francisco, CA  94104

23

Telephone: (415) 693-0700                       Telephone: (415) 433-3200
Facsimile:  (415) 433-6382

24

jzahid@zelle.com                                     Email: tseaver@bermantabacco.com

25

*Plaintiffs' Executive Committee, Liaison to*
*the California Attorney General's Office*       *Plaintiffs' Executive Committee, Chair*

26

27

1
2
3
4
5
6

Allan Steyer (SBN 100318)
STEYER LOWENTHAL BOODROOKAS
 ALVAREZ & SMITH LLP
235 Pine Street, 15th Floor
San Francisco, California 94104
Telephone: (415) 421-3400
Facsimile: (415) 421-2234
Email: asteyer@steyerlaw.com

*Plaintiffs' Executive Committee*

Lee Albert (admitted *pro hac vice*)
GLANCY PRONGAY & MURRAY LLP
230 Park Avenue, Suite 530
New York, NY 101689
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: lalbert@glancylaw.com

*Plaintiffs' Executive Committee*

7
8
9
10
11
12
13

John Radice (admitted *pro hac vice*)
RADICE LAW FIRM, PC
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com

*Additional Plaintiffs' Counsel*

Peggy Wedgworth (*pro hac vice* to be filed)
MILBERG PHILLIPS GROSSMAN LLP
One Pennsylvania Plaza, Suite 1920
New York, New York 10119
Telephone: 212-594-5300
pwedgworth@milberg.com

*Additional Plaintiffs' Counsel*

14
15
16
17
18
19

Terry Gross (SBN 103878)
GROSS & BELSKY P.C.
201 Spear Street, Suite 1100
San Francisco, CA 94105
Tel: (415) 544-0200
Fax: (415) 544-0201
terry@grossbelsky.com

*Additional Plaintiffs' Counsel*

20
21
22

**ATTESTATION**

23
24
25

   I, Dena C. Sharp, am the ECF User whose ID and password are being used to file this

document.  In compliance with Civil L.R. 5-1(i)(3), I hereby attest that all counsel listed above

have concurred in this filing.

26

*/s/ Dena C. Sharp*

27