Jeffrey M. Davidson (SBN 248620)
Phillip Warren (SBN 89744)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Email:  jdavidson@cov.com
Email:  pwarren@cov.com

Michael E. Martinez (*pro hac vice*)
Lauren Norris Donahue (*pro hac vice*)
**K&L GATES LLP**
70 W. Madison St., Suite 3300
Chicago, Illinois 60602
Telephone:  (312) 372-1121
Email:  michael.martinez@klgates.com
Email:  lauren.donahue@klgates.com

*Attorneys for Defendants SK Energy Americas,
Inc., SK Trading International Co. Ltd., and
David Niemann*

Amanda Bonn (SBN 270891)
Eliza Finley (SBN 301318)
**SUSMAN GODFREY LLP**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
Email:  abonn@susmangodfrey.com
Email:  efinley@susmangodfrey.com

John B. Quinn (SBN 090378)
Steven G. Madison (SBN 101006)
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100
Email:  johnquinn@quinnemanuel.com
Email:  stevemadison@quinnemanuel.com

*Attorneys for Defendant Vitol Inc.
and Brad Lucas*

*Attorneys for Defendant Vitol Inc.*

*[Additional Counsel Listed on Signature Page]*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CALIFORNIA GASOLINE SPOT MARKET ANTITRUST LITIGATION<br><br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Civil Case No. 20-cv-3131-JSC<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:   January 28, 2021<br>Time:  9:00 a.m.<br>Dept:   San Francisco, Courtroom E, 15th Floor<br>Judge:  Hon. Jacqueline S. Corley |

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION TO DISMISS ................................................................ 1

STATEMENT OF ISSUES TO BE DECIDED ........................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .............................................................. 1

I.     INTRODUCTION ............................................................................................................ 1

II.    BACKGROUND ............................................................................................................. 4

     A.    The Torrance Refinery Explosion Caused a Gasoline Shortage and Higher Prices. ................................................................................................................. 4

     B.    Defendants Entered into Joint Ventures to Import Needed Supply into California. ................................................................................................................. 4

     C.    The Complaint's Allegations Against SKEA and Vitol Are Vague and Conclusory. ........................................................................................................ 5

         1.    Alleged Communications Among Defendants ............................................. 5

         2.    Alleged Trading "Tactics" by Defendants .................................................. 6

         3.    Alleged Pricing Impact ............................................................................... 7

III.   STANDARD OF REVIEW ............................................................................................. 7

     A.    Motion to Dismiss........................................................................................... 7

     B.    Substantive Law Governing Plaintiffs' Claims .............................................. 8

         1.    California Cartwright Act (Cal. Bus. & Prof. Code § 16700, *et seq.*) ........ 8

         2.    California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*) ............................................................................................................ 9

         3.    Federal Sherman Act (15 U.S.C. § 1) ........................................................ 9

IV.   ARGUMENT ................................................................................................................ 10

     A.    The Complaint Fails to State an Antitrust Claim........................................... 10

         1.    The Complaint Fails to Allege that Presumptively Procompetitive Joint Ventures to Import Alkylate Are Unlawful. .............................................. 11

         2.    The Complaint Fails to Plead a Conspiracy to Fix Gasoline Prices. ........ 14

         3.    The Complaint Fails to Plead Antitrust Injury and Causation. ................. 20

     B.    Binding Law Forecloses Plaintiffs' UCL Claim............................................ 22

     C.    The Complaint Fails to Adequately Plead the Elements of a UCL Claim............ 23

         1.    The Entire Claim Fails for Lack of Particularity and Notice.................... 23

         2.    The Entire Claim Fails for Lack of Reliance. ........................................... 24

i

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT PURSUANT

Case No. 20-cv-3131

3. The Claim Fails Under the "Unlawful" Prong for the Additional Reason that There Is No Underlying Violation of Law.........................................24

4. The Claim Fails Under the "Unfair" Prong for Additional Reasons. ....... 35

D. Plaintiffs Cannot Sue for Unjust Enrichment. ....................................... 35

E. Plaintiffs Lack Standing to Seek Injunctive Relief............................... 36

F. Plaintiffs' Claims for Injuries Before May 2016 Are Time-Barred. ................... 38

1. The Discovery Rule Does Not Apply to Plaintiffs' Claims..................... 38

2. Plaintiffs Have Not Adequately Alleged Fraudulent Concealment.......... 38

3. Defendants' Tolling Agreements with the California AG Do Not Apply.40

V. CONCLUSION............................................................................................. 40

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aguilar v. Atl. Richfield Co.*,
    25 Cal.4th 826 (2001) ..................................................................................................8, 19

*In re Amaranth Nat. Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008) ........................................................................31

*In re Animation Workers Antitrust Litig.*,
    87 F. Supp. 3d 1195 (N.D. Cal. 2015) ...........................................................38, 39, 40

*Astiana v. Hain Celestial Grp., Inc.*,
    783 F.3d 753 (9th Cir. 2015) ......................................................................................35

*In re Auto. Antitrust Cases I & II*,
    1 Cal. App. 5th 127 (2016) .........................................................................................16

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
    166 F. Supp. 3d 988 (N.D. Cal. 2015) ........................................................................16

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................10, 15, 16, 36

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979)........................................................................................19

*Bona Fide Conglomerate, Inc.* v. *SourceAmerica*,
    691 F. App'x 389 (9th Cir. 2017) ...............................................................................19

*Braman v. The CME Group, Inc.*,
    149 F. Supp. 3d 874 (N.D. Ill. 2015) ....................................................................25, 30

*In re Cal. Bail Bond Antitrust Litig.*,
    No. 19-cv-00717-JST, 2020 WL 3041316 (N.D. Cal. Apr. 13, 2020) ...........................7, 9

*Capital Imaging Assocs. P.C. v. Mohawk Valley Med. Assocs., Inc.*,
    996 F.2d 537 (2d Cir. 1993).........................................................................................20

*Cargill, Inc. v. Hardin*,
    452 F.2d 1154 (8th Cir. 1971) .....................................................................................27

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal.4th 163 (1999) ..................................................................................................24

*Cellular Plus, Inc. v. Super. Ct.*,
    14 Cal. App. 4th 1224 (1993) ......................................................................................20

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

*CFTC v. Choi*,
  No. 08-cv-965-AHM, 2008 WL 5231402 (C.D. Cal. Oct. 21, 2008)................................34

*CFTC v. Co Petro Mktg. Group, Inc.*,
  680 F.2d 573 (9th Cir. 1982) ...............................................................................26, 27

*CFTC v. Enron Corp.*,
  No. 4:03-cv-0909-MH, 2004 WL 594752 (S.D. Tex. Mar. 10, 2004) ...............................30

*CFTC v. Khanna*,
  No. 09-cv-1783-BEN-CAB, 2009 WL 6058659 (S.D. Cal. Dec. 28, 2009) ......................34

*CFTC v. Kraft Foods Grp., Inc.*,
  153 F. Supp. 3d 996 (N.D. Ill. 2015)................................................................................29

*CFTC v. Moncada*,
  31 F. Supp. 3d 614 (S.D.N.Y. 2014)...........................................................................26, 27

*CFTC v. Nat'l Inv. Consultants, Inc.*,
  No. 05-cv-2641-JSW, 2005 WL 2072105 (N.D. Cal. Aug. 26, 2005) ...............................34

*CFTC v. Parnon Energy Inc.*,
  875 F. Supp. 2d 233 (S.D.N.Y. 2012)...............................................................................30

*CFTC v. Schor*,
  478 U.S. 833 (1986)..........................................................................................................32

*CFTC v. Wilson*,
  No. 13-cv-7884-RJS, 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018)................................32

*Chavez v. Whirlpool Corp.*,
  93 Cal. App. 4th 363 (2001) ...............................................................................................8

*Chi. Title Ins. Co. v. Great W. Fin. Corp.*,
  69 Cal.2d 305 (1968) ..........................................................................................................8

*Clayworth v. Pfizer, Inc.*,
  49 Cal.4th 758 (2010) ..........................................................................................................8

*In re Commodity Exch., Inc., Silver Futures & Options Litig.*,
  560 F. App'x 84 (2d Cir. 2014)...................................................................................20, 32

*In re Commodity Exch., Inc., Silver Futures & Options Litig.*,
  No. 11-md-2213-RPP, 2012 WL 6700236 .................................................................30, 31, 32

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984)..........................................................................................................13

*In re Crude Oil Commodity Litig.*,
  No. 06-cv-6677-NRB, 2007 WL 1946553 (S.D.N.Y. June 28, 2007).......................9, 29, 31

iv

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

*Distance Learning Co. v. Maynard*,
  No. 19-cv-03807-KAW, 2020 WL 2995529 (N.D. Cal. June 4, 2020)...............................14

*Doe v. SuccessfulMatch.com*,
  70 F. Supp. 3d 1066 (N.D. Cal. 2014) ..................................................................................24

*Eagle v. Star-Kist Foods, Inc.*,
  812 F.2d 538 (9th Cir. 1987) ...........................................................................................3, 21

*ECD Investor Grp. v. Credit Suisse Int'l*,
  No. 14-cv-8486-VM-SN, 2017 WL 3841872 (S.D.N.Y. Sept. 1, 2017) .......................17, 18

*Eddins v. Redstone*,
  134 Cal. App. 4th 290 (2005) ...............................................................................................16

*Exxon Corp. v. Superior Court*,
  51 Cal. App. 4th 1672 (1997) ...............................................................................................13

*Finney v. Ford Motor Co.*,
  No. 17-cv-06183-JST, 2018 WL 2552266 (N.D. Cal. June 4, 2018) ...................................40

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
  852 F. Supp. 2d 1171 (N.D. Cal. 2012) ..........................................................................10, 18

*Freeman v. San Diego Ass'n of Realtors*,
  77 Cal. App. 4th 171 (1999) ........................................................................................9, 12, 13

*G.H.I.I. v. MTS, Inc.*,
  147 Cal. App. 3d 256 (1983) ...................................................................................................8

*Garrison v. Oracle Corp.*,
  159 F. Supp. 3d 1044 (N.D. Cal. 2016) ....................................................................38, 39, 40

*In re German Auto. Mfrs. Antitrust Litig.*,
  MDL No. 2796 CRB (JSC), 2020 WL 1542373 (N.D. Cal. Mar. 31, 2020).......................13

*Gibson v. Jaguar Land Rover N. Am., LLC*,
  No. 20-cv-00769-CJC, 2020 WL 5492990 (C.D. Cal. Sept. 9, 2020)..................................22

*In re GlenFed, Inc. Sec. Litig.*,
  42 F.3d 1541 (9th Cir. 1994) ...........................................................................................23, 25

*Hadley v. Kellogg Sales Co.*,
  243 F. Supp. 3d 1074 (N.D. Cal. 2017) ...........................................................................23, 35

*Hahn v. Or. Physicians' Serv.*,
  868 F.2d 1022 (9th Cir. 1988) ...............................................................................................13

*California ex rel. Harris v. Safeway, Inc.*,
  651 F.3d 1118 (9th Cir. 2011) ...............................................................................................11

v

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

*Hershey v. Energy Transfer Partners, L.P.*,
    610 F.3d 239 (5th Cir. 2010) ..........................................................................29

*Hexcel Corp. v. Ineos Polymers, Inc.*,
    681 F.3d 1055 (9th Cir. 2012) ........................................................................39

*In re Ind. Farm Bureau Coop. Ass'n, Inc.*,
    CFTC No. 75-14, 1982 WL 30249 (C.F.T.C. Dec. 17, 1982) .........................32

*Ironshore Specialty Ins. Co. v. Everest Ins. Co.*,
    No. 20-cv-01652-AB, 2020 WL 4251371 (C.D. Cal. July 21, 2020) ..............40

*Ixchel Pharma, LLC v. Biogen, Inc.*,
    9 Cal.5th 1130 (2020) ....................................................................................11

*Jones v. Micron Tech. Inc.*,
    400 F. Supp. 3d 897 (N.D. Cal. 2019) .....................................................10, 14

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
    305 F.R.D. 164 (N.D. Cal. 2015) ....................................................10, 36, 38

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ........................................................................23

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ..................................................................10, 18

*Khoury v. Maly's of Cal., Inc.*,
    14 Cal. App. 4th 612 (1993) ...........................................................................9

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal.4th 1134 (2003) .............................................................................35, 36

*In re Late Fee & Over-Limit Fee Litig.*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007) ...........................................................20

*Leist v. Simplot*,
    638 F.2d 283 (2d Cir. 1980) ...........................................................................17

*Lenhoff Enterps., Inc. v. United Talent Agency, Inc.*,
    729 F. App'x 528 (9th Cir. 2018) ...................................................................25

*In re MacBook Keyboard Litig.*,
    No. 5:18-cv-02813-EJD, 2020 WL 6047253 (N.D. Cal. Oct. 13, 2020)..........22

*Madrid v. Perot Sys. Corp.*,
    130 Cal. App. 4th 440 (2005) .........................................................................35

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)...........................................................................11

vi

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

*Marin Cty. Bd. of Realtors, Inc. v. Palsson*,
    16 Cal.3d 920 (1976) ................................................................................11

*Marsh v. Anesthesia Servs. Med. Grp., Inc.*,
    200 Cal. App. 4th 480 (2011) .....................................................8, 9, 14

*Medina v. Microsoft Corp.*,
    No. 14-cv-0143-RS, 2014 WL 4243992 (N.D. Cal. Aug. 25, 2014)...............9, 14

*Mehr v. Fédération Internationale de Football Ass'n*,
    115 F. Supp. 3d 1035 (N.D. Cal. 2015) ...............................................8

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
    521 F.3d 1097 (9th Cir. 2008) ...........................................................7

*Miller v. Pac. Inv. Mgmt. Co. LLC*,
    No. 12-cv-4122-LTS-JCF, 2013 WL 12305507 (S.D.N.Y. Apr. 23, 2013)....................29

*Morgan Stanley Capital Grp. v. Trafigura AG*,
    No. 09-cv-1073-DLC, 2010 WL 2398906 (S.D.N.Y. June 15, 2010)................18

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ........................................16, 19, 20

*In re Nat. Gas Commodity Litig.*,
    358 F. Supp. 2d 336 (S.D.N.Y. 2005).......................................28, 29

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    375 F. Supp. 3d 1058 (N.D. Cal. 2019) ...........................................13

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008) ........................................................36, 37

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ........................................................13

*In re Nifedipine Antitrust Litig.*,
    335 F. Supp 2d 6 (D.D.C. 2004) ....................................................37

*NorthBay Healthcare Grp. - Hosp. Div. v. Blue Shield of Cal.*,
    342 F. Supp. 3d 980 (N.D. Cal. 2018) ...........................................35

*O'Shea v. Littleton*,
    414 U.S. 488 (1974)................................................................36, 37

*In re Optical Disk Drive Antitrust Litig.*,
    No. 10-md-2143-RS, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011)......................18

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
    939 F. Supp. 2d 1002 (N.D. Cal. 2013) ...........................................35

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

*Ozeran v. Jacobs*,
    798 F. App'x 120 (9th Cir. 2020) ............................................................22

*Pac. Recovery Sols. v. United Behavioral Health*,
    No. 20-cv-02249-YGR, 2020 WL 5074315 (N.D. Cal. Aug. 25, 2020) ...........................10

*People v. Martinez*,
    10 Cal. App. 5th 686 (2017) ............................................................34

*Ploss v. Kraft Foods Grp., Inc.*,
    197 F. Supp. 3d 1037 (N.D. Ill. 2016) ............................................................28

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    893 F.3d 1047 (8th Cir. 2018) ............................................................36

*In re Qualcomm Antitrust Litig.*,
    292 F. Supp. 3d 948 (N.D. Cal. 2017) ............................................................8

*Reddy v. CFTC*,
    191 F.3d 109 (2d Cir. 1999)............................................................27

*Reynolds v. Cal. Dental Serv.*,
    200 Cal. App. 3d 590 (1988) ............................................................13

*Rhynes v. Stryker Corp.*,
    No. 10-5619-SC, 2011 WL 2149095 (N.D. Cal. May 31, 2011)............................................................23

*Robinson Helicopter Co. v. Dana Corp.*,
    34 Cal.4th 979 (2004) ............................................................34

*Rose v. Bank of America, N.A.*,
    57 Cal.4th 390 (2013) ............................................................9

*Ross v. Am. Exp. Co.*,
    35 F.Supp.3d 407 (S.D.N.Y. 2014)............................................................19

*In re Rough Rice Commodity Litig.*,
    No. 11-cv-618-JWD, 2012 WL 473091 (N.D. Ill. Feb. 9, 2012) ............................................................30

*Ryan v. Microsoft Corp.*,
    No. 14-cv-04634-LHK, 2015 WL 1738352 (N.D. Cal. Apr. 10, 2015) ............................................................38

*Shersher v. Super. Ct.*,
    154 Cal. App. 4th 1491 (2007) ............................................................35

*Smith v. State Farm Mut. Auto. Ins. Co.*,
    93 Cal. App. 4th 700 (2001) ............................................................11

*Song Fi, Inc. v. Google, Inc.*,
    No. 14-cv-0508-CW, 2016 WL 1298999 (N.D. Cal. Apr. 4, 2016)............................................................8

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

*Sonner v. Premier Nutrition Corp.,*
    971 F.3d 834 (9th Cir. 2020) ...........................................................................22, 35

*In re Soybean Futures Litig.,*
    892 F. Supp. 1025 (N.D. Ill. 1995) ...........................................................................17

*In re Stac Elecs. Sec. Litig.,*
    89 F.3d 1399 (9th Cir. 1996) ...................................................................................23

*Staley v. Gilead Scis., Inc.,*
    446 F. Supp. 3d 578 (N.D. Cal. 2020) ...................................................................8, 12

*Stoller v. CFTC,*
    834 F.2d 262 (2d Cir. 1987) .....................................................................................28

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006) .................................................................................................2, 12

*In re Vaccine Cases,*
    134 Cal. App. 4th 438 (2005) .....................................................................................9

*Volkart Bros., Inc. v. Freeman,*
    311 F.2d 52 (5th Cir. 1962) .....................................................................................32

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.,*
    549 U.S. 312 (2007) ................................................................................................12

*Wilson v. CFTC,*
    322 F.3d 555 (8th Cir. 2003) ...................................................................................27

*In re Zinc Antitrust Litig.,*
    155 F. Supp. 3d 337 (S.D.N.Y. 2016) ....................................................................14

**Statutes**

7 U.S.C. § 1 ............................................................................................................ *passim*

7 U.S.C. § 6c ................................................................................................25, 26, 28, 29

7 U.S.C. § 9 ......................................................................................................................29

15 U.S.C. § 1 .......................................................................................................... *passim*

15 U.S.C. § 26 ..................................................................................................................36

Cal. Bus. & Prof. Code § 16725 ....................................................................................11

Cal. Bus. & Prof. Code §17200 ............................................................................ *passim*

Cal. Bus. & Prof. Code § 16700 *et seq.* ............................................................... *passim*

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

Cal. Corp. Code § 29537 ........................................................................................................33

Cal. Corp. Code § 29538 ........................................................................................................35

Cal. Corp. Code § 29500 *et seq.* ........................................................................................ *passim*

Cal. Corp. Code § 29501 ........................................................................................................35

Cal. Corp. Code § 29503 ........................................................................................................35

Cal. Corp. Code § 29535 ...................................................................................................33, 35

Cal. Corp. Code § 29536 ...................................................................................................33, 34

Cal. Corp. Code § 29537 ........................................................................................................33

**Other Authorities**

Areeda & Hovenkamp, ANTITRUST LAW ...........................................................................11, 13, 16

Dep't of Finance, Enrolled Bill Report AB 4254 (Aug. 31, 1990) ......................................33, 34

Dept' of Corps., Enrolled Bill Report of AB 4254 (Sept. 4, 1990) ...........................................34

Fed. R. Civ. P. 8(a) .........................................................................................................24, 25

Fed. R. Civ. P. 9(b) .............................................................................................................. *passim*

Fed. R. Civ. P. 12(b) ....................................................................................................1, 7, 8, 40

*In re Collins*, Comm. Fut. L. Rep. (CCH) P 22,982, 1986 CFTC LEXIS 661 (C.F.T.C.
    Apr. 4, 1986) ...................................................................................................................27

*In re Collins*, Comm. Fut. L. Rep. (CCH) P 26981, 1997 CFTC LEXIS 66 (C.F.T.C. Mar.
    5, 1997) .......................................................................................................................26, 27

S. Rep. No. 93-1131, 1974 U.S.C.C.A.N. 5843 .....................................................................28

x

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on January 28, 2021, at 9:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Jacqueline S. Corley, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California, Courtroom E, 15th Floor, Defendants SK Energy Americas, Inc.; SK Trading International Co., Ltd.; Vitol Inc.; David Niemann; and Brad Lucas (collectively, "Defendants") will, and hereby do, move pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1) to dismiss Plaintiffs' Consolidated Class Action Complaint ("Complaint" or "CCAC") (ECF 186).[1] The Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Request for Judicial Notice, the arguments of counsel, and such other submissions and material that the Court may consider.

## STATEMENT OF ISSUES TO BE DECIDED

Whether Plaintiffs' Complaint fails to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) and whether Plaintiffs lack standing to seek injunctive relief under Federal Rule of Civil Procedure 12(b)(1).

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.       INTRODUCTION

This action stems from a price increase in California's massive retail gasoline market that followed the devastating February 2015 explosion at ExxonMobil's Torrance refinery. Nearly all the Complaint's factual allegations are sourced from a complaint filed by the California Attorney General in state court ("CAG Complaint"). *See People of the State of California v. Vitol, Inc. et al.*, Case No. CGC20584456 (S.F. Sup. Ct., filed May 4, 2020).

The Complaint opens by providing a logical and benign explanation for rising prices: the Torrance refinery supplied approximately 20% of the gasoline sold in Southern California (and 10% of the statewide supply), and the explosion took the refinery offline for more than a year. (CCAC ¶¶ 3, 56, 106–07.) Diminished supply caused prices to rise. (*Id.* ¶ 9.) But rather than accept this obvious explanation for retail

---

[1] SK Trading International Co., Ltd. is challenging personal jurisdiction via a concurrently-filed Rule 12(b)(2) motion to dismiss.

gasoline price increases, the Complaint fabricates a supposed conspiracy between two individual traders, Defendant Brad Lucas (then employed by Defendant Vitol Inc. ("Vitol")) and Defendant David Niemann (then employed by Defendant SK Energy Americas, Inc. ("SKEA")) in the gasoline spot market. Trades between Vitol and SKEA accounted for *less than 1%* of the total gasoline in California. Yet the Complaint implausibly contends that these traders conspired to manipulate spot-market prices, causing multi-year increases in downstream retail gasoline prices that continued more than a year *after* SKEA permanently stopped trading in the California gasoline market. Plaintiffs allege that Defendants violated the Sherman Act, the Cartwright Act, and California's Unfair Competition Law ("UCL"), and were unjustly enriched.

The Complaint fails to state a claim upon which relief can be granted, for five principal reasons:

*First*, the Complaint fails to identify a *single specific communication* or *single trade* evidencing any conspiracy to manipulate or actual manipulation of even a *single* gasoline price. The Complaint's weak factual content derives from the equally weak CAG Complaint, which also—despite a nearly two-year investigation—does not allege any such specific communication or trade. The Complaint's vague invocation of supposedly manipulative trading "tactics" (CCAC ¶¶ 115–17, 127, 185) falls woefully short of the heightened pleading required for antitrust and manipulation claims.

*Second*, the Complaint's allegations regarding joint ventures between Vitol and SKEA to import gasoline-related products into California are not actionable as a matter of antitrust law or the UCL. The Complaint concedes that, following the refinery explosion and the resulting 10% statewide supply reduction, Vitol and SKEA "immediately . . . negotiated large contracts to supply gasoline and gasoline blending components for delivery in California," at times importing over "ten million gallons" at a time. (*Id.* ¶¶ 5, 107–10.) Although the Complaint asserts these were "sham" joint ventures that constitute *per se* antitrust violations (*id.* ¶ 138), notably missing is any allegation that Defendants' alleged joint importation conduct reduced output or increased prices. To the contrary, the Complaint describes the joint ventures as facially *procompetitive* because they *increased* supply. Joint ventures with those characteristics must be assessed under the "rule of reason," which weighs their costs and benefits. *See, e.g.*, *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006). Plaintiffs cannot—and do not even attempt to—allege a rule of reason claim. Any such claim would require pleading and proving that two trading firms with small market shares somehow

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**
**AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

possessed market power sufficient to restrain market-wide supply over a multi-year period—a hurdle Plaintiffs cannot overcome.

*Third*, the Complaint fails to allege Defendants possessed any ability to impose artificial or supra-competitive prices on the market, or that they actually did. Instead, California's Energy Commission concluded the primary cause of elevated gasoline prices was that California's *retail gasoline outlets* were increasing their margins and charging higher prices than those in other states. *See* Ex. A of Defendants' concurrently-filed Request for Judicial Notice (hereinafter, "RJN") ("The CEC has concluded that the primary cause of the residual price increase [since 2014] is simply that California's retail gasoline outlets are charging higher prices than those in other states."). These alternative explanations for elevated retail gasoline prices following the refinery explosion are compelling and further bolstered by Plaintiffs' allegation that statewide gasoline prices were "still out of whack" in November 2017 (CCAC ¶ 7), almost a year *after* SKEA exited the California gasoline market and stopped trading altogether. The Complaint provides no reason why these obvious facts should be disregarded, nor why a speculative inference of market manipulation by traders who lack market power and do not interface with retail consumers should be entertained. It thus omits the essential requirement that a Sherman Act or Cartwright Act plaintiff plead and prove injuries that directly result from the alleged unlawful conduct, rather than injuries that are secondary, consequential, or remote. *See Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 542 (9th Cir. 1987) (a properly-pleaded antitrust claim must explain why price changes are due to conspiracy rather than those that "may have been produced by independent factors").

*Fourth*, the Complaint's UCL claim is equitable in nature and thus unavailable here, where adequate remedies at law exist. Plaintiffs impermissibly seek the same monetary remedy (measured in terms of purported "overcharges") and cast such relief in mutually exclusive terms as both damages and restitution. Even if a UCL claim were available, the Complaint fails to plead one with the requisite particularity under either of the two "borrowed" statutory schemes, the federal Commodity Exchange Act ("CEA") and the California Commodity Law of 1990 ("CCL").

*Finally*, Plaintiffs cannot pursue a standalone unjust enrichment claim (Count Four) under California law. Plaintiffs' request for injunctive relief under Count One (the only remedy sought under the Sherman Act) likewise fails because the allegedly wrongful conduct ceased in 2016.

3

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

## II.   BACKGROUND

### A.   The Torrance Refinery Explosion Caused a Gasoline Shortage and Higher Prices.

CARBOB is gasoline produced to meet California's emissions standards, the most stringent in the nation. (CCAC ¶ 54.) In February 2015, an explosion at Exxon's Torrance refinery caused a massive supply disruption throughout California. The Torrance refinery produced 20% of all gasoline sold in Southern California and 10% of the statewide supply. (*Id.* ¶ 56.) It also produced "significant quantities of alkylate," a "high-quality gasoline blending component that can be combined with other blendstocks to create Regular and Premium" CARBOB. (*Id.* ¶¶ 56, 69.) The Torrance refinery was non-operational for 15 months, causing a sharp and prolonged shortage of gasoline and blending components. (*Id.* ¶ 107.)

After this unexpected refinery disruption and a reduction of supply, CARBOB prices rose. Alternative supply sources were limited not only because of the CARBOB specifications, but also because the California gasoline market is "geographically isolated from refining hubs in the rest of the United States" and there "are no pipelines that ship finished gasoline products into California." (*Id.* ¶¶ 53–57.) Thus, when local gasoline supply does not meet demand, additional supply must be shipped into the state, which takes several weeks. (*Id.* ¶¶ 53, 57.) As the U.S. Energy Information Administration ("EIA") explained in an article cited in the Complaint:

> Because of its unique product specifications and long distance from international gasoline markets, California specifically, and the West Coast in general, does not typically import much gasoline. As a result, the sudden loss of supply from the Torrance refinery resulted in immediate supply shortfalls and higher wholesale and retail prices. The higher wholesale prices covered the costs of importing more gasoline from distant markets into California to make up for the supply shortfalls.

(RJN, Ex. B.) Consistent with the law of supply and demand, the Torrance outage thus caused prices for gasoline contracts to spike "almost immediately." By February 2015, consumers saw a "historically unprecedented" increase "in gasoline pricing in California relative to the United States." (CCAC ¶ 141.)

### B.   Defendants Entered into Joint Ventures to Import Needed Supply into California.

The Complaint alleges that Vitol and SKEA responded to the shortage by securing replacement supply for the California market, acknowledging the firms acted quickly and "negotiated large contracts to supply gasoline and gasoline blending components for delivery in California," which at times exceeded

---

4

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**
**AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

"more than ten million gallons." (*Id.* ¶ 5.) Some of these transactions were accomplished through joint ventures that spread the risk and operational burdens of fulfilling these contracts. (*Id.* ¶ 132.)

### C.   The Complaint's Allegations Against SKEA and Vitol Are Vague and Conclusory.

The Complaint then contends that, apart from these procompetitive joint efforts to increase supply, SKEA and Vitol also agreed to manipulate prices of CARBOB published by the Oil Price Information Service, or OPIS. (*Id.* ¶ 111.) OPIS is a private company that publishes certain data about spot markets and reports "real-time news" and "a daily West Coast Spot Market Report." (*Id.* ¶ 71.) Notably, reporting trading data to OPIS is voluntary and optional. (*Id.* ¶ 73.)

Spot markets are "physical" markets that involve trades made for actual delivery. (*Id.* ¶¶ 59, 61.) They contrast with "futures" markets, in which commodities trade mostly on a "paper" or financial basis, typically without physical delivery of the underlying commodity. (*Id.* ¶ 61.) The spot market price is just one of multiple factors that influence the price of California gasoline in the wholesale "rack market," which sets the wholesale prices paid when gasoline tanker trucks are filled. (*Id.* ¶¶ 65–66.) SKEA and Vitol are not alleged to have participated in the wholesale or retail markets.

The Complaint alleges SKEA and Vitol agreed to manipulate "the spot market price for refined gasoline and gasoline blending components" during pricing windows for large contracts. (*Id.* ¶ 6.) These contracts were not entered into with the retail consumers represented by Plaintiffs, but with large purchasers, such as ExxonMobil. (*Id.* ¶¶ 108.) Certain gasoline contracts use a "floating price" that is tied to a future OPIS-reported price for such gasoline. (*Id.*) They may specify that, during a date range known as a "pricing window," the price will be set based on a differential from spot prices or prices published by OPIS at that time. The Complaint alleges Defendants "engaged in trades directly or indirectly between them that were reported to OPIS for the purpose of inflating the OPIS-published price for Regular and Premium gasoline" in order to "create the illusion of a supply/demand imbalance for refined gasoline and to drive spot market prices to artificial highs during strategic pricing windows." (*Id.* ¶¶ 112–13.) In fewer words, the Complaint alleges that a seller of spot market gasoline would benefit from a higher price.

### 1.   Alleged Communications Among Defendants

The Complaint does not cite a single communication by SKEA or Vitol evidencing any agreement to manipulate OPIS-reported prices. Instead, as demonstrated below in Section IV(A)(2)(a), it refers to a

5

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

handful of communications (*id.* ¶¶ 99, 100, 133, 135) that relate to joint ventures to import product into California—facially *procompetitive* conduct to increase supply—with no mention of trading or OPIS. The Complaint also refers to an April 2015 meeting in Houston (after the alleged price increases began), but it does not allege the purpose of the meeting or what was discussed. (*Id.* ¶¶ 90, 131.)

## 2. Alleged Trading "Tactics" by Defendants

The Complaint does not identify a single allegedly manipulative trade. Instead, it refers vaguely to certain trading "tactics" that "could take different forms" without explaining how they were allegedly wrongful or even when or how often any such trades occurred. (*Id.* ¶¶ 115.)

<u>OPIS-Reported Trades.</u> The Complaint first alleges that SKEA and Vitol, at unspecified times, engaged in "OPIS-reported" trades that were the "high deal of the day," the "first deal of the day at an inflated price," "unusual" trades, "market-spiking" trades, and "uneconomic" trades. (*Id.* ¶¶ 115–19.) No specifics of any such trades are alleged. Nor does the Complaint explain how these "tactics" wrongfully affected prices at any level of the market.

<u>Facilitating Trades.</u> The Complaint next alleges that SKEA and Vitol would execute trades supposedly "related" to the OPIS-reported transactions, for various purposes. (*Id.* ¶ 122.) The Complaint does not allege when these trades occurred, stating they could be "before or after the reported trade." (*Id.* ¶ 125.) Nor does the Complaint explain why such trades are anything other than lawful hedges or book transfers (as explained in Section IV(A)(2)(b)).

In another "example," the Complaint alleges that "prior to a pricing window, Vitol and/or SK[EA] took preplanned 'short' positions, ensuring that they would need to buy during the pricing window," which would then "push[] up the OPIS-reported prices during the pricing windows . . . ." (*Id.* ¶ 126.) The Complaint does not allege Vitol and SKEA *agreed* to take these short positions, nor that they traded with one another during this "example" trading window. Moreover, taking a short position before a "pricing window" on a long position is a routine and lawful hedging strategy (as explained in Section IV(A)(2)(b)).

<u>Unreported Trades to Share Profits.</u> Finally, the Complaint alleges that SKEA and Vitol would "share the profits [from] the[ir] alkylate cargo[]" joint ventures through "unreported trades." (*Id.* ¶¶ 127–28, 134.) Defendants allegedly did so by entering "prearranged buy and sell contracts with each other as a means of transferring money . . . ." (*Id.* ¶ 127.) The Complaint does not identify any facts that would

6

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

1   indicate that profit- and loss-allocating trades in the context of a joint venture are either unusual or

2   unlawful. Nor does the Complaint allege facts showing how these admittedly *unreported* trades could

3   have affected OPIS-reported prices. To the contrary, any such unreported alkylate trades could not have

4   affected OPIS because "alkylate is not a separately reported commodity on California's spot markets."

5   (*Id.* ¶ 119.)

###    3.    Alleged Pricing Impact

7   The Complaint contends that SKEA and Vitol's conduct "impacted CARBOB spot prices," which

8   then "increase[d] the price of gasoline at all retailer distribution outlets," and that those wholesale "price

9   increases" were then "passed on to consumers." (*Id*. ¶¶ 144–45, 148.) But the Complaint does not identify

10   the allegedly artificial spot prices, or allege when or how often they occurred.

11   The Complaint also fails to allege facts indicating Vitol and SKEA possessed market power to

12   influence the actual, as opposed to reported, price of gasoline in either the spot markets or downstream

13   retail markets through dominant market shares or large trading positions. To the contrary, the Complaint

14   concedes that "[m]ost of the CARBOB consumed in California is produced by refineries located . . . in

15   the San Francisco Bay Area and . . . greater Los Angeles," and that gasoline is sourced from outside

16   California only "[w]hen unexpected disruptions in supply occur." (*Id.* ¶¶ 55, 57.) At best, Plaintiffs allege

17   Defendants transacted unspecified trades for "smaller quantities of gasoline" that influenced the OPIS-

18   reported price on unspecified days. (*Id.* ¶ 114.) The Complaint acknowledges not all spot market

19   transactions are reported to OPIS (*id.* ¶ 73), and not all contracts in the spot market are pegged to the

20   OPIS-reported rate.

## III.    STANDARD OF REVIEW

### A.    Motion to Dismiss

23   A Rule 12(b)(6) motion should be granted "where the complaint lacks a cognizable legal theory

24   or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521

25   F.3d 1097, 1104 (9th Cir. 2008). A complaint "must contain sufficient factual matter, accepted as true, to

26   'state a claim to relief that is plausible on its face.'" *In re Cal. Bail Bond Antitrust Litig.*, No. 19-cv-00717-

27   JST, 2020 WL 3041316, at *5 (N.D. Cal. Apr. 13, 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

28   (2009)). This plausibility standard demands "more than a sheer possibility that a defendant has acted

7

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**
**AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

unlawfully." *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 592 (N.D. Cal. 2020) (quoting *Iqbal*, 556 U.S. at 678). For a Rule 12(b)(6) motion, the Court "accepts factual allegations in the complaint as true," but "need not accept as true allegations contradicted by judicially noticeable facts," and mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948, 963 (N.D. Cal. 2017) (internal citations and quotation marks omitted).

A complaint also will be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction if Article III standing is not alleged for "each form of relief claimed." *Mehr v. Fédération Internationale de Football Ass'n*, 115 F. Supp. 3d 1035, 1055–58 (N.D. Cal. 2015) (dismissing claims for lack of standing). To satisfy Article III standing, a plaintiff must allege (1) an injury-in-fact, (2) fairly traceable to the challenged action of the defendant, and (3) likely to be redressed by a favorable decision. *Id.* at 1055.

**B.     Substantive Law Governing Plaintiffs' Claims**

**1.     California Cartwright Act (Cal. Bus. & Prof. Code § 16700, *et seq.*)**

California's antitrust statute, the Cartwright Act, prohibits combinations or conspiracies that constitute an unreasonable restraint of trade. *Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 493 (2011) (citation omitted). This prohibition is analogous to Section 1 of the federal Sherman Act. *See Aguilar v. Atl. Richfield Co.*, 25 Cal.4th 826, 838–39 (2001). A plaintiff attempting to assert a Cartwright Act claim must plead specifics: "(1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts." *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 373 (2001).

California courts have cautioned against the "dangerous vice inherent" in Cartwright Act claims that are "ambiguous and investigatory in nature," which could lead to a "blanket license to indulge in interrogatories, depositions, and motions to produce ad infinitum, ad nauseam." *Chi. Title Ins. Co. v. Great W. Fin. Corp.*, 69 Cal.2d 305, 326 (1968), *distinguished on other grounds in Clayworth v. Pfizer, Inc.*, 49 Cal.4th 758, 781 n.18 (2010). Accordingly, federal courts follow California courts in demanding "a 'high degree of particularity in the pleading of Cartwright Act violations.'" *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 265 (1983) (citations omitted); *see also Song Fi, Inc. v. Google, Inc.*, No. 14-cv-0508-CW, 2016 WL 1298999, at *6 (N.D. Cal. Apr. 4, 2016) (same). Where the complaint lacks "factual allegations of

8

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

*specific conduct* in furtherance of the conspiracy to eliminate or reduce competition," it fails as a matter of law. *Marsh*, 200 Cal. App. 4th at 493, 499–500 (emphasis added) (citation omitted); *see also Medina v. Microsoft Corp.*, No. 14-cv-0143-RS, 2014 WL 4243992, at *3 (N.D. Cal. Aug. 25, 2014) (requiring a "high degree of particularity" and  "factual allegations of specific conduct directed toward the furtherance of the conspiracy, in more than mere conclusory terms"); *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 196–97 (1999) ("conclusory statement" that competitors used their "market power" to boycott plaintiff was insufficient to survive demurrer).

### 2. California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*)

California's Unfair Competition Law prohibits "unlawful, unfair or fraudulent business act[s] or practice[s]." Cal. Bus. & Prof. Code § 17200. The UCL "'borrows' violations of other laws and treats them as unlawful practices that the UCL makes independently actionable." *Rose v. Bank of America, N.A.*, 57 Cal.4th 390, 396 (2013). If the Complaint fails to state a claim under the borrowed substantive law, the UCL claim necessarily fails as well. *See, e.g.*, *In re Vaccine Cases*, 134 Cal. App. 4th 438, 458–459 (2005).

A UCL claim must allege "with reasonable particularity the facts supporting the statutory elements of the violation." *Khoury v. Maly's of Cal., Inc.*, 14 Cal. App. 4th 612, 619 (1993). Here, Plaintiff's UCL claim is based on three theories: (1) the Cartwright Act, (2) the federal Commodity Exchange Act, and (3) the California Commodity Law of 1990. The alleged CEA manipulation claim sounds in fraud and is therefore subject to a heightened pleading standard. *See, e.g.*, *In re Crude Oil Commodity Litig.*, No. 06-cv-6677-NRB, 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007). The UCL claim is also based on alleged fraud under the CCL. (CCAC ¶¶ 81, 134.)

### 3. Federal Sherman Act (15 U.S.C. § 1)

Like the Cartwright Act, Section 1 of the federal Sherman Act "prohibits any contract, combination, or conspiracy constituting an "unreasonable restraint" of trade. *In re Cal. Bail Bond Antitrust Litig.*, 2020 WL 3041316, at *11 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). To state a claim under Section 1 of the Sherman Act, Plaintiffs "must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain

9

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

trade or commerce among the several States . . . ; (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (citations omitted). The complaint must plead enough factual matter to suggest that such an anticompetitive agreement was made. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Allegations of facts that "could just as easily suggest 'rational, legal business behavior by the defendants as they could suggest an illegal conspiracy' are insufficient to state a claim" under Section 1 of the Sherman Act. *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 914–15 (N.D. Cal. 2019) (quoting *Kendall*, 518 F.3d at 1049).

Plaintiffs "also must show that they were harmed by the defendant's [alleged conduct], and that this harm flowed from an anti-competitive aspect of the practice under scrutiny." *Pac. Recovery Sols. v. United Behavioral Health*, No. 20-cv-02249-YGR, 2020 WL 5074315, at *3 (N.D. Cal. Aug. 25, 2020) (citing *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012)). For injunctive relief, it is insufficient for Plaintiffs to allege only a past injury and the alleged antitrust injury must be "actual or imminent, not conjectural or hypothetical." *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 195 (N.D. Cal. 2015) (internal citations omitted).

## IV.    ARGUMENT

### A.    The Complaint Fails to State an Antitrust Claim.

The Complaint fails to plead a Cartwright Act violation because it does not (1) identify any unlawful agreement between Defendants, nor (2) allege facts plausibly showing that Defendants' conduct in the spot market caused increased retail prices at the pump.

The Cartwright Act prohibits unreasonable restraints of trade between "two or more persons," but does not prohibit "*unilateral* conduct." *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1185 (N.D. Cal. 2012) (quoting *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 198 Cal. App. 4th 1366, 1374, 1386 (2011)). The Complaint identifies two types of agreements between SKEA and Vitol: (1) joint ventures to import gasoline-related products into California in the spot market, and (2) trades for CARBOB and alkylate in the spot market. Plaintiffs attempt to extrapolate from these procompetitive and lawful activities an unlawful conspiracy to manipulate OPIS-reported prices, but the Complaint fails to satisfy the heightened pleading standard for such a claim.

10

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

Moreover, the Complaint fails to plead facts showing antitrust injury and causation. Under the Cartwright Act, the injury must be "traceable to actions in furtherance" of the purpose to restrain trade. *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 722 (2001). But the Complaint fails to plead facts plausibly showing how Defendants—spot market traders who lack market power—could plausibly have caused sustained, elevated prices in the downstream retail market over a multi-year period.

### 1. The Complaint Fails to Allege that Presumptively Procompetitive Joint Ventures to Import Alkylate Are Unlawful.

Only narrow categories of competitive restraints are treated as "*per se*" unlawful, meaning their actual effects need not be analyzed under the "rule of reason." *Per se* condemnation is rare. It applies only where courts have so much experience with the type of competitive restraint that they may confidently deem it illegal without further inquiry. *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1133 (9th Cir. 2011); Areeda & Hovenkamp, ANTITRUST LAW ¶ 1911a ("per se illegality" requires "judicial experience" showing "virtually all restraints in that category . . . reduce output or increase price").

The joint ventures at issue here are not properly subject to *per se* treatment, and thus the Complaint seeks to evade the appropriate rule of reason standard by alleging, in conclusory terms, that SKEA and Vitol's joint importation agreements were "sham" joint ventures that constitute "*per se*" violations of the Cartwright Act (CCAC ¶¶ 101, 138–39). But that analysis applies only to joint ventures that are "manifestly anticompetitive" and "offer[] no reasonable prospect of any efficiency-enhancing benefit to society." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 338 (2d Cir. 2008) (Sotomayor, J., concurring) (citing cases). Indeed, the Cartwright Act itself expressly provides that "[i]t is *not unlawful* to enter into agreements or form associations or combinations . . . *which are in furtherance of trade*." Cal. Bus. & Prof. Code § 16725 (emphasis added).

Courts decline to "mechanically apply[] a per se rule" to the actions of joint venture partners "without any regard to their economic effects or possible justification." *Marin Cty. Bd. of Realtors, Inc. v. Palsson*, 16 Cal.3d 920, 931, 934 (1976). The California Supreme Court instead recently and resoundingly reaffirmed that "[b]usinesses engaged in commerce routinely employ legitimate partnership" arrangements, which "can help businesses leverage complementary capabilities" and "ensure stability in supply or demand . . . ." *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal.5th 1130, 1160–61 (2020).

Accordingly, potentially "procompetitive" arrangements such as joint ventures must be judged under the "rule of reason." *Id.* at 1161. The same is true for claims under Section 1 of the Sherman Act. *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 595 (N.D. Cal. 2020) (citing *Texaco Inc. v. Dagher*, 547 U.S. 1, 6–7, 6 n.1 (2006) (holding that a joint venture to sell gasoline in California was not "*per se* unlawful" and that plaintiff "should have challenged it pursuant to the rule of reason")).

That is precisely the case here. Unlike *per se* antitrust violations, Defendants' joint ventures to import alkylate during a supply disruption admittedly *increased output* and thereby tended to *reduce prices*—mitigating the consequences of a severe supply disruption. *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 324 (2007) ("increases in output generally result in lower prices to consumers"). Such joint ventures that "provide[d]" additional "product" are not even potentially unlawful unless the parties "(1) acting separately had or could have provided this product in competition with each other, or (2) had separate interests that were diverse from or antithetical to the interests of [the joint venture] in providing" the additional product. *Freeman*, 77 Cal. App. 4th at 192.

But the Complaint never alleges that any Defendant had the risk tolerance or resources to import alkylate alone; instead, it alleges the following legitimate reasons why Defendants instead "pool[ed] their capital and share[d] the risks of loss as well as the opportunities for profit," *Texaco*, 547 U.S. at 6:

- **Difficulty Locating Supply.** When "unexpected disruptions in supply occur, gasoline meeting California's unique CARBOB specifications must be sourced from outside of California." (CCAC ¶ 57.)

- **Substantial Costs and Operational Challenges.** Even if an alternate supply of alkylate is identified, importing it into California carries substantial costs and operational challenges. In the wake of the refinery fire, ExxonMobil needed to replace its supply through contracts that "exceeded ten million gallons of alkylate . . . ." (*Id.* ¶ 109.) Supplying such large quantities is an expensive proposition, as alkylate is a "high-value product" (*id.* ¶ 104), and that expense is compounded by logistical challenges resulting from the fact that these alkylate cargoes must "typically [be] brought into the state on marine vessels." (*Id.* ¶ 53.)

- **Time Lag and Price Risk.** There is a significant risk that market prices might change by the time a large alkylate shipment arrives in California. The "large alkylate contracts" at issue "were floating price contracts and usually tied to the OPIS-reported prices for Premium gasoline." (*Id.* ¶ 109.) There can be a significant time lag due to transit time, as ships carrying CARBOB or other blendstocks from refineries in Asia "can take several weeks to arrive at California's ports." (*Id.* ¶ 57.) The Complaint alleges Vitol and SKEA thought perhaps the Torrance refinery might be offline "for a month or two" further, but there is no way they could have known with certainty (*id.* ¶ 103), creating substantial price risk for the joint ventures during transit.

12

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

1    Given the potential procompetitive efficiencies resulting from these joint ventures to import alkylate, they

2    cannot be condemned as unlawful *per se*. *See Freeman*, 77 Cal. App. 4th at 180; *see also In re German*

3    *Auto. Mfrs. Antitrust Litig.*, MDL No. 2796 CRB (JSC), 2020 WL 1542373, at *5 (N.D. Cal. Mar. 31,

4    2020) ("Because procompetitive effects are possible, per se treatment is inappropriate for joint ventures.").

5    Because the alleged joint ventures are not *per se* unlawful, they require a more rigorous

6    examination under the rule of reason. *Reynolds v. Cal. Dental Serv.*, 200 Cal. App. 3d 590, 596 (1988);

7    *see also Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) ("[J]oint ventures . . . hold the

8    promise of increasing a firm's efficiency and enabling it to compete more effectively. Accordingly, such

9    combinations are judged under a rule of reason . . . ."). The rule of reason is intended for the analysis of

10   "agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the

11   business, the history of the restraint, and the reasons why it was imposed," so as to "form a judgment

12   about the competitive significance of the restraint." *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-*

13   *in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1096 (N.D. Cal. 2019), *aff'd* 958 F.3d 1239 (9th Cir.

14   2020) (internal citations omitted).

15   The Complaint does not attempt to challenge these joint ventures under the rule of reason, nor

16   could it plausibly do so. Defendants do not control market shares sufficient to confer market power,

17   without which output-increasing joint ventures raise no antitrust concerns. Market power is the "essential

18   ingredient in a rule-of-reason case" brought under Section 1 of the Sherman Act. *Hahn v. Or. Physicians'*

19   *Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988). Indeed, the "need to prove market power is a threshold

20   consideration in an antitrust case and is the sine qua non of recovery." *Exxon Corp. v. Superior Court*, 51

21   Cal. App. 4th 1672, 1681 (1997); *see also Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044

22   (9th Cir. 2008). The Complaint contains zero allegations that SKEA and Vitol, jointly or individually, had

23   any form of market power, and in fact the gasoline transacted between the firms accounted for less than

24   1% of the total market. In addition, any rule of reason analysis must also consider "[w]hether the restraint

25   considered on its face makes any plausible threat to reduce market wide output and thus increase prices;

26   if not, the complaint can be dismissed." Areeda & Hovenkamp, ANTITRUST LAW ¶ 2100g; *see also Exxon*,

27   51 Cal. App. 4th at 1682 (anticompetitive effects are those that "impair competition significantly"). That

28

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**
**AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

is precisely what should result here because the Complaint fails to allege that these output-increasing joint ventures created any such plausible threat.

### 2.   The Complaint Fails to Plead a Conspiracy to Fix Gasoline Prices.

Beyond SKEA and Vitol's procompetitive joint ventures, the Complaint attempts to allege a broader agreement to manipulate OPIS-reported prices for CARBOB sold on the "spot market" through purportedly "market-moving" trades. (CCAC ¶¶ 113–14.) When attempting to allege an unlawful conspiracy, antitrust plaintiffs may rely on both direct and circumstantial evidence. *See Distance Learning Co. v. Maynard*, No. 19-cv-03807-KAW, 2020 WL 2995529, at *3, 9 (N.D. Cal. June 4, 2020). But the Complaint pleads neither direct nor circumstantial evidence of an anticompetitive conspiracy.

### a)   The Complaint Lacks Direct Evidence of a Price-Fixing Conspiracy.

The Complaint fails to allege any direct evidence that SKEA and Vitol conspired to manipulate OPIS-reported prices. "Direct evidence factual allegations are explicit and require no inferences to establish the existence of a conspiracy." *Distance Learning*, 2020 WL 2995529, at *3 (quoting *Jones*, 400 F. Supp. 3d at 915). The Complaint cites only four internal Vitol and SKEA documents, *supra* at 5-6 and *infra* at 14–15, which neither individually nor collectively suffice to plead "the formation and operation of the conspiracy" with the "high degree of particularity" required. *Marsh*, 200 Cal. App. 4th at 493; *see also Medina*, 2014 WL 4243992, at *3. Not a single cited document says anything about trading or OPIS, let alone manipulating OPIS through unlawful trades.

*First*, the Complaint concedes one of the documents, a June 2016 email, discussed "an alkylate cargo with SK[EA]" for which Vitol would "JV the back side no one knows this so P&C . . . ." (CCAC ¶ 135.) Such alleged communications show only that SKEA and Vitol participated in narrow, procompetitive agreements to import gasoline-related products during a supply shortage, and do not reasonably "support the broad[er] scheme alleged" to manipulate OPIS-reported prices through improper trading activity. *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 369 (S.D.N.Y. 2016); *see also infra* at 19 (further addressing allegations relating to confidentiality).

*Second*, the Complaint cites an October 2014 email from a "Vitol executive in Asia"—where alkylate and other gasoline products destined for California originate—stating that he was "looking to work on CARBOB with SK (Nemo) [Niemann] to USWC [U.S. West Coast] in 2015." (CCAC ¶¶ 99,

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**
**AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

110.) Nothing in this document says anything about manipulating OPIS-reported prices; instead, it facially suggests (1) supplying product for SK to import to the U.S. West Coast and/or (2) engaging in a joint venture to do so, either of which would be legitimate and procompetitive.

*Third*, the Complaint cites a November 2014 internal SKEA status report that supposedly "outline[d] the existence of a . . . 'JV' with Vitol and explaining that Vitol wanted to cooperate with SK in the California market." (*Id.* ¶ 100.) Tellingly, the Complaint fails to quote from the document or explain the nature of the "JV" that was supposedly "outlined" in it, much less indicate that the JV had anything to do with OPIS pricing.

*Finally*, the Complaint misleadingly implies that a fourth email reflected an agreement between SKEA and Vitol to "boost the profits from selling the alkylate" by "inflat[ing] the OPIS-reported prices during the pricing window for that alkylate." (*Id.* ¶¶ 132–34.)

But the cited document says *nothing* about an agreement to manipulate OPIS. Instead, the document, which Defendants submit with this motion, is *explicitly* about a procompetitive joint venture to import a cargo of alkylate from India to California on a marine vessel called the "Oriental Emerald." (RJN, Ex. C. at 1–2.) The document includes an email exchange in which SKEA's trader, Defendant Niemann, and an Indian refiner negotiated the terms of a deal for SKEA to purchase and transport the cargo, which would arrive in Los Angeles in mid-October. (*Id.*) Vitol's trader, Defendant Lucas, replied to Mr. Niemann by asking him to "confirm that "[w]e are going to JV this roughly 50/50, so in case I sell Oct against this, I am covered. Thanks!!" (*Id.* at 1.) Mr. Niemann responds, saying "agreed never sent anything before as didn't think you wanted me to do that." (*Id.*) Nothing in the document reflects an agreement to manipulate OPIS, verbal or otherwise. The *only* agreement is to "JV" an alkylate cargo from India, increasing gasoline supply in California.

Apart from these four documents, the Complaint offers only the conclusory assertion that Defendants entered into unspecified "agreements to coordinate Regular and Premium gasoline trading" that "eliminated competition between Vitol and SK[EA] for these products." (CCAC ¶ 138.) But the Court must disregard these "few stray statements [that] speak directly of agreement" because "on fair reading these are merely legal conclusions resting on the prior allegations." *Twombly*, 550 U.S. at 564.

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

<span>1</span>

        **b)**       **The Complaint Lacks Indirect Evidence of a Price-Fixing Conspiracy.**

<span>2</span>        The Complaint also does not sufficiently plead circumstantial (*i.e.*, indirect) evidence of a price-

<span>3</span>fixing conspiracy to manipulate OPIS. An antitrust plaintiff relying on indirect evidence of a conspiracy

<span>4</span>must plead "allegations plausibly suggesting (not merely consistent with) agreement." *Twombly*, 550 U.S.

<span>5</span>at 557. Parallel conduct by competitors, when placed in an appropriate context that suggests an inference

<span>6</span>of conspiracy through well-pled factual allegations, can constitute sufficient indirect evidence of

<span>7</span>conspiracy. But mere similar or seemingly coordinated conduct does not by itself support an inference of

<span>8</span>conspiracy, as the fact that "firms are rational profit maximizers in the same market implies that they will

<span>9</span>do a fair number of things in parallel fashion." Areeda & Hovenkamp, ANTITRUST LAW ¶ 307.

<span>10</span>        One way a plaintiff can establish an unlawful agreement through circumstantial evidence is to

<span>11</span>allege *both* (1) "consciously parallel conduct" *and* (2) "plus factors"—i.e., "further circumstances pointing

<span>12</span>toward a meeting of the minds" of the alleged conspirators. *In re Musical Instruments & Equip. Antitrust*

<span>13</span>*Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) (citing *Twombly*, 550 U.S. at 570); *see also In re Auto. Antitrust*

<span>14</span>*Cases I & II*, 1 Cal. App. 5th 127, 169 (2016) (same). "Plus factors" reflect "economic actions and

<span>15</span>outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly

<span>16</span>coordinated action," and thus—when paired with allegations of consciously parallel conduct—permit an

<span>17</span>inference of conspiracy. *In re Musical Instruments & Equip. Antitrust Litig.* 798 F.3d at 1193 (citing *In re*

<span>18</span>*Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999)); *see also Eddins v. Redstone*, 134 Cal. App. 4th

<span>19</span>290, 305 & n.11 (2005). Here, Plaintiffs fail to plead either parallel conduct or any "plus factors."

<span>20</span>    **<u>No Parallel Conduct Based on Trading "Tactics."</u>** Plaintiffs purport to allege Defendants

<span>21</span>engaged in parallel trading activity, claiming it reveals a market-manipulation conspiracy. (*See* CCAC

<span>22</span>¶¶ 111–21, 128.) But far from detailing the "who, what, when and where" of Defendants' alleged

<span>23</span>anticompetitive conduct, the Complaint evades its heightened pleading obligations by saying largely

<span>24</span>unspecified "tactics" were used "[a]t times" (*id.* ¶ 112) or "[s]ometimes" (*id.* ¶ 115), but not at "other

<span>25</span>times" (*id.*), and that "unusual" trades were "generally" uneconomic (*id.* ¶ 118). Such vague and

<span>26</span>superficial allegations provide no basis to identify the relevant transactions and prepare a defense, let alone

<span>27</span>give rise to a well-pleaded inference of an unlawful conspiracy. *See Bay Area Surgical Mgmt. LLC v.*

<span>28</span>

*Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 995–98 (N.D. Cal. 2015) (dismissing Cartwright Act claim for failure to allege "sufficient facts to support the claim that Defendants formed a conspiracy").

Moreover, the trading practices the Complaint *does* allege fail to establish an anticompetitive conspiracy as opposed to independent, economically rational, and lawful conduct by Defendants. Although the Complaint asserts that various unidentified trades were undertaken for nefarious purposes, it does not allege any facts regarding even a single such trade. And the Complaint fails to address why the alleged trading "tactics" were inconsistent with ordinary market activity, such as "book outs" or hedges. Each purported "tactic" identified in the Complaint is addressed in turn:

*First*, the Complaint contends "[o]ne tactic used by Vitol and SK[EA] when trading Regular gasoline was to transact the high deal of the day when the deal was reported to OPIS" and that "[s]ometimes, this deal was the absolute highest" while at "other times, subsequent deals pushed the price even higher." (CCAC ¶ 115.) But the fact that "sometimes" during a two-year period, Vitol and SKEA— companies in the business of trading California gasoline—independently executed trades that may or may not have marked the daily market "high" does not evidence an illegal conspiracy. And to the extent Defendants' trades were not even the "high deal of the day," Plaintiffs fail to allege how Defendants' trades could have had the effect of manipulating OPIS-reported prices or impacting retail prices.

*Second*, the Complaint alleges that "prior to a pricing window, Vitol and/or SK[EA] took preplanned 'short' positions, ensuring that they would need to buy during the pricing window." (*Id.* ¶ 126.) But such "[s]hort selling is an important element of 'hedging' an investment," and is thus lawful and procompetitive. *ECD Investor Grp. v. Credit Suisse Int'l*, No. 14-cv-8486-VM-SN, 2017 WL 3841872, at *3 (S.D.N.Y. Sept. 1, 2017). For instance, if a trader possessed a large quantity of CARBOB—a "long" position—which she intended to sell at the OPIS-reported price during a future "pricing window," she would face risk that the OPIS-reported price might decline. To hedge against that risk, the trader could prudently take an offsetting "short" position, which she would subsequently cover during the pricing window. Numerous cases recognize the legality and procompetitive purposes of similar shorting strategies. *See, e.g.*, *Leist v. Simplot*, 638 F.2d 283, 287–88 (2d Cir. 1980) (noting the "owner of a commodity can hedge against declining prices by entering into equivalent short futures contracts for the month when he expects to be able to sell"); *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1033 (N.D.

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

Ill. 1995) (stating a "merchant who purchases soybeans to resell at some later date may wish to avoid the risk that prices will fall" and thus "take a short position or adopt a short hedge").[2]

*Third*, the Complaint alleges SKEA and Vitol entered into "buy and sell contracts with each other as a means of transferring money rather than actual gasoline." (CCAC ¶ 127.) But such a "book out" or "book transfer" in which parties with a "series of buy and sell obligations" choose to "'net out' their respective contracts" is a routine and procompetitive market activity. *Morgan Stanley Capital Grp. v. Trafigura AG*, No. 09-cv-1073-DLC, 2010 WL 2398906, at *3 (S.D.N.Y. June 15, 2010) (explaining mechanics of a book transfer). Book transfers are important "because they increase liquidity . . . and provide additional hedging opportunities for market participants." *Id.* at *4.

*Fourth*, the Complaint alleges that SKEA and Vitol engaged in "round-trip" or "wash" trades that had the effect of "*limiting*" their "total exposure . . . ." (CCAC ¶¶ 124–25 (emphasis added).) But the alleged effect of "limit[ing] the downside risk" makes the transactions a "hedge" and is inconsistent with a faux round-trip trade. *Credit Suisse*, 2017 WL 3841872, at *3. The Complaint does not allege even a single purported example of an actual, riskless "round-trip" trade.

*Finally*, the Complaint alleges that Vitol and SKEA engaged in "inflated" or "uneconomic" trades to "shar[e] profits" from their alkylate joint ventures. (CCAC ¶¶ 114, 116, 127.) Conclusory allegations of a small number of "uneconomic" or "inflated" trades do not support an inference of a broad, multi-year antitrust claim.[3]  And trades designed to balance the books and "share profits" in connection with Vitol and SKEA's procompetitive joint ventures to import and sell alkylate are not evidence of a conspiracy to manipulate OPIS. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (declining to infer conspiracy from a lawful joint venture). The Complaint also admits that "[a]lkylate . . . is not a separately reported commodity on California's spot markets," and it offers zero explanation how any unreported

---

[2] The Complaint lacks any allegations that Vitol and SKEA "preplanned" such short positions *together*, which is necessary to plead a Cartwright Act violation. *See Free FreeHand Corp.*, 852 F. Supp. 2d at 1185.

[3] *See, e.g.*, *In re Optical Disk Drive Antitrust Litig.*, No. 10-md-2143-RS, 2011 WL 3894376, at *9 (N.D. Cal. Aug. 3, 2011) (dismissing claim where allegations of sporadic misconduct were "a far cry from establishing plausibility for a broad six year continuing agreement among all defendants to fix the prices of all ODDs sold through innumerable other channels").

alkylate trades could have possibly impacted OPIS-reported prices and downstream retail prices. (*Id.* ¶ 119.)

Fairly characterized, the purported trading "tactics" alleged are either (1) so conclusory they must be disregarded, or (2) "no more consistent with an illegal agreement than with rational and competitive business strategies," hence failing to suggest a conspiracy. *Musical Instruments*, 798 F.3d at 1189. Antitrust law "renders ambiguous evidence or inferences insufficient," as otherwise "it might effectively chill procompetitive conduct in the world at large . . . ." *Aguilar v. Atl. Richfield Co.*, 25 Cal.4th 826, 846 (2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. 574, 593–94 (1986)). Rendering these legitimate trading practices unlawful based on the Complaint's conclusory allegations would have just such a chilling effect—without such options, the number of firms willing to trade or import gasoline products into California would decrease, reducing supply and raising prices.

**No Plus Factors.** The Court is not required to consider whether Plaintiffs have pleaded any "plus factors," because plus factors in the absence of viable parallel conduct do not suffice to state an antitrust conspiracy claim. *See Bona Fide Conglomerate, Inc.* v. *SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) ("Plus factors are relevant only if the complaint adequately alleges parallel conduct among the defendants.") (citing *Musical Instruments,* 798 F.3d at 1193–1194). In any event, the Complaint fails to allege any such plus factors here.

Confidentiality of Joint Ventures. The Complaint's allegations that SKEA and Vitol kept "covert" any joint ventures regarding alkylate cargoes fail to imply a price-fixing conspiracy. (*See, e.g.*, CCAC ¶¶ 129, 135.) Defendants had no obligation to announce to the market their plans to import jointly alkylate from Asia, and their desire not to do so does not imply an unlawful agreement to manipulate OPIS. Courts have long recognized that "[w]ithholding from others advance knowledge of one's new products . . . ordinarily constitutes valid competitive conduct" that does not violate the antitrust laws. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 281 (2d Cir. 1979). It would therefore be improper "to read evidence of [a] benign agreement as evidence of a separate, illegal agreement to collusively" manipulate OPIS. *Ross v. Am. Exp. Co.*, 35 F.Supp.3d 407, 452 (S.D.N.Y. 2014).

Relationship Between Traders. The Complaint's innuendo concerning innocuous interactions between Defendants Lucas and Niemann—admittedly "friends and former colleagues"—also fails to

19

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

support an inference of conspiracy.[4]  (CCAC ¶ 8.) Courts routinely deem such allegations insufficient. *See Musical Instruments*, 798 F.3d at 1196 ("mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement"); *Capital Imaging Assocs. P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993) (opportunity alone does not support inference of illegal conspiracy).

Economic Self-Interest. Finally, the Complaint contends that (1) Vitol and SKEA entered into agreements to "share profits," (2) Mr. Lucas and Mr. Niemann "financially benefited as a result of their conduct," and (3) Defendants were incentivized to manipulate OPIS-reported prices to benefit in their large contracts with open pricing windows. (CCAC ¶¶ 129–40.) But these allegations of a motive to maximize prices also do not support an inference of an illegal, market-manipulation conspiracy. Otherwise, "every company in every industry could be accused of conspiracy because they all would have such a motive." *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007), *aff'd* 741 F.3d 1022 (9th Cir. 2014); *see also In re Commodity Exch., Inc., Silver Futures & Options Litig.*, 560 F. App'x 84, 86 (2d Cir. 2014) (an incentive to manipulate the market "could just as easily be imputed to any company" with a similar position "in any commodity market").

### 3. The Complaint Fails to Plead Antitrust Injury and Causation.

The Cartwright Act claim also fails because the Complaint does not plead antitrust injury or causation. Plaintiffs fail to plausibly plead that the alleged injuries "were not secondary, consequential, or remote, but the direct result of the unlawful conduct and were the kind of injuries the antitrust laws seek to prevent." *Cellular Plus, Inc. v. Super. Ct.*, 14 Cal. App. 4th 1224, 1233 (1993) (collecting cases).

The Complaint blithely and implausibly concludes that Defendants' conduct "impacted CARBOB spot prices," which then "increase[d] the price of gasoline at all retailer distribution outlets," which was then "passed on to consumers" for two years or more, even *after* Mr. Niemann left SKEA. (CCAC ¶¶ 92, 141, 144–45, 148.) But the Complaint does not identify a single artificial spot price, or say when one

---

[4]  *See, e.g.*, CCAC ¶ 97 ("Before being hired by SK[EA], Niemann held a similar role at Vitol for approximately ten years. Niemann and Lucas worked together at Vitol, and they maintained contact after Niemann was hired by SK[EA]."); ¶ 131 (alleging that Lucas and Niemann both attended the same April 2015 meeting); ¶ 137 ("For the duration of the scheme, Lucas of Vitol and Niemann of SK[EA] had the opportunity to coordinate with each other and reach agreements").

20

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

occurred. Nor does it plausibly allege how SKEA and Vitol could have "impact[ed]" CARBOB spot prices for an extended period of time when the spot market price changes on a daily basis, and given the acknowledgment that other firms often transacted at higher prices. (*Id.* ¶¶ 65, 71–75, 115, 144.) Similarly, while the Complaint alleges that SKEA and Vitol engaged in "tactics" to increase the OPIS-reported price during "key pricing windows" (*id.* ¶¶ 114–21), it fails to identify a single key pricing window.

The Complaint also lacks any plausible allegations as to how SKEA's and Vitol's unspecified trades in the upstream spot markets directly impacted competition or market-wide prices paid by California consumers multiple levels downstream in the retail market. Plaintiffs acknowledge there are at least three steps between OPIS-reported prices and any purported injury to consumers: (1) the spot market for the delivery of gasoline to California, (2) the wholesale "rack market" of finished gasoline to retailers, and (3) the retail market of finished gasoline for consumers. (CCAC ¶¶ 65, 77.) The Complaint does not specify the dates, frequency, or extent to which Defendants are alleged to have affected OPIS prices. And it concedes that actual spot market prices—which vary from transaction to transaction and often do not match the OPIS-reported average price—are merely one component of the rack price, which then "impacts" the retail price. (*Id.* ¶¶ 65, 75.) Plaintiffs thus fail to allege how SKEA and Vitol, who lack market power, could cause market-wide, retail price effects for two years or more.

Plaintiffs' attenuated theory is also implausible compared to other market forces that admittedly caused elevated gasoline prices. The Complaint asserts without any factual support that Vitol's and SKEA's conduct elevated prices for "Regular and Premium" during "key pricing periods" by engaging in trades to "signal[] a supply/demand imbalance to the market." (*Id.* ¶¶ 120–21.) But Plaintiffs' theory is contradicted by the Complaint itself and the California's Energy Commission. Both highlight the "supply and demand fundamentals" in California that caused elevated prices, pointing to the Torrance outage in 2015, a significant spike in refiner margins, and "the residual price increase" due to "California's retail gasoline outlets . . . charging higher prices than those in other states." (RJN, Ex. A at 2.) Plaintiffs make no effort to plausibly identify *any* retail effects from specific conduct of Vitol and SKEA, let alone disentangle those supposed effects from those caused by broader, market-wide forces. *See Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 542 (9th Cir. 1987) (holding that antitrust injury is speculative if it is indirect and "may have been produced by independent factors").

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

For all of these reasons, the Cartwright Act claim should be dismissed for failure to plausibly allege an unlawful conspiracy or antitrust injury.

**B.    Binding Law Forecloses Plaintiffs' UCL Claim.**

The Ninth Circuit recently clarified that the common practice of pleading UCL claims in addition to legal claims seeking substantively similar remedies is impermissible because the availability of adequate legal remedies precludes assertion of the inherently equitable UCL claim. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (affirming dismissal of UCL claim and holding that plaintiff "must establish that she lacks an adequate remedy at law" to assert such claim).[5]  Plaintiffs' UCL claim must be dismissed in its entirety because the Complaint suffers from this fatal threshold defect.

"The only remedies available to a private plaintiff under California's UCL are the equitable remedies of injunction and restitution." *Ozeran v. Jacobs*, 798 F. App'x 120, 122 (9th Cir. 2020). Plaintiffs concede this when they request that "to the extent the Court ultimately deems inadequate the remedies at law that Plaintiffs request, Plaintiffs and members of the Class are entitled to equitable relief such as restitution and injunctive relief . . . ." (CCAC ¶ 186.) Other than two boilerplate, conclusory allegations (*see id.* ¶¶ 176, 190), this passing reference to an "ultimate" determination is the Complaint's only mention of the possibility that remedies at law might be inadequate.

The injuries alleged in the Complaint make clear that legal remedies *are* adequate, a point reinforced by Plaintiffs' request for the *same* monetary relief (measured in terms of purported "overcharges") described as damages. (Id. ¶¶ 178–79 & p.45 ¶ E.) That Plaintiffs seek to recover not only the *full amount* of these "overcharges," but also to recover *treble damages* (*id.* ¶¶ 178–79) highlights why no claim for equitable relief is available. *See Sonner*, 971 F.3d at 844.

The failure to allege inadequate remedies at law defeats the claim at the pleading stage. *See In re MacBook Keyboard Litig.*, No. 5:18-cv-02813-EJD, 2020 WL 6047253, at *2–3 (N.D. Cal. Oct. 13, 2020) (dismissing UCL claim seeking restitution and injunctive relief for failure to plead inadequate legal

---

[5] *See also Gibson v. Jaguar Land Rover N. Am., LLC*, No. 20-cv-00769-CJC, 2020 WL 5492990, at *3–4 (C.D. Cal. Sept. 9, 2020) ("[Plaintiff alleges] that he and the putative class 'lost money or property' as a result of [defendant's] wrongful conduct. Nor has Plaintiff alleged facts that could support a finding that monetary relief is insufficient to compensate him and the putative class for the alleged harm. Therefore, he may not bring equitable claims. This is fatal to Plaintiff's UCL claim.") (internal citations omitted).

remedy). Plaintiffs cannot avoid dismissal based on the *possibility* that their Cartwright Act claim will not succeed. The question is whether an adequate damages remedy is *available* for the types of injuries alleged, not whether the plaintiff will obtain those damages. *See Rhynes v. Stryker Corp.*, No. 10-5619-SC, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011) (where "the compensatory damages Plaintiffs seek provide an adequate remedy at law to redress their alleged injuries," plaintiffs' argument about having "no adequate remedy at law if their other claims fail is unavailing").

### C.      The Complaint Fails to Adequately Plead the Elements of a UCL Claim.

Even if Plaintiffs' UCL claim was not conclusively foreclosed, it would fail on the merits, whether asserted under the fraudulent, unlawful, or unfair prongs of the UCL. (CCAC ¶¶ 181–85.) The same defective allegations underpin each prong.

### 1.      The Entire Claim Fails for Lack of Particularity and Notice.

Plaintiffs' UCL claims are all based on the same underlying conduct: Defendants allegedly worked together to engage in trading designed to give an allegedly false "impression" to market participants of "strong demand" in order to "artificially" drive up market price. (*Id.* ¶¶ 113–15, 132.) These allegations of an effort to deceive physical gasoline markets are "grounded in fraud" and must be pleaded with particularity under Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996). The particularity requirement extends to all three UCL prongs. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009) (affirming that Rule 9(b) applied to entire UCL claim that was "grounded in fraud" and therefore "the pleading of that claim as a *whole* must satisfy the particularity requirement of Rule 9(b)"); *see also Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1094 (N.D. Cal. 2017) (where a plaintiff alleges a UCL claim based on a "unified course of fraudulent conduct," Rule 9(b) applies to all three prongs).

To satisfy Rule 9(b), Plaintiffs must allege the "who, what when, where, and how" of the alleged misconduct. *Kearns*, 567 F.3d at 1124. This requires Plaintiffs not only to identify the specific allegedly misleading statements, but also to "set forth, in a specific manner, the reasons why the charged statements are alleged to be false when made." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1550 (9th Cir. 1994).

Here, Plaintiffs' allegations are entirely general. Plaintiffs fail to identify *any single false statement* or *any single transaction* undertaken by either Defendant, much less explain with specificity *how* the

23

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

transaction gave other market participants a false "impression" of "strong demand" or led to artificial prices. *See id.* at 1547–48. Accordingly, they have failed to comply with Rule 9(b).[6]

### 2.    The Entire Claim Fails for Lack of Reliance.

Plaintiffs' UCL claim alleges that Defendants used a refinery explosion as cover to "artificially inflate the price of gasoline" while "concealing," "disguis[ing]," and "hiding" this scheme from the rest of the market. (CCAC ¶¶ 4, 6, 124, 132.) Defendants allegedly achieved the price increases by submitting physical gasoline trades to OPIS that gave market participants the false "impression" that "there was an increase in demand when, in fact, the demand was pre-planned and artificial." (*Id.* ¶¶ 115, 126.)

To state a UCL claim based on such allegedly misleading statements, a plaintiff must allege she "actually relied" on the statements. *Doe v. SuccessfulMatch.com*, 70 F. Supp. 3d 1066, 1075 (N.D. Cal. 2014). This is true not only for UCL fraud claims, but also for unlawful and unfair claims based on the same underlying conduct. *See id.* at 1075–76 ("[T]he Court has consistently required allegations of actual reliance and injury at the pleading stage for claims under all three prongs of the UCL where such claims are premised on misrepresentations.").

Plaintiffs—alleged purchasers of retail gasoline (CCAC ¶¶ 14–22)—have not alleged that they actually relied on any misleading statement by Defendants. Nor could they. The allegedly false statements were gasoline spot market trades submitted to OPIS. (*Id.* ¶ 112.) Plaintiffs did not trade physical gasoline and thus never encountered Defendants' alleged trade submissions, and thus they cannot allege that OPIS submissions "played a substantial part" in their decision to purchase gasoline. *SuccessfulMatch.com*, 70 F. Supp. 3d at 1076 (quoting *In re Tobacco II Cases*, 46 Cal.4th 298, 326 (2009)).

### 3.    The Claim Fails Under the "Unlawful" Prong for the Additional Reason that There Is No Underlying Violation of Law.

Beyond these basic infirmities, the unlawful prong claim also fails because Plaintiffs have not adequately alleged a predicate violation of law. A UCL "unlawful" claim must be based on an independent legal violation. *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 179–80 (1999).

---

[6] In addition, by failing to identify a single specific transaction, Plaintiffs have not satisfied Federal Rule of Civil Procedure 8(a). *Id.* (explaining that Rule 8(a) requirements allegations of "neutral facts *necessary to identify the transaction*"). Accordingly, the UCL claims fails under Rule 8(a) as well.

1   Where a plaintiff has failed to state a claim under the borrowed statute, the UCL unlawful claim must fail

2   too. *See, e.g.*, *Lenhoff Enterps., Inc. v. United Talent Agency, Inc.*, 729 F. App'x 528, 532 (9th Cir. 2018).

3   Plaintiffs allege predicate violations under the federal Commodity Exchange Act and the California

4   Commodity Law, and they have failed to state claims under either statute. (CCAC ¶ 182.)

5        **a)    Plaintiffs do not allege a "prohibited transaction" under CEA §**

6   **6c(a)(1).**

7        Plaintiffs first allege Defendants violated 7 U.S.C. § 6c(a)(2) by engaging in wash sales and

8   accommodation trades, and alternatively by causing a price to be reported that was not true or bona fide.

9   (CCAC ¶¶ 95–96.) They appear to mean Section 6c(a)(1), since Section 6c(a)(2) merely describes

10  prohibited transactions subject to the prohibition in Section 6c(a)(1).

11       Plaintiffs fail to allege a violation of § 6c(a)(1) for multiple reasons. *First*, § 6c(a)(1) prohibits the

12  making of certain "transactions," and Plaintiffs have not identified *any* specific transactions. *Second*,

13  § 6c(a)(1) applies only to *futures market* transactions, and only those transactions that are made public to

14  the relevant futures market. Here, Plaintiffs allege that Defendants manipulated price through spot or

15  physical transactions, not futures transactions. (CCAC ¶¶ 106–28.) *Third*, Defendants did not engage in

16  wash sales or accommodation trades, and Plaintiffs' allegations fail to plead such transactions. *Finally*,

17  the Complaint makes clear that Defendants actually engaged in the supposedly unlawful trades, and the

18  trade prices were therefore "true and bona fide" for purposes of § 6c(a)(2)(B).

19       **Failure to allege a specific transaction.** Section 6c(a)(1), titled "Prohibited transactions," makes

20  it unlawful to engage in futures transactions in certain circumstances. As already discussed, Plaintiffs'

21  allegations are "grounded in fraud" and must be pleaded with particularity. *Supra* at 23. Section 6c(a)(1)

22  sets forth transaction-based offenses, but the Complaint does not identify a single transaction that allegedly

23  violated it. This violates Rule 9(b) *and* Rule 8(a). *See In re GlenFed*, 42 F.3d at 1548 (under Rule 8(a), a

24  plaintiff must plead facts "necessary to identify the transaction" at issue); *Braman v. The CME Group,*

25  *Inc.*, 149 F. Supp. 3d 874, 893–94 (N.D. Ill. 2015) (dismissing "imprecise and non-specific" CEA claim

26  under Rule 9(b) based on plaintiffs' failure to "allege[] any specifics concerning the actual transactions

27  that allegedly caused them harm").

28

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**
**AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

**Failure to allege futures trading and appearance to the futures market.** Plaintiffs' § 6c(a)(1) claim also fails because that section prohibits only transactions in *futures contracts*. *See* 7 U.S.C. § 6c(a)(1) (prohibiting transactions "involving the purchase or sale of any commodity for futures delivery"); *CFTC v. Moncada*, 31 F. Supp. 3d 614, 617 (S.D.N.Y. 2014). A futures contract is a type of derivatives contract that has standardized terms and generally must be traded on a futures exchange. *See CFTC v. Co Petro Mktg. Group, Inc.*, 680 F.2d 573, 579–581 (9th Cir. 1982). Plaintiffs generally allege that Defendants, who were physical gasoline traders, "also" traded in futures markets (CCAC ¶¶ 78, 84), but Plaintiffs do not allege that any of the trades at issue took place on futures exchanges. Rather, Plaintiffs allege that Defendants' improper trades occurred in the *physical* or *"spot"* gasoline market (*id.* ¶¶ 111, 115, 121), which the Complaint acknowledges is a distinct market from the futures market (*id.* ¶ 61).

In addition, only trades that occur on a futures exchange and are therefore published to the market are actionable. If a transaction occurs off market (or "off exchange," in industry terminology), it cannot violate § 6c(a)(1) as a matter of law. *See In re Collins*, Comm. Fut. L. Rep. (CCH) P 26981, 1997 CFTC LEXIS 66, at *7 (C.F.T.C. Mar. 5, 1997) ("*Collins II*") (reversing judgment because non-public transfers of futures positions did not implicate § 6c(a)(1)'s purpose, which is "to protect the integrity of the market mechanisms associated with [futures] exchange trading").

Thus, to state a § 6c(a)(1) claim, Plaintiffs must allege not only that the wrongful transaction was a futures market transaction, but also that it "appeared" to the futures market as a legitimate trade. Plaintiffs have not alleged either element here.

**Failure to allege a wash sale or accommodation trade.** Plaintiffs also fail to allege any transaction that is actually prohibited under § 6c(a)(1). The CEA, of course, does not prohibit *all* futures transactions made on an exchange; instead, only transactions covered by § 6c(a)(2) or elsewhere in the CEA are barred. Plaintiffs first contend that Defendants engaged in "wash sales" and "accommodation trades" under § 6c(a)(2)(A)(i) (CCAC ¶¶ 95, 182), but their allegations do not support such a claim.

"Wash sale" is a term of art under the CEA. It is "a transaction made without an intent to take a genuine, *bona fide* position in the market, such as a simultaneous purchase and sale designed to negate each other so that there is no change in financial position." *Reddy v. CFTC*, 191 F.3d 109, 115 (2d Cir. 1999). An "accommodation trade" is a wash sale in which one trader assists another to effectuate a wash

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

sale. *In re Collins*, Comm. Fut. L. Rep. (CCH) P 22,982, 1986 CFTC LEXIS 661, at *22 n.22 (C.F.T.C. Apr. 4, 1986) ("*Collins I*"). To plead an illegal wash sale, Plaintiffs must allege (1) "a purchase and sale of a commodity for future delivery," (2) "of the same delivery month of the same futures contract," (3) "at the same or similar price," and (4) "with the intent of not making a bona fide trading transaction." *Moncada*, 31 F. Supp. 3d at 617. Plaintiffs' "wash sale" allegations fail to satisfy these elements:

*First*, Plaintiffs have not alleged a wash result. *See Wilson v. CFTC*, 322 F.3d 555, 559 (8th Cir. 2003). As noted above, the Complaint does not identify any futures transactions. This means Plaintiffs have necessarily failed to plead the essential elements of a wash sale—namely, the existence of two offsetting futures trades in the same futures contract delivery month at the same or similar price. *Moncada*, 31 F. Supp. 3d at 617.

*Second*, even if Plaintiffs had identified any futures transactions, Plaintiffs fail to allege that Defendants engaged in a wash sale with "the intent of not making a bona fide trading transaction." *Id*. It is not enough to allege merely that a trader publicly took a position in a futures contract and later offset that position, which is legal and routine.[7] A violation occurs only if the trader has the specific *intent* to "give the appearance of submitting trades to the open market while negating the risk or price competition incident to such a market." *Collins II*, 1997 CFTC LEXIS 66, at *39–40. The Complaint assigns various motivations to Defendants, but there are no well-pleaded allegations of any such intent to submit trades that were not bona fide to the market. For example, Plaintiffs allege that Defendants would execute offsetting trades to "negate[] the volume" of the first trade and ensure "no gasoline would actually change hands." (CCAC ¶ 124.) But trading commodities without making or accepting delivery is a common and legitimate practice. Traders commonly take a position, think better of it, and exit the position before delivery. It is also common and lawful to trade without intending to accept delivery, for example when speculating on pre-delivery price movements. *See Cargill*, 452 F.2d at 1156 n.2 ("As a matter of reality and practice rarely does a future commodity dealer actually intend to take or make delivery on that commodity. Commentators estimate it to be less than 1 per cent.").

---

[7] *See Co Petro*, 680 F.2d at 579–580 (futures contracts are designed to "facilitate[] offsetting transactions by which purchaser or sellers can liquidate their positions by forming opposite contracts"); *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1156 n.2 (8th Cir. 1971) (explaining that, "99 per cent" of the time, traders exit futures positions by entering "an opposite and offsetting transaction in the same future").

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

Plaintiffs also contend that Defendants at times engaged in trades that "had the effect of *locking in a loss* but also *limiting the total exposure* that Vitol or SK[EA] faced . . . . " (CCAC ¶ 125 (emphasis added).) These allegations actually negate any improper motive, since avoiding losses and limiting exposure are standard, lawful trading objectives. These principles were recognized in a preeminent wash sale decision over 30 years ago. *See Stoller v. CFTC*, 834 F.2d 262, 264 (2d Cir. 1987) (noting that "transactions in which the parties seek to minimize risk" are not wash sales under § 6c(a)(1)). Nor do Plaintiffs find support in alleging that Defendants took "preplanned 'short' positions" that were unwound through offsetting trades during "pricing windows" on larger contracts. (CCAC ¶ 126.) This activity merely reflects hedging, *supra* at 17–18, a typical and beneficial commercial strategy to mitigate market risk. *See* S. Rep. No. 93-1131, 1974 U.S.C.C.A.N. 5843, 5854, 5466–5467 (recognizing the legitimate use of futures contracts to hedge "against inventories or commitments in the cash commodity").

In their final attempt at pleading intent, Plaintiffs contend that Defendants undertook trades to transfer profits from their procompetitive joint ventures. (CCAC ¶¶ 127–28.) Joint venture partners allocating profits and losses is normal activity and is not illegal, and doing so through offsetting contracts is a conventional way for traders to settle accounts.

**<u>Failure to allege transactions that caused an untrue or non-bona fide price report.</u>** Plaintiffs' alternative theory of prohibited transactions is that Defendants engaged in transactions "used to cause any price to be reported, registered, or recorded that is not a true and bona fide price." 7 U.S.C. § 6c(a)(2)(B). This theory rests on the same allegations as Plaintiffs' misguided "wash sale" theory, and it also sounds in fraud. *See, e.g.*, *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1068 (N.D. Ill. 2016) (allegations that defendant submitted false trade information were subject to Rule 9(b)); *see also In re Nat. Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343–44 (S.D.N.Y. 2005) (allegations that defendant "knowingly reported false pricing and volume information to a trade publication" were subject to Rule 9(b)).

This theory fails too. First, Plaintiffs have not identified any instance in which an allegedly untrue or non-bona fide futures price was reported; likewise, Plaintiffs have not explained *how* or *why* the price was not true or bona fide. Accordingly, the allegations fail to satisfy Rule 9(b). *See GlenFed*, 42 F.3d at 1548 (holding that Rule 9(b) requires that plaintiffs not only to identify the allegedly false statement but also plead the "circumstances indicating [the statement's] falseness"). Second, Plaintiffs' generalized

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**
**AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

allegations merely indicate that Defendants entered into physical trades at high prices, and those prices were submitted to OPIS. (*E.g.*, CCAC ¶¶ 112, 115.) Plaintiffs allege that these trades actually occurred; Plaintiffs do *not* allege that Defendants invented trades or otherwise submitted fictitious information to OPIS. Obviously, submitting accurate trade information does not constitute causing an untrue price report in violation of § 6c(a)(1) and (a)(2)(B).

**b)**     **Plaintiffs have not alleged manipulation under the CEA.**

Plaintiffs' unlawful prong claim is also predicated on alleged manipulation of gasoline benchmark prices in violation of the CEA. (CCAC ¶ 182.) The Complaint does not specify a CEA section, but 7 U.S.C. § 9(3) makes it unlawful to manipulate the price of a commodity in interstate commerce. The Complaint's sparse allegations fail to plead the four required elements of a CEA manipulation claim, that "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendant specifically intended to cause the artificial price." *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 247 (5th Cir. 2010).

Because Plaintiffs' allegations are grounded in fraud, *supra* at 23, each element of the predicate manipulation claim must be pleaded with particularity. *See Nat. Gas*, 358 F. Supp. 2d at 343 (manipulation claim that defendants created an inaccurate perception of demand sounded in fraud). Accordingly, Plaintiffs' manipulation allegations must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market." *Crude Oil*, 2007 WL 1946553, at *6. The Complaint does not remotely meet this standard.

**No ability to influence market prices.** At the threshold, Plaintiffs must allege Defendants had ability to influence market prices. This element is often satisfied by pleading facts showing a defendant held a "dominant market position" or bought and held "large positions" that enabled it to unilaterally effect a market-wide price change. *See, e.g.*, *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1019 (N.D. Ill. 2015) (collecting cases). Here, by contrast, trades between SKEA and Vitol accounted for less than 1% of the market, and Plaintiffs offer only the conclusory allegations that Defendants supposedly traded at artificially high prices (CCAC ¶ 116), which is not the same as factually alleging an ability to *influence* market price. *See Miller v. Pac. Inv. Mgmt. Co. LLC*, No. 12-cv-4122-LTS-JCF, 2013 WL 12305507, at *3 (S.D.N.Y. Apr. 23, 2013) (dismissing market manipulation claim due to plaintiff's failure to plead "any

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

*facts* showing that [the defendant's] relatively small trading position could have affected the market to the degree alleged" (emphasis added)). Absent factual allegations that SKEA or Vitol "had the 'ability' to force an increase in the price of gas," Plaintiffs have failed to plead this essential element. *CFTC v. Enron Corp.*, No. 4:03-cv-0909-MH, 2004 WL 594752, at *6 (S.D. Tex. Mar. 10, 2004).

**No artificial price.** Nor have Plaintiffs pleaded the existence of an artificial price that "does not reflect basic forces of supply and demand." *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012). Plaintiffs rely on a final report by the California Petroleum Market Advisory Committee ("PMAC Report") showing gasoline prices were high from 2015 to 2017 on a differential basis, relative to national averages.[8] (CCAC ¶¶ 141–47; *see also* RJN, Ex. D) It does not follow that a price is "artificial" simply because it is high, and Plaintiffs do not allege specific facts indicating that California gasoline prices did not reflect basic forces of supply and demand during the relevant period. *See In re Rough Rice Commodity Litig.*, No. 11-cv-618-JWD, 2012 WL 473091, at *6 (N.D. Ill. Feb. 9, 2012) (dismissing claim alleging only "unusual market prices" as "insufficient to establish artificial prices, as a matter of law"). Moreover, the PMAC Report that underlies Plaintiffs' artificial price allegations considered the historical data and did *not* conclude the increased price differential indicated artificiality. Instead, it stated that "[t]he committee members agreed that this [historic price] differential alone does not imply that any market participants have acted illegally *or even that the market is less than highly competitive*." (RJN, Ex. D at 3, 32 (emphasis added)).

Plaintiffs' conclusory allegations about trading misconduct also cannot support the existence of an artificial price. Plaintiffs allege generally that Defendants engaged in "unusual market-spiking" and "uneconomic" trades. (CCAC ¶¶ 118, 127.) But allegations that "large unspecified and 'uneconomic' trades were taking place" are "too general to plead the existence of artificial prices." *In re Commodity Exch., Inc., Silver Futures & Options Litig.*, No. 11-md-2213-RPP, 2012 WL 6700236, at *16; *see also Braman*, 149 F. Supp. 3d at 889 (allegations of trading misconduct do not indicate an artificial price).

---

[8] Plaintiffs also cite two other unofficial sources for the same historical price information, but those both merely summarize or excerpt information from the PMAC Report. (CCAC ¶¶ 141 n.35, 144 n.38.)

**No artificial price causation.** Plaintiffs also fail to plead facts showing that Defendants *caused* an artificial price, which is an independent element. *See Commodity Exch.*, 2012 WL 6700236, at *16 ("The causation element requires that a defendant be the proximate cause of the price artificiality.").

Plaintiffs' causation allegations are wholly conclusory. (*See* CCAC ¶ 141 (referring to "price spikes caused by Defendants' illegal conduct" without alleging any supporting facts).) To satisfy the causation element, a plaintiff must identify specific dates of the purportedly manipulative acts. *See Crude Oil*, 2007 WL 1946553, at *6. However, Plaintiffs offer only the vague and conclusory allegation that Defendants began to manipulate prices "no later than late February of 2015." (CCAC ¶ 111.) In addition, in a multi-defendant action like this one, Plaintiffs must "specify which of the defendants perpetrated the acts in question." *Crude Oil*, 2007 WL 1946553, at *6. Plaintiffs offer no such specificity here.

The Complaint includes a nominal causation section (CCAC ¶¶ 141–57), predicated on the PMAC Report. However, as noted above, the PMAC Report does not support Plaintiffs' theory that Defendants were to blame for high prices following the Torrance explosion. Instead, the PMAC Report pinpointed that the price increases occurred as a result of increases in the *refiners'* margin, which is the difference between the cost to acquire crude oil and the price at which finished gasoline is sold in the wholesale "rack" market. RJN, Ex. D at 11. This finding directly contradicts Plaintiffs' causation theory: It shows that *refiners* were capturing the benefits of high prices by selling at high rack prices. The other notable price increase occurred in the *retailers'* margin, which represents the difference in the retailers' cost to acquire in the rack market and sell in the retail market. *Id.* This finding likewise is inconsistent with any claim that Defendants' conduct in the spot market was responsible for pricing increases.

In short, the government report that Plaintiffs depend on to give factual substance to their causation allegations attributes gasoline prices increases to *other* supply chain participants, not Defendants.

**No specific intent to cause an artificial price.** Finally, Plaintiffs must allege that Defendants *specifically intended* to cause an artificial price. The alleged facts must "give rise to an inference of scienter that is at least as strong as any competing inference that can be drawn from those facts." *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 539 (S.D.N.Y. 2008). Once again, Plaintiffs fail to plead this element. Plaintiffs have not alleged that Defendants acted with the specific intent to cause

31

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

a price that did not reflect fair market value. Rather, the Complaint alleges only that Defendants intended to benefit their market positions by submitting high-priced trades to OPIS. (CCAC ¶¶ 119–20.)

Even taken as true, these conclusory allegations at most indicate an intent to trade at high prices, which is fundamentally distinct from an intent to trade at *artificial* prices. Courts have repeatedly rejected attempts to plead manipulation based on supposedly uneconomic trading or trading at high prices, even prices that were "unreasonably high." *See, e.g.*, *Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 58 (5th Cir. 1962) ("Certainly the term 'manipulate' means more than the charging of what some may consider to be unreasonably high prices."); *Silver Futures*, 560 F. App'x at 86–87 (allegations of "uneconomic conduct" that was "inconsistent with trying to obtain the best sales price" did not support an inference of intent in the absence of "specific factual allegations"). It is also insufficient to allege that Defendants stood to benefit from higher prices, because this motive "could just as easily be imputed to any company" with a similar market position. *Commodity Exch.*, 2012 WL 6700236, at *10.

Even specifically intending to cause a price *change* does not constitute manipulation, if the defendant believes the target price reflects fair market value. The Commodity Futures Trading Commission ("CFTC"), the federal agency charged with enforcing the CEA, has held not only that "market participants have a right to trade in their own best interests" but also that "it is this very motivation which gives lifeblood to the forces of supply and demand."[9] *In re Ind. Farm Bureau Coop. Ass'n, Inc.*, CFTC No. 75-14, 1982 WL 30249, at *17 (C.F.T.C. Dec. 17, 1982). Therefore, under the CEA, "it is not enough to prove simply that the accused intended to influence price." *Id.* Consistent with this rule, in a recent manipulation case alleging that the defendants "intended that their bids would affect the settlement price," the court held there was no artificial price and no liability where the price reflected defendants' "conception of fair market value." *See CFTC v. Wilson*, No. 13-cv-7884-RJS, 2018 WL 6322024, at *14–16 (S.D.N.Y. Nov. 30, 2018). Plaintiffs do not allege specific facts indicating that Defendants intended anything other than to trade at prices that accurately reflected the prevailing supply shortage following the Torrance refinery explosion.

---

[9] The CFTC's interpretation of the CEA must be given deference. *See CFTC v. Schor*, 478 U.S. 833, 844 (1986) ("Accordingly, as the CFTC's contemporaneous interpretation of the statute it is entrusted to administer, considerable weight must be accorded to the CFTC's position.") (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 844–45 (1984)).

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

The CEA strikes a careful balance between regulation and ensuring that market participants can act according to their economic interests without fear of reprisal—which is essential to the proper functioning of commodity markets. Plaintiffs seek to upend decades of exacting precedent by pursuing this groundless manipulation claim against Defendants.

### c) Plaintiffs have not alleged violation of the California Commodity Law.

Finally, Plaintiffs' predicate claims under the California Commodity Law also fail. The CCL was enacted in 1990 to combat "a proliferation of 'boiler rooms' (high pressure telephone sales operations) that engage in commodity investment frauds," and to impose technical licensure requirements. Dep't of Finance, Enrolled Bill Report AB 4254 at 2 (Aug. 31, 1990). Neither the statute nor any of the four sections Plaintiffs invoke apply to this case. (*See* CCAC ¶ 182 (citing Cal. Corp. Code §§ 29535–29538).)

**Failure to allege an offer made or accepted in California.** One of the borrowed CCL sections, section 29537, does not prohibit any conduct, but limits the scope of sections 29535 and 29536 by imposing a geographical limitation. Only a commodity transaction resulting from an offer "made in" or "accepted in" California may form the basis for a claim under sections 29535 and 29536. Corp. Code, § 29537. An offer is "made in" California when it (1) originates from California or (2) is directed by the offeror to California and received at the place it is directed. *Id.* § 29537(c). An offer is "accepted in" California when it is (1) communicated to the offeror in California or (2) directed to the offeror in this state, based on a reasonable belief that the offeror is in California, and received at the place to which it is directed (such as a California post office). *Id.* § 29537(d).

Plaintiffs allege violations of sections 29535 and 29536, but fail to allege the necessary element that any illegal offer to transact was made or accepted in California. To the contrary, the allegations suggest all offers by Defendants were made and accepted *outside* California: Vitol and SKEA each allegedly maintained its principal place of business in Houston, Texas; Defendants Lucas and Niemann both allegedly resided in Texas; and the only alleged meeting between Vitol and SKEA took place in Texas. (CCAC ¶¶ 22–23, 33–34, 90, 131.)

**Failure to allege commodity fraud under section 29536.** Additionally, section 29536 prohibits "willfully" committing fraud in connection with a commodity transaction, such as employing a scheme to defraud, making a false report, or misappropriating an investor's funds. Corp. Code § 29536. It was aimed

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

at "fraudulent commodities transactions"—specifically, to combat fraudulent, "boiler room" sales tactics perpetrated against retail investors. Dept. of Corps., Enrolled Bill Report of AB 4254, at 2 (Sept. 4, 1990); Dep't of Finance, Enrolled Bill Report AB 4254 at 2 (Aug. 31, 1990).[10]

Defendants did not commit fraud, as reflected in the total absence of allegations supporting Plaintiffs' claim. The Complaint altogether fails to allege the elements of fraud—misrepresentation, knowledge of falsity, intent to defraud, justifiable reliance, and resulting damage—with the requisite specificity. *See Robinson Helicopter Co. v. Dana Corp.*, 34 Cal.4th 979, 990 (2004); *supra* at 23–24 (discussing failure to comply with Rule 9(b)). Nor does the Complaint allege facts supporting the CCL's heightened "willful" scienter requirement. *See People v. Martinez*, 10 Cal. App. 5th 686, 710 (2017).

To the extent the Complaint attempts to recast its wash sale or manipulation allegations as a violation of the CCL, that effort fails too. (CCAC ¶ 182 (claiming that Defendants engaged in wash sales and manipulation in violation of the CCL).) The terms "wash sales," "accommodation trades," and "manipulation" do not appear anywhere in the text of section 29536, any other section of the CCL, or in the legislative statements explaining the CCL's purpose. *See* Dep't of Finance, Enrolled Bill Report of AB 4254 (Aug. 31, 1990); Dept. of Corps., Enrolled Bill Report of AB 4254 (Sept. 4, 1990). In any event, Defendants did not engage in manipulation or wash sales. *Supra* at Section IV(C)(3)(a).

**<u>Failure to allege violations of sections 29535 and 29538.</u>** Plaintiff's remaining two CCL theories are defective on their face. Section 29535 establishes licensure requirements for "commodity merchants" and operating rules for "boards of trade." The Complaint does not allege—nor could it—that either Defendant is a "commodity merchant" or a "board of trade," or that Defendants violated any such rule or requirement. *See also id.* C (defining "commodity merchant"); § 29501 (defining "board of trade").

---

[10] Consistent with the CCL's legislative history, enforcement of section 29536 has involved retail commodity investors, not sophisticated commodity market participants like refinery conglomerates. *See, e.g.*, *People v. Martinez*, 10 Cal. App. 5th 686, 705–706 (2017) (alleging that defendants "falsely claimed" their "forex trading program was able to mitigate risk" and that customers "relied" on this claim); *CFTC v. Khanna*, No. 09-cv-1783-BEN-CAB, 2009 WL 6058659, at *7 (S.D. Cal. Dec. 28, 2009) (in joint enforcement action by California and CFTC, assertion violation based on false statements to commodity investors); *CFTC v. Choi*, No. 08-cv-965-AHM, 2008 WL 5231402, at *3 (C.D. Cal. Oct. 21, 2008) (same); *CFTC v. Nat'l Inv. Consultants, Inc.*, No. 05-cv-2641-JSW, 2005 WL 2072105, at *8 n.11 (same) (N.D. Cal. Aug. 26, 2005).

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

1    Section 29538 makes it unlawful to tamper with evidence or make an untrue statement to the

2    Commissioner of Business Oversight with the intent to obstruct enforcement of the CCL. *Id.* §§ 29535,

3    29503. The Complaint does not allege that Defendants engaged in any of these acts.

4        **4.    The Claim Fails Under the "Unfair" Prong for Additional Reasons.**

5        As explained above, the unfair prong claim fails for lack of specificity under Rule 9(b) and failure

6    to allege actual reliance. *Supra* at 24. It also fails because the allegations underlying Plaintiffs' "unfair"

7    claim are indistinguishable from their insufficient claims under the fraud and unlawful prongs and all must

8    be dismissed.  *See Hadley*, 243 F. Supp. 2d at 1104–05. Plaintiffs briefly allege that Defendants' conduct

9    violates the unfair prong because it "was contrary to" the CCL, CEA, Cartwright Act, and Sherman Act.

10   (CCAC ¶ 184.) But because Plaintiffs have failed to sufficiently plead any violation of those laws, *supra*

11   at 10, 25, 33; *infra* at 36, the unfair prong claim must also be dismissed. *See NorthBay Healthcare Grp. -*

12   *Hosp. Div. v. Blue Shield of Cal.*, 342 F. Supp. 3d 980, 989 (N.D. Cal. 2018); *Orchard Supply Hardware*

13   *LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002, 1011 (N.D. Cal. 2013) (dismissing UCL claim "for

14   the same reasons [plaintiff] has failed to state a viable violation of the Sherman and Cartwright Acts").

15       **D.    Plaintiffs Cannot Sue for Unjust Enrichment.**

16       The unjust enrichment claim is foreclosed for the same reason as the UCL claim: the availability

17   of an adequate remedy at law—a Cartwright Act claim for *treble* damages. *See Sonner*, 971 F.3d at 844.

18       Independently, "in California, there is not a standalone cause of action for unjust enrichment."

19   *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (internal citations omitted).

20   Although California recognizes a *quasi-contract* claim for restitution that seeks "return" of a benefit the

21   plaintiff conferred on a defendant, *id.*, here Plaintiffs expressly seek "*non*-restitutionary disgorgement" of

22   alleged profits Defendants earned from transactions *to which Plaintiffs were not parties*. (CCAC ¶ 190.)

23   Plaintiffs do not allege any Defendant "acquired the plaintiff's money" by means of unfair competition,

24   *Shersher v. Super. Ct.*, 154 Cal. App. 4th 1491, 1494 (2007), and Plaintiffs do not "have an ownership

25   interest in the money [they] seek[] to recover from defendants." *Korea Supply Co. v. Lockheed Martin*

26   *Corp.*, 29 Cal.4th 1134, 1149 (2003). "[R]estitution means the return of money to those persons from

27   whom it was taken." *Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 455 (2005) (citing *Korea Supply*,

28   29 Cal.4th at 1144–45). Here, Plaintiffs allege only that "Defendants *obtained money* and profits that

35

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**
**AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

unjustly enriched themselves *at the expense of the Plaintiffs* . . . ." (CCAC ¶ 188 (emphases added).) This allegation attempts to elide that Defendants did not transact with and did not obtain anything from Plaintiffs. Plaintiffs have no interest in any *trading profits* Defendants may have earned from trading counterparties several steps upstream of the retail market. *See Korea Supply*, 29 Cal.4th at 1149 ("Any award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took directly from plaintiff.").

### E.   Plaintiffs Lack Standing to Seek Injunctive Relief.

Plaintiffs lack standing to assert a claim (Count One) seeking injunctive relief for alleged violation of the Sherman Act. Plaintiffs do not allege *ongoing* unlawful conduct, and they plead no facts to show a threat of future unlawful conduct.

Section 16 of the Clayton Act (CCAC ¶ 174) makes injunctive relief available "against *threatened* loss or damage by a violation of the antitrust laws . . . ." 15 U.S.C. § 26 (emphasis added). But that threat must be real and immediate: "Section 16's requirement of 'threatened injury,' 15 U.S.C. § 26, dovetails with Article III's requirement that in order to obtain forward-looking relief, a plaintiff must face a threat of injury that is both 'real and immediate, not conjectural or hypothetical.'" *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 12–16 (1st Cir. 2008) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). Plaintiffs "cannot rely solely on a past injury," but rather "must demonstrate a very significant possibility of future harm to warrant the requested relief." *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 195 (N.D. Cal. 2015).

Critically, the Complaint does *not* allege that the purportedly unlawful conduct is continuing. There are no allegations regarding any conduct by Defendants (lawful or otherwise) *after* 2016—not a single allegation about any post-2016 trades, contracts, emails, or any other act. Nor are there any allegations of a plausible threat that the allegedly unlawful conduct will recur, and thus there are no well-pleaded factual allegations making recurrence a "very significant possibility." *Id.*

Instead, Plaintiffs speculate "that the fact that the conduct alleged may have ceased at some point does not mean that Defendants will not engage in similar types of manipulation in the future." (CCAC ¶ 173.) This conjecture does not "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1057 (8th Cir. 2018) (no

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

standing for injunctive relief because plaintiffs "have not even adequately pleaded that Defendants are currently charging supra-competitive prices, let alone a conspiracy"); *New Motor Vehicles*, 522 F.3d at 12–16 (no standing for injunction based on unsupported allegation of an "ongoing" conspiracy).

Any claim of future harm is particularly unsupported given that the purported conspiracy was allegedly carried out by two specific traders, Defendants Lucas and Niemann (CCAC ¶¶ 5, 6, 8, 80, 86, 111), and Mr. Niemann's employment at SK ended *in May 2017*. (*Id.* ¶ 92). Indeed, the California AG suit on which Plaintiffs' case is based (*see id.* ¶ 10 & n.3) acknowledges that any purported "scheme likely terminated at or around the time that Niemann left SK in late 2016" (CAG Complaint ¶ 115); *see also id.* ¶ 124 (alleging conspiracy from "around February 2015 and continuing at least through late 2016"). Plaintiffs thus fail to "demonstrate a significant threat of injury from an impending violation or from a contemporary violation likely to continue or recur." *New Motor Vehicles*, 522 F.3d at 13.

Plaintiffs make no meaningful effort to support their claim for injunctive relief. First, Plaintiffs contend Defendants "assert that their conduct was legitimate." (CCAC ¶ 173.) Disagreement over the propriety of *past* conduct plainly does not establish "a significant threat of injury from an impending violation or from a contemporary violation likely to continue or recur." *New Motor Vehicles*, 522 F.3d at 13. Such an argument would justify an injunction in *every* case. *See, e.g.*, *In re Nifedipine Antitrust Litig.*, 335 F. Supp 2d 6, 18–19 (D.D.C. 2004) ("ongoing threat of recurrent violations" is necessary to "confer standing to seek an injunction"); *O'Shea*, 414 U.S. at 495–96 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.").

Next, Plaintiffs allege "Defendant Lucas continues to be employed by Vitol, *despite the allegations herein* (*also made in the AG Complaint*) . . . ." (CCAC ¶ 173 (emphasis added).) The allegation is false, as Plaintiffs have been informed.  Mr. Lucas has not been employed by Vitol since February 2017. But if Mr. Lucas were still employed by Vitol, that would not substitute for well-pleaded allegations of *ongoing or threatened unlawful conduct*. *See Nifedipine*, 335 F. Supp 2d at 18–19 (dismissing claim for injunctive relief because plaintiffs "have simply not established that there remains any 'threatened conduct that will cause loss or damage'") (quoting 15 U.S.C. § 26)).

Finally, Plaintiffs say that "Vitol and SK are known recidivist antitrust violators." (CCAC ¶ 173.) That baseless allegation[11] is legally irrelevant: Plaintiffs' speculation that Vitol and SK *might* engage in some unspecified future antitrust violation that *might* impact Plaintiffs does not rise to the "very significant possibility of future harm" to warrant the requested relief. *Kamakahi*, 305 F.R.D. at 195.

### F.    Plaintiffs' Claims for Injuries Before May 2016 Are Time-Barred.

Plaintiffs' claims under the Sherman Act, the Cartwright Act, and the UCL are all subject to a four-year statute of limitations. *See In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1208 (N.D. Cal. 2015). As a result, their claims for injuries prior to May 2016 are time-barred without tolling. The Complaint's tolling allegations seeking to extend this period fail because: (1) there is no discovery rule tolling; (2) Plaintiffs have not adequately alleged fraudulent concealment tolling; and (3) Plaintiffs have no rights under the tolling agreements between the California Attorney General and Defendants.

### 1.    The Discovery Rule Does Not Apply to Plaintiffs' Claims.

The limitations window applicable to each of Plaintiffs' claims runs from the *time of injury*, not *discovery*, and so late discovery does not affect the limitations period. *See Animation Workers*, 87 F. Supp. 3d at 1210–11 (Sherman Act and UCL claims based on alleged anticompetitive conduct accrue at the time of injury); *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1064–65 (N.D. Cal. 2016) (Sherman Act and Cartwright Act claims accrue upon injury); *Ryan v. Microsoft Corp.*, No. 14-cv-04634-LHK, 2015 WL 1738352, at *16-17 (N.D. Cal. Apr. 10, 2015) (rejecting application of the discovery rule to Cartwright Act claim).

### 2.    Plaintiffs Have Not Adequately Alleged Fraudulent Concealment.

To plead fraudulent concealment tolling, Plaintiffs would have to allege with particularity that (1) Defendants engaged in "affirmative acts to mislead the plaintiff," not mere "passive concealment"; (2) Plaintiffs did not have knowledge of the facts giving to their claim "as a result of" such affirmative

---

[11] Plaintiffs' allegation is *false* as to Vitol, and plaintiffs had no good-faith basis to make it. The California AG's complaint is the *first* government action alleging Vitol violated any state or federal antitrust law. Nor has Vitol been found to have violated any antitrust law in any private antitrust litigation. That, of course, is *the opposite* of a "recidivist antitrust violator." Nor do Plaintiffs identify any prior antitrust claims against SKEA or SKTI.

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

acts; *and* (3) Plaintiffs acted diligently in trying to uncover the facts giving rise to their claim. *Animation Workers*, 87 F. Supp. 3d at 1214–15.

The Complaint does not satisfy any of the required elements. The only affirmative act of concealment alleged is Defendant Brad Lucas's August 2016 statement, in the course of testimony before the California Energy Commission, that—*in his opinion*—one cause of high gas prices following the Torrance explosion was a lack of transparency from Exxon (the refinery owner) about when the refinery would return to service. (CCAC ¶ 161 ("One of the reasons why, *in my opinion*, was the lack of transparency with what was going on with Torrance.") (emphasis added).)

This is far from the required affirmative misleading conduct—the use of "fraudulent means to keep the plaintiff unaware." *See Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012). Rather, a statement of opinion regarding *one cause* of high gas prices says nothing about—let alone misrepresents—any Vitol or SKEA trading conduct or any impact on prices. Moreover, Plaintiffs contend that Exxon contemporaneously and publicly disagreed with Lucas's opinion (CCAC ¶ 162), undermining any suggestion that Plaintiffs "acted diligently," *Animation Workers*, 87 F. Supp. 3d at 1214, or that "their reliance on [Lucas's] allegedly misleading public statements [was] reasonable" *if* they accepted Lucas's opinion without inquiry. *Garrison*, 159 F. Supp.3d at 1080.

Plaintiffs seem to contend that their limitations period was extended indefinitely unless Lucas affirmatively disclosed the (nonexistent) alleged conspiracy (CCAC ¶ 161), but such an omission cannot establish fraudulent concealment. *See Animation Workers*, 87 F. Supp.3d at 1216; *Garrison*, 159 F. Supp. 3d at 1076 ("the mere 'failure to own up to illegal conduct' . . . "is not sufficient for fraudulent concealment"). In any event, Lucas's statement is also immaterial because Plaintiffs do not allege that they reasonably relied on it. *See Garrison*, 159 F. Supp. 3d at 1078. ("an affirmative act of denial of wrongdoing constitutes an affirmative act of fraudulent concealment only 'if the circumstances make the plaintiff's reliance on the denial reasonable'") (quoting *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 505 (9th Cir. 1988)); *see also Animation Workers*, 87 F. Supp. 3d at 1214 (plaintiffs must show they remained ignorant "*as a result of* defendant[s'] affirmative acts") (emphasis added). Plaintiffs do not even allege they *read* Lucas's testimony, let alone relied on it. *See Garrison*, 159 F. Supp. 3d at 1076,

1078 n.11; *see also Finney v. Ford Motor Co.*, No. 17-cv-06183-JST, 2018 WL 2552266, at *3 (N.D. Cal. June 4, 2018).

Plaintiffs also allege Defendants' conduct was "inherently self-concealing" (CCAC ¶ 160) and that Defendants "falsely represented" in their internal codes of conduct that employees are expected to comply with the law (*id.* ¶¶ 163–64). Neither allegation supports tolling. *See Animation Workers*, 87 F. Supp.3d at 1215 ("[T]hat a defendant's acts are 'by nature self-concealing' is insufficient to show that the defendant has affirmatively misled the plaintiff as to the existence of the plaintiff's claim."); *Garrison*, 159 F. Supp. 3d at 1078 (no concealment by "routine public filings that the defendant obeys antitrust laws").

### 3.   Defendants' Tolling Agreements with the California AG Do Not Apply.

Plaintiffs note that Defendants entered tolling agreements with the California AG (CCAC ¶ 167), but Plaintiffs are not parties to those agreements and cannot invoke them. *See, e.g.*, *Ironshore Specialty Ins. Co. v. Everest Ins. Co.*, No. 20-cv-01652-AB, 2020 WL 4251371, at *8 (C.D. Cal. July 21, 2020) (courts treat tolling agreements as contracts). The agreements defeat any claim of tolling by their terms because Defendants agreed to toll limitations only "with respect to any claims that might be brought by the CAG related to the subject matter of the INVESTIGATION." *See* RJN, Ex. E at 1; *see also* RJN, Ex. F at 1. Defendants never agreed to toll any claims asserted by Plaintiffs (or the putative class), and Plaintiffs have no legal basis to invoke contract rights held exclusively by the California AG.

## V.   CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court grant the motion and dismiss Plaintiffs' claims in their entirety.

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

1

2   Dated:  October 23, 2020                              Respectfully submitted,

3

4   By:  */s/ Jeffrey M. Davidson*                        By:  */s/ Michael E. Martinez*

5   Jeffrey M. Davidson (SBN 248620)                      Michael E. Martinez (*pro hac vice*)
    Phillip Warren (SBN 89744)                            Lauren Norris Donahue (*pro hac vice*)
6   Joan R. Li (SBN 312024)                               Clifford C. Histed (*pro hac vice*)
    **COVINGTON & BURLING LLP**                           Stephen M. Humenik (*pro hac vice*)
7   Salesforce Tower                                      Brian J. Smith (*pro hac vice*)
    415 Mission Street, Suite 5400                        John E. Susoreny (*pro hac vice*)
8   San Francisco, California 94105-2533                  **K&L GATES LLP**
9   Telephone: (415) 591-6000                             70 W. Madison St., Suite 3300
    Facsimile:  (415) 591-6091                            Chicago, Illinois 60602
10  jdavidson@cov.com                                     Telephone:  (312) 372-1121
    pwarren@cov.com                                       Facsimile:  (312) 827-8000
11  jli@cov.com                                           michael.martinez@klgates.com
                                                          lauren.donahue@klgates.com
12                                                        clifford.histed@klgates.com
    John S. Playforth (*pro hac vice*)                    stephen.humenik@klgates.com
13  Laura E. Brookover (*pro hac vice*)                   brian.j.smith@klgates.com
    Brendan D. Duffy (*pro hac vice*)                     john.susoreny@klgates.com
14  Andrew W. Chang (SBN 319009)
    **COVINGTON & BURLING LLP**
15  One CityCenter
16  850 Tenth Street, NW                                  *Counsel for Defendants SK Energy*
    Washington, DC 20001-4956                             *Americas, Inc., SK Trading International Co.*
17  Telephone: (202) 662-6000                             *Ltd., and David Niemann*
    Facsimile:  (202) 662-6291
18  jplayforth@cov.com
19  lbrookover@cov.com
    bduffy@cov.com
20  achang@cov.com

21  *Counsel for Defendants SK Energy*
    *Americas, Inc., SK Trading International Co.*
22  *Ltd., and David Niemann*

23

24

25

26

27

28

**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT**

Case No. 20-cv-3131

1

By: _/s/ Ethan Glass_

By: _/s/ Amanda Bonn_

2

John B. Quinn (SBN 090378)

Amanda Bonn (SBN 270891)

3

Steven G. Madison (SBN 101006)

Eliza Finley (SBN 301318)

Shon Morgan (SBN 187736)

**SUSMAN GODFREY LLP**

4

Ethan Glass (SBN 216159)

1900 Avenue of the Stars, Suite 1400

**QUINN EMANUEL URQUHART &**

Los Angeles, CA 90067

5

**SULLIVAN, LLP**

Telephone: (310) 789-3100

6

865 South Figueroa Street, 10th Floor

Facsimile: (310) 789-3150

Los Angeles, California 90017

abonn@susmangodfrey.com

7

Telephone: (213) 443-3000

efinley@susmangodfrey.com

Facsimile: (213) 443-3100

8

johnquinn@quinnemanuel.com

Neal Manne (SBN 94101)

9

stevemadison@quinnemanuel.com

Alex Kaplan (_pro hac vice_)

shonmorgan@quinnemanuel.com

**SUSMAN GODFREY LLP**

10

ethanglass@quinnemanuel.com

1000 Louisiana, Suite 5100

Houston, TX 77002

11

John M. Potter (SBN 165843)

Telephone: (713) 651-9366

Justin Reinheimer (SBN 268868)

Facsimile: (713) 654-6666

12

Christine W. Chen (SBN 327581)

nmanne@susmangodfrey.com

**QUINN EMANUEL URQUHART &**

akaplan@susmangodfrey.com

13

**SULLIVAN, LLP**

14

50 California Street, 22nd Floor

_Counsel for Defendants Vitol, Inc. and Brad_

San Francisco, California 94111

_Lucas_

15

Telephone: (415) 875-6600

Facsimile: (415) 875-6700

16

johnpotter@quinnemanuel.com

justinreinheimer@quinnemanuel.com

17

christinechen@quinnemanuel.com

18

_Counsel for Defendant Vitol, Inc._

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT

Case No. 20-cv-3131

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTESTATION**

I, Ethan Glass, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.


DATED:   October 23, 2020                    By:   */s/ Ethan Glass*
                                                                        Ethan Glass

DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND MEMORANDUM OF POINTS OF AUTHORITY IN SUPPORT
Case No. 20-cv-3131