1
2
3
4                   UNITED STATES DISTRICT COURT
5                 NORTHERN DISTRICT OF CALIFORNIA
6
7    IN RE CALIFORNIA GASOLINE SPOT          Case No.  20-cv-03131-JSC
8    MARKET ANTITRUST LITIGATION
9                                            **ORDER RE: DEFENDANTS'
                                             MOTIONS TO STAY AND DISMISS**
10                                           Re: Dkt. Nos. 222, 224
11
12
13         Plaintiffs allege that Defendants entered into horizonal agreements to restrain competition

14   in the spot market for gasoline and gasoline blending components formulated for use in California.

15   Plaintiffs filed a putative class action bringing federal and state antitrust claims as well as state law

16   unfair competition and unjust enrichment claims against SK Trading International Co., Ltd. ("SK

17   Trading"), SK Energy Americas, Inc. ("SK Energy"), Vitol Inc. ("Vitol"), and two individual

18   defendants.  Defendants' joint motion to stay this action pending a related state court action and

19   motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) are now pending before the

20   Court.[1]  (Dkt. Nos 222, 224.)  Having considered the parties' briefs and having had the benefit of

21   oral argument on January 28, 2021, the Court GRANTS IN PART and DENIES IN PART the

22   motion to dismiss.  Plaintiffs' Sherman Act claim is dismissed as Plaintiffs have not established

23   standing to pursue a claim for injunctive relief and their UCL claim is dismissed as they have

24   failed to show that their legal remedies are otherwise inadequate.  The motion to dismiss is

25   otherwise denied.  Defendants' motion to stay is DENIED because Defendants have failed to

26   establish a basis to stay this action under either *Colorado River* or this Court's inherent authority.

27   _____

28   [1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. §
     636(c). (Dkt. No. 199 at ¶ 12.)

United States District Court
Northern District of California

# BACKGROUND

## A.  Consolidated Class Action Complaint Allegations

The gravamen of the CCAC is that SK Trading, SK Energy, and Vitol conspired to "restrain competition in the spot market for gasoline formulated for use in California and in certain gasoline blending components used in that gasoline." (Consolidated Class Action Complaint ("CCAC"), Dkt. No. 186 at ¶ 1.[2]) "Defendants' scheme exploited a disruption in refining capacity that resulted from an incident at the refinery in Torrance, California wherein a cracking unit exploded which impaired the refinery's ability to refine alkylates from February 2015 through at least June 2016. (*Id.* at ¶ 3.) The corporate Defendants and their employees—Lucas and Niemann—recognized that the supply disruption provided by the explosion provided them an opportunity to artificially inflate the price of alkylates and thus gasoline (given the relationship between the two). (*Id.* at ¶ 4.) Defendants negotiated large contracts to supply gasoline and gasoline blending components for delivery in California and entered into agreements with each other to "manipulate the spot market price for refined gasoline and gasoline blending components so that they could realize windfall profits on these contracts." (*Id.* at ¶¶ 5-6.) They also entered into profit sharing agreements and agreements to disguise their market interference. (*Id.*)

"Defendants' repeated and pervasive manipulation of the spot market price caused retail gasoline prices to be higher throughout the Class Period."  (*Id.* at ¶ 152.)  Indeed, California Energy Commission's Petroleum Market Advisory Committee "concluded that Californians may have paid at least $12 billion in extra gasoline costs due to the 'unexplained differential' since the 2015 Torrance Refinery explosion." (*Id.* at ¶ 155.)  Plaintiffs thus allege that they paid more for gasoline as a result of Defendants' illegal activities.  (*Id.* at ¶ 9.)

## B.  Procedural Background

Before this action was filed, the California Attorney General filed a *parens patriae* action in the San Francisco Superior Court. *See The People of the State of California v. Vitol, Inc., et al.*, Case No. CGC20584456 (S.F. Superior, filed May 4, 2020) ("AG Action"). The AG Action

---

[2] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

1   includes Cartwright Act and UCL claims. Pacific Wine Distributors, Inc., filed the first action in

2   this District two days after the AG Action was filed, on May 6, 2020. (Dkt. No. 1.) The other

3   named plaintiffs subsequently filed separate actions, each of which was related to this action. The

4   parties thereafter stipulated that all 23 related actions would be consolidated for purposes of trial.

5   (Dkt. Nos. 67, 121, 133, 146, 148, 174.) The Court then appointed Hausfeld and Girard Sharp as

6   co-lead interim class counsel. (Dkt. No. 167.) Shortly thereafter, Plaintiffs filed the now operative

7   Consolidated Class Action Complaint which includes class claims for (1) violation of the Sherman

8   Act, 15 U.S.C. § 1; (2) violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16720; (3)

9   violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200; and (4) unjust

10  enrichment. (Dkt. No. 186.)

11          Following a status conference on October 6, 2020, the Court set a phased briefing schedule

12  for Defendants' forthcoming Rule 12(b) motions with SK Trading's motion to dismiss for lack of

13  personal jurisdiction and improper venue to be heard before the other Defendants' Rule 12(b)(6)

14  motion and motion to stay. (Dkt. No. 207.) The motion to dismiss for lack of personal jurisdiction

15  and improper venue under Rule 12(b)(2), (3) came before the Court for hearing on December 16,

16  2020 and the Court subsequently granted Plaintiffs leave to take jurisdictional discovery and

17  deferred ruling on the motion.  (Dkt. No. 263.)  The Rule 12(b)(6) motion and motion to stay came

18  before the Court for hearing on January 28, 2021.

## DISCUSSION

20          Defendants move to stay this action in light of the AG's action in state court and to dismiss

21  each of Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

22  claim and as barred in part by the statute of limitations.

23  ## I.  MOTION TO DISMISS

24      ### A.  The Cartwright Act

25          The Cartwright Act, Business and Professions Code section 16700 et seq., was "enacted to

26  promote free market competition and to prevent conspiracies or agreements in restraint or

27  monopolization of trade." *Exxon Corp. v. Super. Ct.*, 51 Cal. App. 4th 1672, 1680 (1997). To state

28  a claim under the Cartwright Act, plaintiffs must allege: "(1) the formation and operation of the

*United States District Court*
*Northern District of California*

3

conspiracy; (2) illegal acts done pursuant thereto; and (3) damage proximately caused by such acts." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1126 (N.D. Cal. 2012) (quoting *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 718 (1982)); *see also Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., was modeled after the Sherman Act.").

Plaintiffs allege Defendants entered into an agreement that constitutes a per se violation of the Cartwright Act.  (CCAC at ¶ 177.)  Under the *per se* rule, certain categories of restraint are treated as "necessarily illegal [which] eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work." *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (quoting *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723 (1988)).  "Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices, or to divide markets." *Leegin,* 551 U.S. at 886.  To state a claim for a *per se* antitrust violation, Plaintiffs must allege that Defendants "(1) entered into an agreement (2) to fix prices, rig bids, or divide a market." *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1025 (C.D. Cal. 2011).

Defendants insist that Plaintiffs' Cartwright Act claim is deficient because it fails to plead (1) an unlawful agreement to restrain trade, (2) causation, and (3) injury.  The Court addresses each in turn.

### 1)  Unlawful Agreement to Restrain Trade

The Ninth Circuit recently summarized the federal court requirements for pleading an unlawful agreement to restrain trade:

> Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has held that plaintiffs must put forth: enough factual matter (taken as true) to suggest that an agreement was made.
>
> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Building

4

upon *Twombly* and its companion case, *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), we have held that to state a claim for antitrust conspiracy, plaintiffs must allege "'who, did what, to whom (or with whom), where, and when?'"

In the context of antitrust conspiracy claims, plaintiffs may meet their burden by alleging parallel conduct among competitors and certain "plus factors" suggesting a conspiracy. Alternatively, plaintiffs may meet their burden by putting forth direct evidence of an agreement. To meet the direct evidence standard, however, the evidence must explicitly support the asserted proposition without requiring any inference.

*Frost v. LG Elecs., Inc.,* 801 F. App'x 496, 497 (9th Cir. 2020).  Plaintiffs sufficiently allege the who, what, when, and where and the existence of a conspiracy through direct evidence.

Plaintiffs allege that in October 2014 a Vitol executive advised Lucas—Vitol's primary West Coast gasoline and its blending components trader—that Vitol was looking to work with SK in 2015 and that Lucas should keep the information "super" confidential. (CCAC at ¶ 99.) The following month an internal SK status report explained that Vitol wanted to cooperate with SK in the California market. (*Id.* at ¶ 100.) The cooperation agreements were not in writing and legal counsel for neither party was involved; indeed, "Vitol and SK took steps not to reveal the nature of these agreements to other market participants."  (*Id.* at ¶ 101.)

While there was ample gasoline supply in the California market at the time the parties began cooperating, by December 2014 "there were indications that a significant refinery outage might occur."  (*Id.* at ¶ 103.)  And indeed, in mid-December 2014, Lucas sent an email to Niemann reporting that ExxonMobil had shut a hydrocracker for a leak (a hydrocracker is a part of a refinery involved in the refining of heavier oils into fuel).  (*Id.*)  Lucas added that he hoped the shut down would last a month or two, to which Niemann speculated that the leak could cause further damage. Lucas called further damage "ideal," but "probably too much to wish for," to which Niemann responded "it's a start at least."  (*Id.*)  Shortly thereafter, Niemann, on behalf of SK Energy, began trading premium gasoline for the first time in California, and Niemann and Lucas expanded their coordination to include premium gasoline trading.  (*Id.* at ¶ 105.)  By this time, "Niemann was the senior trader for SK with responsibility for California trading, Lucas had the same role with Vitol, and their respective firms were horizontal competitors in the California gasoline market."  (*Id.* at ¶ 105.)

United States District Court
Northern District of California

5

The Exxon-Mobile Torrance Refinery explosion occurred on February 18, 2015, forcing the Refinery to shut down.  (*Id*. at ¶¶ 106-107.)  As a result, Exxon-Mobile "needed to replace a significant amount of lost gasoline and alkylate production in California."  (*Id.* ¶ 107.)  Accordingly, it entered into contracts with gasoline trading firms like SK and Vitol to negotiate the purchase of Regular gasoline.  (*Id.* ¶ 108.)

Exxon-Mobile's contracts with SK and Vitol had floating prices tied to the California gasoline-spot market and, in particular, to the prices reported to the Oil Price Information Service, LLC (OPIS), a private subscription service.  Once trades are disclosed to OPIS, OPIS reports them in a Daily Market Report. (*Id.* ¶ 71-73, 108.)  Not many trades are reported to OPIS: as few as 5 to 15 per day for Regular gasoline and as few as one to zero for Premium gasoline. (*Id.* ¶ 74.) Thus, a few trades set the prices for Exxon-Mobile's separate contracts with Defendants.

Plaintiffs allege that unbeknownst to Exxon-Mobile—or the spot market as a whole—Vitol and SK agreed to manipulate the trades reported to OPIS and therefore artificially inflate the price that Exxon-Mobile paid to SK and Vitol under its separate contracts with each, and then to share the profits from their Exxon-Mobile contracts.  The manipulation often involved taking a loss on a trade reported to OPIS (paying an artificially high price), but more than making up that loss in what Exxon-Mobile paid under the contracts tied to the OPIS-reported price. (¶¶ 112-118.)  Vitol and SK would engage in these market-making trades with each other and with third parties. Among other tactics, they would also engage in second trades with each other that they did not report to OPIS that were the opposite of the OPIS-reported trade; these hidden trades ensured there was little market risk for either party.  (*Id.* ¶ 124.)

Defendants do not appear to dispute that Plaintiffs' allegations are sufficient to demonstrate an agreement.  Instead, Defendants insist that Plaintiffs' allegations at best demonstrate lawful "output-increasing joint ventures to import alkylate into California and sell it during a supply shortage." (Dkt. No. 266 at 15:13-14.)  To be sure, it is not *per se* unlawful for two competitors to enter into a joint venture.  *See Ixchel Pharma, LLC v. Biogen, Inc*., 9 Cal. 5th 1130, 1161 (2020).  But Plaintiffs' allegations are not that Defendants engaged in a joint venture which is unreasonable under the antitrust laws; rather, Plaintiffs allege that  "the 'joint ventures'

United States District Court
Northern District of California

6

1    were effectively a sham or pretext for unlawful cooperation and were a method of engaging in

2    prearranged transactions in restraint of trade to avoid competition in violation of federal and state

3    antitrust laws."  (CCAC at ¶ 138.)  The question is whether drawing all reasonable inferences in

4    Plaintiffs' favor, they have plausibly pled a joint venture agreement as a pretext to restrain trade.

5    They have.

6          The alleged joint venture was not in writing, not reviewed by counsel, and not known to

7    Exxon-Mobile or the market as a whole.  Defendants referred to their cooperation as being super

8    secret and when Lucas asked for confirmation of the agreement via email, Niemann responded

9    that he agreed, but "never sent anything before as didn't think you wanted me to do that."  (*Id*. at ¶

10   133.)  In June 2016, Vitol executives wrote regarding a trade with SK: "we JV the back side no

11   one knows this so P[rivate] & C[onfidential]." (*Id.* ¶ 135.)  Neither SK nor Vitol publicized their

12   alleged joint venture even though they had done so with other joint ventures in the past.  (¶*Id.* at

13   139.)  Drawing all reasonable inferences in Plaintiffs' favor, the CCAC plausibly alleges that the

14   so-called joint venture was a subterfuge for an illegal price-fixing conspiracy.  The allegations are

15   thus distinguishable from *Kendall v. Visa, U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) *and In re*

16   *Musical Instruments & Equip. Antitrust Litig.,* 798 F.3d 1186 (9th Cir. 2015), which challenged

17   public and transparent business arrangements with an obvious pro-competitive purpose.

18         Defendants next insist that Plaintiffs have not plausibly pled an antitrust price fixing

19   conspiracy because they have not identified a single specific trade that Defendants engaged in as

20   part of their manipulation of OPIS.  They appear to argue that while Plaintiffs may have plausibly

21   alleged a price-fixing conspiracy given the emails, meetings, and fact that prices remained high for

22   longer than would be expected, they do not sufficiently allege how the price fixing occurred. In

23   other words, while the outlines of how the scheme operated might be sufficiently alleged,

24   Plaintiffs have not alleged enough details to support a plausible inference that what is alleged is

25   how the conspiracy actually worked.

26         Defendants demand more at this litigation stage than Rule 8 requires.  Rule 8 requires that

27   Plaintiffs allege enough factual matter (taken as true) to suggest that an agreement was made.

28   "Asking for plausible grounds to infer an agreement does not impose a probability requirement at

United States District Court
Northern District of California

1   the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery

2   will reveal evidence of illegal agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

3   Here, if the alleged facts—agreeing to cooperate as suggested by the quoted emails, manipulating

4   OPIS-reported trades to inflate the price of their contracts, and prices remaining inflated for longer

5   than would be expected—are taken as true, there is a reasonable expectation that discovery will

6   disclose evidence of the horizontal price-fixing agreement.  To put it another way, Plaintiffs have

7   alleged the who (Vitol (through Lucas) and SK (through Neimann), did what to whom

8   (manipulated OPIS-reported trades to artificially inflate the prices paid by Exxon-Mobile on its

9   separate contracts with Vitol and SK), where (in California) and when (late 2014 through 2016).

10  The allegations plausibly support an inference of a *per se* unlawful agreement to fix prices.

         **2)  Causation and Injury**

12           Under the Cartwright Act, the plaintiff must also show that an antitrust violation was the

13  proximate cause of its injuries. *Kolling v. Dow Jones & Co.*, 137 Cal.App.3d 709, 723 (1982).

14  Both direct and indirect purchasers have standing under the Cartwright Act.  *Cellular Plus, Inc. v.*

15  *Superior Court*, 14 Cal. App. 4th 1224, 1234 (1993).  "[T]he case will be quite rare in which a *per*

16  *se* violation ... does not cause competitive injury." *Kolling*, 137 Cal. App. 3d at 724.

17           Defendants insist that Plaintiffs have failed to demonstrate either injury or causation

18  because Plaintiffs have not identified specific trades or pricing windows that were impacted by

19  Defendants' conduct, Plaintiffs have not shown how any upmarket trades could have affected

20  downstream consumers, and because Plaintiffs' theory is implausible in light of other market

21  forces which caused elevated gasoline prices (such as, presumably, the refinery explosion).

22  Plaintiffs, however, are not required to plead specific trades to plead injury for a  Cartwright Act

23  claim.  *See Darush v. Revision LP*, No. CV 12-10296 GAF AGRX, 2013 WL 8182502, at *5

24  (C.D. Cal. July 16, 2013) (finding that plaintiffs' allegations that its 'injury is caused by [its]

25  unlawful termination as a distributor—pursuant to Defendants' unlawful price fixing agreement—

26  resulting in a reduction in competition and increased prices to consumers purchasing Revision

27  products'" adequately alleged injury); *see also Flagship Theatres of Palm Desert, LLC v. Century*

28  *Theatres, Inc.*, 198 Cal. App. 4th 1366, 1380 (2011), as modified on denial of reh'g (Sept. 29,

1   2011) (To allege an antitrust injury, the plaintiff "must show that it was injured by the

2   anticompetitive aspects or effects of the defendant's conduct, as opposed to being injured by the

3   conducts neutral or even procompetitive aspects … to make that showing, the plaintiff need not

4   show that the market has actually become less competitive than it would have been without the

5   defendant's conduct.").

6       Plaintiffs allege that

7           Defendants' anticompetitive and unlawful conduct has proximately
            caused injury to Plaintiffs and members of the Class by restraining
8           competition and thereby raising, maintaining and/or stabilizing the
            prices of gasoline at levels above those that would have prevailed in
9           a competitive market. Defendants' conduct restrained trade in the
            market in which Plaintiffs and members of the Class made their
10          purchases. In paying overcharges as a result of Defendants' conduct,
            Plaintiffs and members of the Class suffered an injury of a type which
11          the antitrust laws were designed to redress.

12  (CCAC at ¶ 178.)  These allegations combined with Plaintiffs' allegations of a scheme to inflate

13  and otherwise impact the price of gasoline in California, as described above, adequately plead

14  causation and an antitrust injury.  Whether other factors likewise impacted the price so as to

15  undermine Plaintiffs' allegations that Defendants' actions were the proximate cause of their injury

16  is not a question that can be resolved at the pleading stage.  "[T]he antitrust injury requirement

17  means that in order to prevail on its antitrust claims, [Plaintiffs] must show that its "loss stems

18  from a competition—reducing aspect or effect of the defendant's behavior." *Flagship Theatres*,

19  198 Cal. App. 4th at 1381.

20                                              ***

21      Accordingly, Defendants' motion to dismiss Plaintiffs' Cartwright Act claim is denied.

22  **B.   The Sherman Act**

23      As discussed above, Plaintiffs allege that Defendants' activities constitute a *per se*

24  violation of the Sherman Act, 15 U.S.C. § 1. (CCAC at ¶ 171.)  However, Plaintiffs only seek

25  injunctive relief for their Sherman Act claim.  Under Section 16 of the Clayton Act, a party may

26  seek injunctive relief "against threatened loss or damage by a violation of the antitrust laws." 15

27  U.S.C. § 26. Defendants insist that Plaintiffs lack standing to seek injunctive relief because there

28  are no allegations of ongoing unlawful activity.

United States District Court
Northern District of California

9

United States District Court
Northern District of California

1    Plaintiffs respond that past exposure to illegal conduct accompanied by continuing adverse

2    effects is sufficient to establish standing.  They insist that the "'mystery gasoline surcharge' is a

3    continuing phenomenon."  (Dkt. No. 253 at 32:10-11.)  However, the paragraphs of the CCAC

4    that Plaintiffs identify—paragraphs 7 and 141—do not allege that it is a continuing phenomenon.

5    Paragraph 7 quotes from a 2017 news article which described gas prices as "still out of whack."

6    Likewise, paragraph 141 describes the price spike through 2018.  Neither of these paragraphs

7    plausibly suggest that the surcharge is ongoing into 2021.  Moreover, Plaintiffs elsewhere cabin

8    the effects as lasting through 2017.  (CCAC ¶ 146 ("California gas prices remained at levels

9    substantially above the historic average through 2015 and 2016 and into 2017").  "Past exposure

10   to illegal conduct does not in itself show a present case or controversy regarding injunctive relief,

11   however, if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414

12   U.S. 488, 495–96 (1974).

13   Plaintiffs next "point to potential future conduct."  (Dkt. No. 253 at 32:15.)  Potential

14   harm, however, is insufficient.  As the Supreme Court has "repeatedly reiterated[,] threatened

15   injury must be certainly impending to constitute injury in fact, and [] [a]llegations of possible

16   future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal

17   citation and quotation marks omitted).  Instead, Plaintiffs must demonstrate "a significant threat of

18   injury from an impending violation ... or from a contemporary violation likely to continue or

19   recur." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 12–13 (1st Cir.

20   2008) (internal citation and quotation marks omitted).  In *New Motor Vehicles*, for example, the

21   First Circuit found that plaintiffs lacked standing to pursue their Sherman Act injunctive relief

22   claim because "[t]he perfect storm that allegedly precipitated massive arbitrage opportunities for

23   selling Canadian cars in the United States ceased long ago." *Id*. at 15 (internal quotation marks

24   omitted).  So too here.

25   Plaintiffs' allegations relate to Defendants' actions in 2014-2016.  (CCAC ¶¶ 97-157.)

26   Further, while the parties dispute whether Vitol still employs Lucas, Plaintiffs concede that

27   Niemann left SK Energy in May 2017.  (*Id*. at ¶ 92.)  Plaintiffs' reliance on their allegations that

28   both SK Energy and Vitol are still registered to conduct business in California and that Kim (who

United States District Court
Northern District of California

oversaw global trading for SK Trading and to whom Niemann reported during the period in question) is still employed by SK entities, is not persuasive.  If these allegations were sufficient to establish a significant threat of future injury, there would nearly always be standing to obtain injunctive relief where the competitors remain the market.  *Clapper*, 568 U.S at 416 (finding that standing requires allegations of harm that is "certainly impending").  Even if the Court were to conclude that Plaintiffs' allegation that "Vitol and SK are known recidivist antitrust violators" was plausible notwithstanding the thin supporting allegations, this would not be enough to show imminent threatened antitrust activity with respect to the gasoline market in California.  (CCAC at ¶¶ 22, 23, 173.)  In *Adkins*, the court found that "Facebook's repetitive losses of users' privacy supplies a long-term need for supervision." *Adkins v. Facebook, Inc*., 424 F. Supp. 3d 686, 698 (N.D. Cal. 2019).  Here, in contrast, Plaintiffs allege prior bad acts unrelated to the conduct at issue here.

Accordingly, Plaintiffs have failed to demonstrate standing to pursue their injunctive relief claims under the Sherman Act.  *See Bennett v. Spear*, 520 U.S. 154, 167–68 (1997) ("each element of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.") (internal citation and quotation marks omitted).  Defendants' motion to dismiss the Sherman Act claim is granted with leave to amend.

### C.  The UCL

Defendants insist that Plaintiffs' UCL claim is foreclosed by the Ninth Circuit's recent decision in *Sonner v. Premier Nutrition Corp*., 971 F.3d 834 (9th Cir. 2020).  In *Sonner*, the court affirmed dismissal of plaintiff's UCL and CLRA claims because she failed to allege that she lacked an adequate remedy at law.  *Id*. at 844.  The court relied on the plaintiff's concession that she sought the same sum in equitable restitution as she sought in damages, and the plaintiff's failure to "explain how the same amount of money for the exact same harm is inadequate or incomplete." *Id*.  Plaintiffs counter that *Sonner* is distinguishable because it was decided at a different procedural posture and it does not apply to their claim for injunctive relief.  Neither argument is availing.

United States District Court
Northern District of California

1    First, it is of no moment that *Sonner* was decided at a much later stage in the litigation—

2    after the plaintiff attempted to amend her complaint on the eve of trial to drop her damages claim.

3    *Id*. at 838.   "Nothing in *Sonner* limits its precedential value to such circumstances." *Zaback v.*

4    *Kellogg Sales Co.*, No. 20-00268 BEN MSB, 2020 WL 6381987, at *4 (S.D. Cal. Oct. 29, 2020)

5    (collecting cases that have "applied *Sonner* to dismiss complaints in cases involving similar claims

6    at the more familiar early stages of litigation").   The dispositive issue in *Sonner* was the plaintiff's

7    failure to plead inadequate remedies at law or explain why the remedies she requested in the

8    complaint would be inadequate.   So too here.   Plaintiffs do not plead that they have inadequate

9    remedies at law and instead allege that "*to the extent the Court ultimately deems inadequate the*

10   *remedies at law that Plaintiffs request*, Plaintiffs and members of the Class are entitled to

11   equitable relief such as restitution and injunctive relief pursuant to California Business and

12   Professions Code § 17203."   (CCAC at ¶ 186.)   But nowhere in the complaint do Plaintiffs allege

13   that the three-fold damages they seek are inadequate or otherwise distinguish their request for

14   restitution from their request for damages.   (*Id*. at p. 46 ¶ E.)   *See Sonner*, 971 F.3d at 844 (finding

15   that plaintiff "must establish that she lacks an adequate remedy at law before securing equitable

16   restitution for past harm under the UCL and CLRA."); *Julian v. TTE Tech., Inc*., No. 20-CV-

17   02857-EMC, 2020 WL 6743912, at *5 (N.D. Cal. Nov. 17, 2020) (dismissing where "on the face

18   of the complaint, it appears that what Plaintiffs' claim for damages and restitution are not really

19   different").

20   Second, "numerous courts in this circuit have applied *Sonner* to injunctive relief claims."

21   *In re MacBook Keyboard Litig*., No. 5:18-CV-02813-EJD, 2020 WL 6047253, at *3 (N.D. Cal.

22   Oct. 13, 2020) (collecting cases); *see also Huynh v. Quora*, Inc., No. 5:18-CV-07597-BLF, 2020

23   WL 7495097, at *19 (N.D. Cal. Dec. 21, 2020) (same).   Neither *Krommenhock* nor *JUUL Labs*

24   held otherwise; to the contrary, the courts in both cases granted the motions to dismiss.   *See*

25   *Krommenhock v. Post Foods, LLC*, No. 16-CV-04958-WHO, 2020 WL 6074107, at *1 (N.D. Cal.

26   Sept. 29, 2020) (dismissing complaint to allow leave to amend to allege that the plaintiffs'

27   remedies at law were inadequate in light of *Sonner*);   *In re JUUL Labs, Inc., Mktg., Sales*

28   *Practices, & Prod. Liab. Litig*., No. 19-MD-02913-WHO, 2020 WL 6271173, at *55 (N.D. Cal.

1    Oct. 23, 2020) (dismissing and granting leave to amend to "allege that [plaintiffs] remedies at law

2    are inadequate and to support their claim to equitable restitution under the UCL and FAL").

3            Finally, Plaintiffs' citation to a pre-*Sonner* case for the proposition that they are permitted

4    to plead alternative claims for relief is unavailing.  Several courts have rejected this same

5    argument.  *See, e.g.*, *Anderson v. Apple Inc*., No. 3:20-CV-02328-WHO, 2020 WL 6710101, at *7

6    (N.D. Cal. Nov. 16, 2020) (rejecting reliance on pre-*Sonner* cases regarding pleading alternative

7    remedies noting that *Sonner* appeared to have resolved the split of authority regarding "whether

8    plaintiffs should be barred from pleading claims for equitable relief under the UCL and CLRA if

9    they have alleged a claim that would provide an adequate remedy at law."); *In re MacBook

10   Keyboard Litig*., 2020 WL 6047253, at *2 ("this is not an election of remedies issue. The question

11   is not whether or when Plaintiffs are required to choose between two available inconsistent

12   remedies, it is whether equitable remedies are available to Plaintiffs at all. In other words, the

13   question is whether Plaintiffs have adequately pled their claims for equitable relief, and that

14   question is not premature on a motion to dismiss.").

15           Plaintiffs' UCL claim is dismissed with leave to amend to the extent they have a good faith

16   basis for alleging that they lack an adequate remedy of law.

17       **D.  Unjust Enrichment**

18           Defendants contend that Plaintiffs' unjust enrichment claim is also foreclosed by *Sonner*

19   since they have not alleged that they lack an adequate remedy at law.  Defendants also insist that

20   there is not a standalone claim for unjust enrichment under California law.

21           Plaintiffs counter that the remedy they seek—nonrestitutionary disgorgement—is available

22   here.  Indeed, the relief that Plaintiffs seek for their unjust enrichment claim is not the same as that

23   sought for their UCL claim.  While Plaintiffs seek restitution for their UCL claim, for their unjust

24   enrichment claim Plaintiffs seek "non-restitutionary disgorgement of the financial profits that

25   Defendants obtained as a result of their unjust conduct."  (CCAC at ¶ 190.)  In addition, in contrast

26   to their UCL claim, for their unjust enrichment claim Plaintiffs affirmatively allege no alternative

27   remedy at law for the claim.  (*Id.*)  *Sonner* is therefore distinguishable, as there, unlike here,

28   plaintiff failed to allege a difference between the money damages sought and restitution claimed.

13

Further, nonrestitutionary disgorgement is not available under the UCL.  *See S. California Water Co. v. Aerojet-Gen. Corp.*, No. CV 02-6340ABCRCX, 2003 WL 25537163, at *11 (C.D. Cal. Apr. 1, 2003) (citing *Korea Supply Company v. Lockheed Martin Corporation*, 29 Cal.4th 1134, 1147 (2003)). Nonrestitutionary disgorgement is, however, a remedy for unjust enrichment claims "[w]here a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust." *Meister v. Mensinger*, 230 Cal. App. 4th 381, 398 (2014). Under these circumstances, "the defendant may be under a duty to give to the plaintiff the amount by which [the defendant] has been enriched. *Id.* (internal quotation marks and citations omitted; alteration in original).

Defendants fail to address Plaintiffs' claim for nonrestitutionary disgorgement, nor do they make a showing as to how this claim overlaps with Plaintiffs' damages claim.  Accordingly, Defendants' motion to dismiss Plaintiffs' claim for unjust enrichment is denied.

### E.  Statute of Limitations

Defendants insist that Plaintiffs' pre-2016 claims are barred by the four-year statute of limitations on antitrust and UCL claims.[3]  Because the Court has dismissed Plaintiffs' Sherman Act and UCL claims, the Court only considers whether Plaintiffs' Cartwright Act claim is time-barred.  As statute of limitations is an affirmative defense, Defendants bear the burden that based on the CCAC's allegations, the Cartwright Act is untimely.  Defendants have met that burden as to all Plaintiffs and class members who purchased gas four years prior to the filing of the complaint. Plaintiffs do not contend otherwise.

The burden thus moves to Plaintiffs to show that tolling of some sort saves the pre-2016 claims.  Plaintiffs insist that their pre-2016 claims are subject to tolling under the discovery rule, the doctrine of fraudulent concealment, and by virtue of express tolling agreements between the AG and Defendants.[4]  (CCAC at ¶ 168.)

---

[3] Defendants do not move to dismiss Plaintiffs' unjust enrichment claim as untimely.  (Dkt. No. 224 at 49 ("Plaintiffs' claims under the Sherman Act, the Cartwright Act, and the UCL are all subject to a four-year statute of limitations.").)

[4] Although both parties address tolling under federal law, California tolling rules apply as the

United States District Court
Northern District of California

### 1) **The Discovery Rule**

The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1192 (2013) (internal citation omitted). "[A] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Beasley v. Conagra Brands, Inc*., 374 F. Supp. 3d 869, 883 (N.D. Cal. 2019) (internal citation omitted) (quoting *McKelvey v. Boeing N. Am., Inc.*, 74 Cal. App. 4th 151, 160 (1999)).

Plaintiffs allege that they discovered the basis for their claims when the AG filed its complaint in state court.  (CCAC at ¶ 159.)  "Before then, Plaintiffs and the Class had neither actual nor constructive knowledge, and no reason to believe, that they paid prices for gasoline that were affected by Defendants' illegal conduct, and thus until then had no duty to investigate the claims set forth in this Consolidated Complaint."  (*Id.*)  Plaintiff Pacific Wine Distributors, Inc., filed its complaint in this Court two days after the AG's complaint was filed in state court. Plaintiffs have thus alleged when they discovered the basis for the claim, that they could not have discovered it earlier, and that they acted diligently upon discovery of the basis for their claims by filing this action two days later.

Defendants do not dispute that Plaintiffs have sufficiently pled delayed discovery; instead, they insist that the discovery rule does not apply to the Cartwright Act claim because the time runs from the injury rather than the discovery. As support Defendants rely exclusively on *Ryan v. Microsoft Corp*., No. 14-CV-04634-LHK, 2015 WL 1738352, at *16 (N.D. Cal. Apr. 10, 2015).[5] *Ryan* reasoned that "the default accrual rule is the last element rule, where a claim accrues when [it] is complete with all of its elements'—those elements being wrongdoing, harm, and causation." *Id.* at *15.  The court then concluded that the plaintiffs had not identified "any circumstances

---

Court has dismissed the Sherman Act claim and only California claims remain.
[5] Defendants fault Plaintiffs for not refuting the "body of cases establishing that the discovery rule does not apply."  (Dkt. No. 266 at 33.)  But Defendants cite only *one* case holding that the discovery rule does not apply to Cartwright Act cases.  (Dkt. No. 224 at 49.)

United States District Court
Northern District of California

1  warranting a deviation from the default common law last element accrual rule," and therefore the

2  discovery rule did not apply.  *Id.*

3       Plaintiffs respond by citing a different district court case:  *In re California Bail Bond*

4  *Antitrust Litig.*, No. 19-CV-00717-JST, 2020 WL 3041316 (N.D. Cal. Apr. 13, 2020). The *Bail*

5  *Bond* court concluded that the defendants had not met their burden of proving as a matter of law

6  that the discovery rule *did not* apply in light of the California Supreme Court's decision in *Aryeh*

7  *v. Canon Bus. Sols., Inc*., 55 Cal. 4th 1185, 1195 (2013).  In *Aryeh*, the California Supreme Court

8  rejected the notion that judicial interpretations of the Sherman Act—including those barring

9  delayed discovery based on ignorance—apply fully to Cartwright Act claims.  *Aryeh*, 55 Cal. 4th

10  at 1195 (holding that "[i]nterpretations of federal antitrust law are at most instructive, not

11  conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not

12  on federal antitrust statutes but instead on statutes enacted by California's sister states around the

13  turn of the 20th century.").  Instead, it held that when determining whether equitable exceptions to

14  the last element accrual rule apply to a claim, courts should look to the particular theory of the

15  claim to determine whether the discovery tolling rule should apply.  *Id.* at 1196.

16       As Defendants' motion is based on its bald assertion that the discovery tolling rule

17  categorically does not apply to Cartwright claims—and assertion belied by *Aryeh*— their motion

18  to dismiss on this ground is denied without prejudice.

19       **2) Fraudulent Concealment**

20       "The doctrine of fraudulent concealment tolls the statute of limitations where a defendant,

21  through deceptive conduct, has caused a claim to grow stale." *Aryeh*, 55 Cal. 4th at 875.  The

22  limitations period is tolled "only for that period during which the claim is undiscovered by

23  plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have

24  discovered it." *MGA Entm't, Inc. v. Mattel, Inc*., 41 Cal. App. 5th 554, 561 (2019) (quoting

25  *Bernson v. Browning-Ferris Industries*, 7 Cal. 4th 926, 931 (1994)). "The doctrine of fraudulent

26  concealment of the cause of action ... has an effect similar to the statutory rule of delayed accrual

27  and the same pleading and proof is required ..., i.e., the plaintiff must show (a) the substantive

28  elements of fraud, and (b) an excuse for late discovery of the facts*." Invs. Equity Life Holding Co.*

1    *v. Schmidt*, 195 Cal. App. 4th 1519, 1533 (2011), as modified (June 15, 2011) (internal citation

2    and quotation marks omitted).

3        As noted above, Defendants do not dispute that Plaintiffs have adequately alleged delayed

4    discovery.  Given this, and the Court's conclusion that Plaintiffs have plausibly alleged a

5    Cartwright Act claim based on a price fixing conspiracy, Plaintiffs have adequately pled grounds

6    for fraudulent concealment.

7        **3) AG Tolling Agreements**

8        Plaintiffs also invoke the tolling agreements that Defendants signed with the California

9    Attorney General in the state court action.  (CCAC ¶ 167.)   Defendants counter that Plaintiffs as

10   non-parties to the agreements cannot invoke the agreements' tolling provision.  Indeed, the

11   agreements state that they apply "to any claims that might be brought by the CAG related to the

12   subject matter of the INVESTIGATION." (Dkt. No. 225-5 at 1; Dkt. No. 225-6 at 1.[6])  Plaintiffs

13   nevertheless insist that they can enforce the agreements as third-party beneficiaries given the

14   nature of the *parens patrie* action.  Even if this were the case, it would only toll the claims of two

15   of the Plaintiffs—Justin Lardinois and Asante Cleveland—because a *parens patrie* action cannot

16   be brought on behalf of business or non-California residents.  (CCAC at ¶¶ 19, 20.)  However,

17   given the Court's conclusion with respect to the discovery rule and fraudulent concealment

18   doctrine, the Court need not finally resolve this issue as there are other bases for tolling Plaintiffs'

19   claims at this stage of the litigation.

20       Accordingly, Defendants' motion to dismiss Plaintiffs' claims as barred by the statute of

21   limitations is denied.

22                                              ***

23       As set forth above, Defendants' motion to dismiss is granted in part and denied in part.

24

25   _____

     [6]  The Court takes judicial notice of the tolling agreements under the incorporation-by-reference

26   doctrine. Under this doctrine, "[a] court may consider evidence on which the complaint
     necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the

27   plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6)
     motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (internal quotation marks and

28   citation omitted).

1    The motion is denied as to the Cartwright Act and unjust enrichment claims, but granted as to the

2    Sherman Act and UCL claims.  Further, Plaintiffs have adequately pled equitable tolling based on

3    the delayed discovery rule and fraudulent concealment doctrine.

4    **II.  MOTION TO STAY**

5           Defendants' motion to stay is two-fold: they seek stays (1) under the *Colorado River*

6    abstention doctrine, or alternatively, (2) under the Court's inherent authority to manage its own

7    docket.  The Court begins with *Colorado River* abstention.

8           **A.  *Colorado River* Abstention**

9           The *Colorado River* doctrine represents a "narrow exception to the virtually unflagging

10   obligation of the federal courts to exercise the jurisdiction given them." *Smith v. Ctr. Ariz. Water*

11   *Conservation Dist.*, 418 F.3d 1028, 1033 (9th Cir. 2005) (internal citation and quotation marks

12   omitted); *see Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976)).

13   Abstention in favor of a parallel state action may be proper due to considerations of "[w]ise

14   judicial administration giving regard to conservation of judicial resources and comprehensive

15   disposition of litigation."  *Nakash v. Marciano*, 882 F.2d 1411, 1415 (9th Cir. 1989) (citation

16   omitted). Such cases are "rare," "limited," and "exceptional," with "only the clearest of

17   justifications" supporting abstention. *R.R. St. & Co. v. Transp. Ins. Co.*, 656 F.3d 966, 977–78 (9th

18   Cir.2011) (internal quotation marks and citation omitted). The Ninth Circuit "generally require[s]

19   a stay rather than a dismissal." *Id.* at 979 n. 8. *Colorado River* abstention does not require "exact

20   parallelism" between the actions; instead, the actions need only be "substantially similar[.]"

21   *Nakash*, 882 F.2d at 1416.

22          In determining whether to stay a case pursuant to *Colorado River*, courts in the Ninth

23   Circuit consider eight factors:

24                (1) which court first assumed jurisdiction over any property at stake;
                  (2) the inconvenience of the federal forum; (3) the desire to avoid
25                piecemeal litigation; (4) the order in which the forums obtained
                  jurisdiction; (5) whether federal law or state law provides the rule of
26                decision on the merits; (6) whether the state court proceedings can
                  adequately protect the rights of the federal litigants; (7) the desire to
27                avoid forum shopping; and (8) whether the state court proceedings
                  will resolve all issues before the federal court.
28

United States District Court
Northern District of California

1   *R.R. St. & Co.*, 656 F.3d at 978–79. "No one factor is necessarily determinative; a carefully

2   considered judgment taking into account both the obligation to exercise jurisdiction and the

3   combination of factors counseling against that exercise is required." *Colorado River*, 424 U.S. at

4   818-19, 96.  Put another way, the decision does not "rest on a mechanical checklist, but on a

5   careful balancing of the important factors as they apply in a given case, with the balance heavily

6   weighted in favor of the exercise of jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*

7   *Corp.*, 460 U.S. 1, 16 (1983). Thus, courts have denied a *Colorado River* stay even where a

8   majority of the factors favors abstention. *See, e.g., Ramirez v. Avalonbay Cmtys., Inc.*, No. C 14–

9   04211 WHA, 2015 WL 4396380, at *2 (N.D. Cal. July 17, 2015).

10       However, the eighth factor—whether there is "substantial doubt as to whether the state

11   proceedings will resolve the federal action precludes the granting of a stay"—is "dispositive."

12   *Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 913 (9th Cir.1993); *see also Holder v.*

13   *Holder*, 305 F.3d 854, 868 (9th Cir. 2002) ("Because there is substantial doubt that a final

14   determination in the custody proceeding will resolve all of the issues in Jeremiah's federal Hague

15   Convention petition, we conclude that the district court abused its discretion in staying

16   proceedings."). Any such doubt as to resolution of the federal action compels the court to deny a

17   *Colorado River* stay without consideration of the other factors. *Intel*, 12 F.3d at 913 n.7. The Ninth

18   Circuit has cautioned that the existence of a substantial doubt as to whether the state proceedings

19   will resolve the federal action generally precludes the granting of a *Colorado River* stay. *Id.* at

20   913. That is, "[a] district court may enter a *Colorado River* stay order only if it has 'full

21   confidence' that the parallel state proceeding will end the litigation." *Id.* (citation omitted).

22       **1)  Substantial Doubt as to Whether the AG Action Will Resolve the Case**

23       Defendants insist that "there is no meaningful difference between the State AG complaint

24   and the CCAC: they contain the same state law claims for relief, the same corporate defendants,

25   and heavily overlapping plaintiff classes."  (Dkt. No. 222 at 10:9-11.)  Plaintiffs counter that there

26   are three critical differences which preclude a finding of substantial similarity: (1) the AG Action

27   only represents natural persons in California and this lawsuit contains claims by non-California

28   residents as well as businesses; (2) in addition to pleading the same claims as in the AG Action,

19

United States District Court
Northern District of California

1    this action also includes a common law unjust enrichment claim and a claim for injunctive relief

2    under the Sherman Act, 15 U.S.C. § 1; and (3) this action also names individual defendants, not

3    named in the AG Action.

4         That the class members in each lawsuit are different defeats a finding of substantial

5    similarity.  The AG Action does not and cannot seek redress for the claims of businesses or non-

6    California plaintiffs, both of which are included as named plaintiffs and in the putative class here.

7    *See Mai Katy Xiong v. G4S Secure Sols. (USA) Inc*., 2019 WL 3817643, at *2 (E.D. Cal. Aug. 14,

8    2019) ("That the state actions and federal action have overlapping claims and seek similar

9    statutory penalties does not mean the adjudication of the state actions will fully resolve the federal

10   action" given that the state action "class is underinclusive as to the this action"); *Perez v. Nidek*

11   *Co*., 657 F. Supp. 2d 1156, 1167 (S.D. Cal. 2009), aff'd, 711 F.3d 1109 (9th Cir. 2013) (declining

12   to stay where "plaintiffs and potential classes are different"). "The decision to invoke *Colorado*

13   *River* necessarily contemplates that the federal court will have *nothing* further to do in resolving

14   *any* substantive part of the case, whether it stays or dismisses." *Holder*, 305 F.3d at 868 (quoting

15   *Moses H. Cone*, 460 U.S. at 28) (emphasis added).  The Court cannot reach that conclusion given

16   that the state action will not and cannot resolve the claims of the businesses and non-California

17   residents who are parties and putative class members in this action.

18        Further, courts routinely decline to stay federal actions where the scope of claims is

19   broader in the federal case than the state case.  *See, e.g*., *Sciortino v. Pepsico, Inc*., 108 F. Supp. 3d

20   780, 815 (N.D. Cal. 2015) (declining to stay where "broader remedies" were sought in the federal

21   action); *I.K. ex rel. E.K. v. Sylvan Union Sch. Dist*., 681 F. Supp. 2d 1179, 1199 (E.D. Cal. 2010)

22   (finding that defendants argument that "most" of the issues in the federal complaint would be

23   resolved in the state court action was a dispositive "conce[ssion] that not *all* the federal issues in

24   this case will be resolved by the state court action.") (emphasis added); *In re Mattel, Inc*., 588 F.

25   Supp. 2d 1111, 1120 (C.D. Cal. 2008) (denying motion to state where "[o]nly one part of one

26   cause of action is duplicated in the Attorney General's case"). Defendants do not argue otherwise,

27   and instead, insist that the federal claim here lacks merit.  While the Court has dismissed the

28   federal Sherman Act claim, *see supra*, it has denied Defendants' motion to dismiss the unjust

enrichment claim—a claim not pled in the state action.

Because "the existence of a substantial doubt as to whether the state proceedings will resolve the federal action precludes the granting of a [*Colorado River*] stay," is dispositive, the Court's analysis need proceed no further.  *Intel Corp*, 12 F.3d at 913.  Defendants' motion for a stay under *Colorado River* is denied.

## B. Stay Based on the Court's Inherent Authority

Defendants also request that the Court stay the action based on its inherent authority. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  In deciding whether to grant a stay, a court may weigh the following: "the possible damage which may result from the granting of a stay; the hardship or inequity which a party may suffer in being required to go forward; and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962) (citing *Landis*, 299 U.S. at 254-255).

While the Ninth Circuit has not addressed the issue, several district courts and Courts of Appeals outside the Ninth Circuit have concluded that where the court finds that a stay is not warranted under *Colorado River*, *Landis* does not provide an alternative basis for a stay.  *See AIIRAM LLC v. KB Home*, No. 19-CV-00269-LHK, 2019 WL 3779185, at *6 (N.D. Cal. Aug. 12, 2019) (collecting cases). "To permit a district court to rely solely on its inherent power to control its docket, when the effect of the district court's order is to accomplish the same result contemplated by *Colorado River*, would allow a court to bypass the rigorous test set out by the Supreme Court." *Cottrell v. Duke*, 737 F.3d 1238, 1249 (8th Cir. 2013).

Defendants' reliance on *United Specialty Ins. Co. v. Bani Auto Grp.*, Inc., No. 18-CV-01649-BLF, 2018 WL 5291992, at *7 (N.D. Cal. Oct. 23, 2018), does not persuade the Court otherwise.  The *Bani* court did not directly consider the incongruence of granting a stay under *Landis* while finding a stay under *Colorado River* inappropriate, and more significantly, did not involve parallel state and federal actions regarding the same claims, but instead, a federal

United States District Court
Northern District of California

insurance coverage action and state action that was the source of the coverage dispute.  Likewise, Defendants' reliance on *Bradshaw v. City of Los Angeles*, No. 2:19-CV-06661-VAP-JC, 2020 WL 2065007, at *4 (C.D. Cal. Mar. 23, 2020), is misplaced as it and the cases it cites were considering whether a parties' request for a stay should be analyzed under *Colorado River* or *Landis*—not whether a stay under *Landis* was proper notwithstanding a finding that a stay under *Colorado River* was not.

Given the "exceedingly narrow" bounds of the *Colorado River* doctrine, *Landis* does not provide an alternative to a *Colorado River* stay here.  Defendants' motion for a stay is denied.

## CONCLUSION

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss.  Plaintiffs' Sherman Act and UCL claims are dismissed with leave to amend to the extent Plaintiffs have a good faith basis for doing so consistent with this Order. The motion is otherwise denied. Defendants' motion to stay is also DENIED.

Plaintiffs' amended complaint, if any, is due in 30 days.  If Plaintiffs elect not to amend their complaint, they shall file a statement on the docket to this effect thereby triggering Defendants' deadline to answer the complaint.

In light of this Order, the parties' joint discovery letter brief regarding Plaintiffs' Rule 45 subpoena to OPIS is denied as moot.  (Dkt. No. 280.)  The stay of discovery if lifted with respect to the claims that survive.

The Court sets a further Case Management Conference for June 3, 2021 at 1:30 p.m.  An updated Case Management Conference statement is due a week before.

This Order disposes of Docket Nos. 222, 224, and 280.

**IT IS SO ORDERED.**

Dated: March 29, 2021

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

22