JEFFREY M. DAVIDSON (SBN 248620)
PHILLIP WARREN (SBN 89744)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone:  (415) 591-6000
Email:  jdavidson@cov.com
Email:  pwarren@cov.com

MICHAEL E. MARTINEZ (*pro hac vice*)
LAUREN NORRIS DONAHUE (*pro hac vice*)
K&L GATES LLP
70 W. Madison St., Suite 3300
Chicago, Illinois 60602
Telephone:  (312) 372-1121
Email:  michael.martinez@klgates.com
Email:  lauren.donahue@klgates.com

*Attorneys for Defendants SK Energy Americas, Inc.,*
*SK Trading International Co., Ltd., and*
*David Niemann*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CALIFORNIA GASOLINE SPOT MARKET ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Case No.: 3:20-cv-03131-JSC<br><br>**SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION BY DEFENDANT SK TRADING INTERNATIONAL CO., LTD.**<br><br>Dept:  San Francisco, Courtroom E<br>Judge:  Hon. Jacqueline S. Corley |

**TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................................... 1

II.     THE COURT'S DECEMBER 18 ORDER ................................................................... 2

III.    LEGAL STANDARDS ................................................................................................ 2

    A.      Motion to Dismiss for Lack of Personal Jurisdiction ...................................... 2

    B.      Specific Jurisdiction Based on Agency Requires Substantial or Pervasive Control ......... 2

    C.      Specific Jurisdiction Based on Parent Company's Own Independent Contacts ................ 4

IV.     ARGUMENT ................................................................................................................ 5

    A.      Agency Theory Fails to Establish a Basis for Specific Jurisdiction over SKTI ................ 5

        1.      SKTI and SKEA Were Not a "Single Integrated Entity." .................................... 6

        2.      SKTI's Monitoring of SKEA's Trading Risk Is Not Sufficient to Establish Agency. ............ 8

        3.      SKTI Did Not and Could Not Control SKEA's Day-to-Day Trading. ................... 9

    B.      SKTI Did Not Participate in or "Ratify" the Alleged Conspiracy. .................................. 14

        1.      SKTI Did Not Enter Into Any Relevant Agreements with Vitol. ......................... 14

        2.      SKTI Did Not Direct SKEA to Engage in Any Improper Conduct. ..................... 18

        3.      SKTI Did Not Ratify "Unusual Trading Strategies." ........................................... 19

V.      CONCLUSION ............................................................................................................ 20

**TABLE OF AUTHORITIES**

**Cases**

*AirWair Int'l Ltd. v. Pull & Bear Espana SA*,
   2020 WL 2113833 (N.D. Cal. May 4, 2020) ...................................................................................3

*Aldrich v. NCAA*,
   484 F. Supp. 3d 779, 794 (N.D. Cal. 2020) ...................................................................................3

*Apple Inc. v. Allan & Assocs. Ltd.*,
   445 F. Supp. 3d 42, 56 (N.D. Cal. 2020) ...................................................................................3, 13

*Batzel v. Smith*,
   333 F.3d 1018 (9th Cir. 2003) ...................................................................................4

*BBA Aviation PLC v. Superior Ct.*,
   190 Cal. App. 4th 421 (2010) ...................................................................................6

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
   753 F.3d 521 (5th Cir. 2014) ...................................................................................14

*City of Greenville v. Syngenta Crop Prot., Inc.*,
   830 F. Supp. 2d 550 (S.D. Ill. 2011)...................................................................................8

*CollegeSource, Inc. v. AcademyOne, Inc.*,
   653 F.3d 1066 (9th Cir. 2011) ...................................................................................2

*Corcoran v. CVS Health Corp.*,
   169 F. Supp. 3d 970, 982 (N.D. Cal. 2016) ...................................................................................3, 6

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014)...................................................................................2

*Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*,
   557 F.2d 1280 (9th Cir. 1977) ...................................................................................2

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   2018 WL 6629250 (N.D. Ill. Oct. 22, 2018)...................................................................................14

*Dearborn v. Mar Ship Operations, Inc.*,
   113 F.3d 995 (9th Cir. 1997) ...................................................................................14

*Delacruz v. Serv. Corp. Int'l*,
   2018 WL 2287962 (E.D. Cal. May 18, 2018) ...................................................................................3

*In re Diisocyanates Antitrust Litig.*,
   2020 WL 1140245 (W.D. Pa. Mar. 9, 2020) ...................................................................................5, 7

ii

*Doe v. Unocal Corp.*,
    248 F.3d 915 (9th Cir. 2001) ...............................................................................................2

*Dole Food Co., Inc. v. Watts*,
    303 F.3d 1104 (9th Cir. 2002) .............................................................................................5

*Dorel Indus., Inc. v. Superior Ct.*,
    134 Cal. App. 4th 1267 (2005) ...........................................................................................13

*In re Dynamic Random Access Memory (DRAM)*,
    2005 WL 2988715 (N.D. Cal. Nov. 7, 2005) ......................................................................15

*Fishman v. Franchisee Advert. Fund Tr., Ltd.*,
    2019 WL 6135030 (C.D. Cal. Nov. 19, 2019)......................................................................14

*Gonzalez v. HCA, Inc.*,
    2011 WL 3793651 (M.D. Tenn. Aug. 25, 2011) ...................................................................9

*Henderson v. United Student Aid Funds, Inc.*,
    918 F.3d 1068 (9th Cir. 2019) .............................................................................................4

*In re Hydroxycut Mktg. & Sales Pracs. Litig.*,
    810 F. Supp. 2d 1100 (S.D. Cal. 2011).................................................................................13

*Iconlab Inc. v. Valeant Pharms. Int'l, Inc.*,
    2017 WL 7240856 (C.D. Cal. Apr. 25, 2017) .......................................................................4

*Kramer Motors, Inc. v. British Leyland, Ltd.*,
    628 F.2d 1175 (9th Cir. 1980) .................................................................................7, 12, 16

*Kristensen v. Credit Payment Servs. Inc.*,
    879 F.3d 1010 (9th Cir. 2018) ..........................................................................................4, 19

*Laub v. Horbaczewski*,
    2018 WL 5880950 (C.D. Cal. Mar. 16, 2018).......................................................................4

*Lodestar Anstalt v. Bacardi & Co.*,
    2017 WL 3534984 (C.D. Cal. 2017)......................................................................................3

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*,
    2015 WL 4755335 (N.D. Cal. Aug. 11, 2015) ......................................................................3

*In re Magnetic Audiotape Antitrust Litig.*,
    334 F.3d 204 (2d Cir. 2003).................................................................................................2

*Naiman v. TranzVia LLC*,
    2017 WL 5992123 (N.D. Cal. Dec. 4, 2017).........................................................................4

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
    311 F. Supp. 2d 1048 (D. Colo. 2004)..................................................................................14

iii

*In re Packaged Seafood Prod. Antitrust Litig.*,
  277 F. Supp. 3d 1167, 1190 (S.D. Cal. 2017)...................................................................14

*Pebble Beach Co. v. Caddy*,
  453 F.3d 1151 (9th Cir. 2006) ............................................................................................2

*Pitt v. Metro. Tower Life Ins. Co.*,
  2020 WL 1557429 (N.D. Cal. Apr. 1, 2020) .............................................................4, 6, 12

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
  2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013) ...................................................................18

*Ranza v. Nike*,
  793 F.3d 1059 (9th Cir. 2015) .......................................................................................7, 13

*Reynolds v. Binance Holdings Ltd.*,
  2020 WL 5074391 (N.D. Cal. Aug. 26, 2020) .....................................................................6

*Sher v. Johnson*,
  911 F.2d 1357 (9th Cir. 1990) ............................................................................................2

*Sonora Diamond Corp. v. Superior Ct.*,
  83 Cal. App. 4th 523 (2000) .........................................................................7, 9, 12, 13

*Staley v. Gilead Scis., Inc.*,
  446 F. Supp. 3d 578 (N.D. Cal. 2020) ........................................................................15, 18

*Teradyne, Inc. v. Astronics Test Sys., Inc.*,
  2020 WL 8173024 (C.D. Cal. Nov. 6, 2020)........................................................................3

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2012 WL 314039 (N.D. Cal. Feb. 1, 2012) ......................................................................15

*United States v. Bestfoods*,
  524 U.S. 51 (1998)...............................................................................................................9

*In re W. States Wholesale Nat. Gas Antitrust Litig.*,
  715 F.3d 716 (9th Cir. 2013) ............................................................................................18

*In re W. States Wholesale Nat. Gas Litig.*,
  605 F. Supp. 2d 1118 (D. Nev. 2009)..................................................................................9

*Williams v. Yamaha Motor Co.*,
  851 F.3d 1015 (9th Cir. 2017) ........................................................................................2, 3

*Willis v. Gov't Emps. Ins. Co.*,
  2016 WL 3946782 (D.N.M. Feb. 1, 2016) ...........................................................................7

iv

**Statutes**

Cal. Corp. Code § 300........................................................................................................................12


**Other Authorities**

California Energy Commission, *Additional Analysis on Gasoline Prices in California*
    (Oct. 21, 2019) ........................................................................................................................20

## I.    INTRODUCTION

SK Trading International Co., Ltd. (SKTI) is a Korean company headquartered in Korea. Plaintiffs' allegations, by contrast, relate to a trader employed by SK Energy Americas, Inc. (SKEA) in Houston, Texas, who traded gasoline products for delivery in California and participated in joint ventures to import gasoline components into California. It was SKEA that entered into the relevant transactions. SKTI, on the other hand, has never executed a trade of physical gasoline in California, never entered into a gasoline or gasoline futures contract in California, and never entered into a joint venture with another company in California. To hale SKTI across an ocean into a California courtroom, Plaintiffs contend (1) that SKTI directed SKEA's trading activities; and (2) that conventional attributes of the parent-subsidiary relationship allow them to impute SKEA's activities to SKTI on an "agency" theory. Neither approach succeeds.

Plaintiffs base their arguments for specific jurisdiction primarily on the activities of one SKTI executive, Namho Kim, who was the head of SKTI's global distillates trading business during the relevant period. Mr. Kim was deposed for six hours. He testified in his deposition—and repeats in his attached declaration—that SKEA had broad discretion to design trading strategies and execute trades and that he never exercised control over the trading activities at issue in this case. His and SKTI's role were limited to tracking the profitability of SKEA and other SKTI affiliates in Seoul, London, Singapore, and Dubai that traded naphtha, gasoline, diesel, and jet fuel and ensuring that they did not exceed loss and risk limits. The documents confirm that although he received regular reports of the subsidiaries' trading activities and occasionally provided high-level responses, neither Mr. Kim nor anyone else at SKTI exercised day-to-day control of SKEA's trading, let alone directed the conduct alleged in the Complaint.

What remains is an effort to force SKTI to litigate in a foreign forum because it exercised the kind of routine oversight that parent corporations around the world exercise over their subsidiaries, rebranding conventional corporate ownership and supervision as "agency." Were this permitted, it would be impossible for multinational enterprises to rely on the bedrock principle of separate corporate personhood, chilling international business activity.

In the end, months of jurisdictional discovery have merely confirmed that SKTI should never have been named as a defendant. The Court should grant SKTI's motion to dismiss.

SKTI'S SUPPLEMENTAL BRIEF ISO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION;
Case No.: 3:20-cv-3131-JSC

## II.    THE COURT'S DECEMBER 18 ORDER

In its Order on SKTI's motion to dismiss, the Court held that Plaintiffs failed to establish a prima facie case of personal jurisdiction under any of their theories.  Dkt. No. 263 (Order).  But the Court allowed for discovery into two theories: (1) that SKTI was "itself involved in directing and overseeing the anticompetitive horizontal spot market trading activity" alleged in the Complaint; and (2) that SKEA was an "agent" of SKTI.  *Id*. at 13.  The Court rejected the Plaintiffs' alter ego theory entirely.  *Id*.

## III.    LEGAL STANDARDS

### A.    Motion to Dismiss for Lack of Personal Jurisdiction

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant."  *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).  Courts may consider declarations and other evidence.  *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).  Where allegations are contradicted by evidence, the evidence governs.  *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011).  Thus, a motion to dismiss for lack of personal jurisdiction must be granted unless the plaintiff sets forth written "materials . . . demonstrat[ing] facts which support a finding of jurisdiction" as a matter of law.  *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977); *see also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (plaintiff's showing after jurisdictional discovery must "include an averment of facts that, if credited . . . would suffice to establish jurisdiction over the defendant." (quotations and citation omitted)).  Since "[i]ssues of credibility or disputed issues of fact may require an evidentiary hearing," a plaintiff carries its "ultimate burden" of establishing personal jurisdiction only if "the *undisputed* facts reveal sufficient contacts to support jurisdiction."  *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990) (emphasis added).

### B.    Specific Jurisdiction Based on Agency Requires Substantial or Pervasive Control

The Ninth Circuit used to permit personal jurisdiction over a parent corporation under an agency theory if a subsidiary performed acts that otherwise would have been performed by the parent.  But, as the Court noted (Order at 13), the Supreme Court's ruling in *Daimler AG v. Bauman*, 571 U.S. 117 (2014), overturned this formulation of the agency test.  *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1021, 1024 (9th Cir. 2017) (*Daimler* "did not suggest that our particular *formulation* for finding an

2

agency relationship should survive in the context of specific jurisdiction."). If any agency theory of specific jurisdiction remains viable after *Williams*,[1] the standard is higher than the Ninth Circuit's pre-*Daimler* formulation. Under "any standard for finding an agency relationship," the plaintiff must show that the parent entity "substantially control[led]" the subsidiary. *Williams*, 851 F.3d at 1024–25; *see also AirWair Int'l Ltd. v. Pull & Bear Espana SA*, 2020 WL 2113833 (N.D. Cal. May 4, 2020) (agency test not met when plaintiff failed to establish parent's substantial control). Contrary to Plaintiffs' assertion, Dkt. No. 294 (Supp.) at 2, that "there is no requirement of a unity of interest in the case law," several courts in this Circuit have noted that after *Daimler* and *Williams*, any agency inquiry is functionally "identical" to the alter ego analysis—a plaintiff must show that the parent "exercises 'pervasive control'" over its subsidiary's daily activities. *Apple Inc. v. Allan & Assocs. Ltd.*, 445 F. Supp. 3d 42, 56 (N.D. Cal. 2020); *see also Los Gatos*, 2015 WL 4755335, at *5.[2] A mere showing of "some high level control" falls well short of this demanding standard. *Teradyne, Inc. v. Astronics Test Sys., Inc.*, 2020 WL 8173024, at *9 (C.D. Cal. Nov. 6, 2020); *Delacruz v. Serv. Corp. Int'l*, 2018 WL 2287962, at *7 (E.D. Cal. May 18, 2018).

Plaintiffs now suggest that a murky theory of "ratification" may be a basis for personal jurisdiction separate from agency—perhaps as a special case of "participation" in alleged illegal activity. *See* Supp. at 3, 13; *but see id*. at 2 (discussing ratification together with agency). This is wrong. "Ratification" involves a defendant's affirmance of its subsidiary's challenged acts, as opposed to its own acts directed at the forum. "Ratification" is thus a means by which a plaintiff may attempt to

---

[1] SKTI preserves its contention that after *Williams*, an agency theory can no longer be a basis for specific personal jurisdiction. *See, e.g.*, *Aldrich v. NCAA*, 484 F. Supp. 3d 779, 794 (N.D. Cal. 2020) (to establish specific jurisdiction, "[p]laintiffs must show that the [defendant's] contacts—and not those of its 'agents'—gave rise to the claims"); *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, 2015 WL 4755335, at *5 (N.D. Cal. Aug. 11, 2015) ("the rationale set forth in *Daimler*—that the Ninth Circuit's agency test inappropriately 'stacks the deck'—would seem to undermine application of the [Ninth Circuit's agency test] even in specific jurisdiction cases"); *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 982  (N.D. Cal. 2016) (agreeing with the *DuPont* district court decision); *Lodestar Anstalt v. Bacardi & Co.*, 2017 WL 3534984, at *9 (C.D. Cal. 2017) ("Following *Williams*, the Court concludes that [plaintiffs] cannot establish specific personal jurisdiction pursuant to an agency relationship.").

[2] Plaintiffs' cited cases (Supp. at 2) do not address whether a unity of interest is required when a plaintiff seeks personal jurisdiction over a foreign parent based on a U.S. subsidiary's forum contacts.

*impute* a subsidiary's contacts to a foreign parent. As a result, courts have not recognized "ratification" as a valid theory of personal jurisdiction separate from "the well-established alter ego and agency theories." *Iconlab Inc. v. Valeant Pharms. Int'l, Inc.*, 2017 WL 7240856, at *6 (C.D. Cal. Apr. 25, 2017), *aff'd*, 828 F. App'x 363 (9th Cir. 2020); *see also Pitt v. Metro. Tower Life Ins. Co.*, 2020 WL 1557429, at *4 (N.D. Cal. Apr. 1, 2020). Rather, "the principal-agent relationship is still a requisite, and ratification can have no meaning without it." *Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003), *superseded in part by statute on other grounds*.[3]

Accordingly, under a "ratification" theory, Plaintiffs would still have to demonstrate that SKEA purported to act on SKTI's behalf when SKEA participated in the alleged conspiracy. *Id.* For example, "[i]f an agency relationship was not established prior to" the putative agent's actions, "the continued funding of the [putative agent] entity is not considered ratification." *Naiman v. TranzVia LLC*, 2017 WL 5992123, at *13 (N.D. Cal. Dec. 4, 2017); *see also Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1074 (9th Cir. 2019) (ratification may only create agency if putative agent "pretended and demonstrably assumed to act" as agent for putative principal); *Batzel*, 333 F.3d at 1036 (no ratification where evidence did not establish agency "at the time" of allegedly ratified acts). Plaintiffs also would need to show that SKTI accepted the benefits of SKEA's actions and had or should have had "actual knowledge of all material facts," *Naiman*, 2017 WL 5992123, at *10, and knew or should have known that the actions were illegal. *See Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1015 (9th Cir. 2018) (knowledge of illegality required; "knowledge that an agent is engaged in an otherwise commonplace marketing activity" is insufficient); *Naiman*, 2017 WL 5992123, at *13 (similar).

**C.    Specific Jurisdiction Based on Parent Company's Own Independent Contacts**

Jurisdiction based on "participation" in allegedly illegal activity turns on the defendant corporation's *own* contacts with the forum—not those of a subsidiary. The plaintiff must show that the

---

[3] Plaintiffs cite several purported "ratification" cases (Supp. at 2–3), but none established ratification as an independent jurisdictional theory (and only one even involved personal jurisdiction at all). Plaintiffs' lone personal jurisdiction case, *Laub v. Horbaczewski*, 2018 WL 5880950 (C.D. Cal. Mar. 16, 2018), did not involve allegations of a parent ratifying the acts of its subsidiary acting on its own behalf. *Id.* at *6–7 (assessing whether a new corporation ratified the acts of a promoter that had acted on the yet-to-be-formed corporation's behalf).

defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). The "express aiming" requirement is satisfied in antitrust cases when the defendant's "allegedly anticompetitive behavior is targeted at a resident of the forum, or at the forum itself." *Id.* (citation omitted). If purposeful direction is satisfied, Plaintiffs must show a direct nexus between the contacts and the cause of action. *Id*. at 742.[4]

Based on these principles, this Court has held that even evidence that SKEA's trading operation "was conducted under the continuous and pervasive control and supervision of SK Trading and its subsidiaries, and SK Trading also specifically reviewed and approved key decisions to coordinate trading activities with Vitol" would not be not enough "to show that SK Trading purposefully directed the *specific anticompetitive activity* alleged here for personal jurisdiction purposes." Order at 8–9 (emphasis added and quotations and citation omitted).

## IV.   ARGUMENT

Plaintiffs flood the Court with 99 exhibits, apparently hoping that none is read too carefully. But when Plaintiffs' misrepresentations and strained interpretations of these exhibits are corrected, the evidence establishes that SKTI's relationship to SKEA involved nothing more than the standard incidents of corporate ownership, not an agency relationship. Nor is there proof that SKTI purposefully engaged in the alleged SKEA conduct at issue.

### A.   Agency Theory Fails to Establish a Basis for Specific Jurisdiction over SKTI

Plaintiffs ask the Court to find that routine corporate governance activities—common to most parent-subsidiary relationships—reflect substantial, pervasive control that should subject SKTI to the Court's jurisdiction under an agency theory. That standard would render every corporate group susceptible to being haled into a forum with which it has no independent contacts. *In re Diisocyanates Antitrust Litig.*, 2020 WL 1140245, at *6 (W.D. Pa. Mar. 9, 2020) (standard "would always result in the finding of specific personal jurisdiction between a parent and subsidiary, or between affiliates, on an

---

[4] Plaintiffs argue that the standard for proving a parent corporation's participation in an antitrust conspiracy is low. Supp. at 3. But all of their cases relate to the adequacy of merits pleading, not the issue of the evidence necessary to establish *personal jurisdiction* over a parent company.

5

agency theory"). The evidence here falls *far* short of showing that SKTI exerted substantial, day-to-day control of the SKEA trading conduct at issue.

### 1.    SKTI and SKEA Were Not a "Single Integrated Entity."

Despite the Court's ruling that they could not proceed with an alter ego theory, Plaintiffs lead with an alter ego argument—*i.e.*, that SKEA's contacts may be imputed to SKTI because the companies operate as a "single integrated entity." Supp at 4. That argument fails immediately since "numerous courts in this circuit have rejected the use of [the single enterprise] theory as a basis for establishing jurisdiction." *Pitt*, 2020 WL 1557429, at *4 (collecting cases). It also fails because it is unsupported by the evidence. SKTI is a separate legal entity from SKEA. Dkt. No. 221-1, Declaration of Jinwoo Jeong (Jeong Decl.) ¶ 15. Its corporate records are separate from those of SKEA. *Id.* ¶ 16. Its assets are kept separate from those of SKEA. *Id.* ¶ 17. SKTI has never held itself out as liable for the debts of SKEA. *Id.* ¶ 18. Plaintiffs do not dispute any of these points.

Plaintiffs observe that SKTI and SKEA are part of the SK Group, a conglomerate based in Korea, and share a common email domain. Supp. at 4, 6; Ex. 97 at 3.[5] But corporate groups routinely refer to themselves collectively under the same trade name; maintain the same email domain; share "administrative services, regulatory and lobbying services, a legal team, and office space"; and even have parents enter into regulatory settlements and pursue litigation "on behalf of [their] collective subsidiaries"—all without dissolving corporate separation for purposes of jurisdiction. *Pitt*, 2020 WL 1557429, at *4. Courts routinely reject the exact factual showings Plaintiffs attempt here. *See, e.g.*, *BBA Aviation PLC v. Superior Ct.*, 190 Cal. App. 4th 421, 430 (2010) (use of parent's name and logo on "signage, employee uniforms, badges, business cards, and employment documents" insufficient to establish agency); *Reynolds v. Binance Holdings Ltd.*, 2020 WL 5074391, at *6 (N.D. Cal. Aug. 26, 2020) (Corley, J.) (shared websites and emails and descriptions online presenting entities "as one" insufficient and collecting cases finding same); *Pitt*, 2020 WL 1557429, at *5 (fact that subsidiary group "represented itself as 'MetLife,' 'we,' or 'our'" was not "inherently suspect," given the "size and complexity of the corporate structure"); *Corcoran*, 169 F. Supp. 3d at 984 (presentation as "one

---

[5] The exhibits referred to by number are attached to the Stein Declaration (Dkt. No. 294-1), and the exhibits referred to by letters are attached to the accompanying Davidson Declaration.

6

integrated company" for marketing insufficient); *In re Diisocyanates*, 2020 WL 1140245, at \*6 (shared email domain insufficient).

Equally unremarkable is SKTI's placement of one director on the SKEA board (Supp. at 8 n.7). *See Ranza v. Nike*, 793 F.3d 1059, 1074 (9th Cir. 2015) (parent's "overlapping directors and officers with its subsidiaries" insufficient to establish substantial control); *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1177 (9th Cir. 1980) (same); *Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523, 549–50 (2000) (it has "long been considered a normal attribute of ownership that officers and directors of the parent serve as officers and directors of the subsidiary.").[6]

Nor is it of consequence that fourteen SKTI employees were at various times seconded to, meaning employed by, SKEA. Supp. at 10. The evidence here shows that secondees were employed, evaluated, and paid by SKEA while in the United States and did not continue reporting to SKEA after their secondments ended. Ex. A (Namho Kim Dep. Tr.) at 131:14–20; Ex. B (Jinwoo Jeong Dep. Tr.) at 100:9–20; Ex. 3, Rog. 6; *see In re Diisocyanates*, 2020 WL 1140245, at \*6 ("shared executives or employees" insufficient).[7] Corporate separateness was therefore maintained at all times.

Plaintiffs cite an SKEA email describing its desire to help "lead the growth of SKTI in the future" through its Light Distillates trading book (Ex. 8) and a high-level report on SKEA's "US LD Book Biz Plan" (Ex. 10) for the proposition that SKTI needed SKEA as its agent to "increase trading in the United States." Supp. at 5. But every multinational company with a U.S. subsidiary seeks to earn profits through that subsidiary's activities. *See Willis v. Gov't Emps. Ins. Co.*, 2016 WL 3946782, at \*7 (D.N.M. Feb. 1, 2016) ("a parent company will naturally direct its subsidiaries to maximize profits").

Plaintiffs' alter ego-style allegations are not remotely sufficient to establish specific jurisdiction.

---

[6] Plaintiffs point to a ministerial California corporate filing listing Mr. Kim as SKEA's CEO, but fail to reveal that the filing was made only in 2020, far outside of the relevant period and four years after SKEA stopped trading California gasoline products. *See* Supp. at 9 n.8. The filing is irrelevant to establishing agency or day-to-day control during the relevant time period ending in 2016.

[7] Plaintiffs incorrectly claim that SKTI evaluated SKEA employees, citing a 2015 performance evaluation of Hanbyeol Cho, Supp. at 12, *before* he joined SKEA in 2016, Ex. C. The performance reviews from 2014–2016 list "Americas Crude Trading (SKEA)" as Mr. Cho's department because the HR software system auto-populates the employee's *current* department. When Mr. Cho was at SKEA in 2016, his performance evaluation was done by Wonyong Koo, head of SKEA. Ex. D.

7

**2.    SKTI's Monitoring of SKEA's Trading Risk Is Not Sufficient to Establish Agency.**

As it acknowledged in its opening brief, SKTI monitored the financial performance and risk exposures of its subsidiaries, including SKEA.  To enable that monitoring, SKEA necessarily reported its trading activity to SKTI.  For example, SKEA logged its trades into an Energy Trading Risk Management system, a "commercially available risk management tool," Ex. A at 45:12–20, that calculated the VaR (value at risk) and loss limit, as defined by SKTI's risk management policy.  *Id*. at 43:14–20; Ex. 3, Rog. 3.  Plaintiffs acknowledge that SKTI needed "to balance its global trading risk to ensure that any adverse financial exposure was tolerable to the company as a whole" (Supp. at 6), but then take an extreme position that any foreign parent company that adopts such prudent risk-management tools becomes subject to U.S. jurisdiction.

Relying on these normal risk management functions,[8] Plaintiffs argue that SKTI "could not act independently from SKEA."  Supp. at 6.  What is missing is *any* evidence that SKTI's risk management monitoring dictated SKEA's day-to-day trading and strategy decisions.  Nor is there evidence that SKTI provided specific direction to SKEA to make or not make particular trades, as opposed to receiving informational reporting.  *See* Ex. 99 (chart of MtM reports, all supplied by SKEA to SKTI).  To the contrary, Namho Kim testified that SKEA was "completely independent, and each sub-book can make its own decision[s]" about trading.  Ex. A at 82:2–24.  Mr. Kim's "responsibilities for the global trading business were limited to overseeing overall performance and risk management, and managing global resources including budgets.  I paid attention to the trading books' profit-and-loss numbers and whether they were in compliance with the trading risk management policy."  Kim Decl. ¶ 2.

Courts have rejected jurisdiction on these facts, recognizing that "monitoring the subsidiary's performance, supervising the subsidiary's finance and capital budget decisions, and articulating general policies . . . does not rise to the level necessary to impute the subsidiary's jurisdictional contacts to the parent."  *City of Greenville v. Syngenta Crop Prot., Inc.*, 830 F. Supp. 2d 550, 555–56 (S.D. Ill. 2011);

---

[8] *E.g.*, that SKEA sent to SKTI weekly reports and daily "Mark to Market" (MtM) reports "to ensure that all trades were within SKTI's pre-established trading limits"; that SKTI maintained a system that would alert SKEA if the losses exceeded a pre-set amount; and that SKTI's MPR Support Team (discussed below in Section IV(B)) requested financial information.  Supp. at 7.

*see also Sonora*, 83 Cal. App. 4th at 523 ("[T]he parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect [have] taken over performance of the subsidiary's day-to-day operations in carrying out that policy"); *Gonzalez v. HCA, Inc.*, 2011 WL 3793651 (M.D. Tenn. Aug. 25, 2011) ("A parent corporation is entitled to establish group-wide financial protocols, monitor the performance of its subsidiaries, and reap financial benefits from their profits."); *United States v. Bestfoods*, 524 U.S. 51, 72 (1998) (similar).

*In re Western States Wholesale Natural Gas Litigation*, 605 F. Supp. 2d 1118, 1134 (D. Nev. 2009) is instructive. There, plaintiffs argued that the court could exercise personal jurisdiction over the parent of a natural gas trader alleged to have manipulated natural gas prices by delivering false trading information to trade indices and by engaging in wash trades. *Id*. at 1126. The court found that the parent's receipt of daily reports from a subsidiary and "setting general policies and guidelines regarding best policies and practices, as well as certain overall limits, such as the limit on VAR" did not establish that the parent company exercised day-to-day control. *Id*. at 1134. There as here, the parent "set overall limits on certain metrics" but "had no role in making the day-to-day decisions of who [the subsidiary] was to trade with, when, for what amount [], and at what price." *Id*. On those facts, the court lacked personal jurisdiction.

**3. SKTI Did Not and Could Not Control SKEA's Day-to-Day Trading.**

Plaintiffs' jurisdictional theories largely rest on the role of a single SKTI executive, Namho Kim, whom Plaintiffs contend had "full decision-making authority for SKEA," thus making it the agent of SKTI. Supp. at 7–13. But the clear evidence, including Mr. Kim's testimony, is to the contrary.

*First*, Mr. Kim *could not* have exercised day-to-day control over SKEA's trading in the highly specialized market for California gasoline. Mr. Kim simply did not have the experience or expertise in U.S. West Coast Gasoline trading to do so. Ex. A at 64:6–9 ("So as to the U.S. gasoline market, I don't have any experience nor do I have any knowledge about that."); Kim Decl. ¶ 3 ("I did not control, direct, or manage SKEA's day-to-day trades of California gasoline between 2014 and 2016"; "[T]he gasoline market in the United States is very specialized, and I do not have experience in that market."; "I did not understand the California market well enough to be able to tell SKEA how to conduct its gasoline trading business.").

SKTI'S SUPPLEMENTAL BRIEF ISO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION;
Case No.: 3:20-cv-3131-JSC

Plaintiffs inaccurately characterize exhibits as reflecting Mr. Kim's day-to-day involvement in SKEA's trading. In fact, they all are consistent with Mr. Kim's testimony that he did not have sufficient experience in California gasoline trading to give any direction beyond telling traders to generate profits and minimize risk. Plaintiffs' Exhibit 99 lists hundreds of emails in which SKEA employees transmitted trading positions and financial reports to allow SKTI to assess the risk of SKEA's trading book. But Plaintiffs cite only a handful of *responses* to SKEA from Mr. Kim, all of which are too anodyne to suggest the exercise of day-to-day control. For example, on a rare occurrence when he responded to a report from SKEA, his "guidance" was to consider terminating a contract if the costs continue without "generating profit." Ex. 22. When an SKTI employee presented Mr. Kim a chart of the joint ventures for all the trading books (listing only the "title" of the JV, partner, product, operating party, and "launch" date), Mr. Kim noticed that certain joint ventures were missing. Ex. 44. This does not reflect any direction or control over the SKEA-Vitol joint ventures at issue. Plaintiffs' other exhibits also fail to show that Mr. Kim gave any directives "to engage in basic trading strategies" (Supp. at 11), as opposed to the infrequent high-level "direction" to maximize profit and minimize risk. *See, e.g.*, Ex. 45 (report from Wonyong Koo (head of SKEA) to Mr. Kim about whether to expand into jet fuel trading); Ex. 46 (Mr. Kim responding to another email about expanding into jet trading by telling Mr. Koo to proceed without "increasing" risk management loss limit and VaR).[9]

*Second*, neither Mr. Kim nor anyone else at SKTI directed the trading by David Niemann that is at the center of the Complaint, or required him to obtain authorization before executing individual trades. Kim Decl. ¶ 7 ("SKTI did not attempt to oversee Mr. Niemann's trading strategies or require him to get authorization from SKTI before executing individual trades. . . . As long as Mr. Niemann's

---

[9] The other comments from Mr. Kim are equally generic admonitions to earn profits and not be complacent. *See, e.g.*, Ex. 43 ("If you have taken Position based on the strategic judgment as to the market condition and remain unchanged in your view, then, you need to grow the muscle to take the blows of short term losses. And change the position promptly once you get to have the different judgment."); Ex. 78 ("please see to it that the good performance at the beginning of the year does not become a factor that reduces the Distillates Division's activities"); Ex. 82 ("Please stretch profit to the maximum by utilizing the market situation inflection point."); Ex. 79 ("maximize profit" and "maximize quantity" and increase "profit-making ability"); Kim Decl. ¶ 11 ("profitability max test," as explained during deposition, was meant to encourage high-level goal for "SKTI's trading subsidiaries to be more active in terms of taking risks," and not suggest any particular trades or specific trading strategies).

overall trading positions were within SKTI's quantitative risk parameters, he had complete authority to trade as he saw fit without obtaining approval from SKTI for specific trades."); *see also* Ex. 28 (Niemann given "full authority related to trading").  Plaintiffs cite only one example of Niemann sending Mr. Kim an email regarding gasoline, with Mr. Kim's reply of "Well noted!"  Ex. 35.

The other exhibits that Plaintiffs claim prove that Mr. Kim "tightly controlled" Niemann's trading strategies support nothing of the kind.  *See, e.g.*, Exs. 36–39.  The exhibits show only that Mr. Kim received numerous reports and passed along reports and summaries about SKEA and Niemann's trading activities to other SKTI personnel.  *See, e.g.*, Exs. 34, 36.[10]  Plaintiffs identify no evidence that Mr. Kim gave specific direction to Niemann relating to particular trades or trading strategies.

*Third*, Plaintiffs erroneously conflate Mr. Kim's limited authority to monitor risk with substantial, day-to-day control over SKEA's trading operations.  Mr. Kim was responsible for the overall performance of distillates trading during the relevant period, and as Plaintiffs acknowledge, Mr. Kim paid attention "to the numbers there," *i.e.*, to aggregate financial metrics.  Supp. at 8; *see also* Ex. A at 54:16–22 (Mr. Kim testifying that he is only interested in "numbers obtained from the ETRM system, the overall numbers, and those numbers relevant to the MTMs, whether those numbers are compliant with the risk management policy that's in place").  Monitoring the numbers necessarily involves monitoring financing decisions, such as approving credit lines (Exs. 20, 56) and monitoring counterparty risk (*e.g.*, decreasing the credit level of a trading partner due to the risk of non-payment (Ex. 47)).  That is not directing or controlling trading activity.

Plaintiffs' reliance on a letter that Mr. Kim signed from SKTI, "For and on behalf of SK Energy Americas, Inc.," has nothing to do with SKEA's day-to-day trading.  *See* Ex. 25.  That letter was confirming SKEA's decision to withdraw from a development agreement that SKEA had entered into with another company to build a storage terminal in Long Beach.  *Id*.  Because this was a multi-year investment project, SKEA would have needed investment from SKTI.  Ex. A at 110:13–112:9.  As Mr.

---

[10] Plaintiffs' claim that Niemann was frustrated that SKTI was "micromanaging" him (Supp. at 10) is not a responsible treatment of the document.  As the document reflects, Niemann was expressing frustration about company oversight of his business expenses (travel and hotels); it had nothing to do with control of his trading.  Indeed, in the same email string, Niemann noted that his team at SKEA had been successful with "no support from anyone else in this office or any other office."  Ex. 37.

11

Kim testified, if the project had required a "smaller amount of money," like SKEA's daily trading activity, there would have been no need for SKTI's involvement. *Id*. at 112:4–9. Mr. Kim's follow-up letter "on behalf of" SKEA reflects that SKTI itself did not have a legal relationship with the partner company. SKTI's involvement comports with the common-sense principle that a parent-subsidiary relationship "contemplates a close financial connection between parent and subsidiary and a certain degree of direction and management exercised by the former over the latter." *See Pitt*, 2020 WL 1557429, at *7 (quoting *Sonora*, 83 Cal. App. 4th at 541). Recognizing this, the "Ninth Circuit has held that a parent company may finance a subsidiary without imputing the subsidiary's contacts to the parent." *Id*.; *see also Kramer*, 628 F.2d at 1177 (insufficient that a parent company guaranteed loans for the subsidiary, approved major decisions, and was closely involved in pricing decisions).

*Fourth*, Plaintiffs' theory that a lack of SKEA board meetings allowed SKTI and Mr. Kim to supplant Mr. Koo and the SKEA board, Supp. at 8, is based on a flawed, unreasonable inference. Plaintiffs' cited statute says nothing about whether a board is required to meet, and instead permits the board to delegate management of day-to-day operations to a "management company or other person" (such as Mr. Koo, head of SKEA). *See* Cal. Corp. Code § 300.

*Fifth*, the limited involvement of Mr. Kim and others at SKTI in the hiring of Mr. Niemann did not result in SKTI exercising control over SKEA's trading activities. It was SKEA that hired Niemann, because SKEA had the knowledge of the California gasoline trading market and the players in that unique market. Ex. A 91:6–22; *see also* Ex. B at 117:18–118:11 (SKEA trader, "based on market information he had obtained, [ ] found out that Niemann was not employed at the time, and he was capable, and he had a lot of knowledge relating to the gas trading in the U.S."). Mr. Kim and other SKTI executives did not know enough about the West Coast trading market or the candidates under consideration for the position to second-guess SKEA's decision, and so their role was a formality. Kim Decl. ¶ 9.[11] It is undisputed that Niemann worked for SKEA, not SKTI, and his employment contract was with SKEA, signed by SKEA's head, Mr. Koo. Ex. 7. In any event, it is well-established that

---

[11] Plaintiffs mischaracterize Ex. 26 (Supp. at 9) as showing that Mr. Kim directed Mr. Koo to carry out negotiations with Niemann when deciding to hire him in 2014. That document dates from 2016, long after Niemann was hired. Ex. 26. It relates to a dispute over Niemann's contract renewal, not his hiring.

12

shared HR and hiring functions are "macromanagement" issues that do not equate to day-to-day control. *See, e.g.*, *Ranza*, 793 F.3d at 1074–75 (parent's "involve[ment] in some hiring decisions" does not "show that [it] directs [the subsidiary's] routine day-to-day operations"); *Apple*, 445 F. Supp. 3d at 54–55 (evidence that defendant "controlled" employee movement was insufficient to show direction).

*Finally*, equally infirm is Plaintiffs' effort to connect general oversight activities with the type of pervasive control needed to establish agency. Plaintiffs refer to documents where Mr. Kim signed off on SKEA plans to enter into long-term lease agreements and to extend credit to trading counterparties. Exs. 40, 52, 53, 74, 87 (routine approval for leases); Exs. 20, 47 (routine approvals for credit). They also cite documents related to SKTI oversight of SKEA on overall budgets and human resources questions. Exs. 49, 50, 51, 53 (monitoring financial budget and expenses); Exs. 65, 66 (general oversight concerning interaction with regulatory agencies and allocation of budget with associated fines); Exs. 57, 58, 63, 64 (general oversight over human resources); Exs. 60, 61 (high-level guidelines and policies for bonuses for all distillates traders). This is exactly the type of ordinary, responsible corporate governance that is insufficient to establish jurisdiction. *See Sonora*, 83 Cal. App. 4th at 549-50; *Ranza*, 793 F.3d at 1074–75. Courts have rejected agency jurisdiction even in cases presenting much stronger indicia of parent-subsidiary control. *See, e.g.*, *Dorel Indus., Inc. v. Superior Ct.*, 134 Cal. App. 4th 1267, 1276 (2005) ("day-to-day" control not established by parent company (1) conducting meetings with subsidiary to monitor its investment, meeting with subsidiary's customers, and guaranteeing lease and insurance coverage, and (2) requiring subsidiary to submit the minutes of every product committee meeting).

Plaintiffs' cases (Supp. at 11, 13) are illustrative of the types of "initimate[] involve[ment]" in daily subsidiary operations that could establish jurisdiction but are not present here. For example, in *In re Hydroxycut Mktg. & Sales Pracs. Litig.*, 810 F. Supp. 2d 1100, 1120 (S.D. Cal. 2011), the parent repeatedly met with the subsidiary's manufacturers and retailers to discuss account details; approved new product labels; made decisions on "product promotions, marketing, and sales initiatives"; closely reviewed advertising decisions; and even asserted control over warehouse space and inventory issues. *See id.* at 1111–15, 1120–21. Plaintiffs have shown nothing close to this type of "immers[ion]" in day-

SKTI'S SUPPLEMENTAL BRIEF ISO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION;
Case No.: 3:20-cv-3131-JSC

to-day operations.[12]

**B.     SKTI Did Not Participate in or "Ratify" the Alleged Conspiracy.**

Plaintiffs' arguments that SKTI *itself* participated in the alleged conspiracy to inflate California gasoline prices, or that SKTI ratified SKEA's alleged participation, also fail.  As discussed above, Plaintiffs conflate jurisdictional theories of agency, ratification, and participation, but they cannot sustain their burden under any theory.  SKTI did not enter into any agreements with Vitol.  The cited "direction" from SKTI was nothing more than routine cheerleading by a corporate owner for its subsidiary to pursue profitability.  And SKTI lacked basic knowledge about California gasoline trading, much less the sophistication that would have been required to oversee a complex market-manipulation conspiracy.  For the same reason, SKTI lacked the understanding of California trading that could have permitted it to recognize and "ratify" any allegedly illegal activity.

**1.     SKTI Did Not Enter Into Any Relevant Agreements with Vitol.**

The allegedly anticompetitive conduct in this case involves joint ventures and trading activity between SKEA and Vitol.  Plaintiffs first falsely allege that *SKTI* entered into anticompetitive agreements with Vitol (Supp. at 14), but do not identify a single example of an SKTI/Vitol agreement regarding California gasoline trading.  Their own exhibits confirm this.  *See, e.g.*, Ex. 67 (SKEA

---

[12] Plaintiffs' other cases (Supp. at 13) either involved evidence of comprehensive control or are plainly inapposite.  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521, 532–34 (5th Cir. 2014) (parent created subsidiary to execute certain sales to preserve parent's Chinese tax exemption); *Dearborn v. Mar Ship Operations, Inc.*, 113 F.3d 995, 997–99 (9th Cir. 1997) (contract giving government operational control over vessel sufficient to create agency under Suits in Admiralty Act); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 6629250, at *5–6 (N.D. Ill. Oct. 22, 2018) (allegations of parental control over subsidiary sufficient to plead parent's participation in relevant antitrust market where parent allegedly "dicate[d] where [subsidiary] should focus its sales" and "accompan[ied] [subsidiary's] sales representatives on trips to dealerships"); *In re Packaged Seafood Prod. Antitrust Litig.*, 277 F. Supp. 3d 1167, 1190 (S.D. Cal. 2017) (allegations that parent approved supply contract terms; controlled subsidiary's communications with regulators; and directed price and volume terms for individual subsidiary customers sufficient to plead agency for liability purposes); *Fishman v. Franchisee Advert. Fund Tr., Ltd.*, 2019 WL 6135030, at *5 (C.D. Cal. Nov. 19, 2019) (allegations that "Subway instructed T-Mobile as to the content" and timing of text messages sufficient to plead agency); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1070–72 (D. Colo. 2004) (summary judgment inappropriate on parent's "potential direct liability" based on parent's alleged "coordinated use of its different subsidiaries to increase the power of its subsidiaries and, hence, itself, in various markets").

"Business Report" presentation without any indication of SKTI involvement); Ex. 70 (Vitol discussion of potential agreement with SKEA, specifically mentioning Niemann and not SKTI); Ex. 71 (terms of JV between SKEA and Vitol); Ex. 36 (informational report of JV between SKEA and Vitol); Ex. 73 (same); Ex. 75 (same). Plaintiffs' assertions therefore rest on plain mischaracterizations of the exhibits. For example, SKTI did not "identify" Vitol as an ideal partner for coordination for California gasoline trading, as any "coordination" efforts were developed independently by Niemann.[13] Ex. 36 (Taejin Kim of SKEA noting that Lucas wanted to engage in "joint play" with Niemann); *see also* Ex. 40 (Niemann asked for a lease of storage tanks); Ex. 16 ("Niemann's trading strategy" and "opinion").[14]

Plaintiffs' inability to demonstrate SKTI's actual involvement in any of the allegedly anticompetitive conduct is by itself fatal to their participation theories. This Court properly identified this as a case where Plaintiffs "fall short of tethering" allegations to SKTI as opposed to SKEA, Order at 8–9, and a foreign company cannot be subject to jurisdiction based on its own participation in an alleged price-fixing conspiracy if, like SKTI, it "never manufactured nor sold [the product] in any of the forum states, nor . . . maintain[ed] any business or corporate formalities in the forum states, nor . . . receive[d] any substantial revenue from the sale of [the product] (or any other products) in the forum states." *In re Dynamic Random Access Memory (DRAM)*, 2005 WL 2988715, at *6 (N.D. Cal. Nov. 7, 2005); *cf. In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 314039, at *1–2 (N.D. Cal. Feb. 1, 2012) (personal jurisdiction where documents showed parent's active participation in price-fixing conspiracy). Contrary to Plaintiffs' contention, it is insufficient to show merely that SKTI executives had high-level, loose "involvement," Supp. at 18 (quoting *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578 (N.D. Cal. 2020)), if SKTI did not itself engage in the challenged conduct.[15]

---

[13] Exhibit 30 contains no mention of Vitol except in the context of describing Niemann as having previously worked at Vitol. Exhibit 68 likewise concerns the *Asia* Light Distillates book, and trading strategy and contracts with Vitol for *Asia* light distillate products such as naphtha—*not* U.S. light distillate products, such as CARBOB or alkylate.

[14] Plaintiffs' reliance on a chat message between Lucas and Niemann is inapposite, as it has nothing to do with SKTI, does not mention SKTI, and certainly does not even suggest that SKTI "rejoiced" (Supp. at 15) over the February 18, 2015 Torrance refinery explosion. *See* Ex. 77.

[15] *Staley*—which did not involve personal jurisdiction at all—involved direct, documented involvement by the parent in the allegedly illegal activity; the subsidiary's agreement with a third party expressly referred disputes to the parent's executives. *Staley*, 446 F. Supp. 3d at 608.

15

Namho Kim's "approval" of certain lease agreements and a single storage joint venture with Vitol also does not indicate participation in any anticompetitive conduct, for two independent reasons. *First*, virtually all of the evidence that Plaintiffs submit shows that SKEA developed its trading strategies independently from SKTI.  Plaintiffs cite just one document that even suggests Mr. Kim approved an SKEA agreement that might relate to a trading strategy.  But it involved an SKEA (not SKTI) decision in late 2014, to enter into a (procompetitive) joint venture with Vitol to buy excess summer-blend gasoline and store it over the winter to sell the next summer.  Exs. 36, 71–73.  An SKEA employee submitted an approval request on October 24, 2014.  Ex. 72.  Plaintiffs suggest that this shows Mr. Kim's involvement in conspiratorial activity.  In fact, Mr. Kim's approval was an after-the-fact, pro forma sign-off on activity that SKEA had already undertaken.  A week before sending the approval form to Mr. Kim, that same employee had reported to the head of SKEA that the joint venture was already underway.  Ex. 36.  And Mr. Kim then reported the progress of the joint venture to the SKTI CEO before he gave his pro forma approval a week later.  *Id*.  There is no evidence that Mr. Kim provided any direction regarding the strategy that SKEA had already undertaken.

When asked at his deposition about a reference to a separate 2016 "Vitol JV" in an email from SKEA head Mr. Koo, Mr. Kim testified that he does not have "any basic knowledge" about the Vitol joint ventures, since from his perspective, "as long as [the traders] abide by the risk management related rules," their trades and strategies are otherwise "totally up to them."  Ex. A at 79:1–7; *see also* Kim Decl. ¶ 12 ("As I explained [during my deposition about the email], I was not familiar enough with the alkylate joint ventures to explain them to the CEO's satisfaction, so he requested a report from [the SKEA book leader] Mr. Koo.").[16]  Regardless, approval of one joint venture does not show SKTI itself participated in any conspiracy, nor does it establish sufficient day-to-day control for agency.  *See Kramer*, 628 F.2d at 1177 (review and approval of major decisions insufficient).

*Second*, the reports that SKEA provided to SKTI contain no hint of any anticompetitive or unlawful conduct by SKEA.  *See, e.g.*, Exs. 80–85.  Instead, the reports indicated that the agreements

---

[16] Likewise, in his deposition, Mr. Kim was asked about OPIS, the gasoline pricing reporting service that is central to the conspiracy alleged; he testified that he knew only that OPIS is "some sort of market information institute or agency."  Ex. A at 95:1–20; Kim Decl. ¶ 3.

SKTI'S SUPPLEMENTAL BRIEF ISO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION;
Case No.: 3:20-cv-3131-JSC

were procompetitive and are incapable of showing that SKTI was aware of or participating in any improper activity. For example, the storage joint venture referenced above was entered into with Vitol in October 2014 (before the Torrance refinery explosion) to store excess summer-blend gasoline over the winter because SKEA lacked adequate storage capacity on its own. Ex. 73. This procompetitive joint venture thus would not have been possible in the absence of cooperation among the parties. Plaintiffs' Exhibit 88 explains that that "[e]ver since Exxon Torrance Refinery had a trouble with FCC [a refinery component] after February," gasoline supply on the U.S. West coast was "tight." As a result, SKEA considered importing supply to reduce the market "tightness," and contemplated a joint venture with Vitol to do so for reasons of "risk management." Similarly, SKEA's later reports to SKTI about other joint ventures with Vitol to import alkylate, a gasoline blending component, reflect procompetitive purposes. *Id.*; *see also* Ex. 83 (joint venture to "reduc[e] risk"); Ex. 44 ("Purpose: risk reduction regarding [] cargo and profit increase using each firm's strength in logistics and sales").[17]

*Finally*, Plaintiffs' references to meetings as evidence of "participation" are unavailing. In arguing that Defendants' practices were the product of secret agreements, Plaintiffs had previously pointed to an April 2015 meeting in Houston that Messrs. Kim and Niemann attended with representatives of Vitol (CCAC, Dkt. No. 186 ¶¶ 90, 131), prompting the Court to refer to this meeting in its Order on jurisdictional discovery (Order at 13). Accordingly, one would have expected Plaintiffs to seek out facts related to this meeting in jurisdictional discovery. Instead, Plaintiffs entirely abandoned their efforts to tie that meeting to their alleged conspiracy after SKTI provided an interrogatory response that explained the meeting was a short "meet-and-greet" courtesy visit that involved no in-depth discussion of California gasoline or gasoline components, and no discussion of specific Vitol-SKEA transactions, trading strategies, or Vitol-SKEA business ventures. Ex. 3, Rog. 1; Kim Decl. ¶ 10. Remarkably, Plaintiffs made a tactical decision not to ask a single question about the

---

[17] Plaintiffs' claim that SKTI approved other joint ventures with Vitol to bring in gasoline is false. Supp. at 17 n.12 (citing Ex. 88). Exhibit 88 simply reflects a report from SKEA to Namho Kim that because the Exxon refinery shutdown made "gasoline supplies tight in USWC," SKEA, "[i]n the future," would expand trading to importing gasoline via ship (versus pipeline) and was considering joint ventures with Vitol for a "risk management to secure certain amount of supplies in advance." Ex. 88. The strategy is presented as a fait accompli. Mr. Kim tells them to "proceed in active fashion" and to "take on new projects aggressively." *Id.*

SKTI'S SUPPLEMENTAL BRIEF ISO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION;
Case No.: 3:20-cv-3131-JSC

Houston meeting in the jurisdictional depositions.

Plaintiffs' assertions regarding SKTI/Vitol "meetings" in Singapore in October 2015 likewise fall flat. Supp. at 19. The cursory references to a possible meeting in Singapore with Lucas at an "SK meeting" or "meetings between key SKTI personnel and Vitol," regardless of subject, are not evidence of participation in a conspiracy, especially given SKTI and Vitol's status as global trading firms that also trade numerous other gasoline and energy products outside the United States. *See* Ex. 92. Sometimes a meeting is just a meeting; these are the types of conclusory assertions the Court rejected as insufficient to establish a prima facie case. Order at 7–10.[18]

### 2. SKTI Did Not Direct SKEA to Engage in Any Improper Conduct.

Plaintiffs next suggest that SKTI may have directed SKEA to engage in conspiratorial conduct. *See* Supp. at 15–17. But the evidence they cite comes nowhere close to establishing any such direction. The only thing they point to is exhortations from SKTI that SKEA should try to maximize profits (Exs. 43, 78, 82). Such statements fail to demonstrate that SKTI either "joined" or "ratified" any alleged conspiracy, and *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716 (9th Cir. 2013) does not suggest otherwise. In that case—which this Court has already distinguished once (Order at 9)—the court, apparently relying solely on the complaint, held that plaintiffs sufficiently pleaded participation in a price-fixing conspiracy by alleging that "traders were instructed by their superiors" at controlling companies "to adjust the prices and volumes of trades they had made and, in some cases, to report trades that never occurred." *W. States*, 715 F.3d. at 744. That is, in that case, unlike here, the parent had knowingly instructed specific illegal acts.

In fact, SKTI could not have directed the conspiracy Plaintiffs allege. No one at SKTI understood the California gasoline trading market well enough to direct any such enterprise. Numerous emails show SKTI employees' ignorance of even the basic working of the California market. S*ee, e.g.,*

---

[18] Plaintiffs' citation to *Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*, 2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013) is unavailing. That case did not hold that "'attendance at meetings on behalf of corporate families' 'tie affiliated entities to an antitrust conspiracy'" for personal jurisdiction purposes. Supp. at 19 (quoting *Precision*, 2013 WL 6481195, at *17). The *Precision* court considered only whether the plaintiffs had relied on improper "group pleading" in their substantive allegations. *Id.* at *15. Plaintiffs' reliance on *Staley*, 446 F. Supp. 3d 578, fails for the same reasons. *See supra* note 15.

SKTI'S SUPPLEMENTAL BRIEF ISO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION;
Case No.: 3:20-cv-3131-JSC

Ex. E (risk management team member asking SKEA gasoline to explain several basic concepts related to California gasoline trading and asking "What is the meaning of OPIS"?)  It was precisely because SKTI lacked expertise that SKEA's trader David Niemann was "de facto book leader" with "full authority in making trading decisions."  Ex. 76; Ex. 28.

### 3.    SKTI Did Not Ratify "Unusual Trading Strategies."

Plaintiffs finally assert that SKTI was aware of and permitted illegal conduct by SKEA. Supp. 16–19.  The cited documents do not back up that assertion, and Plaintiffs fail to set forth any facts that SKTI could have "ratified" SKEA's purportedly unusual or illicit trading strategy.  *See Kristensen*, 879 F.3d at 1015 (9th Cir. 2018) (knowledge of illegality required for ratification).

Plaintiffs simply fabricate the assertion that "SKTI employees were aware that Niemann was engaging in unusual trading activity" and that "SKTI employees raised concerns."  Supp. at 18.  None of the documents they cite show any "concerns" from SKTI, only questions related to administrative details associated with SKEA's transactions.  *See, e.g.*, Ex. 90 (TRM member asks an SKEA trader to check how a transaction was entered; SKEA trader responds that one entry was incorrect).[19]

Nor do the documents show any "awareness" that Niemann was engaging in improper activity. Plaintiffs assert that Exhibit 89 shows that SKEA reported to SKTI that it had engaged in sham "round trip" trades.  Supp. at 18.  This is false.  In that document, the leader of SKTI's Marketing, Production, and Research and Development (MPR) team explains that SKEA had purchased a cargo of gasoline components from Reliance, a refiner in India, as part of a joint venture with Vitol to import needed supply into California.  Ex. 89.  SKEA then sold Vitol its share of the cargo (at the same purchase price). *Id*. ("SK, after purchasing all, sold it back-to-back at the same price to Vitol (140MB).").  That is nothing like a "wash" trade (Supp. at 18 n.13), which would include identical and offsetting sales back-and-forth between two counterparties.  The purpose of the email was to explain the accounting of those transactions—how and when to record the shipments that were en route to California near the end of the

---

[19] TRM members measured risk positions and ensured that trades were accurately inputted into the software programs with appropriate supporting documentation.  Ex. 3, Rog 3.  They were not traders and lacked experience in California gasoline trading.  *Id*.; Kim Decl. ¶ 6.

SKTI'S SUPPLEMENTAL BRIEF ISO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION;
Case No.: 3:20-cv-3131-JSC

month.  *Id*.; *see also* Ex. 91 (MPR team asking how to record profits and loss).

Plaintiffs similarly misconstrue Exhibit 17, which they assert shows a risk management team member asking why SKEA purchased and sold 50,000 barrels of CARBOB from and to Vitol and noting it was not a "trivial transaction."  Supp. at 18.[20]  Plaintiffs conflate two separate transactions, both of which were perfectly legitimate.  The response from SKEA, which Plaintiffs omitted from their filing, shows commonplace transactions: (1) one transaction involved a non-offsetting exchange of gasoline for delivery via pipeline for gasoline delivered into storage tanks; and (2) the other transaction, called a "basis swap agreement," was a speculative investment.  Ex. F (complete email chain of Plaintiffs' Exhibit 17, referring to "prop purchases").

Plaintiffs also baselessly assert that "SKTI's employees were well aware that OPIS was ripe for manipulation."  Supp. 16.  The document Plaintiffs cite (Ex. 28), is not even a document from SKTI but rather a transition memo from an SKEA gasoline trader to his SKEA successor describing how OPIS pricing works.  Although that memo indicates that the OPIS methodology may not be *representative* of prevailing prices in all instances and contrasts OPIS's methodology with the methodology used by another market reporting service (Platts), it ultimately concludes OPIS "is a more fair method than the Platt's valuation method."  Ex. 28 at SKEA-010-0022935–36.  Nowhere in this technical discussion of OPIS's methodology is there any discussion about manipulation of the OPIS price.  *Id.*

Finally, Plaintiffs are wrong that SKTI had concerns about SKEA's reactions to the California Energy Commission (CEC) gasoline market investigation.  Supp. 19–20.  The document discusses communications strategy given the view that the CEC had distorted a Vitol trader's testimony.  Ex. 93.  And the investigation itself hardly suggests illegality.  The CEC ultimately concluded that the "primary cause of the residual price increase is simply that California's retail gasoline outlets are charging higher prices than those in other states"[21] and did not find any misconduct among trading firms.

V.    **CONCLUSION**

The Court should dismiss the Complaint against SKTI for lack of personal jurisdiction.

---

[20] The translation is wrong.  The correct translation is "I don't think this was just a random bet," not "It doesn't seem like a trivial transaction."  Ex. F.

[21] California Energy Commission, *Additional Analysis on Gasoline Prices in California*, (Oct. 21, 2019), https://www.energy.ca.gov/sites/default/files/2019-10/Gas_Price_Report_0.pdf.

20

DATED: June 4, 2021

COVINGTON & BURLING LLP


By:   */s/ Jeffrey M. Davidson*
JEFFREY M. DAVIDSON (SBN 248620)
  (jdavidson@cov.com)
PHILLIP WARREN (SBN 89744)
  (pwarren@cov.com)
JOAN R. LI (SBN 312024)
  (jli@cov.com)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Facsimile:  (415) 591-6091


JOHN S. PLAYFORTH (*pro hac vice*)
  (jplayforth@cov.com)
LAURA E. BROOKOVER (*pro hac vice*)
  (lbrookover@cov.com)
ALEXANDER J. CAVE (*pro hac vice*)
  (acave@cov.com)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile:  (202) 662-6291

K&L GATES LLP


By:  /s/ Michael E. Martinez
MICHAEL E. MARTINEZ (*pro hac vice*)
  (michael.martinez@klgates.com)
LAUREN NORRIS DONAHUE (*pro hac vice*)
  (lauren.donahue@klgates.com)
CLIFFORD C. HISTED (*pro hac vice*)
  (clifford.histed@klgates.com)
STEPHEN M. HUMENIK (*pro hac vice*)
  (stephen.humenik@klgates.com)
BRIAN J. SMITH (*pro hac vice*)
  (brian.j.smith@klgates.com)
JOHN E. SUSORENY (*pro hac vice*)
  (john.susoreny@klgates.com)
K&L GATES LLP
70 W. Madison St., Suite 3300
Chicago, Illinois 60602
Telephone:  (312) 372-1121
Facsimile:  (312) 827-8000


Attorneys for Defendant
SK TRADING INTERNATIONAL CO., LTD.


## **ATTESTATION**

I, Jeffrey M. Davidson, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence

to the filing of this document has been obtained from each signatory hereto.


 DATED:   June 4, 2021                          By:   /s/ Jeffrey M. Davidson
                                                     Jeffrey M. Davidson

SKTI'S SUPPLEMENTAL BRIEF ISO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION;
Case No.: 3:20-cv-3131-JSC