Michael P. Lehmann (SBN 77152)
Christopher L. Lebsock (SBN 184546)
Samantha J. Stein (SBN 302034)
Kyle G. Bates (SBN 299114)
Tae Kim (SBN 331362)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
mlehmann@hausfeld.com
clebsock@hausfeld.com
sstein@hausfeld.com
kbates@hausfeld.com
tkim@hausfeld.com

Dena C. Sharp (SBN 245869)
Scott M. Grzenczyk (SBN 279309)
Trevor T. Tan (SBN 281045)
Mikaela M. Bock (SBN 335089)
GIRARD SHARP LLP
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
scottg@girardsharp.com
ttan@girardsharp.com
mbock@girardsharp.com

*Interim Co-Lead Class Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: CALIFORNIA GASOLINE SPOT MARKET ANTITRUST LITIGATION | Case No. 3:20-cv-03131-JSC<br><br>**PLAINTIFFS' THIRD SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR OPPOSITION TO SKTI'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**<br><br>**RE: Dkt. Nos. 263, 302**<br><br>Judge: Hon. Jacqueline S. Corley<br>Date: August 26, 2021<br>Time: 9:00 a.m.<br>Courtroom: E – 15th Floor |

**REDACTED - FILED UNDER SEAL**

## I. INTRODUCTION

Pursuant to the Court's Order, Plaintiffs file this third supplemental brief regarding Defendant SK Trading International's ("SKTI") motion to dismiss for lack of personal jurisdiction. This brief follows SKTI's disclosure that it had located previously missing files for two relevant custodians: Yuchi Tsui and Minjung Kang.[1] Yuchi Tsui was a member of SKTI's Trading Risk Management ("TRM") team and had responsibility for monitoring California gasoline trading for compliance with SKTI's TRM policy, which SKTI has acknowledged was "▬▬▬▬▬▬" of SKEA's business. First Stein Decl., Ex. 2 (Jinwoo Jeong Dep. at 81:1-12). Minjung Kang was SKEA's Accounting and Treasury Manager throughout the relevant time period. SKTI and SKEA produced over 1,000 new documents for these two custodians, mostly in Korean. Declaration of Samantha J. Stein ("Second Stein Decl.") ¶ 2.

Unsurprisingly, these new documents only add to the already-established and ever-growing body of evidence that SKTI operated SKEA as its arm in the United States, with SKEA functioning as SKTI's agent—or as an SKTI executive put it in one email, SKTI's "▬▬▬▬▬▬". Ex. 1[2] (SKEA000150182). The evidence opposing SKTI's personal jurisdiction motion is already substantial (*see* ECF Nos. 294, 295, 320, 321), but Plaintiffs add five new translated documents from the most recent SKTI production for the Court's consideration. Plaintiffs also provide one important new document from a recent Vitol production, which had not been previously produced by any of the Defendants. Ultimately, all of this evidence demonstrates that SKTI purposefully directed its activities at California, including through its agent, SKEA, and participated in the specific anticompetitive activity alleged.

## II. ARGUMENT

### A. SKEA Was SKTI's "U.S. Branch" that SKTI Controlled

"Whether an agency relationship exists is for a court to decide based on an assessment of the facts of the relationship and not based on how the parties define their relationship." *Henderson v. United*

---

[1] The Court previously permitted a second round of supplemental briefing following SKTI's admission that it had located additional relevant jurisdictional discovery in the custodial files of Taejin Kim, the former Trading Manager of SK Energy Americas ("SKEA"), who later became the head of SK's Asia Light Distillates Book in early 2015. Dkt. No. 302.

[2] All Exhibit citations are to the Second Stein Declaration unless otherwise noted.

1  *Student Aid Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. 2019) ("*Henderson*"). While SKTI and SKEA
2  claim there is no agency relationship here, "it is appropriate to consider whether the parties are trying to
3  limit or prevent liability by characterizing their relationship as something other than an agency
4  relationship." *Id.* Here, contrary to SKTI's arguments, there is abundant evidence that SKEA was
5  SKTI's agent in the United States and for its trading activities in California. *See also Ranza v. Nike, Inc.*,
6  793 F.3d 1059, 1068 (9th Cir. 2015) (factual conflicts are resolved in plaintiffs' favor); *CollegeSource,*
7  *Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073, 1078 (9th Cir. 2011) (reversing the district court's
8  decision to grant defendant's motion to dismiss on personal jurisdiction grounds, and holding that
9  "[b]ecause we are reviewing a dismissal for lack of personal jurisdiction, we resolve this factual conflict
10 in [the plaintiff]'s favor.").
11        The recent productions show that SKTI viewed SKEA as its "▮▮▮▮▮▮▮" and treated it as such.
12 For example, Exhibit 1 shows that an SKTI Trading Risk Manager, Yuchi Tsui ("Tsui"), ▮▮▮▮▮▮
13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As Exhibit 1 reflects, SKTI ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17 ▮▮▮▮▮▮▮▮▮▮▮▮▮. There is no indication that SKEA had any role in approving Tsui's ▮▮ or hiring
18 her in some sort of consultancy capacity; SKTI was in control. *See also* First Stein Decl. (ECF No. 294-
19 1), Exs. 12, 94 (SKTI's Risk Management policies applicable to its "▮▮▮▮▮▮"). And while SKTI has
20 emphasized to this Court about how it has no experience with or knowledge of SKEA's business, internal
21 documents reflect that SKEA in fact looked to SKTI for guidance on operating its business. An example
22 is Exhibit 1, in which SKEA's Yongsu ("Dave") Jang ("Jang") wrote to Tsui ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Tsui was not hands-off
24 but instead provided Jang with a comprehensive, detailed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25 ▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 2.
26        Additionally, contrary to the arguments that SKTI was not involved in trading is the evidence
27 that SKEA and SKTI worked hand-in-hand. Exhibit 3 reflects how ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1  ██████████████████████████████████████████████████████████████
2  ████████████████████████████████. Ex. 3. But it was not just a report; ████
3  ██████████████████████████████████████████████████████████████
4  ██████████████████████████████████████████████████████████████
5  ██████████████████████████████████████████████████████████████
6  ██████████████████████████████████████████████████████████████
7  ██████████████████████████████████████████████████████████████
8  ██████████████████████████████████████████████████████████████
9  ████████ The price curve is used both for valuation and as a guide for future trading. This newly
10 produced evidence thus only reinforces the conclusion that SKTI was actively involved in SKEA's
11 trading activities, including trades aimed at and targeting California.
12        The reality is SKTI was not merely the "hands-off" parent company with directors who sat on
13 SKEA's Board and periodically provided oversight—SKTI instead was ████████████████ to
14 SKEA. ████████████ dictated how SKEA conducted its business, from ████████████████
15 ██████████████████████████████████████████████████████████████
16 ██████████████████████████, SKEA. Ex. 4. And tellingly, when ████████████████
17 ██████████████████████████████████████████████████████████████
18 ████████████████. *Id*. Examples like this show how SKTI's influence was significant to SKEA's
19 business and how it could operate, and this information is only from written documents. Tsui's
20 documents also reflect that ████████████████████████████████████████
21 ██████████████████████████████████████. *See* Exs. 4, 5. The documents reflect that
22 ██████████████████████████████████████████████████████████████—
23 and Plaintiffs do not even yet have the phone records reflecting the apparently ongoing communications
24 between SKTI and SKEA personnel, such as Tsui and Jang.
25        A further example of this relationship is the email SKTI's Tsui ████████████████
26 ████████████████████████. Ex. 5. Tsui first explained that ████████████████
27 ██████████████████████████████████████████████████████████████

1  ▮▮▮▮▮▮▮▮ *Id*. She explained that, ▮▮▮▮▮▮▮▮
2  ▮▮▮▮▮▮▮▮ *Id*. However,
3  ▮▮▮▮▮▮▮▮
4  ▮▮▮▮ *Id*. In other words, ▮▮▮▮
5  ▮▮▮▮▮▮▮▮
6  ▮▮▮▮—indicating she had asked before for an explanation, without
7  success. *Id*. No return email was produced; it is unknown whether she and Jang spoke over the phone
8  afterwards, or what happened to this line of inquiry. What is known, however, is that ▮▮▮
9  ▮▮▮▮▮▮▮▮
10 ▮▮▮▮ Ex. 4 (SKEA00150202). *See Henderson*, 918
11 F.3d at 1075 (agency test could be satisfied where the defendant "ratified the . . . [unlawful] practices
12 by remaining silent and continuing to accept the benefits of the [agents'] tortious conduct despite
13 knowing what the [agents] were doing or, at the very least, knowing of facts that would have led a
14 reasonable person to investigate further.").

15 Under the circumstances, factual conflicts as to agency must be resolved in Plaintiffs' favor.

16 **B. Additional Evidence Reveals SKTI's Participation in Anticompetitive Conduct**

17 It is undisputed that SKTI's Namho Kim met with competitors at Vitol, including Brad Lucas,
18 in April of 2015. However, SKTI denied in its Interrogatory Responses that there was any illicit activity,
19 and SKTI's Namho Kim's signed a sworn declaration stating that the SK-Vitol meetings involved "no
20 discussion of specific Vitol-SKEA transactions, general or specific trading strategies, or Vitol-SKEA
21 business ventures." Kim Decl. ¶ 10, ECF No. 306-1. In other words, SKTI has portrayed these meetings
22 as innocent and harmless, despite the obvious concerns with competitors meeting behind closed doors.

23 SKTI's named co-Defendant and co-conspirator, Vitol, recently produced a tranche of new
24 documents, which are part of a remedial production made because of purported "coding-errors" in the
25 initial review of these documents. One document from this new Vitol production—which, though
26 written by SK's Niemann, was not produced in any SK production—is particularly significant regarding
27 the SKTI-Vitol meeting in April of 2015, shortly after the Torrance refinery explosion. In this document,

1   ██████████████████████████████████████████████████████████████████

2   ████████████████████████████. Ex. 6. ████████████████████████████

3   ██████████████████████████████████████████████████████████████████

4   ███████████████████████████████████████████████. *Id*. There is no specific

5   reference to a "JVs" or other specific work, just ████████████████████████████.

6      The California Attorney General's office recently highlighted this document to Judge Andrew

7   Cheng in arguing the jurisdictional motion brought by SKTI in that court—and for good reason. The

8   U.S. Department of Justice's Antitrust Division trains Federal Bureau of Investigation ("FBI") personnel

9   to look for generic terms like ██████████ and ██████████ used between competitors, which are often

10  code words used to conceal anticompetitive activity. *See* U.S. Dept. of Justice, Antitrust Division, *An*

11  *Antitrust Primer For Federal Law Enforcement Personnel*, p.3 (Revised: Sept. 2018), *available at*

12  https://www.justice.gov/atr/page/file/1091651/download (describing signs and overt acts in furtherance

13  of a conspiracy, including meetings between competitors and "the use of code words to conceal the

14  conspiracy"). ████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████. *See Precision Assocs.,*

16  *Inc. v. Panalpina World Transp., (Holding) Ltd.*, No. CV-08-42 JG VVP, 2013 WL 6481195, at *17

17  (E.D.N.Y. Sept. 20, 2013) (attendance at meetings may "tie affiliated entities to an antitrust

18  conspiracy"). The fact that this document was only produced by Vitol—not SK—and long after the

19  California Attorney General's investigation underscores the need for further discovery as to SKTI.

20  **III.   CONCLUSION**

21      After three rounds of briefing, there is more than sufficient evidence demonstrating that the Court

22  may and should exercise personal jurisdiction over SKTI.[3]

---

[3] As noted in the last CMC statement, the SK Defendants withheld hundreds of documents as privileged. They have produced three privilege logs for jurisdictional discovery, each of which has significant shortcomings. Nearly 85% of entries across the first two logs indicate that no attorney sent or received the communication and many documents appear to be routine correspondence among businesspeople. After Plaintiffs and the California AG's office identified these deficiencies to SK, the SK Defendants served "amended" logs in June but made no change except to spell out an acronym. The parties conferred again on July 19, 2021, and SK has agreed to produce revised logs.

Dated: August 9, 2021                                  Respectfully submitted,

By:  *Dena C. Sharp*
Dena C. Sharp (SBN 245869)
Scott M. Grzenczyk (SBN 279309)
Trevor T. Tan (SBN 281045)
Mikaela M. Bock (SBN 335089)
GIRARD SHARP LLP
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
scottg@girardsharp.com
ttan@girardsharp.com
mbock@girardsharp.com

Michael P. Lehmann (SBN 77152)
Christopher L. Lebsock (SBN 184546)
Samantha J. Stein (SBN 302034)
Kyle G. Bates (SBN 299114)
Tae Kim (SBN 331362)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
mlehmann@hausfeld.com
clebsock@hausfeld.com
sstein@hausfeld.com
kbates@hausfeld.com
tkim@hausfeld.com

*Interim Co-Lead Class Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 9, 2021, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the CM/ECF system. I also caused a copy of the under-seal documents to be served via electronic mail on defense counsel.

/s/ Dena C. Sharp
Dena C. Sharp