Michael P. Lehmann (SBN 77152)
Christopher L. Lebsock (SBN 184546)
Samantha J. Stein (SBN 302034)
Tae Kim (SBN 331362)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
mlehmann@hausfeld.com
clebsock@hausfeld.com
sstein@hausfeld.com
tkim@hausfeld.com

Dena C. Sharp (SBN 245869)
Adam E. Polk (SBN 273000)
Trevor T. Tan (SBN 281045)
Mikaela M. Bock (SBN 335089)
GIRARD SHARP LLP
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com
ttan@girardsharp.com
mbock@girardsharp.com

*Interim Co-Lead Class Counsel*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CALIFORNIA GASOLINE SPOT MARKET ANTITRUST LITIGATION | Case No. 3:20-cv-03131-JSC |
| | **PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANT SK TRADING INTERNATIONAL CO., LTD.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** |
| | **Re: ECF No. 263** |

**REDACTED VERSION**

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 1

II.   LEGAL STANDARDS ............................................................................................ 1

    A.    Overview ...................................................................................................... 1

    B.    Specific Personal Jurisdiction Under Agency Doctrine .................................. 2

    C.    Specific Jurisdiction as a Result of Direct Involvement In the Alleged
        Conspiracy .................................................................................................... 3

III.  ARGUMENT AND JURISDICTIONAL FACTS ...................................................... 3

    A.    SKEA Was SKTI's Agent. ............................................................................ 4

        1.    SKTI And SKEA Operate as a Single Integrated Entity. ..................... 4

        2.    SKTI Closely Monitored SKEA's Trading Activities. .......................... 6

        3.    SKTI and Kim Had Full Decision-Making Authority for SKEA. .......... 7

    B.    Participation In and Ratification of the Alleged Conspiracy ......................... 13

        1.    SKTI and Vitol Begin Coordinating in 2014 and Early 2015. ........... 14

        2.    SKTI and Kim Accelerate Max Profit Strategy After Refinery Incident. .......... 15

        3.    SKTI Was Aware of SKEA's Unusual Trading Strategies. ................. 17

    C.    Jurisdiction Over SKTI is Reasonable. ....................................................... 20

IV.   CONCLUSION ..................................................................................................... 20

PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANT SKTI'S MOTION TO
DISMISS FOR LACK OF PERSONAL JURISDICTION
CASE NO. 3:20-CV-03131

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
No. 15-CV-06314-YGR, 2018 WL 3707283, at \*5 (N.D. Cal. Aug. 3, 2018) ........................ 19

*Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*,
456 U.S. 556 (1982) .................................................................................................................. 3

*Bowoto v. Chevron Texaco Corp.*,
312 F. Supp. 2d 1229 (N.D. Cal. 2004)..................................................................................... 2

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. CV 07-5944-SC, 2014 WL 2581525 (N.D. Cal. June 9, 2014)........................................ 20

*Chavez v. Stellar Mgmt. Grp. VII, LLC*,
No. 19-CV-01353-JCS, 2020 WL 870919 (N.D. Cal. Feb. 21, 2020) ...................................... 3

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
753 F.3d 521 (5th Cir. 2014) .................................................................................................. 13

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
No. MDL 09-2047, 2017 WL 5971622 (E.D. La. Nov. 30, 2017)........................................... 13

*Contract Assocs. Office Interiors, Inc. v. Ruiter*,
No. CIV.S0700334 WBS EFB, 2008 WL 2225702 (E.D. Cal. May 29, 2008) ...................... 19

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
No. 18-CV-864, 2018 WL 6629250 (N.D. Ill. Oct. 22, 2018) ................................................ 13

*Dearborn v. Mar Ship Operations, Inc.*,
113 F.3d 995 (9th Cir. 1997)................................................................................................... 13

*Edwards v. Freeman*,
34 Cal. 2d 589 (1949)................................................................................................................. 2

*Fishman v. Subway*,
No. 2:19-cv-02444-ODw, 2019 WL 6135030 (C.D. Cal. Nov. 19, 2019)........................... 2, 13

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
141 S. Ct. 1017 (2021) ............................................................................................................ 16

*Henderson v. United Student Aid Funds, Inc.*,
918 F.3d 1068 (9th Cir. 2019), *as amended on denial of reh'g & reh'g en banc* (May
6, 2019)....................................................................................................................................... 2

ii

*Hydroxycut Mktg. & Sales Practices Litig.*, 810 F. Supp. 2d 1100, 1120 (S.D. Cal. 2011) ... 11, 13

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
    No. PWG-14-111, 2016 WL 160263 (D. Md. Jan. 14, 2016) ................................................. 19

*Jackson v. Euphoria Wellness, LLC*,
    No. 3:20-CV-03297-CRB, 2020 WL 5366419 (N.D. Cal. Sept. 8, 2020) ............................. 20

*Laub v. Horbaczewski*,
    No. LACV17-6210-JAK-KS, 2018 WL 5880950 (C.D. Cal. Mar. 16, 2018) ......................... 2

*Mavrix Photographs, LLC v. Livejournal, Inc.*,
    873 F.3d 1045 (9th Cir. 2017) ............................................................................................. 2

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
    311 F. Supp. 2d 1048 (D. Colo. 2004) ............................................................................ 3, 13

*In re Packaged Seafood Prod. Antitrust Litig.*,
    277 F. Supp. 3d 1167 (S.D. Cal. 2017) ............................................................................ 10, 13

*In re Polyester Staple Antitrust Litig.*,
    No. 3:03CV200, 2004 WL 7345007 (W.D.N.C. Aug. 5, 2004) ............................................. 3

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
    No. CV-08-42 JG VVP, 2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013) ................................ 19

*Ripani v. Liberty Loan Corp.*,
    95 Cal. App. 3d 603 (1979) .................................................................................................. 2

*Rood v. Cty. of Santa Clara*,
    113 Cal. App. 4th 549 (2003) ............................................................................................... 2

*Salyers v. Metro. Life Ins. Co.*,
    871 F.3d 934 (9th Cir. 2017) ............................................................................................... 2

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004) ............................................................................................... 1

*Staley v. Gilead Scis., Inc.*,
    446 F. Supp. 3d 578 (N.D. Cal. 2020) .................................................................................. 18

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    599 F. Supp. 2d 1179 (N.D. Cal. 2009) ................................................................................. 3

*TruePosition, Inc. v. LM Ericsson Tel. Co.*,
    899 F. Supp. 2d 356 (E.D. Pa. 2012) .................................................................................... 3

iii

*In re W. States Wholesale Natural Gas Antitrust Litig.*,
   715 F.3d 716 (9th Cir. 2015) ............................................................................ 1, 3, 16

*Williams v. Yamaha Motor Co., Ltd.*,
   851 F.3d 1015 (9th Cir. 2017) ............................................................................. 2

**Statutes**

Cal. Civ. Code § 2307 ............................................................................................. 2

California Corporations Code § 300 ....................................................................... 8

The Sherman Act ..................................................................................................... 1

**Other Authorities**

Restatement (Third) of Agency § 4.01(1) (2006) .................................................. 2

Rule 12(b)(2) ........................................................................................................... 1

Rule 30(b)(6) ........................................................................................................... 4

## I.    INTRODUCTION

On December 18, 2020, the Court deferred ruling on Defendant SK Trading International Co., Ltd.'s ("SKTI") lack of personal jurisdiction motion under Rule 12(b)(2). Dkt. No. 263 ("Order") at 14-15. In its Order, the Court credited "two of Plaintiffs' personal jurisdiction theories" and allowed them to seek jurisdictional discovery on these theories: (1) that SKTI directed and oversaw the anticompetitive spot market trading activities; and (2) that the wrongdoing of SKTI's subsidiary, SK Energy Americas, Inc. ("SKEA"), can be imputed to SKTI under an agency theory. *Id.* at 13. In coordination with the California Attorney General's ("AG") office, the parties prepared a jurisdictional discovery plan (Dkt. No. 277), and Plaintiffs completed their review of the prior productions that SKEA and co-Defendant Vitol, Inc. ("Vitol") had made to the AG's office during its prefiling investigation (the "AG Production").

Both the new materials discovered in the AG Production and in the jurisdictional discovery have provided Plaintiffs and the Court with substantial new evidence confirming that jurisdiction is appropriate over SKTI. The evidence reflects that SKEA was SKTI's trading arm in the United States, and California was a primary market for SKEA's trading activities. SKTI knew of and ratified the trading activities and joint ventures that Plaintiffs allege were at the heart of the allegedly anticompetitive conduct in this case. As detailed below, Plaintiffs now have sufficient evidence to make a *prima facie* showing that SKTI purposefully directed its activities towards California and that their antitrust claims arise out of those activities. Because SKTI cannot meet its high burden of demonstrating that exercising jurisdiction would be unreasonable, its motion to dismiss for lack of personal jurisdiction should be denied.

## II.    LEGAL STANDARDS

### A.    Overview

In accordance with the Court's Order,[1] to establish specific jurisdiction over SKTI, it is Plaintiffs' burden to show SKTI: (1) purposefully directed conduct towards California, and (2) that Plaintiffs' claims arise from that conduct. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). There is a sliding scale between these two prongs. *In re W. States Wholesale Natural Gas Antitrust*

---

[1] The Court dismissed Plaintiffs' federal Sherman Act claim (Dkt. No. 281), however, and thus only SKTI's contacts with California are relevant, as opposed to the United States as a whole.

*Litig.*, 715 F.3d 716, 742 (9th Cir. 2015) ("*W. States*") (a stronger showing under the first prong permits a "lesser showing on the other" prong) (quotation omitted). SKTI has the burden of demonstrating that the Court's exercise of personal jurisdiction would be unreasonable.

### B.    Specific Personal Jurisdiction Under Agency Doctrine

"Fundamental tenets of agency theory require that an agent 'act on the principal's behalf and subject to the principal's control.'" *Williams v. Yamaha Motor Co., Ltd.*, 851 F.3d 1015, 1024 (9th Cir. 2017) ("*Yamaha*") (quoting Restatement (Third) Of Agency § 1.01 (2006)); *see Edwards v. Freeman*, 34 Cal. 2d 589, 592 (1949) (same). "[T]he parent company must have the right to substantially control its subsidiary's activities." *Yamaha*, 851 F.3d at 1024-25; *see Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017). There is no requirement of a unity of interest in the case law. *Id.*; *see also Fishman v. Subway*, No. 2:19-cv-02444-ODw (ASx), 2019 WL 6135030, at *4 (C.D. Cal. Nov. 19, 2019) ("an agent must act on the principal's behalf and be subject to the principal's control").

"Whether an agency relationship exists is for a court to decide based on an assessment of the facts of the relationship and not based on how the parties define their relationship." *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. 2019), *as amended on denial of reh'g & reh'g en banc* (May 6, 2019) ("*Henderson*"). The agent's authority to act can be express or implied, *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 940 (9th Cir. 2017), and may be inferred from the facts or through ratification. *See Ripani v. Liberty Loan Corp.*, 95 Cal. App. 3d 603, 611 (1979); Cal. Civ. Code § 2307; *Henderson*, 918 F.3d at 1073 ("There are several ways to establish an agency relationship, including actual authority and ratification."); *see also van't Rood v. Cty. of Santa Clara*, 113 Cal. App. 4th 549, 571 (2003) ("An actual agency also may be created by ratification.") (citing Cal. Civ. Code § 2307).

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *See* Restatement (Third) of Agency § 4.01(1) (2006); Cal. Civ. Code, § 2307 (same). "A principal can ratify an act by (a) manifesting assent that the act shall affect the person's legal relationships, or (b) conduct that justifies a reasonable assumption that the person so consents." *Id.* § 4.01(2). *See also Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1247 (N.D. Cal. 2004); *Laub v. Horbaczewski*, No. LACV17-6210-JAK-KS, 2018 WL 5880950, at *7 (C.D. Cal.

2

Mar. 16, 2018) (specific jurisdiction found where defendant ratified agent's forum-related conduct).

###### C.    Specific Jurisdiction as a Result of Direct Involvement In the Alleged Conspiracy

Exercising personal jurisdiction is also appropriate if "[SKTI] was itself involved in directing and overseeing the anticompetitive horizontal spot market trading activity." Order at 13; *see  W. States.*, 715 F.3d at 743-44 (purposeful direction satisfied where defendant "either directly or indirectly through one of its controlled affiliates" manipulated sales in forum state); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009) (allegations that parent corporations were aware of subsidiaries' conduct suggested parent's direct involvement in conspiracy); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1068-74 (D. Colo. 2004) ("*Clear Channel*") (parent's direct participation in anticompetitive behavior was shown through evidence it acted "through its own employees and agents" including its subsidiary).

Moreover, the evidence required to show that a parent corporation knowingly participated in an antitrust conspiracy "is not onerous" and includes "tacitly or expressly ratif[ying] the known illegal actions[.]" *TruePosition, Inc. v. LM Ericsson Tel. Co.*, 899 F. Supp. 2d 356, 365 n.12 (E.D. Pa. 2012) (citation omitted); *see Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 573 (1982); *In re Polyester Staple Antitrust Litig.*, No. 3:03CV200, 2004 WL 7345007, at *5 (W.D.N.C. Aug. 5, 2004) (affirmative encouragement is sufficient).

### III.    ARGUMENT AND JURISDICTIONAL FACTS[2]

In its prior ruling, the Court relied on SKTI's representations "disavow[ing] any direct relationship between [SKTI] and [SKEA]," including a declaration from Jinwoo Jeong ("Jeong"), a manager at SKTI,[3] who claimed that SKTI did not exercise day-to-day control over SKEA and has never conducted any activities through SKEA. Order at 9. Evidence obtained through jurisdictional discovery,

---

[2] To the extent the jurisdictional facts are in dispute, Plaintiffs need only establish a *prima facie* case of personal jurisdiction as many of the relevant jurisdictional facts also go to SKTI's liability (*e.g.*, the extent of SKTI's participation in the alleged conspiracy and whether SKEA was its agent). *See Chavez v. Stellar Mgmt. Grp. VII, LLC*, No. 19-CV-01353-JCS, 2020 WL 870919, at *4 (N.D. Cal. Feb. 21, 2020) ("The Ninth Circuit has held that requiring only a prima facie showing of personal jurisdiction at the outset of a case is preferable to holding an evidentiary hearing if the disputed issues also go to the merits of the case) (citing *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n.2 (9th Cir. 1977)).

[3] Jeong did not work for SKTI during the relevant period. Dkt. No. 221-1(Jeong Declaration ¶¶1-3).

including the depositions of Jeong (in his individual capacity and as SKTI's Rule 30(b)(6) "person most knowledgeable"), and SKTI's Global Distillates Head, Namho Kim ("Kim"), now plainly contradicts SKTI's prior representations to this Court. It shows that SKTI not only had a direct relationship with SKEA, but that it had the power to control SKEA's trading business, including exercising control over co-Defendant David Niemann ("Niemann")—and SKTI utilized this power. In fact, Niemann complained to SKTI executives about the fact that it "micromanaged" SKEA. Taken together, the evidence of SKTI's involvement in SKEA and its California trading activities—including the allegedly illegal trading activities at issue here—are sufficient to make a *prima facie* showing of specific personal jurisdiction.

### A.    SKEA Was SKTI's Agent.

#### 1.    SKTI And SKEA Operate as a Single Integrated Entity.

Before describing SKTI's specific activities, it is important to understand its role within the "SK Group"—a type of conglomerate that is "unique to Korea"—of which both SKTI and SKEA are a part, along with other SK-related entities, including SK Energy Co., Ltd. ("SKEI") (SKEA's direct parent entity). *See* Declaration of Samantha Stein, Ex. 1[4] (Deposition of Namho Kim ("Kim Dep.") at 20:21-21:1, 29:18-20, 30:18-20) ("SK Group is just a notion. It just is a concept. It's not an actual entity or anything like that."). All of the companies within the SK Group, frequently referred to internally as "SK," work together for the benefit of the whole group and its integrated activities. SKEI has refineries in Korea that produce fuel, and SKTI trades that fuel, using its global subsidiaries as conduits, with Kim as the Global Distillates Head, responsible for "managing [] global resources, including the budget and resources" and "promoting the teamwork amongst various organizations that are on the global book." *See* Ex. 1 (Kim Dep. at 21:2-12, 33:11-19); *see also* Exs. 7 (SKEA00144037), 96 (SKTI00000001) (SKTI organizational chart that includes "SKEA"), and 97 (SKEA00144153). In fact, while Kim served as the head of distillates at both SKTI and SKEI, he was paid only by SKEI. Exs. 1, 3 (Kim Dep. at 19:12-14; Resp. to Interrog. 7). Similarly, Dongsoo Kang served as the head of the "staff organization" for both SKTI and SKEI. Ex. 1 (Kim Dep. at 99:20-101:1). And Niemann, who nominally worked at SKEA, was expected to trade SKEI products. *See* Ex. 7 (SKEA00144037) (Niemann's job included "trading of US

---

[4] All Exhibit numbers referenced herein refer to those attached to the Stein Declaration.

4

West Coast regional gasoline . . . and marketing gasoline and components which are produced by SK Energy Co., Ltd. in its refineries."). The entities within the SK Group, particularly those involved in trading, worked together as a "team." Indeed, the *same* attorney from the "SK Group" signed *both* SKTI and SKEA's jurisdictional discovery responses. Exs. 4, 5, 3 (SKEA Resp. to Jxn RFPs; SKTI Resp. to Jxn RFPs; SKTI Resp. to Interrog).[5]

SKTI and SKEA operated as a single, integrated entity. In fact, in 2014, SKTI internally acknowledged that "SKEA is a Post that will lead the growth of SKTI in the future[.]" Ex. 8 (SKEA00029775). Others in the gasoline trading world understood that SKEA was subsumed within the larger SK Group. For example, in June of 2014, Oil Price Information Service ("OPIS") reported in an article that SK was "increasing its trading presence in California" and explained that "[t]he expansion is part of the company's global strategy *to boost spot trading activity* and move away from its refinery supply business model. SK has a strong presence in Asia and Europe, so trading in the U.S. will help globalize its oil market coverage." Ex. 9 (SKEA00029327) (emphases added). The article noted that two traders (Taejin Kim and Michael Kinninger) were already trading out of "SK's Los Angeles office" but explained that with Niemann's hiring, "SK" was "expected to increase its West Coast trading volume significantly." *Id*. An anonymous "source" told OPIS that "SK wants to do more than just supplying refinery barrels. The company wants to optimize their refinery barrels and trade based on arbitrage economics." *Id*. Notably, while SKTI corrected one inaccuracy in the article, it did not seek to correct other aspects, including the portrayal of SKTI and SKEA as a single entity. *Id*.

In order for SKTI to increase trading in the United States, it needed SKEA to serve as its agent there. SKTI wrote up the business plans for SKEA, such as the April 2014 "US LD [United States Light Distillates] Book Biz Plan," which outlined how SKTI expected "the post [SKEA] to complete global LD [Light Distillates] book network connecting Asia/US/Europe, and grow to be the western profit center." Ex. 10 (SKEA-10-0020329). SKTI wrote that "[a]ttaining profitability in LA [Los Angeles] Carbob pipe trading is a top priority" and in another page explained that "PADD 5 [California], a huge

---

[5] Jeong testified that the signing attorney, Hongsang (Jay) Jeon, is in-house counsel for SKTI. Ex. 2 (Jeong Dep. at 22:10-23:2).

consuming market . . . is where we must survive and grow as a front bridgehead for US trading." *Id.* It is unsurprising then that all SKEA employees and all SKTI employees (and all SKEI employees) share the same email domain address (@sk.com) and that all SKEA employees, from Niemann to his assistant Shelly Mohammed ("Mohammed"), are identified in their emails as supporting the operations of "SKEA/SKTI". *See, e.g.*, Ex. 95 (SKEA-008-0017289). Indeed, when SKEA hired Niemann, SKTI adopted him as its own trader. Exs. 11, 2 (SKEA-009-0011542; Jeong Dep. at 92:9-93:23) (SKTI's Marketing, Production, and Research & Development ("MPR") Support Team—"the team [] involved in ascertaining . . . the profits as generated by each of the *business units* of SKTI"—noted in 2015 that "[SK]TI hired a Global Trader and [he is] making big money in the US") (emphases added).

### 2.    SKTI Closely Monitored SKEA's Trading Activities.

Maintaining global trading business meant that SKTI could not act independently from SKEA; it had to actively monitor SKEA because it needed to balance its global trading risk to ensure that any adverse financial exposure was tolerable to the company as a whole. As such, SKTI had a Trading Risk Management Policy, the "purpose" of which was "to establish a clear and consistent policy to check, report and control the risk arising from the trading activities of SK Trading International" including "*the trading activities for all of SKTI's locations including its overseas branch offices and entities in* Singapore, U.K, U.A.E, *U.S.A* and the headquarters in Seoul, Korea." Exs. 12, 94 (SKEA 00005510; SKEA00005547) (emphases added). SKTI's Jeong explained that "SKTI . . . it's a trading company. . . . [it] has to find opportunities in the market, and so that it can make some profits in the process. So, in going about finding these opportunities to generate profits, it essentially is taking a risk in the market in order for it to survive and grow in the market on a sustainable basis. So, in that regard, risk management is an essential element. So the company has come up with a risk management policy." Ex. 2 (Jeong Dep. 80:24-81:12).

The policy itself states that: "SKTI has participated in petroleum and commodity markets around the world. By participating in these markets, SKTI is exposed to the various market related risks as a Trading Company on the purpose of creation of outcomes through taking risk. Thus, the risk management specified in the policy focuses not only on avoiding negative financial risks but also on managing the

6

creation of outcomes that the company is able to attain by taking risks." Ex. 12 (SKEA00005520). In short, the local trading departments within SKTI, such as SKEA, would make trades, but every trade had to be monitored by SKTI and its risk management apparatus to make sure that the SKTI's financial exposure was "tolerable". *Id*. at SKEA00005510. The risk management policy established a disciplinary process (*see id.* at SKEA00005511-13), and SKTI used it to discipline SKEA employees if they did not act in accordance with the policy (*id*.; Ex. 13 (SKEA00005628)).

Indeed, SKTI's trading risk management policy required SKEA to notify SKTI of every trade it made. Exs. 12, 14 (SKEA00005516; SKEA-008-0013991). Pursuant to that policy, SKTI actively monitored every one of them. SKEA sent daily "Mark to Market" ("MTM")[6] reports to SKTI containing information regarding the day's profits and losses, the quantity of light distillates traded, and the type of trade to ensure that all trades were within SKTI's pre-established trading limits.  Exs. 15, 1, 85, 99 (SKEA-010-0002365-66; Kim Dep. 49:12-15; SKEA00127256; summary chart). SKTI also maintained a system that alerted it if SKEA's losses exceeded a pre-set amount. Ex. 1 (Kim Dep. at 58:9-59:18). SKTI kept such a close eye on SKEA's trading that its risk management team would immediately question SKEA employees about higher and lower than normal trading activities, point out typos in deal numbers, and ask for information regarding a trade's background. *E.g.*, Exs. 14, 16, 17, 18 (SKEA-008-0013991; 00123213; 00123028; 00125682). SKEA also submitted weekly reports to SKTI, and SKTI's MPR Support Team requested financial information from SKEA such as profit and loss estimations and details of paper hedging transactions. Exs. 2, 19 (Jeong Dep. at 110:22-25; 111:2:21; SKEA00136819).

### 3. SKTI and Kim Had Full Decision-Making Authority for SKEA.

As the global book head, Kim was responsible for risk management and managing global resources. He was heavily involved in the execution and monitoring of the risk management policy. Ex. 1 (Kim Dep. 34:17-35:14).  Kim also determined when SKEA's credit limit could be extended, and he reviewed reports from an internal system that identified risk situations—including "abnormal[]"

---

[6] MTM is a common industry term used to describe the tracking the fair value fluctuating assets and liabilities to understand a "company's current financial situation based on current market conditions." *See* https://www.investopedia.com/terms/m/marktomarket.asp (last visited May 7, 2021).

7

activity—of the "distillate-related organizations" under his supervision. Exs. 20, 1 (SKEA-010-0018073; Kim Dep. at 40:7-41-12). Kim testified that the "MTM reports would reflect the performance of the global book that I am responsible for -- that I was responsible for, so I -- that was one of the things that I paid great attention to. And when I look at those reports, I pay attention to the numbers there." Ex. 1 (Kim Dep. 49:16-24). SKEA's traders emailed Kim weekly reports that included information on trading performance, the status of major open positions, plans, storage availability, pipeline trading, and cargo trading. Ex. 21 (SKEA00015536). Kim responded to these reports and provided guidance. Ex. 22 (SKEA00028838).

Although Wongyong Koo (Koo") was ostensibly the CEO of SKEA, SKTI's own corporate witness testified that he was not at the "corporate officer level. He was just the representative." Ex. 2 (Jeong Dep. 54:19-24). Internal documents refer to Koo merely as the "Head of *Regional* Office"– implying he was just a head of a regional office within the SKTI organization. Ex. 23 (SKEA-009-0001872) (emphasis added). Indeed, SKEA's employees regularly referred to SKTI as "HQ [headquarters]" *E.g.* Ex. 24 (SKEA00133742). And while SKEA's traders, such as Niemann, reported directly to Koo, Koo reported directly to Kim and SKTI—not to the Board of Directors of SKEA. Ex. 23, 1 (SKEA-009-0001872; Kim Dep. 65:2-17). In fact, SKEA admitted its Board of Directors never met and "did not engage in any Board of Director activities" (and thus did not comply with California Corporations Code § 300). *Id.*; Ex. 6 (SKEA's Second Set of Resp. to Investigative Interrog. No. 16).[7]

Without a functioning Board of Directors, SKTI and Kim effectively had full decision-making authority for SKEA. For example, SKTI's Kim had the power to sign legal documents "[f]or and on behalf of SK Energy Americas Inc."—and he exercised that power. *See* Figure 1, excerpted from Ex. 25 (SKEA00144217) (Kim's letter terminating SKEA's development agreement in California). When confronted with these facts at his



- Figure 1 -

---

[7] SKTI's Jeong testified that while Dongsoo Kang "was registered as a board member [of SKEA] that was only for the purpose of satisfying some legal requirement[;]" "he was registered . . . as a board member, but that was only for . . . satisfying the legal requirement." Ex. 2 (Jeong Dep. 55:3-8).

PLS' SUPPL. BR. IN OPP'N TO SKTI'S PERSONAL JURISDICTION MOT.
CASE NO. 3:20-CV-03131-JSC

deposition, Kim explained that he signed documents for SKEA in situations where SKEA "cannot make [an] *independent* decision". Ex. 1 (Kim Dep. at 110:13-16 (emphasis added)). Kim elaborated that "it was a situation where the parent company of SKEA had to get involved because this investment business matter involves too much risk or too huge a risk . . . . I determined that I was the right person to sign this document." *Id.* 110:17-111:6. As Kim said, "It's not like SKEA would have the decision-making authority in all of the investment projects that it is involved in." *Id.* 111:11-13. Although Kim was not on SKEA's Board, and although SKEA never paid him and he had no official role at SKEA during 2014-16, he had the power to take control of SKEA's affairs when he felt it was appropriate to do so.[8] Ex. 6, 1 (SKEA's Second Set of Resp. to Investigative Interrog. No. 16; Kim Dep. 19:15-24).

It is thus no surprise then that it was Kim—not Koo—who made the ultimate decision to hire SKEA's new Senior Trader, Niemann, in 2014, telling Koo to carry out the negotiations with Niemann in accordance with Kim's terms. Ex. 26 (SKEA00144422). Kim himself interviewed Niemann in Houston on April 30, 2014. Ex. 27 (SKEA00029247-48). Following the interview, Kim then sent a report to SKTI's CEO, Hyungkun Kim, discussing Niemann's qualifications and relaying that he would discuss Niemann's employment further with SKTI's Corporate Services and Human Resources ("HR") Committees. *Id*. As Niemann (not Koo) would become the "de facto US LD Book leader"[9] for SKTI's global distillates book, understandably, SKTI had to be involved. Ex. 28 (SKEA-010-0022924-25). Hyungkun Kim approved the request to hire Niemann on May 30, 2014, Koo signed Niemann's employment agreement on June 5, 2014, and Niemann began work on August 1. Exs. 29, 7 (SKEA00134060; SKEA00144037). Ultimately, the "decision making" was done at the "SKTI level" as Kim told Koo. Ex. 30 (SKEA-010-0020162).

---

[8] Notably, despite the fact that Kim works for SKTI, SKEA lists him as its CEO in its Corporate Statement of Information filed with the California Secretary of State. Ex. 98. Kim claimed he had no idea why he was listed. Ex. 1 (Kim Dep. 113:21-114:20).

[9] Niemann, however, was always "only a means to achieve our purpose" as Kim wrote Koo and others at SKTI in October of 2016. Ex. 38 (SKEA00030998). And SKTI was always responsible for the US LD book. For example, when Niemann was considering leaving SKEA toward the end of 2016, Taejin Kim of Asia Light Distillates Book at the time, was "reprimanded" by SKTI's President for not having a contingency plan to secure substitute manpower if Niemann left. *Id.*

9

Kim, however, utilized Koo to keep an eye on Niemann, insisting Niemann work in Houston where Koo was based. Ex. 31 (SKEA00029184). Indeed, Koo and other "expats" (expatriates) from SKTI served as instruments for carrying out SKTI's interests as nominal employees of SKEA. Koo's visa application indicates that he was sent from SKTI when he was appointed as the head of SKEA. Ex. 32 (SKEA00028818). Between 2014 and 2016, fourteen SKTI employees were sent to SKEA. Ex. 3 (SKTI's Resp. to Interrog. No. 6). These employees often reported directly to Kim. *See, e.g.*, Ex. 33, 34 (SKEA00029050; SKEA-005-0000016). "Expat" employees would frequently go from working at SKTI to SKEA "[a]nd then sometimes some of them might return to SKTI." Ex. 2 (Jeong Dep. at 99:16-100:1).

Niemann reported directly to Kim on occasion, including sending updates on CARBOB trading activity directly to Kim, explaining, for instance, "September [2014] LA carbob has not performed as we expected after the first week of September[.]" Ex. 35 (SKEA00138361). Kim considered Niemann to be "our trader" and tightly controlled many aspects of Niemann's employment such as his trading strategies and what types of fuel he could trade in. Ex. 36 (SKEA-010-0020553). At one point, Niemann objected to the level of control exercised by SKTI, complaining to Kim how SKTI was "micromanaging" him. Ex. 37 (SKEA00144312). Niemann's importance to SKTI—and Koo's lack of control over basic SKEA operations—is highlighted by an email from Koo to Kim expressing concerns over the time Niemann spent golfing. Kim suggested that limits get placed on Niemann, but Kim undermined Koo by telling him to allow Niemann's golfing "to the extent that it does not interfere with work." Ex. 39 (SKEA00143868). SKEA employees also regularly reported to SKTI about Niemann's trading strategies, market outlooks, and storage plans. *See, e.g.*, Exs. 16, 40 (SKEA00123213; SKEA00029766-67).  In turn, Kim reported to SKTI's CEO. (*See e.g.*, Ex. 1 (Kim Dep. 72:2-10). When the latter complained to Kim stating "Trading profit is continuously going down" in the US and elsewhere Stein Dec. Ex. 41 (SKEA00144143), Kim then directed Koo to analyze the reasons for the decrease and send him the results, and Koo complied. *Id.*; *see also In re Packaged Seafood Prod. Antitrust Litig.*, 277 F. Supp. 3d 1167, 1190 (S.D. Cal. 2017) ("*PSP*") (parent routinely "provided direction to StarKist regarding its pricing and volume" and made frequent communications with subsidiary sufficient to "infer a plausible agency relationship.").

And while Kim testified that he had only a "limited role" in trading, in the relevant period, Kim

10

was directly involved in overseeing the trading activity. Ex. 1 (Kim Dep. at 33:2-23). For example, in December of 2014, in response to a trading progress report from Koo, Kim told Koo: "Please share the major decisions and status on trading with me as the recipient and cc the TI executives as follows[.]" Ex. 42 (SKEA00029820). Kim even told SKEA employees he was keeping watch on Koo's contango trading operations,[10] stating "I will be around to watch you and believe you will do it well." Ex. 43 (SKEA-010-0020978); *see Hydroxycut Mktg. & Sales Practices Litig.*, 810 F. Supp. 2d 1100, 1120 (S.D. Cal. 2011) ("*Hydroxycut*") (finding agency where CEO of parent corporation "remained informed regarding manufacturing costs" and "kept a close eye" on financials of subsidiaries and received regular sales reports further supported agency allegations). The evidence also strongly suggests that Kim did in fact read and closely scrutinize SKEA reports, at one point noticing the omission of a SKEA and Vitol Joint Venture on a report, and requesting additional details. Ex. 44 (SKEA00030626-27). *See Hydroxycut*, 810 F. Supp. 2d at 1120 (that parent company noticed subsidiary's reports "were wrong and were wrong in the report sent out the two weeks before as well" supported agency).

The reality is that SKEA needed SKTI's permission to engage in basic trading strategies such as "contango plays" and expanding into trading different types of fuel such as jet fuel. Exs. 45, 46 (SKEA00104407; 00134931). SKTI also controlled the companies with which SKEA could trade or joint venture. Exs. 47, 48 (SKEA-008-0017120; SKEA00104066). A member of SKTI's risk management team emailed a list of such companies—including Vitol—to the heads of SKEA and other subsidiaries. *Id*. But the vast majority of the directives came from Kim. *E.g.*, Exs. 45, 46 (SKEA00104407; 00134931).

It was SKTI—not SKEA's board of directors—that set and monitored profit goals and a yearly budget for SKEA and dictated what items were included in SKEA's business plan. Exs. 49, 50, 51 (SKEA00137446; 00113888; 00136132.) SKEA had to receive SKTI's approval for ordinary business activities such as renewing leases and renting new office space. Exs. 52, 53 (SKEA00132098; 00029865). SKTI further extended its control by reviewing SKEA's travel, entertainment, expense, and office supply

---

[10] "Contango" refers to a situation where the futures price is above the spot price, providing traders with an arbitrage opportunity because the futures price and the spot price will eventually converge, and generally they tend to do so in the direction of the future spot price.

budgets. Ex. 54, 55 (SKEA00026854; 00094506). SKEA also needed SKTI's permission to trade in open credit. Ex. 56 (SKEA00137610). SKEA was obligated to report capital, financial instruments, credit line, loans, bonds, management budget, and its investment budget to SKTI—and not to SKEA's board of directors, which, as noted above, never met. Ex. 24 (SKEA00133742).

SKTI also controlled SKEA's basic HR functions. SKTI developed a hiring and talent expansion plan for SKEA which listed SKEA's hiring under SKTI's control in a document setting forth the corporate hiring structure. Ex. 57 (SKEA00016364). At times, SKTI overruled SKEA's objections, for example, directing SKEA to hire a specific trader despite SKEA's protests that the trader should not be hired based on his past profit record. Ex. 58 (SKEA-010-0021498). Moreover, SKTI evaluated SKEA employees and determined SKEA employees' bonuses based on whether they made profit goals SKTI—not SKEA—had set.   Exs. 59, 60, 61 (SKTI00002629; SKEA00028844; 00028841). As an example, Namho Kim SKEA employees also reported their grievances to SKTI. Ex. 62 (SKEA00104220). In one such example, SKEA's Mohammed had a dispute with SKEA about a bonus payment of ▮▮▮▮, and although Namho Kim dealt with her directly on this issue, ultimately he and Koo told Mohammad that SKTI's CEO at the time, Jinhwa Song ("Song"), was the "decision-maker" and would meet with her. Ex. 63 (SKEA00144382). Song, in fact, traveled to Houston in 2016. Ex. 3 (SKTI's Resp. to Interrog. No. 1). SKTI's participation in SKEA's employment related matters was not isolated. As another example, in August of 2014, Kim emailed Koo regarding the termination of trader Michael Kinninger, telling Koo to work together with SKTI's Corporate Services Team to carry out the termination. Ex. 64 (SKEA00143806).

There are numerous other examples of SKTI's involvement and control over SKEA. For example, SKTI oversaw SKEA's response to an investigation from the California Air Resources Board for "failure to meet the carbon intensity target for 2014."[11] In September of 2015, SKEA's Koo reported his dealings with the agency to Kim who advised him of what to do about the violation. Ex. 65 (SKEA00027017). A month later, a member of SKTI's risk management team instructed the gasoline trading manager at SKEA

---

[11] https://ww2.arb.ca.gov/news/carb-cracks-down-low-carbon-fuel-standard-violators (last visited May 7, 2021).

to pay the regulatory fine ███████████████████████████████████████, overriding Koo's decision to pay the fine ███████████████████████. Ex. 66 (SKEA00138095).

In reality, SKTI did not just set the overarching strategic direction for SKEA; it was involved in the routine activities of SKEA's business. The evidence above reflects that a "classic agency relationship" exists between SKTI and SKEA because SKTI used SKEA to conduct business in a foreign jurisdiction while retaining "significant overall direction and control" over operations. *Dearborn v. Mar Ship Operations, Inc.*, 113 F.3d 995, 999 (9th Cir. 1997). That a parent corporation oversaw routine matters of a subsidiary's business, "including the retention and employment terms of" its employees, as well as the contractual relationship between the subsidiaries and third-parties, plausibly establishes the requisite control for agency. *See PSP*, 277 F. Supp. 3d at 1190; *Clear Channel*, 311 F. Supp. 2d at 1071 (control shown by parent's control over "the policies and behavior of its subsidiaries" and participation in the "budgeting process for all subsidiaries and reviews subsidiaries' plans for achieving revenue"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-CV-864, 2018 WL 6629250, at *6 (N.D. Ill. Oct. 22, 2018); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521, 534 (5th Cir. 2014) (imputation of agent's contacts proper for purposes of establishing specific jurisdiction). "In sum, the facts establish that [SKTI] was deeply involved in the details of [SKEA's] business . . . [SKTI] vigilantly monitored the finances of the companies, took action when problems such as forecast accuracy arose, and exercised [] authority as to all significant aspects of the subsidiaries' operations." *Hydroxycut*, 810 F. Supp. 2d at 1121; *see Fishman*, 2019 WL 6135030, at *5 (finding agency relationship); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. MDL 09-2047, 2017 WL 5971622, at *21 (E.D. La. Nov. 30, 2017) (finding specific jurisdiction under agency theory where there was evidence of "a controlling chain" between parent and a subsidiary, including sharing corporate officers and office space, control of "long-term strategic decisions" and monitoring and approval of "daily activities").

## B. Participation In and Ratification of the Alleged Conspiracy

Beyond the fact that SKEA was an agent of SKTI for purposes of SKEA's trading operations, SKTI participated in, and ratified the acts of SKEA in furtherance of, the alleged conspiracy. The principal-agent relationship simply facilitated this participation and ratification.

### 1.    SKTI and Vitol Begin Coordinating in 2014 and Early 2015.

In March of 2014, SKEA's Koo and SKTI's Kim began taking steps to implement SKTI's plans for expansion on the West Coast of the United States. Summarizing their conversations during one of Kim's visits regarding the future of the USLD trading book—a financial portfolio of assets used to fund trades in light distillate fuels such as gasoline, Koo and Kim's future plans included upgrading "Arbitrage & Regional Cargo Trading[.]" Ex. 30 (SKEA-010-0020162). SKTI and SKEA noted that problems at "Old Refineries" in California could disrupt the state's gasoline supply. Ex. 67 (SKEA-008-0000703).

As part of its trading plans, SKTI identified Vitol—an established West Coast trading firm—as an ideal partner for coordination. During a 2014 yearly strategic meeting, SKTI identified Vitol as a "joint venture" partner and discussed the need to hire an experienced senior trader. Ex. 68, 30 (SKEA00136678; SKEA-010-0020162-63). However, merely labeling an agreement between two companies a "joint venture" does not make it lawful. In fact, an internal SKTI report from 2016 describes another one of its so-called "joint ventures" as a way for "[p]revention of competition through JV between the two companies which are Market Competitors[.]" Ex. 69 (SKEA-008-0006950).

After Niemann's hiring, Vitol employees including Brad Lucas ("Lucas")—a friend and former colleague of Niemann's when both worked for Vitol—discussed the potential "to work on Carbob with SK (Nemo) to USWC for 2015," referring to Niemann. Ex. 70 (VIC-00267226). On October 14, 2014, a trader at SKEA sent an email to Lucas, Niemann, and SKEA's Taejin Kim (an SKEA trader who was transitioning to become the head of SKTI/SKEI's Asia Light Distillates Book) with an "outline" of ideas for a "Summer spec storage J/V [joint venture]" proposing a "50/50" split and a plan to hold inventory to March 2015. Ex. 71 (VIC-00208465). During the second half of 2014, SKTI approved multiple so-called "JVs" "between SKEA and Vitol concerning CARBOB for "contango" trading.

Although SKTI and SKEA characterized these agreements with Vitol as JVs, they were never formalized or memorialized in a written agreement and were only referenced in internal emails and other documents. For instance, on October 18, 2014, Kim reported on the status of a CARBOB JV to SKTI CEO Hygunkun Kim. Ex. 36 (SKEA-010-0020553). On October 24, 2014, Kim approved a "CARBOB Trading JV Approval Request" between SKEA and Vitol for the period of November 2014 and March

PLS' SUPPL. BR. IN OPP'N TO SKTI'S PERSONAL JURISDICTION MOT.
CASE NO. 3:20-CV-03131-JSC

2015 to "[e]nable Contango play[.]" Ex. 72 (SKEA-010-0018113-14). On November 7, Taejin Kim reported a CARBOB JV with Vitol to "[e]ngage in Contango Play by utilizing the decrease in CARBOB and NYMEX Contango." Ex. 73 (SKEA-010-0020570). Around the same time, SKEA's Koo and Taejin Kim sought and received approval from Kim to enter into a lease agreement in Los Angeles and the Pacific Northwest, noting that the tanks "can be used as a Vitol JV Pool[.]" Ex. 74 (SKEA-010-0018106). On November 12, Koo emailed SKTI's CEO to inform him that they had signed "storage lease agreements in LA" and the Pacific Northwest for six months to pursue "Contango Play[.]" Ex. 75 (SKEA-010-0020632). In a July 2016 USLD Gasoline transfer report, SKEA's gasoline trader Yongsu Jang wrote to his successor that "there are no official term contracts, but instead, our collaboration with Vitol has been increased in many areas" including "Prem. Carbob Blending[.]" Ex. 76 (SKEA00121571).

As SKTI and SKEA began entering into JVs with Vitol in the West Coast market in late 2014, Niemann and Lucas meanwhile used a chat message service to discuss the possibility of a refinery outage to raise prices. Lucas told Niemann: "XOM [ExxonMobile] shuts hydrocracker in Torrance for leak . . . Hopefully for a month or two . . . ." Niemann responded: "or it falls into the FCC and kills both units." Ex. 77 (VIC-00316376-78). Lucas agreed, saying: "[t]hat would be ideal. Probably too much to wish for." *Id*. Niemann responded: "it's a start at least." *Id*. They would ultimately get what they hoped for. The ExxonMobil refinery in Torrance began experiencing significant problems on February 16, 2015 and by February 18, there was an explosion at the refinery. Niemann and Lucas rejoiced, and so did SKTI.

### 2.   SKTI and Kim Accelerate Max Profit Strategy After Refinery Incident.

Kim had wanted to implement an aggressive profit maximizing strategy in the relevant period, writing Koo in early 2015 that the distillates group would be pursuing an "earning capacity max test". Ex. 43 (SKEA00134562). According to Kim, this "max profit" strategy "reflected" his "trading philosophy[.]" Ex. 1 (Kim Dep. at 100:2-101:6). On February 20, 2015, only days after the explosion, Koo wrote to Kim about the refinery problems and difficulties plaguing the California refiners and reported how much fuel had been sold (including through the "Vitol Carbob J/V") and how prices, particularly for premium, had increased. Ex. 78 (SKEA00103329). Koo also reported that "we are planning to actively pursue a joint venture with Vitol . . . to expand the trade area" *Id.* at 103332. Kim

responded by stressing to SKEA's Koo the importance of utilizing the profit "Max Test" and "pursuing the maximum profit" including "maximizing the quantity" *Id*. After Koo reported profit increases in the immediate aftermath to Kim, he instructed that Koo: "increase of the absolute size of the profit-making ability." Ex. 79 (SKEA00104229).

Over the next few days, SK made significant profits based on Niemann's California trading. Kim reported to SKTI's CEO about "the US LD book performance," noting that "a huge profit was generated at the beginning of the year" and "a target of ███████████ per year will be set for the US LD by increasing quantity and conducting the profitability max test." Ex. 80 (SKEA00143969). In March of 2015, Kim wrote again to Koo and two other "expats": "Alright. 150MB/D was traded between January and February . . . please increase the volume/inventory . . . so that we can make money!!!" Ex. 81 (SKEA00144739). One of the expats who worked closely with Niemann replied: "Yes, I will. . . . Currently, I'm working with Niemann to determine another way to jump back[.]" *Id. See W. States*, 715 F.3d at 743-44 (finding "express aiming" from activities "to advance or control the market prices of natural gas that its affiliates sold in the United States or in Wisconsin" and where officers or directors made "strategic marketing policies and decisions" to report prices to natural gas price indices "that affected the market prices of natural gas."); *see also Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1027 (2021) ("[W]hen a corporation has 'continuously and deliberately exploited [a State's] market, it must reasonably anticipate being haled into [that State's] court[s]' to defend actions 'based on' products causing injury there.").

During this period in early 2015, Kim (among several other SKTI employees) was a direct recipient of SKEA's MTM reports, which for this period of time included all of the reported spot market trading reported by OPIS. Exs. 85, 99 (SKEA00127253-55; summary chart). During this period, Plaintiffs allege that SK and Vitol conspired to manipulate OPIS, the most widely accepted price benchmark for supply contracts in California, by reporting trades to OPIS in order to spike the market at opportune times for their supply contracts (*e.g.*, during "pricing windows"), including through the use of "wash" trades.

SKTI's employees were well aware that OPIS was ripe for manipulation. In a January 2015 task transfer memo, Taejin Kim explained to a new expat gasoline trader at SKEA, Yongsu Jang, how "the

16

values in the West Coast Spot Market Report published by OPIS are followed" to set CARBOB pricing Ex. 28 (SKEA-010-0022935). He then explained that the "Carbob differential is computed by OPIS by checking and compiling Carbob transactions . . . and then by averaging the lowest and highest values, and this value is reported on a daily basis[.]" *Id.* He pointed out that because "the average value is used, *there is a possibility that the actual market value could be distorted.*" *Id.* (emphases added). He then illustrated it with a hypothetical: "If … transactions on a given day are 10, 10, 10, 11, 12, 13, and 20, the actual average value is 12, but the maximum value and the minimum value are taken into consideration, so that the average value is recognized as 15." *Id.* at SKEA-010-0022936.

Figuring out how to use refinery and supply troubles to increase profit is fully consistent with SKTI's profit maximization strategy. Indeed, in June of 2016, when Koo reported to Kim about other troubles confronting California refineries and how their profits were improving because of the upsurge in gasoline pricing, Koo suggested that they "manage [the situation] conservatively." Ex. 82 (SKEA00023650). Kim responded that Koo should "stretch profit to the maximum by utilizing the market situation inflection point"—*i.e.*, use the inflection points (market troubles) to increase profit. *Id.*

### 3.   SKTI Was Aware of SKEA's Unusual Trading Strategies.

Meanwhile, SKTI knew full well that SKEA and Vitol were engaging in profit sharing and information exchanges. In June 2015, Koo wrote to SKTI's CEO, copying Kim, that "we are working to expand our business while reducing risk through information exchange and JV operation with Vitol, a major market player. We will continue to strive to improve profitability." Stein Dec. Ex. 83 (SKEA-009-0001965). He also monitored the JV activity between SKEA and Vitol,[12] receiving regular reports on trading activities and OPIS pricing. *E.g.*, Ex. 84 (SKEA00127253). In one such communication, Koo reported to Kim and other SKTI executives about the "Alkylate spot jv with Vitol" and there would be a

---

[12] SKEA and Vitol had many coordinated strategies during the relevant period, all of which SKTI closely monitored. As the conspiracy progressed, in July of 2015, SKTI extended its tank storage contract in the Los Angeles area. Ex. 87 (SKEA-010-0023537). SKEA had previously leased storage tanks in the Los Angeles area between December 2014 to May 2015, and in a June 3, 2015 email, a member of SKTI's trading team reported to SKTI's CEO that such tanks "could be used for Carbob trading" and "be utilized for the Carbob JV with Vitol[.]" Ex. 11 (SKEA-009-0011544). In August of 2015, SKTI approved another JV with Vitol to bring a gasoline into Los Angeles by ship and Kim requested updates on the delivery in real time. Ex. 88 (SKEA00103969).

PLS' SUPPL. BR. IN OPP'N TO SKTI'S PERSONAL JURISDICTION MOT.
CASE NO. 3:20-CV-03131-JSC

"50:50 share of the total profit and loss[.]" Ex. 44 (SKEA00030626). There were similar reports as well. For instance, Taejin Kim (after becoming SKTI/SKEI's Asia Light Distillates Book head) met with Lucas and described how Lucas had told him that Vitol was "achieving good performance record" in 2015 and 2016 "through JV with SK (mainly Alky) in the USWC market." Ex. 86 (SKEA-010-0006546). He wrote that "[f]or Brad personally, JV with Niemann is more effective and creates higher net profits than any other Regional Book" and elaborated that Lucas "continued collaboration with Niemann through Storage, cargo JV, etc." *Id.* The involvement of the parent company's executives with "significant management and oversight role" in the collaboration between a subsidiary and a third-party strongly suggests that the parent played role in scheme. *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 608 (N.D. Cal. 2020).

Moreover, SKTI employees were aware that Niemann was engaging in unusual trading activity with Lucas and Vitol, including "round trip" or "back to back" trades,[13] but SKTI did nothing to stop it. For example, on November 10, 2015 SKTI's MPR Support Team Manager Kiyoung Yoon reported details to other members of the team about income from SKEA's alkylate operation. Ex. 89 (SKEA00014363). Yoon reported that after SKEA bought volumes from a third-party, SKEA "back-to-back resold" 140MB to Vitol. *Id*. Yoon noted that SKEA and Vitol each shared profits through "payment of physical trade." Some SKTI employees raised concerns with these types of trading activities. Ex. 90 (SKEA-009-0001530). In December 2015, a member SKTI's MPR Support Team asked Yongsu Jang, an SKEA gasoline trader, how much SKEA earned through sales in December and *the specific sources* of its profits. Ex. 91 (SKEA00026827). In July 2016, SKTI's Trading Risk Management Team asked an SKEA employee why SKEA bought 50MB of CARBOB from Vitol and sold it again to Vitol, stating "[i]t doesn't seem like a trivial transaction, so I would like to know the reason for this transaction." Ex. 17 (SKEA00123028). Although SKTI was aware that SKEA was frequently engaging in irregular round trip trades, SKTI ignored the red flags, instead "maximiz[ing] profitability taking various risks based on professional RM" and "stretch[ing] profit realization till maximum point." Ex. 88 (SKEA00103968).

---

[13] Niemann and Lucas began engaging in unusual "wash" or "round trip" (also called "back to back") trades, a type of prearranged trade where no gasoline actually changes hands, to inflate the OPIS reported price. This type of trade became common between SKEA and Vitol after the refinery incident even though such trading was prohibited under Vitol's compliance manual. Compl., ¶¶ 82-83, 128.

18

In April of 2015, after the SKEA/Vitol joint venture's early successes, Kim travelled to Houston, Texas to meet with Niemann and later they met with Brad Lucas of Vitol and the head of Vitol's Houston Office. Ex. 3 (SKTI's Resp. to Interrog. No. 1). Kim and Niemann went out for dinner during that visit, and although SKTI asserts that they never discussed "*in any detail* trading or trading strategies for California gasoline or gasoline components[,]" "detail" is unnecessary to convey approval of anticompetitive conduct. *Id*. Moreover, it appears that Lucas and Niemann traveled to Singapore at the same time in October of 2015. SKEA employees noticed that Lucas attended a number of "SK's meeting[s]" while he was there. Ex. 92 (SKEA00026946). It is unknown who within SKTI attended those meetings, but it is known that there were meetings between key SKTI personnel and Vitol during the relevant period. *See*, *e.g.* Exs. 62, 3 (Response to Interrogatory No. 1). *See Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*, No. CV-08-42 JG VVP, 2013 WL 6481195, at *17 (E.D.N.Y. Sept. 20, 2013) ("attendance at meetings on behalf of corporate families" "tie affiliated entities to an antitrust conspiracy").[14]

Taken together, the evidence not only shows that SKTI "is a parent company, controlling or directing the anticompetitive conduct of" SKTI (*Intell. Ventures I LLC v. Cap. One Fin. Corp.*, No. PWG-14-111, 2016 WL 160263, at *5 (D. Md. Jan. 14, 2016)), but also that, at a minimum, SKTI knew about irregularities in Niemann's and SKEA's trading activities but took no action to stop it, instead electing to reap the benefits. SKTI ratified SKEA's wrongdoing, even if it was unaware of what was going to occur in advance. SKTI "had acquired the requisite knowledge of illicit conduct, effectively triggering its duty to disaffirm [their] acts." *Contract Assocs. Office Interiors, Inc. v. Ruiter*, No. CIV.S0700334 WBS EFB, 2008 WL 2225702, at *2 (E.D. Cal. May 29, 2008); *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-CV-06314-YGR, 2018 WL 3707283, at *5 (N.D. Cal. Aug. 3, 2018) (principal knew of the conduct at issue yet accepted its benefits). Tellingly, when the California Energy Commission announced it was investigating the increase in gasoline prices in California, Koo reassured Kim that he

---

[14] SKTI's counsel would not allow Plaintiffs to ask Kim about the antitrust conspiracy in this case, claiming it was not a topic of jurisdictional discovery. To the extent the Court feels this area has been inadequately explored, Plaintiffs request a further deposition of Kim for jurisdictional purposes.

19

had already told Niemann that before he spoke with anyone "he should consult us first at the corporate level before we could take any measure to deal with the situation." Ex. 93 (SKEA-008-0007810).

Moreover, the fact that SKTI participated in meetings with Vitol both before and prior to the refinery incident, entered into and approved of the so-called JVs with Vitol on behalf of SKEA, was aware that OPIS could be easily manipulated, and that it knew SKEA and Niemann were engaging in unusual trading activities with Vitol, but took no action—and in fact encouraged risky behavior to maximize profits—is more than sufficient to demonstrate a parent corporation's direct participation in an anticompetitive scheme. Directing anticompetitive behavior at California "but rerouting them through a related entity" does not "shield" SKTI for purposes of personal jurisdiction. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. CV 07-5944-SC, 2014 WL 2581525, at *4 (N.D. Cal. June 9, 2014) ("*CRT*").

## C. Jurisdiction Over SKTI is Reasonable.

SKTI cannot demonstrate a "compelling case" as to why it would be unreasonable to exercise jurisdiction over it. *Jackson v. Euphoria Wellness, LLC*, No. 3:20-CV-03297-CRB, 2020 WL 5366419, at *4 (N.D. Cal. Sept. 8, 2020); *see CRT*, 2014 WL 1091589, at *7 ("It is the defendant's burden to demonstrate unreasonableness."). Its arguments are premised on the fact that it "has no contacts" with California. (Dkt. No. 244 at 14). But in light of its significant activities aimed at California directly or through its wholly-owned subsidiary, SKEA, SKTI's complaints about the purported unreasonableness of litigating in this forum are unpersuasive.[15] In the absence of evidence that the burden on SKTI would "be so great as to constitute a deprivation of due process," it has failed to meet its burden of showing unreasonableness. *CRT*, 2014 WL 1091589, at *7 ("it is not plausible that a wealthy, multinational corporation . . . would be somehow overstressed at litigating one case").

## IV. CONCLUSION

For the foregoing reasons, SKTI's motion to dismiss for lack of personal jurisdiction should be denied.

---

[15] SKTI indeed filed a cross-complaint against the California Attorney General's office seeking declaratory judgment, though it reserved its rights if no jurisdiction is found.

20

Dated: May 14, 2021

Respectfully submitted,

/s/ *Dena C. Sharp*

Dena C. Sharp (SBN 245869)
Adam E. Polk (SBN 273000)
Trevor T. Tan (SBN 281045)
Mikaela M. Bock (SBN 335089)
GIRARD SHARP LLP
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com
ttan@girardsharp.com
mbock@girardsharp.com

Michael P. Lehmann (SBN 77152)
Christopher L. Lebsock (SBN 184546)
Samantha J. Stein (SBN 302034)
Tae Kim (SBN 331362)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
mlehmann@hausfeld.com
clebsock@hausfeld.com
sstein@hausfeld.com
tkim@hausfeld.com

*Interim Co-Lead Class Counsel*

Judith A. Zahid (SBN 215418)
ZELLE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 693-0700
jzahid@zelle.com

*Plaintiffs' Executive Committee, Liaison to the California Attorney General's Office*

Todd A. Seaver (SBN 271067)
BERMAN TABACCO
44 Montgomery Street, Suite 650

21

San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: tseaver@bermantabacco.com

*Plaintiffs' Executive Committee, Chair*

Allan Steyer (SBN 100318)
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
235 Pine Street, 15th Floor
San Francisco, California 94104
Telephone: (415) 421-3400
Facsimile: (415) 421-2234
Email: asteyer@steyerlaw.com

*Plaintiffs' Executive Committee*

Lee Albert (admitted *pro hac vice*)
GLANCY PRONGAY & MURRAY LLP
230 Park Avenue, Suite 530
New York, NY 101689
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: lalbert@glancylaw.com

*Plaintiffs' Executive Committee*

22

PLS' SUPPL. BR. IN OPP'N TO SKTI'S PERSONAL JURISDICTION MOT.
CASE NO. 3:20-CV-03131-JSC