1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                   NORTHERN DISTRICT OF CALIFORNIA

8

9   IN RE CALIFORNIA GASOLINE SPOT          Case No.  3:20-cv-03131-JSC

10  MARKET ANTITRUST LITIGATION

                                            **ORDER RE: MOTION FOR FINAL**
11                                          **APPROVAL AND MOTION FOR**
                                            **ATTORNEYS' FEES, EXPENSES, AND**
12                                          **SERVICE AWARDS**

13                                          Re: Dkt. Nos. 621, 622

14

15          Plaintiffs filed this putative class action bringing state antitrust and unjust enrichment

16  claims against SK Energy Americas, Inc., Vitol Inc., and two individual defendants alleging

17  Defendants formed horizonal agreements to restrain competition and manipulate the spot market

18  for gasoline and gasoline blending components formulated for use in California. Plaintiffs now

19  move for final approval of the class action settlement and for attorneys' fees, costs, and service

20  awards for the representative Plaintiffs.  (Dkt. Nos. 621, 622, 626.[1])  Having considered the

21  briefing and relevant legal authority, had the benefit of oral argument on March 12, 2025, and

22  given the additional information provided in Plaintiffs' supplemental submission (Dkt. Nos. 626,

23  627), the Court GRANTS the motion for final approval and GRANTS IN PART and DENIES IN

24  PART the motion for attorneys' fees, costs, and service awards.

25                              **BACKGROUND**

26          The California Attorney General filed a parens patriae action in the San Francisco Superior

27  _____

28  [1] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
    ECF-generated page numbers at the top of the document.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

Court bringing Cartwright Act and UCL claims against Defendants. *See The People of the State of California v. Vitol, Inc.*, et al., Case No. CGC20584456 (S.F. Superior, filed May 4, 2020) ("AG Action"). Two days after the AG Action was filed, Pacific Wine Distributors, Inc., filed the first action in this District. (Dkt. No. 1.) The other named plaintiffs subsequently filed separate actions, each of which was related to this action. The parties thereafter stipulated that all 23 related actions be consolidated for purposes of trial. (Dkt. Nos. 67, 121, 133, 146, 148, 174.) The Court appointed Hausfeld and Girard Sharp as co-lead interim class counsel. (Dkt. No. 167.)

After a series of motions to dismiss, Plaintiffs filed a motion for class certification. (Dkt. No. 512.) At the hearing on the motion for class certification, the parties advised the Court a settlement had been reached in the AG action. (Dkt. No. 577.) Over the ensuing months, the parties sought, and the Court granted, a series of requests to stay proceedings while the settlement in the AG Action was finalized and the parties in this action attempted to resolve the claims here. On February 1, 2024, the parties advised the Court they had reached a settlement in principle, and ultimately, the underlying motion for preliminary approval was filed. (Dkt. Nos. 595, 601.) At the preliminary approval hearing, the Court ordered Plaintiffs to file a supplemental submission addressing concerns regarding notice and the settlement amount. (Dkt. No. 612.) Plaintiffs then filed a supplemental submission which includes a revised long-form notice. (Dkt. No. 613.) On August 23, 2024, the Court granted Plaintiffs' motion for preliminary approval. (Dkt. No. 614.)

Following notice to the class, Plaintiffs filed the now pending motion for final approval and motion for attorneys' fees and costs as well as several supplemental declarations regarding claims administration. (Dkt. Nos. 618, 621, 622, 623.) Upon review of the motions, the Court requested supplemental briefing regarding the individual class members' recovery and Counsels' request for nearly $7 million in litigation expenses. (Dkt. No. 625.) Plaintiffs submitted declarations from Class Counsel and the Settlement Administration addressing the Court's questions. (Dkt. Nos. 626, 627.) On February 28, 2025, the San Francisco Superior Court granted final approval of the AG Action. (Dkt. No. 626-1.)

//

//

# THE SETTLEMENT AGREEMENT

### A.     The Settlement Class

The Settlement Class is composed of:

> (a) natural persons who, at the time of purchase, were not residents of the State of California, and (b) all Persons that are not natural persons, wherever located, that: (i) purchased Gasoline from a retailer, (ii) for their own use and not for resale, (iii) within the State of California, (iv) from February 18, 2015, through May 31, 2017.

(Dkt. No. 601-2, Settlement Agreement, § 1.26.)  The Settlement Class excludes:

> (a) the California Attorney General, bringing suit in the name of the People of the State of California, including in his role as parens patriae for natural persons residing in the State of California, as pleaded in the complaint in the People's Action; (b) the Settling Defendants or any other named defendant in the litigation; (c) officers, directors, employees, legal representatives, heirs, successors, or wholly or partly owned subsidiaries or affiliated companies of the Settling Defendants or any other named defendant in the litigation; (d) Class Counsel and their respective partners and employees; (e) the Court and other judicial officers, their immediate family members, and associated court staff assigned to the Litigation; and (f) those individuals who timely and validly exclude themselves from the Settlement Class.

(*Id.*)

### B.     Payment Terms

The Settlement Agreement requires Defendants to establish a non-reversionary Gross Settlement Fund of $13.9 million in an escrow account maintained by Huntington National Bank. (*Id.* at §§ 1.9, 1.13, 1.15, 3.1, 3.6.)  Under the Settlement Agreement, the following amounts, as approved by the Court, may be deducted from the Gross Settlement Fund to yield the Net Settlement Fund: (1) the costs of notice and administration, (2) litigation costs, and (3) service awards for the Settlement Class Representatives.  (*Id.* at § 1.15.)  Plaintiffs intend to seek recovery of attorneys' fees from the Net Settlement Amount.  (Dkt. No. 613 at 4.)

The Plan of Allocation for dividing the Net Settlement Fund among class members recognizes two different pools of Settlement Class Members: (1) businesses, and (2) and non-California consumers.  (Dkt. No. 601 at 26; Dkt. No. 601-3, Plan of Allocation, § 2.)  The Net Settlement Fund will be distributed in pro rata shares among these two pools based on "the

relative strength of the claims depending on where the Gasoline was purchased (Southern or Northern California)" as follows:

> (1) 85% of the Settlement Fund will be allocated to compensate businesses that allegedly paid supracompetitive prices for Gasoline due to Defendants' conduct, and the remaining 15% of the Settlement Fund will be allocated to non-California natural persons (unless that leads to compensation of either group beyond their collective single damages),
>
> (2) Gasoline purchases made in Southern California will be compensated at twice the rate compared to those in Northern California (purchases in Southern California will carry weight of 1 and purchases in Northern California will carry a weight of 0.5).

(Dkt. No. 601 at 26 (citing Dkt. No. 601-3, Plan of Allocation, §§ 22-25).)

Any funds unclaimed after six months "shall be redistributed among those Eligible Claimants who have cashed their checks and who would receive at least $15 from the redistribution, after payment of any additional costs or fees incurred in administering the Net Settlement Fund for the redistribution." (Dkt. No. 601-3 at § 29.) However, if Class Counsel decide "redistribution would be uneconomical" they may seek an order approving of a cy pres recipient. (*Id.* at § 30.)

**C.    Scope of Release**

Any Settlement Class member who does not submit a timely request for exclusion releases:

> any and all manner of claims, including Unknown Claims, causes of action, cross-claims, counter-claims, charges, liabilities, demands, judgments, suits, obligations, debts, setoffs, rights of recovery, or liabilities for any obligations of any kind whatsoever (however denominated), whether class or individual, in law or equity or arising under constitution, statute, regulation, ordinance, contract, or otherwise in nature, for fees, costs, penalties, fines, debts, expenses, attorneys' fees, or damages, whenever incurred, and liabilities of any nature whatsoever (including joint and several), known or unknown, suspected or unsuspected, asserted or unasserted, which Plaintiffs or any Settlement Class Member ever had, now have, or hereafter can, shall or may have, individually, representatively, derivatively, or in any other capacity, against the Defendant Releasees, arising from or related in any way to the conduct alleged in this Action, or that could have been alleged in this Action that also arise from or relate to the factual predicate of the Action, to the fullest extent allowed by law, with respect to purchases and/or use of Gasoline within the State of California during the period of February 18, 2015 through May 31, 2017.

(*Id.* at § 1.29.)

4

United States District Court
Northern District of California

**D.     Notice**

Plaintiffs selected Verita Global, LLC as the Settlement Administer.  (Dkt. No. 601-1, Sharp Decl. at ¶ 25.)   On October 2, 2024, the Settlement Administrator provided notice of the settlement via direct notice (postcard and email) when contact information was reasonably available, and by widespread publication notice on relevant websites and social media platforms which comprised approximately 147,293,441 impressions targeting likely Settlement Class Members.  (Dkt. No. 622-1, Cooley Decl. at ¶¶ 4-7.) All notices contained a QR code and URL directing Settlement Class Members to a website dedicated to this matter and the parallel matter brought by the California Attorney General. (*Id.* ¶ 9.)  The Settlement Administrator also established a toll-free telephone number to answer questions regarding the Settlement Agreement. (*Id.* at ¶ 10.)

The deadline for Class Members to file claims, requests for exclusion, and objections was January 8, 2025.  (*Id.* at ¶ 12.)  The Settlement Administrator received 8,175 timely-filed claim forms, of which 1,548 are from businesses and 6,627 are from individuals.  (Dkt. No. 627, 2nd Supp. Cooley Decl. at ¶ 4.) The Settlement Administrator received 60 timely requests for exclusion, of which 8 are on behalf of businesses and the remaining 52 are from individuals.  (Dkt. No. 613-1, Supp. Cooley Decl. at ¶ 9.) The Settlement Administrator received no objections.  (*Id.* ¶ 10.)

Between January 9 and 28, 2025, the Settlement Administrator received inquiries from individuals and entities who stated they were unable to file their claims by January 8, 2025 because of the Southern California wildfires.  (Dkt. No. 624 at 3.)  None of these individuals indicated they intended to object or opt-out of the settlement.  (*Id.*)  Class Counsel recommends allowing these individuals and entities who contacted the Settlement Administrator prior to January 28, 2025 to file a late claim.

**DISCUSSION**

The approval of a settlement is a multi-step process. At the preliminary approval stage, the court should grant such approval only if it is justified by the parties' showing that the court will likely be able to (1) "certify the class for purposes of judgment on the proposal" and (2) "approve

the proposal under Rule 23(e)(2)." Fed. R. Civ P. 23(e)(B). If the court preliminarily certifies the

class and finds the settlement appropriate after "a preliminary fairness evaluation," then the class

will be notified, and a final fairness hearing scheduled to determine if the settlement is fair,

adequate, and reasonable pursuant to Rule 23. *Villegas v. J.P. Morgan Chase & Co*., No. CV 09-

00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012).

At the second stage, "after notice is given to putative class members, the Court entertains

any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of

the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. Oct. 8, 2014) (citing *Diaz v.*

*Tr. Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). Following the final fairness

hearing, the Court must finally determine whether the parties should be allowed to settle the class

action pursuant to their agreed upon terms. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc*.,

221 F.R.D. 523, 525 (C.D. Cal. 2004).

# I.    CLASS CERTIFICATION

Final approval of a class action settlement requires, as a threshold matter, an assessment of

whether the class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b).

*Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1019–1022 (9th Cir. 1998). Because no facts that would

affect these requirements have changed since the Court preliminarily approved the class on August

23, 2024, this Order incorporates by reference the Court's prior analysis under Rules 23(a) and (b)

as set forth in the Order granting preliminary approval. (Dkt. No. 614 at 7-10.)

# II.    ADEQUACY OF NOTICE

Under Federal Rule of Civil Procedure 23(e), the Court "must direct notice in a reasonable

manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).

Notice includes "[n]otice of the motion [for attorney's fees which] must be served on all parties

and, for motions by class counsel, directed to class members in a reasonable manner." Fed. R. Civ.

P. 23(h)(1).

Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances,

including individual notice to all members who can be identified through reasonable effort." The

notice must "clearly and concisely state in plain, easily understood language" the nature of the

1    action, the class definition, and the class members' right to exclude themselves from the class.

2    Fed. R. Civ. P. 23(c)(2)(B)*; see also Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566,

3    575 (9th Cir. 2004) ("Notice is satisfactory if it generally describes the terms of the settlement in

4    sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be

5    heard.") (cleaned up). Although Rule 23 requires reasonable efforts be made to reach all class

6    members, it does not require that each class member actually receive notice. *See Silber v. Mabon*,

7    18 F.3d 1449, 1454 (9th Cir. 1994) (noting the standard for class notice is "best practicable"

8    notice, not "actually received" notice).

9            The Court finds the notice plan previously approved by the Court, as implemented by the

10    Settlement Administrator, complies with Rule 23(c)(2)(B).  First, the Settlement Administrator

11    provided four types of notice: email notice, postcard notice, digital notices to be distributed on

12    social media platforms, and a long-form notice accessible via the settlement website.  (Dkt. Nos.

13    601-7, 601-08, 601-9, 601-11.)  Second, the short form notices (the email, postcard, and digital

14    notices) clearly and concisely provide an overview of the lawsuit and the claims process and

15    provide clear instructions for how to obtain more information and file a claim, and the long-form

16    notice describes the allegations and claims in plain language, defines the two components of the

17    Settlement Class (California businesses, and non-California consumers), includes contact

18    information for Class Counsel and the Settlement Administrator, summarizes the settlement

19    amount and the Plan of Allocation, provides a range of possible recovery, and directs class

20    members to a website, email, and toll-free number for additional information.  Third, the

21    Settlement Administrator maintained both a website with information about the case and

22    settlement and a toll-free hotline.  (Dkt. No. 622-1 at ¶¶ 9-11.)  Fourth, between October 2, 2024,

23    the notice date, and January 8, 2025, the claims deadline, the Settlement Administrator received

24    8,050 claims, 60 requests for exclusion, and no objections.  (Dkt. No. 623-2 at ¶¶ 8-9.)

25            Given the above, the Court concludes the parties have sufficiently provided the best

26    practicable notice to class members.

27    **III.    FINAL APPROVAL OF THE SETTLEMENT AGREEMENT**

28            To grant final approval, the Court must find that the terms of the parties' settlement are

United States District Court
Northern District of California

1    fair, adequate, and reasonable under Rule 23(e). *In re California Pizza Kitchen Data Breach*

2    *Litig.*, No. 23-55288, -- F.4th --, 2025 WL 583419, at *5 (9th Cir. Feb. 24, 2025). In making this

3    determination, courts generally must consider the following factors:

> (1) the strength of the plaintiff's case; (2) the risk, expense,
> complexity, and likely duration of further litigation; (3) the risk of
> maintaining class action status throughout the trial; (4) the amount
> offered in settlement; (5) the extent of discovery completed and the
> stage of the proceedings; (6) the experience and views of counsel; (7)
> the presence of a governmental participant; and (8) the reaction of the
> class members to the proposed settlement.

8    *Churchill*, 361 F.3d at 575. "This list is not exclusive and different factors may predominate in

9    different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).

10    Under the revised Rule 23(e), the Court must also consider whether the settlement resulted

11    from collusion among the parties. *See Briseno v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021)

12    (holding that courts must apply the collusion factors set forth in *In re Bluetooth Headset Products*

13    *Liability Litigation*, 654 F.3d 935, 941 (9th Cir. 2011), to post-class action settlements as well as

14    those settled before certification.) When the settlement is reached pre-certification, however, the

15    court must apply "an even higher level of scrutiny" and "substantively grapple with whether the

16    Bluetooth warning signs created an unfair settlement." *McKinney-Drobnis v. Oreshack*, 16 F.4th

17    594, 608 (9th Cir. 2021) (cleaned up).

18    **A.    The Fairness Factors**

19    **1.    The Strength of Plaintiffs' Case and Risk, Expense, Complexity, and
         Likely Duration of Further Litigation**

20    The Court first considers "the strength of [Plaintiffs'] case on the merits balanced against

21    the amount offered in the settlement." *See Nat'l Rural Telecommunications Coop. v. DIRECTV*,

22    *Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (internal quotation marks and citation omitted).

23    Although this action settled before the Court ruled on the merits of Plaintiffs' claims, the Court

24    need not reach an ultimate conclusion about the merits of the dispute "for it is the very uncertainty

25    of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual

26    settlements." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d

27    615, 625 (9th Cir. 1982). To that end, there is no "particular formula by which th[e] outcome must

28

United States District Court
Northern District of California

be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Id.* (internal quotation marks and citation omitted). "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value." *Id.*

Here, although Plaintiffs believe they have a strong case, they recognize the expense, risk, and length of continued proceedings necessary to prosecute the action through trial and potential appeal. At the time the parties settled the action, Plaintiffs' motion for class certification and the parties' *Daubert* briefing was pending before the Court. Plaintiffs acknowledge the risk the Court might not have certified the class, and even if it had, prevailing on their claims at trial was not certain given "trial [would] involve a clash of expert analyses as to whether Defendants' actions were anticompetitive; how damages should be calculated; and what damages, if any, should be awarded, particularly given what Defendants described as the 'umbrella damages' theory of this case." (Dkt. No. 622 at 15.)

Given the risks posed by continuing to litigate Plaintiffs' claims, the certainty of Class Member recovery under the settlement weighs in favor of granting final approval.

### 2.    Settlement Amount

When considering the fairness and adequacy of the amount offered in settlement, "it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *DIRECTV, Inc.*, 221 F.R.D. at 527. "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Id.* (collecting cases).

The Court previously concluded the amount of the settlement, $13.9 million, was within the range of possible approval. (Dkt. No. 614 at 13-14.) Plaintiffs' expert, Dr. Meyendorff, opined the damages for the Cartwright Act claim for businesses and non-California resident natural persons was $42.34 million (before trebling) and Vitol and SKEA were unjustly enriched by $19.5 million. (Dkt. 545-4 at 42; Dkt. No. 512-4 at 38.) Thus, the settlement amount is

9

approximately 33% of the Cartwright Act damages or 71% of the amount by which Defendants were allegedly unjustly enriched. Plaintiffs submitted a summary of past distributions in comparable settlements which reflects that the amounts here are within the range of approval. (Dkt. No. 601-5.)

Given the nature and scope of the claims at issue, particularly after the California Attorney General settled claims on behalf of California natural persons, the $13.9 million Settlement Amount weighs in favor of final approval.

### 3.    Extent of Discovery Completed and Stage of Proceedings

In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, "formal discovery is not a necessary ticket to the bargaining table." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Rather, a court's focus is on whether "the parties carefully investigated the claims before reaching a resolution." *Ontiveros v. Zamora*, 303 F.R.D. 356, 371 (E.D. Cal. 2014). The Court's preliminary approval order discussed the litigation history and the discovery obtained prior to settlement. (Dkt. No. 614 at 12.) The settlement was reached here with the assistance of an experienced mediator.

The Court thus concludes this factor likewise weighs in favor of final approval.

### 4.    Experience and Views of Counsel

The experience and views of counsel also weigh in favor of approving the settlement. Class counsel has extensive experience in class action and antitrust litigation and strongly support approval of the settlement given the risks and challenges involved.

### 5.    Presence of a Government Participant

No government entity is a party to this action.

### 6.    Reaction of Class Members

As previously discussed, the Settlement Administrator provided notice through a press release, digital marketing campaign, and direct email/mail. The Settlement Administrator estimates the digital marketing campaign reached over 70% of Class Members. (Dkt. No. 622-1 at ¶ 6.) While a portion of the email and mail notices were returned, the Settlement Administrator reissued notice in postcard form to the individuals whose emails were returned, and did address

United States District Court
Northern District of California

searches and remailing for those for whom mail notice was returned.  (Dkt. No. 622-1 at ¶¶ 7-8.)
The Settlement Administrator received a total of 8,175 timely-filed claims, 60 requests for
exclusion, and no objections.  (Dkt. No. 623-1 at ¶¶ 8-10; Dkt. No. 627 at ¶ 4.)  "[T]he absence of
a large number of objections to a proposed class action settlement raises a strong presumption that
the terms of a proposed class settlement action are favorable to the class members." *In re
Omnivision Techs., Inc.*, 559 F.Supp.2d 1036, 1043 (N.D. Cal. 2008) (citation omitted); *see also
Churchill Vill.*, 361 F.3d at 577 (holding approval of a settlement that received 45 objections
(0.05%) and 500 opt-outs (0.56%) out of 90,000 class members was proper).

The Court also looks at the claims rate as a sign of class member sentiment regarding the
settlement. *See Rodriguez*, 563 F.3d at 967.  The claims rate here is approximately 2.55% for
business and .12% for non-California consumers based on Class Counsels' estimate of the class
size.  (Dkt. No. 624 at 2; Dkt. No. 627 at ¶ 4.)  While this is less than the Settlement
Administrator's estimated claims rate, given the parallel AG action, the Court concludes the
claims rate here does not weigh against final approval.  (Dkt. No. 601-6 at ¶ 37.)  It is also "on par
with other consumer cases, and does not otherwise weigh against approval."  *Schneider v.
Chipotle Mexican Grill, Inc*., 336 F.R.D. 588, 599 (N.D. Cal. 2020) (granting final approval where
the claims rate was .83% claims rate and collecting similar cases).

*** 

In sum, the fairness factors weigh in favor of granting Plaintiffs' motion for final approval
of the class action settlement.

B.    The *Bluetooth* Factors

Finally, the Court must determine whether the settlement was the result of good faith,
arms-length negotiations or fraud and collusion. *In re Bluetooth Headset Prod. Liab. Litig*., 654
F.3d 935, 947 (9th Cir. 2011). In determining whether the settlement is the result of collusion,
courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs
that class counsel have allowed pursuit of their own self-interest and that of certain class members
to infect the negotiations." *Id*. The Ninth Circuit has identified three such signs:

(1) when counsel receive a disproportionate distribution of the

United States District Court
Northern District of California

settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;

(2) when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and

(3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id*. at 947 (internal quotation marks and citations omitted).

For the first *Bluetooth* factor, the Court compares the payout to the class to class counsel's claim for fees. *See In re California Pizza Kitchen Data Breach Litig*., 2025 WL 583419, at *6 ("class counsel receiving a disproportionately large fee award compared to what the class members received signals potential collusion.") The Settlement Administrator estimates the average class member recovery will be $20.61 for the consumer claimants and $800.88 for the business claimants, but this does not include the top 13 business claimants whose projected recovery is over $20,000. (Dkt. No. 627 at ¶ 8.) Class counsel seek 30 percent of the Net Settlement Amount (the Gross Settlement Amount minus litigation costs, service awards, and the Settlement Administrator costs), which it estimates at between $2,058,169.82 and $1,908,169.82. (Dkt. No. 621 at 6-7, 16.) This percentage alone may be a sign of collusion. *See Bluetooth*, 654 F.3d at 947. However, because Class Counsel's lodestar is $17,721,644.50, the fee requested is approximately 11.3% of this and thus equals a negative multiplier. (Dkt. No. 621-1, Sharp Decl. at ¶ 50.) This is true even when the $3 million in fees Class Counsel was awarded in the AG Action is included as even with that amount included the total fees Class Counsel would receive (assuming $2 million here and $3 million in the AG Action) is 28 percent of their lodestar. (Dkt. No. 621 at 25; Dkt. No. 626-1 at 6.) Thus, while the high percentage is a red flag, it does not raise a concern regarding collusion.

The second warning sign—a "clear sailing" provision—is not present here. *See Bluetooth*, 654 F.3d at 940, n.6 ("a 'clear sailing agreement,' wherein the defendant agrees not to oppose a petition for a fee award up to a specified maximum value."). Defendants did not agree they would not oppose Plaintiffs' request for fees. (Dkt. No. 601-2 at 15, § 15.4.)

United States District Court
Northern District of California

1    The third warning sign—whether the parties have arranged for fees not awarded to the

2    class to revert to the defendant rather than be added to the settlement fund, *see Bluetooth*, 654 F.3d

3    at 948—is also not present here. The Settlement Agreement is non-reversionary—all of the funds

4    will be distributed to the class members. (Dkt. No. 601-2 at 9, § 3.6.)

5    The Court thus concludes the Settlement Agreement did not result from, nor was it

6    influenced by, collusion. Instead, the Settlement Agreement adequately satisfies the settlement

7    Class Members' claims.

8                                            * * *

9    In sum, the *Churchill* fairness factors support approval, and the *Bluetooth* factors do not

10   indicate collusion. The Court is therefore satisfied the Settlement Agreement was not the result of

11   collusion between the parties and instead is the product of arms-length negotiations between

12   experienced and professional counsel. For each of these reasons, the Settlement Agreement passes

13   muster under Rule 23(e) and final approval is appropriate.

14   **IV.    MOTION FOR ATTORNEYS' FEES, COSTS, AND CLASS REPRESENTATIVE
             SERVICE AWARD**

15   **A.    Attorneys' Fees**

16   Rule 23 permits a court to award "reasonable attorneys' fees ... that are authorized by law

17   or by the parties' agreement." Fed. R. Civ. P. 23(h). "Attorneys' fees provisions included in

18   proposed class action settlement agreements are, like every other aspect of such agreements,

19   subject to the determination of whether the settlement is 'fundamentally fair, adequate, and

20   reasonable.'" *Staton v. Boeing Co*., 327 F.3d 938, 963 (9th Cir. 2003) (quoting Fed. R. Civ. P.

21   23(e)).  The Ninth Circuit has approved two methods of determining attorney's fees in cases where

22   the amount of the attorney's fee award is taken from the common fund set aside for the entire

23   settlement: the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft

24   Corp*., 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The district court retains discretion

25   in common fund cases to choose either method. *Id.* Under either approach, "[r]easonableness is the

26   goal, and mechanical or formulaic application of either method, where it yields an unreasonable

27   result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of the U.S*., 307

28

13

F.3d 997, 1007 (9th Cir. 2002).

### 1.    Percentage-of-Recovery Method

The Ninth Circuit uses a 25 percent of the fund "benchmark" for awarding fees. *Bluetooth*, 654 F.3d at 942. "An adjustment, either up or down, must be accompanied by a reasonable explanation of why the benchmark is unreasonable under the circumstances." *Reyes v. Experian Information Services, Inc.*, 856 Fed. Appx. 108, 110 (9th Cir. 2021) (cleaned up).  Here, Class Counsel seeks an award of attorneys' fees that would be 30 percent of the Net Settlement Amount, which counsel estimates would be between $2,058.169.82 and $1,908,169.82.  (Dkt. No. 621 at 7.) The Court finds that an upward adjustment for a fee award of 30 percent of the common fund is appropriate for several reasons.

First, Class Counsel achieved substantial results in this case.  The damages estimate was $42 million, while this "applied to a proposed litigation class period that was shorter than the class period in the settlement, Class Counsel and their experts carefully analyzed potential damages for the broader time period and concluded $42 million was the extent of damages that gasoline purchasers would likely recover in a class trial." (Dkt. No. 621-1, Sharp Decl. at ¶ 42.)  The $13.9 million settlement thus represents approximately one-third of Class Members' estimated single damages.  (*Id.* at ¶ 43.)  This percentage is consistent with that in other antitrust cases.  *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964-65 (9th Cir. 2009) (antitrust settlement for 30% of plaintiffs' estimated damages was fair and reasonable); (Dkt. No. 621 at 18 (collecting cases).)

Second, as discussed above, there were significant risks of continuing with the litigation, not the least of which was obtaining certification of a class.

Third, the requested fee is of the Net Settlement Amount, not the gross amount.  After the Court raised concerns regarding counsel's request for over $7 million in litigation costs, Plaintiffs revised their fee request to be a percentage of the net amount (common fund minus the litigation costs, settlement administration costs, and service awards).

Fourth, there were no objections either to the settlement or the attorneys' fee request, and no requests to opt-out were received.

Finally, as explained below, a 30 percent award is supported by the lodestar cross-check.

**2.     Lodestar Method**

The lodestar method "requires multiplying a reasonable hourly rate by the number of hours reasonably expended on the case." *Shirrod v. Dir., Office of Workers' Comp. Programs*, 809 F.3d 1082, 1086 (9th Cir. 2015). "In determining reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended." *Chalmers City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986), amended on denial of reh'g, 808 F.2d 1373 (9th Cir. 1987).

Class Counsel calculates their lodestar at $17,721,644.50. (Dkt. No. 621-1, Sharp Decl. at ¶¶ 50-52.)

**a.     Reasonable Rate**

"In determining a reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers*, 796 F.2d at 1210-11 (citation omitted). The relevant community for the purposes of determining the prevailing market rate is generally the "forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (citation omitted). In addition to affidavits from the fee applicant, other evidence of prevailing market rates may include affidavits from other area attorneys or examples of rates awarded to counsel in previous cases. *See Cotton v. City of Eureka*, 889 F. Supp. 2d 1154, 1167 (N.D. Cal. 2012) (citation omitted). Civil Local Rule 54-5(b)(3) requires the party seeking fees to submit "[a] brief description of relevant qualifications and experience and a statement of the customary hourly charges of each such person or of comparable prevailing hourly rates or other indication of value of the services."

In support of the motion for attorneys' fees, Class Counsel submitted a declaration from co-lead counsel Dena Sharp and Christopher Lebsock which attach charts setting forth billing summaries for each biller and a compendium of declarations for the other seven class firms setting forth the same.  (Dkt. No. 621-1; Dkt. No. 621-2.)  Class Counsel's hourly rates are supported by their own declarations attesting to similar awards in prior cases. (Dkt. No. 621-1 at ¶¶ 53-54; Dkt. No. 621-2 at pp. 9, 11, 17, 18, 24, 30, 35, 41, 50.)  Further, the rates requested in this case are

1    within the range of rates approved in consumer class actions in this District. *See In re MacBook*

2    *Keyboard Litig.*, No. 5:18-CV-02813-EJD, 2023 WL 3688452, at *15 (N.D. Cal. May 25, 2023)

3    (collecting cases approving similar rates in consumer class actions).  While the Court need not and

4    does not decide that the exact rates requested by counsel are reasonable, they are at least within the

5    range of reasonableness required to use the lodestar figure as a cross check. *Joh v. Am. Income*

6    *Life Ins. Co.*, No. 18-CV-06364-TSH, 2021 WL 66305, at *7 (N.D. Cal. Jan. 7, 2021) ("Where a

7    lodestar is merely being used as a cross-check, the court may use a rough calculation of the

8    lodestar.") (internal quotation marks and citation omitted)).

9         Class Counsel also submitted detailed declarations describing the myriad of work

10   performed in this action over the last five years and documenting categories of time entries. (Dkt.

11   No. 621-1 at ¶¶ 45-55; Dkt. No. 621-2.) Upon review, the reported hours spent litigating this case

12   are not plainly unreasonable.

13        Finally, the requested award of at most $2,058.169.82 is approximately 28.5 percent of the

14   reported $17,721,644.50 lodestar. "A negative multiple strongly suggests the reasonableness of a

15   negotiated fee." *Moreno v. Cap. Bldg. Maint. & Cleaning Servs., Inc*., No. 19-CV-07087-DMR,

16   2021 WL 4133860, at *6 (N.D. Cal. Sept. 10, 2021) (cleaned up). The lodestar cross-check thus

17   supports the fee award here.

18                                          * * *

19        In sum, both the percentage-of-recovery and the lodestar analyses support the requested fee

20   award of 30 percent of the Net Settlement Amount.

21        **B.    Costs**

22        "There is no doubt that an attorney who has created a common fund for the benefit of the

23   class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros v.*

24   *Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (cleaned up).  Plaintiffs request $6,554,433.95 in

25   litigation costs.  Class Counsel initially only provided "categories of expenses incurred and the

26   total amounts paid," which was insufficient to allow the Court to determine the reasonableness of

27   claimed expenses. *Wren v. RGIS Inventory Specialists*, No. C-06-05778 JCS, 2011 WL 1230826,

28   at *30 (N.D. Cal. Apr. 1, 2011). (Dkt. No. 621-1 at Appx. 3-4.)  In response to the Court's Order,

United States District Court
Northern District of California

1    Class Counsel submitted a supplemental declaration.  (Dkt. Nos. 625, 626.)  The Court concludes

2    this supplemental declaration has sufficiently substantiated the expenses listed.  It demonstrates

3    both the reasonableness of the claimed costs and that these types of costs are generally recoverable

4    in similar cases.  Accordingly, the Court awards $6,544,433.95 in litigation costs.

5          The Court previously approved settlement administration costs up to $500,000. (Dkt. No.

6    614 at 18.)  The total settlement administration costs as of February 28, 2025 totaled $312,611.61

7    and Verita estimates that it will incur a total of $564,000 in administration costs, but this amount is

8    uncertain.  It has, however, agreed to cap its costs at $650,000.  (Dkt. No. 627 at ¶ 11; Dkt. No.

9    630 at 2.)

10          **C.     Class Representative Incentive Awards**

11          "Incentive awards are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*,

12    563 F.3d 948, 958 (9th Cir. 2009) (distinguishing incentive awards from incentive agreements, the

13    latter of which are "entered into as part of the initial retention of counsel" and "put class counsel

14    and the contracting class representatives into a conflict position from day one").  However, the

15    decision to approve such an award is a matter within the Court's discretion. *In re Mego Fin. Corp.*

16    *Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). Incentive awards "are intended to compensate class

17    representatives for work done on behalf of the class, to make up for financial or reputation risk

18    undertaken in bringing the action, and, sometimes to recognize their willingness to act as a private

19    attorney general." *Rodriguez*, 563 F.3d at 958-59. Although incentive awards are viewed more

20    favorably than incentive agreements, excessive awards "may put the class representative in a

21    conflict with the class and present a considerable danger of individuals bringing cases as class

22    actions principally to increase their own leverage to attain a remunerative settlement for

23    themselves and then trading on that leverage in the course of negotiations." *Id.* at 960 (internal

24    quotation marks and citation omitted). Thus, "district courts must be vigilant in scrutinizing all

25    incentive awards to determine whether they destroy the adequacy of the class representatives."

26    *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013).

27          In determining whether an incentive award is reasonable, courts generally consider:

28               (1) the risk to the class representative in commencing a suit, both

United States District Court
Northern District of California

17

> financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Covillo v. Specialtys Café*, No. C–11–00594-DMR, 2014 WL 954516, at *8 (N.D. Cal. Mar. 6, 2014) (quoting *Van Vranken v. Atl. Richfield Co*., 901 F. Supp. 294, 299 (N.D. Cal. 1995)). A class representative must justify an incentive award through "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc*., 252 F.R.D. 652, 669 (E.D. Cal. 2008). Further, district courts must evaluate each incentive award individually. *See Staton*, 327 F.3d at 977.

Plaintiffs seek incentive awards of $5,000 each for the three Settlement Class Representatives: Fricke-Parks Press, Inc., Bogard Construction, Inc., and Ritual Coffee Roasters, Inc. (Dkt. No. 621 at 6, n.1.; 28.) Plaintiffs contend these awards are reasonable based on their "substantial time and energy participating in this lawsuit." (*Id*. at 28.) However, none of the Settlement Class Representative submitted declarations attesting to the work they did in the case and Class Counsel's declaration just generally attests:

> Settlement Class Representatives, for their part, participated in the litigation by preparing and sitting for depositions, identifying and producing relevant documents, working with Settlement Class Counsel to provide oversight and input on the litigation, and otherwise remaining informed about the progress of the case. Class Counsel defended five depositions of Class Plaintiffs, which included Fricke-Parks Press, Inc., Bogard Construction, Inc., and Ritual Coffee Roasters, Inc.

(Dkt. No. 621-1 at ¶ 17.) Plaintiffs have failed to justify the requested incentive awards with any evidence demonstrating the quantity or quality of their representative service. Accordingly, the request for incentive awards is denied.

## CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiffs' motion for final approval of the parties' class action settlement. In addition, the Court GRANTS Plaintiffs' motion for attorney's fees and costs; specifically, the Court awards the following: $2,011,669.82 or 30 percent of the Net Settlement Fund ($13.9 million - $6,544,433.95 - $650,000 = $6,705,566.05) in

United States District Court
Northern District of California

18

United States District Court
Northern District of California

1   attorney's fees; $6,544,433.95 in litigation costs; and DENIES the request for $15,000 in incentive

2   awards for the Settlement Class Representatives.

3          The persons and entities that contacted the Settlement Administrator and/or Settlement

4   Class Counsel by January 28, 2025 about submitting claims after the January 8 deadline shall be

5   given the opportunity to submit a claim. The Settlement Administrator shall inform these persons

6   and entities within fourteen (14) days of this Order that they may submit a claim within thirty (30)

7   days of this Order.

8          In accordance with the Northern District's Procedural Guidance for Class Action

9   Settlements, "[w]ithin 21 days after the distribution of the settlement funds and payment of

10  attorneys' fees," Class Counsel shall file "a Post-Distribution Accounting" that provides the

11  following, to the extent applicable:

> The total settlement fund, the total number of class members, the total number of class members to whom notice was sent and not returned as undeliverable, the number and percentage of claim forms submitted, the number and percentage of opt-outs, the number and percentage of objections, the average and median recovery per claimant, the largest and smallest amounts paid to class members, the method(s) of notice and the method(s) of payment to class members, the number and value of checks not cashed, the amounts distributed to each cy pres recipient, the administrative costs, the attorneys' fees and costs, the attorneys' fees in terms of percentage of the settlement fund, and the multiplier, if any.

18  https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/. Class

19  Counsel shall "summarize this information in an easy-to-read chart that allows for quick

20  comparisons with other cases," and "post the Post-Distribution Accounting, including the easy-to-

21  read chart, on the settlement website." *See id*. To the extent the parties agree to a different

22  schedule including a staged process for a motion to approve distribution as discussed at the final

23  approval hearing, they shall file a stipulation with these dates.

24         The parties shall file a proposed judgment.

25  //

26  //

27  //

28  //

1

This Order disposes of Docket Nos. 621, 622.

**IT IS SO ORDERED.**

Dated: March 14, 2025

_____
JACQUELINE SCOTT CORLEY
United States District Judge